1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF TEXAS
2                         AUSTIN DIVISION

3    UNITED STATES OF AMERICA     ) Docket No. A 12-CR-210(3) SS
                                  )
4    vs.                          ) Austin, Texas
                                  )
5    JOSE TREVINO-MORALES         ) September 5, 2013

6
                          TRANSCRIPT OF SENTENCING
7              BEFORE THE HONORABLE SAM SPARKS

8    APPEARANCES:

9    For the United States:      Mr. Daniel M. Castillo
                                 Ms. Michelle E. Fernald
10                               Mr. Douglas W. Gardner
                                 Assistant U.S. Attorneys
11                               816 Congress Avenue, Suite 1000
                                 Austin, Texas 78701
12
                                 Ms. Diana Cruz-Zapata
13                               Assistant U.S. Attorney
                                 601 NW Loop 410, Suite 600
14                               San Antonio, Texas 78216

15   For the Defendant           Mr. Kirk F. Lechtenberger
                                 2525 McKinnon Street, Suite 420
16                               Dallas, Texas 75201

17   Interpreter:                Ms. Cristina Helmerichs

18   Court Reporter:             Ms. Lily Iva Reznik, CRR, RMR
                                 501 West 5th Street, Suite 4153
19                               Austin, Texas 78701
                                 (512)391-8792
20

21

22

23

24

25   Proceedings reported by computerized stenography, transcript
     produced by computer.

**I N D E X**

| Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Ramon Segura-Flores | 7 | 17 | | |
| Steven Pennington | 26 | 58,60 | 63 | 63 |
| Scott Lawson | 65 | 98,110 | | |
| | | 114 | 115 | |

**E X H I B I T S**

| | Offered | Admitted |
|---|---|---|
| Government's | | |
| (None.) | | |
| | | |
| Defendant's | | |
| #1 | 119 | 119 |

08:58:28

08:58:28

| | |
|---|---|
| 08:58:38 | 1 |
| 08:58:41 | 2 |
| 08:58:44 | 3 |
| 08:58:46 | 4 |
| 08:58:49 | 5 |
| 08:58:53 | 6 |
| 08:58:55 | 7 |
| 08:58:57 | 8 |
| 08:59:02 | 9 |
| 08:59:06 | 10 |
| 08:59:11 | 11 |
| 08:59:17 | 12 |
| 08:59:21 | 13 |
| 08:59:23 | 14 |
| 08:59:25 | 15 |
| 08:59:26 | 16 |
| 08:59:28 | 17 |
| 08:59:29 | 18 |
| 08:59:30 | 19 |
| 08:59:34 | 20 |
| 08:59:35 | 21 |
| 08:59:38 | 22 |
| 08:59:43 | 23 |
| 08:59:44 | 24 |
| 08:59:46 | 25 |

THE COURT:  The Court calls 12-CR-210, United States vs. Jose Trevino-Morales for announcements.

MR. GARDNER:  Your Honor, good morning.

Doug Gardner, Michelle Fernald, and Ms. Diana Cruz-Zapata and Daniel Castillo for the asset forfeiture for the United States.

MR. LECHTENBERGER:  Your Honor, Kirk Lechtenberger for Mr. Trevino.

THE COURT:  I still have a question mark as to all other counsel.  I still have no information from Mr. Trevino whether or not he wished to sever his relationship with Mr. Finn and Ms. Williams.  Would you educate me on that?

MR. LECHTENBERGER:  Would you like Mr. Trevino to address the Court sufficiently?  Or would it be just sufficient for me to tell you?

THE COURT:  As an officer of this court.

MR. LECHTENBERGER:  Fair enough.

Mr. Trevino has told me -- and I've told Mr. Finn and Ms. Williams -- that he no longer wants to have anything to do with him, your Honor.

THE COURT:  Mr. Finn, and, Ms. Williams, if you'll file a motion to withdraw, I will sign them.

MS. WILLIAMS:  Do you want us to file another motion to withdraw, your Honor?  We have one on file that you denied.

THE COURT:  I denied that one because of the presence

| | | |
|---|---|---|
| 08:59:48 | 1 | of the sentencing date.  Yes.  Just file a second motion, I'll be |
| 08:59:51 | 2 | glad to sign anytime.  And you're excused from further attendance |
| 08:59:56 | 3 | today, if you wish, or you can stay -- |
| 08:59:59 | 4 | MS. WILLIAMS:  Thank you, your Honor. |
| 08:59:59 | 5 | THE COURT:  -- in the courtroom.  All right.  Thank |
| 09:00:04 | 6 | you, sir. |
| 09:00:06 | 7 | Francisco Antonio Colorado-Cessa. |
| 09:00:11 | 8 | MR. DEGEURIN:  Your Honor, Mike DeGeurin and Andres |
| 09:00:15 | 9 | Sanchez for Mr. Colorado.  We also have Andy Parker and John |
| 09:00:20 | 10 | Parras with me. |
| 09:00:22 | 11 | THE COURT:  All right. |
| 09:00:24 | 12 | Fernando Solis. |
| 09:00:27 | 13 | MR. WOMACK:  Good morning, your Honor. |
| 09:00:28 | 14 | Guy Womack for Mr. Garcia. |
| 09:00:29 | 15 | THE COURT:  Mr. Womack. |
| 09:00:30 | 16 | Mr. Lopez, I will call later.  And Eusevio |
| 09:00:39 | 17 | Maldonado-Huitron. |
| 09:00:41 | 18 | MR. ESPER:  Good morning, Judge Sparks. |
| 09:00:42 | 19 | Richard Esper for Mr. Huitron.  We're ready. |
| 09:00:46 | 20 | THE COURT:  Counsel, the way I anticipate that we will |
| 09:00:49 | 21 | proceed in sentencing, by the way, you can see that there are no |
| 09:00:54 | 22 | available seats.  We've attempted to set up the jury room, but |
| 09:01:02 | 23 | we've had some wiring difficulties.  Of course, still have a new |
| 09:01:09 | 24 | courthouse, but that was very poorly done, and we have not been |
| 09:01:15 | 25 | able to redo that.  So the overflow is sitting with audio in the |

09:01:24  1    ceremonial courtroom on the first row.  We're going to have some

09:01:30  2    preliminary proceedings that deal with objections to the

09:01:35  3    presentence investigation that has gone on on these defendants,

09:01:40  4    and they will take into consideration four of those that are to

09:01:45  5    be sentenced today.

09:01:48  6         But when your family member has been sentenced, I'm

09:01:54  7    going to ask you if you will give your seat to the family members

09:01:58  8    of the next person that is to be sentenced -- and the security

09:02:05  9    people will help you with that, if necessary -- and that way, you

09:02:09 10    can assure that family members of each of the defendants at this

09:02:17 11    sentencing can be present.

09:02:18 12         I intend to take up the objections of Mr. Trevino, Mr.

09:02:29 13    Colorado-Cessa, Mr. Garcia, and Mr. Huitron together because it's

09:02:35 14    my understanding because I know the defense of the prosecution

09:02:39 15    intends to present evidence on these objections.  But let's take

09:02:43 16    into consideration first, is it Lechtenberger?

09:02:54 17         MR. LECHTENBERGER:  Yes, your Honor.  That's close

09:02:55 18    enough.

09:02:55 19         THE COURT:  How is it?

09:02:59 20         MR. LECHTENBERGER:  Lechtenberger, your Honor.

09:03:00 21         THE COURT:  Lechtenberger.  Do you intend to present

09:03:09 22    any evidence?

09:03:11 23         MR. LECHTENBERGER:  No, your Honor, other than what

09:03:12 24    I've already stated in writing.

09:03:17 25         THE COURT:  Mr. DeGeurin, do you intend to present any

| | | |
|---|---|---|
| 09:03:20 | 1 | evidence? |
| 09:03:22 | 2 | MR. DEGEURIN:  We do, your Honor. |
| 09:03:23 | 3 | THE COURT:  All right.  Mr. Womack, do you wish to |
| 09:03:27 | 4 | introduce evidence on your objections?  And we're talking about |
| 09:03:30 | 5 | the objection on the case. |
| 09:03:32 | 6 | MR. WOMACK:  No, your Honor. |
| 09:03:35 | 7 | THE COURT:  And, Mr. Esper? |
| 09:03:37 | 8 | MR. ESPER:  Your Honor, my objections in my sentencing |
| 09:03:39 | 9 | memorandum cover everything. |
| 09:03:40 | 10 | THE COURT:  I have all of that.  I'm just wondering if |
| 09:03:42 | 11 | you -- |
| 09:03:42 | 12 | MR. ESPER:  No. |
| 09:03:43 | 13 | THE COURT:  All right.  Mr. DeGeurin, you may call your |
| 09:03:46 | 14 | witness.  Now, this is on the base. |
| 09:03:53 | 15 | MR. DEGEURIN:  Your Honor, I announced that we were |
| 09:03:55 | 16 | going to put on evidence because I was told by Mr. Gardner this |
| 09:03:57 | 17 | morning, he's going to call three witnesses.  The witness that |
| 09:04:00 | 18 | we're going to call is in rebuttal to them. |
| 09:04:02 | 19 | THE COURT:  Well, it's not in rebuttal.  You made the |
| 09:04:05 | 20 | objection.  If you have any witnesses, call them now. |
| 09:04:09 | 21 | MR. DEGEURIN:  All right.  Call Ramon Segura.  Your |
| 09:04:14 | 22 | Honor, Mr. Andres Sanchez, with the Court's permission, is going |
| 09:04:18 | 23 | to handle the objections.  If we can work together on this, I'd |
| 09:04:23 | 24 | appreciate it. |
| 09:04:24 | 25 | THE COURT:  It depends on what working together is. |

09:04:27  1          MR. DEGEURIN:  Well, I mean, we're not going to both

09:04:28  2   ask questions to the witness.

09:04:29  3          THE COURT:  Right.  I knew that.

09:04:34  4          If you'll come forward, please, sir.  This is the clerk

09:04:46  5   of the Court.  She's going to administer an oath to you.

09:04:53  6          (Witness sworn.)

09:05:17  7          THE COURT:  Just relax.  Don't pay any attention to

09:05:19  8   that microphone.  It will pick up with everything you say.  And I

09:05:23  9   want you to tell me your full name and spell your last name.

09:05:31 10          THE WITNESS:  My name is Ramon Segura-Flores.  My first

09:05:41 11   name is R-A-M-O-N.  And my last name is Segura, S-E-G-U-R-A.

09:05:56 12          THE COURT:  It's your witness.

09:05:59 13          MR. SANCHEZ:  Thank you, your Honor.

09:05:59 14          And Mr. Segura appears in the video and he gives an

09:06:03 15   introduction as to who he is in the video.  Just so the Court's

09:06:08 16   aware.  Some of that information's already in the record.

09:06:12 17          THE COURT:  I'll take up individually all of the

09:06:15 18   materials that we have reviewed or I have reviewed.  And I've had

09:06:21 19   the video reviewed.

09:05:57 20       RAMON SEGURA-FLORES, called by the Defendant, duly sworn.

09:05:57 21                      DIRECT EXAMINATION

09:06:24 22   BY MR. SANCHEZ:

09:06:24 23   Q.   Mr. Segura, can you introduce yourself and as far as what is

09:06:29 24   your role when it comes to ADT?

09:06:54 25   A.   My duties are I do all the followup work on all the projects

| | | |
|---|---|---|
| 09:07:22 | 1 | that ADT has.  I make sure payments are made.  I make sure I |
| 09:07:27 | 2 | follow up on contract fulfillment, I follow up on all invoices, |
| 09:07:31 | 3 | contracts, and other documents.  I'm full partner according to |
| 09:07:35 | 4 | the charter of the corporation.  So my job is primarily to track |
| 09:07:41 | 5 | the income and the contract fulfillment of the agency. |
| 09:07:45 | 6 | Q.    And when did you start working at ADT? |
| 09:07:56 | 7 | A.    As I said, I'm one of the founding partners of the firm as |
| 09:08:00 | 8 | of May 15, 2001. |
| 09:08:02 | 9 | Q.    And I want to talk about two sets of information.  First, I |
| 09:08:09 | 10 | want to talk about, roughly, 38 transactions that occurred |
| 09:08:14 | 11 | between 2008 and 2012; and then, later, I want to talk to you |
| 09:08:20 | 12 | about your role in purchasing machinery throughout your time at |
| 09:08:26 | 13 | ADT but, also, specifically, between the years 2003 and 2007. |
| 09:08:37 | 14 | Did you have an opportunity to go through and look at, |
| 09:08:42 | 15 | roughly, 38 transactions beginning in August of 2008? |
| 09:08:52 | 16 | A.    Yes. |
| 09:08:55 | 17 | Q.    And what was the first transaction that you looked at? |
| 09:09:11 | 18 | A.    The first transaction was for the $350,000 -- can I look |
| 09:09:15 | 19 | at -- |
| 09:09:16 | 20 | Q.    Yes, please.  Refer to your notes if you need to. |
| 09:09:20 | 21 | And, your Honor, what he's looking at was provided with |
| 09:09:24 | 22 | our original objections.  He's got a little bit more information. |
| 09:09:27 | 23 | We've provided the same copy that he now has to the government, |
| 09:09:34 | 24 | and we'll, in other words, exchange that for the set that we |
| 09:09:36 | 25 | included with our original objections. |

09:09:46   1          THE COURT:  So what you're telling me is there are

09:09:49   2   additions to what was presented to the probation department,

09:09:54   3   which I've reviewed.

09:09:56   4          MR. SANCHEZ:  That's correct, your Honor.

09:09:57   5          THE COURT:  All right.

09:09:58   6          MR. SANCHEZ:  Minimal additions, but a full copy will

09:10:00   7   replace the original copy at -- when we're done here today.

09:10:03   8          THE COURT:  All right, sir.

09:10:06   9   Q.   (BY MR. SANCHEZ) So what was the first series of

09:10:08   10  transactions that you looked at?

09:10:48   11  A.   The first transaction I looked at was the American Express

09:10:51   12  checks and what I did -- my first step in the analysis is I tried

09:10:56   13  to confirm the level traceability of these checks.  These checks

09:11:01   14  were issued from an American Express bank that was held here in

09:11:03   15  the U.S. using the ADT and account at Bancomer.  This Bancomer

09:11:21   16  account is the one that the clients who make their payments

09:11:25   17  regarding those jobs have been completed, the clients pay into

09:11:28   18  that account.

09:11:29   19  Q.   And what is the -- who is the primary client of ADT?

09:11:40   20  A.   Pemex.

09:11:41   21  Q.   And so, were you able to see that money was deposited from

09:11:45   22  Pemex into the Bancomer account and then, from Bancomer into the

09:11:49   23  American Express account?

09:12:02   24  A.   That's correct.  We traced the movement of the funds, and it

09:12:24   25  was verified that Pemex made the payments in the Bancomer, and

| | | |
|---|---|---|
| 09:12:28 | 1 | the Bancomer account was transferred to the American Express |
| 09:12:32 | 2 | account. |
| 09:12:33 | 3 | Q.   At any point, did you receive any information to suggest |
| 09:12:38 | 4 | that cash was deposited into that Bancomer account and then, cash |
| 09:12:44 | 5 | -- or that money was eventually sent to American Express? |
| 09:12:58 | 6 | A.   No.  All the funds that were transferred were funds that had |
| 09:13:20 | 7 | been deposited by Petroleos Mexicanos due to invoices that had |
| 09:13:25 | 8 | been sent because of the projects had been completed.  There were |
| 09:13:28 | 9 | no funds transferred to the American Express account that came |
| 09:13:32 | 10 | from cash deposits. |
| 09:13:34 | 11 | Q.   I want to jump forward to September of 2009.  Did you have |
| 09:13:40 | 12 | the chance to look at, specifically, a check from Laredo National |
| 09:13:45 | 13 | Bank in the amount of $30,000? |
| 09:14:04 | 14 | A.   Yes.  That's correct. |
| 09:14:07 | 15 | Q.   And can you explain to us, ultimately, what did you find to |
| 09:14:11 | 16 | be the source of that funds of the $30,000?  And can you explain |
| 09:14:15 | 17 | the process, how it ended up in Laredo National Bank? |
| 09:14:55 | 18 | A.   They were -- there's some transfers that were made from an |
| 09:14:58 | 19 | ADT account due to payments made by Pemex because of jobs that |
| 09:15:03 | 20 | had been completed and invoiced for that time. |
| 09:15:08 | 21 | Q.   And the next check in September 10th -- or, sorry, September |
| 09:15:12 | 22 | of 2010, I'm going to skip over that, your Honor, because that |
| 09:15:16 | 23 | one we went over in trial, and there's actually a trial exhibit |
| 09:15:19 | 24 | specifically to that. |
| 09:15:21 | 25 | The next one I want to talk to you about is a wire from |

09:15:25  1   Monex to a Felipe Quintero in the amount of $90,000.  Did you

09:15:30  2   analyze the source of the money for that $90,000?

09:16:01  3   A.   Yes, I -- yes.  I was able to look at those.  I did the same

09:16:36  4   -- I traced it just like I had in another situation.  This

09:16:39  5   transfer of funds was initiated from ADT Petro Servicios because

09:16:44  6   of work done for its client Pemex, which was then directly

09:16:47  7   transferred to Mr. Quintero's account because of the work he had

09:16:51  8   done at the direction of ADT.

09:16:54  9   Q.   And is everything that you're testifying about, are there

09:17:00  10  supporting documents in the binder in front of you?

09:17:11  11  A.   Correct.

09:17:14  12  Q.   Did you do the same thing for the next few transactions in

09:17:19  13  2010 and in the beginning of 2011?

09:17:31  14  A.   That's correct.

09:17:32  15  Q.   I want to talk about a transaction in April of 2005 -- or,

09:17:38  16  sorry, 2011 from the UBS account.  There's a $300,000 wire

09:17:57  17  transfer from the UBS account to Mola Racing.  Do you recall

09:18:02  18  that?

09:18:10  19  A.   Yes.  I remember it clearly.

09:18:12  20  Q.   To determine the source of funds for that particular

09:18:16  21  transfer, did you analyze the UBS accounts and the money going

09:18:20  22  into the UBS accounts?

09:18:35  23  A.   Yes.  That's correct.

09:18:36  24  Q.   And what did you find?

09:19:01  25  A.   Those were funds that came from ADT Petro Servicios that

09:19:06  1  were then transferred to UBS.  UBS was -- the UBS account was an

09:19:09  2  investment account.  These funds came through payments made by

09:19:15  3  ADT Petro Servicios' primary client Pemex for services provided.

09:19:25  4  Q.   Again, the transactions in 2011 -- in September of 2011, did

09:19:31  5  you do the same analysis that you did about those transactions

09:19:36  6  similar to the analysis that we've talked about so far?

09:19:53  7  A.   That's correct.

09:19:54  8  Q.   And were the source of the funds ultimately Pemex?

09:20:06  9  A.   That's correct.

09:20:07  10  Q.   I want to talk to you briefly about a transaction on October

09:20:13  11  4th of 2011.  Do you remember that transaction?  It's the

09:20:28  12  transaction from PIIG Del Noreste?

09:20:31  13  A.   What's the amount?

09:20:33  14  Q.   $802,135?

09:20:42  15  A.   Yes.  Correct.

09:20:44  16  Q.   Can you tell us about that particular transaction?

09:21:22  17  A.   What we were able to determine was the funds that were in

09:21:24  18  the PIIG Northeast account, we did a tracing of those funds and

09:21:28  19  were able to determine that the funds in the PIIG Northeast

09:21:30  20  account came from ADT Petro Servicios' funds because these were

09:21:37  21  then deposited into account No. 9898735, which had been -- which

09:21:43  22  was the account that had been designated for Pemex to make

09:21:46  23  payment for those services rendered.

09:21:51  24  Q.   Moving on, did you look at two loans that ADT obtained in

09:22:02  25  November of 2011 or two loan payments?

09:22:16  1   A.    Yes.

09:22:16  2   Q.    And I want to talk to you specifically about the four

09:22:23  3   repayments of that loan or those loans and other associated loans

09:22:29  4   beginning in November of 2011, December of 2011, February of 2012

09:22:35  5   and April of 2012.

09:22:50  6   A.    Okay.

09:22:51  7   Q.    Those repayments to that loan or for that loan, were those

09:22:57  8   the source of funds for those repayments, were they -- what was

09:23:03  9   the source of those funds, in other words?

09:23:22  10  A.    What is the loan amount that you're referring to?

09:23:24  11  Q.    The total loan amount would be around $1.7 million.  But I'm

09:23:37  12  specifically asking about the $733,000 that was paid directly

09:23:44  13  from the loaner to an auction house?

09:24:06  14  A.    Yes.  You're referring to the Arian Jaff loans.

09:24:12  15  Q.    That's correct.

09:24:51  16  A.    Yes.  Those payments were made -- or those credits were paid

09:24:57  17  by funds that came from the ADT Petro Servicios account,

09:25:02  18  specifically, the account No. 9898735, which is the account to

09:25:07  19  which our largest client Pemex was to make all of its payments.

09:25:12  20  The funds were -- came from -- the initial funds from the loan

09:25:17  21  had come from a Santander account that was held by Mr. Arian

09:25:43  22  Jaff.  And this just highlights how most of the income from ADT

09:25:50  23  Petro Servicios comes from our largest client Pemex which are

09:25:55  24  payments made into the Bilbao Bank -- Bancomer into account No.

09:26:00  25  9898735.

09:26:04  1          THE COURT:  Now, let's wait for a question.  I've

09:26:07  2  allowed a lot of leading questions up until now because of the

09:26:13  3  translation, but now he's starting to make arguments.

09:26:16  4          Now, the second thing is, when you said payments by a

09:26:22  5  loaner, that's payments by one who made the loan as far as the

09:26:29  6  English language is concerned.  Can you tell me the name of who

09:26:33  7  you're referring to?  It's not a borrower, or is it a borrower?

09:26:42  8  Did he mean the borrower?

09:26:42  9          MR. SANCHEZ:  Your Honor, if you'll recall from the

09:26:43  10 trial, in November of 2011, there was a payment made to one of

09:26:48  11 the auction houses.  I think it was Los Alamitos.

09:26:52  12         THE COURT:  It was part of the horses for a million,

09:26:55  13 700,000 or something.

09:26:56  14         MR. SANCHEZ:  No, your Honor.

09:26:57  15         There was a total loan that ADT took out for $1.7

09:27:01  16 million.  700,000 of that, instead of going directly to ADT, went

09:27:06  17 directly to an auction house.  So not -- what I was trying to get

09:27:12  18 or I think we got was -- I mean, the loan payment I don't think

09:27:16  19 is disputed that there's the money that the loan was paid out

09:27:21  20 essentially from a bank that went to the auction house, that's

09:27:23  21 not proceeds of illegal activity.

09:27:26  22         THE COURT:  Well, I understand your argument.  I'm just

09:27:28  23 asking you, what entity sent -- I don't know what this gentleman

09:27:34  24 testified to.  I don't know what a loaner is.  I would think a

09:27:39  25 loaner is somebody that loans money.

```
09:27:41   1        MR. SANCHEZ:  And that's exactly how I was using it in
09:27:43   2   the entity --
09:27:44   3        THE COURT:  All right.  So it was a borrower from ADT
09:27:47   4   that was the borrower.
09:27:49   5        MR. SANCHEZ:  Yes.
09:27:49   6        THE COURT:  All right.
09:27:51   7        MS. FERNALD:  It's Arian Jaff, your Honor.
09:27:53   8        MR. SANCHEZ:  And I believe --
09:27:54   9        THE COURT:  All right.
09:27:55  10        MR. SANCHEZ:  -- Mr. Segura said that, Arian Jaff.
09:28:03  11   Q.  (BY MR. SANCHEZ) Did you for the remaining -- and, your
09:28:10  12   Honor, I'd ask to lead just so we avoid having to go through the
09:28:15  13   15 or so --
09:28:15  14        THE COURT:  Nobody's made any objections.  As long as
09:28:18  15   he's responsive, I'll allow you to lead because -- just because.
09:28:27  16   Q.  (BY MR. SANCHEZ) The remaining transactions, did you do a
09:28:30  17   similar analysis with those transactions?
09:28:40  18   A.  That's correct.
09:28:43  19   Q.  And those transactions, were you able to also determine the
09:28:47  20   source of the funds to be from Pemex?
09:28:59  21   A.  That's correct.
09:29:04  22   Q.  Hold on.  Let me --
09:29:05  23   A.  The account No. 9898735.
09:29:11  24   Q.  In total, was the total amount of transactions you looked at
09:29:17  25   just over $10 million?
```

09:29:27   1   A.   That's correct.

09:29:30   2   Q.   You talked about that a majority of your -- of ADT's income

09:29:35   3   came from wire transfers from Pemex.  Did ADT receive any cash?

09:29:43   4          THE INTERPRETER:  The interpreter requests, did ADT

09:29:45   5   receive what?

09:29:47   6          MR. SANCHEZ:  Cash.

09:29:58   7   A.   No.

09:30:01   8   Q.   (BY MR. SANCHEZ) I want to now switch a little bit of the

09:30:12   9   focus to can you tell us what was your role during 2002, 2003 up

09:30:21   10  to 2007 in regards to obtaining the machinery necessary for ADT

09:30:28   11  to fulfill their contracts?

09:31:19   12  A.   My job was in Pemex regarding that -- within ADT regarding

09:31:24   13  that was I was the one that worked on all the proposals and bids

09:31:28   14  in response to requests for bids by Pemex regarding specific jobs

09:31:34   15  within the -- hearing they would specify the type of materials,

09:31:39   16  the amount of manpower, and the machinery that would be necessary

09:31:41   17  for that project.

09:32:33   18          I was the one that would look at all these RFPs.  I

09:32:36   19  would then analyze one-by-one what would be the need, what we

09:32:40   20  would require to be able to compete on these bids.  I would

09:32:43   21  determine and look at whether we would need to buy or rent the

09:32:47   22  machinery necessary.  I was fully aware of every single bid that

09:32:52   23  we let out or that we participated in.  Starting in 2001, I

09:32:56   24  handled each and every one of them.  I would study the RFPs.  I

09:33:01   25  would then look at what would be required of us, what machine we

| | | |
|---|---|---|
| 09:33:04 | 1 | would need, and equipment we would need.  I would decide -- I was |
| 09:33:08 | 2 | involved in deciding whether it would be bought or rented, what |
| 09:33:11 | 3 | kind of investments we would need to be able to fulfill that |
| 09:33:13 | 4 | project. |
| 09:33:14 | 5 | Q.   During that time period, if ADT acquired equipment through a |
| 09:33:23 | 6 | $6 million cash loan, would you know about it? |
| 09:33:37 | 7 | A.   Absolutely.  Categorically, I would have been aware of it |
| 09:33:48 | 8 | because I handled each one of the authorizations for the funds |
| 09:33:52 | 9 | necessary to make those kinds of acquisitions. |
| 09:33:55 | 10 | Q.   Did that ever occur? |
| 09:34:00 | 11 | A.   Never.  No. |
| 09:34:10 | 12 | Q.   I'll pass witness, your Honor. |
| 09:34:13 | 13 | THE COURT:  Any of the defense lawyers wish to question |
| 09:34:15 | 14 | this witness? |
| 09:34:17 | 15 | MR. WOMACK:  No, sir. |
| 09:34:18 | 16 | MR. ESPER:  I have none. |
| 09:34:19 | 17 | MR. LECHTENBERGER:  No, sir. |
| 09:34:21 | 18 | THE COURT:  Does the government? |
| 09:34:23 | 19 | CROSS-EXAMINATION |
| 09:34:23 | 20 | BY MS. FERNALD: |
| 09:34:24 | 21 | Q.   Mr. Segura, good morning. |
| 09:34:26 | 22 | A.   Good morning. |
| 09:34:28 | 23 | Q.   You began working with Colorado-Cessa in May of 2001.  Is |
| 09:34:42 | 24 | that what you testified to? |
| 09:34:59 | 25 | A.   ADT, Petro Servicios was founded and chartered on May 15th, |

| | | |
|---|---|---|
| 09:35:04 | 1 | 2001, and I was one of the founding members of that firm. |
| 09:35:08 | 2 | Q.    And you are part owner of ADT, correct? |
| 09:35:18 | 3 | A.    Founding member. |
| 09:35:20 | 4 | Q.    How much? |
| 09:35:20 | 5 | A.    Founding partner. |
| 09:35:22 | 6 | THE INTERPRETER:   Interpreter's correction. |
| 09:35:24 | 7 | Q.    (BY MS. FERNALD) I'm sorry?  What percentage of ADT do you |
| 09:35:26 | 8 | own? |
| 09:35:36 | 9 | A.    .04 percent. |
| 09:35:42 | 10 | THE COURT:  What was that answer? |
| 09:35:43 | 11 | THE INTERPRETER:   .04 percent. |
| 09:35:49 | 12 | Q.    (BY MS. FERNALD) The primary client for ADT Petro Servicios |
| 09:35:54 | 13 | is Pemex; is that correct? |
| 09:36:01 | 14 | A.    That's correct. |
| 09:36:04 | 15 | Q.    What percentage of business or income is Pemex to ADT? |
| 09:36:17 | 16 | A.    Ninety percent. |
| 09:36:19 | 17 | Q.    So without the Pemex contracts, ADT would not function on |
| 09:36:24 | 18 | the level that it does, correct? |
| 09:36:36 | 19 | A.    That's correct. |
| 09:36:38 | 20 | Q.    When ADT was formed in 2001, would it be fair to say that it |
| 09:36:44 | 21 | was a small company? |
| 09:37:11 | 22 | A.    When it was established, when it was founded, it was a |
| 09:37:14 | 23 | brand-new company.  Any new company starts from zero.  All the |
| 09:37:17 | 24 | companies start at zero. |
| 09:37:19 | 25 | Q.    Correct.  And you knew Colorado-Cessa even prior to the |

| | | |
|---|---|---|
| 09:37:25 | 1 | formation of ADT, correct? |
| 09:37:36 | 2 | A.   That's correct.   Yes. |
| 09:37:38 | 3 | Q.   In fact, he was pretty much broke prior to the formation of |
| 09:37:42 | 4 | ADT Petro Servicios, correct? |
| 09:38:02 | 5 | A.   He was doing projects with equipment he had. |
| 09:38:12 | 6 | Q.   Mr. Segura, have you reviewed the financial statements that |
| 09:38:17 | 7 | were submitted to UBS for loans by Mr. Colorado-Cessa? |
| 09:38:35 | 8 | A.   Yes. |
| 09:38:36 | 9 | Q.   Do you have any financial statements from 2001 to 2008? |
| 09:38:55 | 10 | A.   Can you repeat that again?   I didn't understand. |
| 09:39:03 | 11 | Q.   My apology.   Do you have financial statements for ADT from |
| 09:39:06 | 12 | 2001 through 2007? |
| 09:39:13 | 13 | A.   Yes. |
| 09:39:14 | 14 | Q.   Do you have them present in that notebook? |
| 09:39:18 | 15 | A.   No. |
| 09:39:21 | 16 | Q.   And where are those financial statements? |
| 09:39:26 | 17 | A.   At the firm. |
| 09:39:28 | 18 | Q.   Do you have them present here in the United States? |
| 09:39:35 | 19 | A.   No. |
| 09:39:38 | 20 | Q.   I want to direct your attention to the 38 transactions that |
| 09:39:42 | 21 | you referred to.   The notebook that is in front of you refers to |
| 09:39:54 | 22 | the 38 transactions; is that correct? |
| 09:40:02 | 23 | A.   True. |
| 09:40:03 | 24 | Q.   Did you obtain those documents for Mr. Colorado-Cessa here |
| 09:40:08 | 25 | today? |

| | | |
|---|---|---|
| 09:40:18 | 1 | A.   Yes. |
| 09:40:19 | 2 | Q.   And where did you get those documents from? |
| 09:40:29 | 3 | A.   All those -- those documents belong to the firm, to the |
| 09:40:34 | 4 | company. |
| 09:40:34 | 5 | Q.   Did you go to the banks and get the documents? |
| 09:40:43 | 6 | A.   No. |
| 09:40:43 | 7 | Q.   Did you obtain the wires or the checks from Pemex for the |
| 09:40:48 | 8 | underlying funds that came through these accounts? |
| 09:41:02 | 9 | A.   I got that from the company. |
| 09:41:05 | 10 | Q.   Do you have the wires from Pemex and the checks and/or the |
| 09:41:10 | 11 | checks from Pemex showing the underlying source of these funds? |
| 09:41:36 | 12 | A.   That's correct.  These are the documents I received from the |
| 09:41:56 | 13 | company, which include the invoices, the statements, and then, |
| 09:42:00 | 14 | when we did the trace of the transfers showing where these funds |
| 09:42:03 | 15 | came from and to -- where the funds into the account came from. |
| 09:42:14 | 16 | Q.   When ADT -- |
| 09:42:15 | 17 | A.   Can I clarify something? |
| 09:42:17 | 18 | Q.   Yes.  Please. |
| 09:42:29 | 19 | A.   Also included is documentation that was provided by the |
| 09:42:31 | 20 | attorneys, right?  But the majority of this is from the company. |
| 09:42:41 | 21 | Q.   Thank you very much. |
| 09:42:45 | 22 |      The funds from Pemex when they paid ADT, did Pemex wire |
| 09:42:55 | 23 | any of those funds into accounts in the United States? |
| 09:43:08 | 24 | A.   Never. |
| 09:43:09 | 25 | Q.   Where did they -- what country did they wire their funds |

09:43:12  1  into?

09:43:19  2  A.    In Mexico.

09:43:21  3  Q.    Are you, Mr. Segura, are you aware of all of

09:43:41  4  Colorado-Cessa's business activities?

09:44:06  5  A.    I am aware of all the activities and transactions of ADT

09:44:18  6  Petro Servicios.  Mr. Colorado-Cessa and I are aware of

09:44:22  7  everything that happens with ADT Petro Servicios.  We do the

09:44:26  8  followup, we do the project analysis, and we do the results

09:44:29  9  analysis.

09:44:33  10  Q.    Are you aware of the government entity of Ministry of Public

09:44:38  11  Service in Mexico?

09:44:51  12  A.    I don't know the institution you're referring to.

09:44:55  13          THE COURT:  You say the government Ministry of what?

09:44:59  14  A.    Public Services?

09:45:00  15  Q.    (BY MS. FERNALD) Public Service.  To repeat for the

09:45:03  16  translator, Mexican Ministry of Public Service.

09:45:19  17  A.    There is no ministries in.

09:45:27  18  Q.    Are you aware that the --

09:45:29  19  A.    In Mexico, we don't have ministries.  There are secretary --

09:45:34  20  there's the secretaries like the one for communications and

09:45:39  21  transportation.  Maybe that's what you're talking about?  Just to

09:46:00  22  try and clarify, at the cabinet level, whether you want to call

09:46:03  23  it a ministry or a secretary, there is no public service entity.

09:46:07  24  There's nothing that's the equivalent of communications and

09:46:10  25  transportation.

09:46:11  1  Q.    So if the Ministry of Public Service in Mexico stated that

09:46:16  2  Pemex was the most corrupt entity in the federal government, you

09:46:21  3  would dispute that?

09:46:41  4  A.    That's not something that I can give an opinion on.  I --

09:46:49  5  what I do is I focus on my work and making sure my business runs.

09:46:53  6  Q.    Are you aware that there are articles in the newspaper

09:46:56  7  reflecting a reorganization as of date with Pemex because of the

09:47:02  8  corruption at Pemex?

09:47:57  9  A.    With regards to the Pemex, all I do with Pemex is I am aware

09:48:03  10  of every public RFP that comes out.  I analyze those RFPs.  I

09:48:09  11  prepare the bids.  I participate in the bidding process.  I make

09:48:16  12  sure that whatever project is awarded, that we complete that

09:48:18  13  project, and then, I invoice.  Regarding that governmental

09:48:22  14  entity, you also hear a lot of positive things about the good

09:48:27  15  things they've done in the environmental sphere, about their good

09:48:30  16  use of the newest technology, about their success in deep water

09:48:34  17  drilling.  A lot of things are said about that entity.

09:48:39  18  Q.    In 2011, are you aware that the Texas -- excuse me.  The

09:48:44  19  Mexican Ministry of Public Administration stated that ADT had

09:48:48  20  falsified documents and charged Pemex for non-performed work?

09:49:56  21  A.    There's a lawsuit that we won that was a case brought by the

09:50:02  22  Public Administration Secretary.  We won that case.  We showed

09:50:06  23  that there were no false billings done.  It was a process that

09:50:10  24  held things up for a year and a half.  While the things was being

09:50:14  25  handled, we were awarded or granted the first en paro.  The

09:50:20  1  government agency has, again, filed new allegations, but they

09:50:24  2  have not been able to demonstrate that any false information or

09:50:28  3  document invoices were presented.

09:50:30  4  Q.   In fact, that lawsuit tied up or delayed some of the

09:50:35  5  payments from Pemex, correct?

09:50:48  6  A.   No.  None.

09:50:50  7  Q.   Did it --

09:50:55  8  A.   No, because according to the law, any contract that is in

09:51:40  9  force at that time continues functioning.  So if the contract was

09:51:45  10  already in force, we continued invoicing, we continued providing

09:51:48  11  the services.  Pemex continues paid.  The sanction that is

09:51:52  12  applied during the process is that while everything is ongoing,

09:51:57  13  we cannot participate in any future projects or bids.  So.

09:52:04  14  Q.   Thank you.  Thank you.

09:52:11  15       You stated earlier that you were aware of all of

09:52:15  16  Colorado-Cessa's business activities.

09:52:53  17  A.   What I'm fully aware of is everything that has to do with

09:52:56  18  ADT Petro Servicios.  As to each one of its invoices or the

09:53:00  19  projects that are being undertaken as to the payment, I am aware

09:53:05  20  of all of that, and I work with Mr. Colorado-Cessa in that

09:53:09  21  regard, making sure that the work is being done and that the

09:53:13  22  results are being paid.

09:53:15  23  Q.   Are you aware of a $6 million loan from Efrain Torres, "Zeta

09:53:20  24  14," to Francisco Colorado-Cessa?

09:53:36  25  A.   No.

09:53:37  1    Q.   Are you aware that that money was to be used to buy

09:53:40  2    machinery for ADT Petro Servicios?

09:54:08  3    A.   I'm going to stop here just because I have more to say, but

09:54:59  4    all of the invoices that were presented for the payment of

09:55:02  5    machinery from ADT Petro Servicios was paid from the account

09:55:08  6    wherein we received the moneys from Pemex.  That was the account

09:55:12  7    and those were the funds that were used to generate all of our

09:55:16  8    income, to buy all of our machinery, to undertake and complete

09:55:19  9    all of the projects.  And that was all generated from the ADT was

09:55:24  10   all -- came into and came out of ADT account, which received its

09:55:28  11   funds from Pemex.  I know this because that was my responsibility

09:55:32  12   to pay all of those invoices and expenses.

09:56:06  13         And $6 million?  You could see that that would be

09:56:11  14   easily detected.  I want to tell you that all the machinery was

09:56:16  15   paid from the ADT account.  All of the income that we generated

09:56:20  16   and received was paid into the ADT account through Pemex, and

09:56:24  17   that all of the invoices were paid from that ADT account.

09:56:28  18   Q.   Mr. Segura, are you aware of a $12 million loan payment to

09:56:37  19   Colorado-Cessa from the Zetas in order to bribe public officials

09:56:43  20   so that ADT could get Pemex contracts?  I don't want to --

09:57:48  21   A.   If you would allow me, please.

09:57:49  22         THE COURT:  Well, the question is a "Yes" or "No."  Are

09:57:55  23   you aware or are you not aware?  That's all that's being asked at

09:57:58  24   this point.

09:58:03  25   A.   Was I aware or not aware?

| | | |
|---|---|---|
| 09:58:05 | 1 | THE COURT:  Of an alleged loan of $12 million.  "Yes" |
| 09:58:11 | 2 | or "No"? |
| 09:58:12 | 3 | A.   No.  I was not. |
| 09:58:13 | 4 | THE COURT:  All right. |
| 09:58:13 | 5 | Q.   (BY MS. FERNALD) Are you aware of a $50 million loan payment |
| 09:58:17 | 6 | by the Zetas to Francisco Colorado-Cessa? |
| 09:58:28 | 7 | A.   No. |
| 09:58:30 | 8 | Q.   When is the last time that you've had any contact with |
| 09:58:33 | 9 | Francisco Colorado-Cessa? |
| 09:58:42 | 10 | A.   I have daily. |
| 09:58:44 | 11 | Q.   And have since he's been incarcerated? |
| 09:58:49 | 12 | A.   Yes. |
| 09:58:50 | 13 | Q.   Mr. Segura, have you ever been involved in any fraudulent |
| 09:58:56 | 14 | activities with ADT Petro Servicios and/or Colorado-Cessa? |
| 09:59:11 | 15 | A.   Never participated. |
| 09:59:13 | 16 | Q.   And, Mr. Segura, finally, have you ever been involved in any |
| 09:59:18 | 17 | criminal activity with ADT Petro Servicios, Francisco |
| 09:59:25 | 18 | Colorado-Cessa, or any activities on behalf of either the company |
| 09:59:31 | 19 | or Mr. Colorado-Cessa? |
| 09:59:47 | 20 | A.   No. |
| 09:59:48 | 21 | Q.   I remind you that you're under oath. |
| 09:59:52 | 22 | A.   Yes, ma'am. |
| 09:59:55 | 23 | Q.   Pass the witness. |
| 09:59:59 | 24 | MR. SANCHEZ:  Nothing, your Honor. |
| 10:00:00 | 25 | THE COURT:  No further?  You may step down, sir. |

| | | |
|---|---|---|
| 10:00:16 | 1 | MR. SANCHEZ:  Your Honor, we don't have any further |
| 10:00:18 | 2 | witnesses at this time.  We'd ask, if necessary, to put on a |
| 10:00:20 | 3 | witness in rebuttal, depending on what the government puts on. |
| 10:00:24 | 4 | THE COURT:  The government may call their first |
| 10:00:26 | 5 | witness. |
| 10:00:26 | 6 | MR. GARDNER:  Your Honor, government calls Special |
| 10:00:28 | 7 | Agent Steve Pennington. |
| 10:00:52 | 8 | (Witness sworn.) |
| 10:00:55 | 9 | THE COURT:  Please state your full name and spell your |
| 10:00:57 | 10 | last. |
| 10:00:57 | 11 | THE WITNESS:  Steve Pennington, P-E-N-N-I-N-G-T-O-N. |
| 10:01:02 | 12 | STEVE PENNINGTON, called by the Government, duly sworn. |
| 10:01:02 | 13 | DIRECT EXAMINATION |
| 10:01:02 | 14 | BY MR. GARDNER: |
| 10:01:03 | 15 | Q.   Thank you, your Honor. |
| 10:01:04 | 16 | You are Special Agent Steve Pennington, one of the case |
| 10:01:07 | 17 | agents in this case, with the IRS Criminal Investigative |
| 10:01:10 | 18 | Division, correct? |
| 10:01:10 | 19 | A.   Correct. |
| 10:01:11 | 20 | Q.   All right.  And you're here to answer questions as to |
| 10:01:15 | 21 | certain objections lodged by Mr. Trevino, Mr. Colorado-Cessa and |
| 10:01:21 | 22 | Mr. Huitron; is that correct? |
| 10:01:23 | 23 | A.   Correct. |
| 10:01:23 | 24 | Q.   All right.  You're not going to address all the objections |
| 10:01:26 | 25 | that's also going to be addressed by Special Agent Lawson and |

| | | |
|---|---|---|
| 10:01:29 | 1 | Special Agent Fernald, correct? |
| 10:01:30 | 2 | A.    Correct. |
| 10:01:30 | 3 | Q.    All right.  So I will identify which objection, which |
| 10:01:33 | 4 | defendant I would ask you to address. |
| 10:01:35 | 5 | So let's start with Jose Trevino-Morales' objection. |
| 10:01:40 | 6 | One which is the base offense level and money amounts.  And does |
| 10:01:44 | 7 | your testimony with regard to this also address Francisco Antonio |
| 10:01:50 | 8 | Colorado-Cessa objection one and objection two, to some extent? |
| 10:01:53 | 9 | A.    Yes. |
| 10:01:53 | 10 | Q.    Okay.  So, Mr. Trevino-Morales' first objection is lodged on |
| 10:01:59 | 11 | the base offense level that he's held accountable to in |
| 10:02:03 | 12 | paragraphs 71 and 90 of the presentence report.  That amount that |
| 10:02:08 | 13 | the probation officer came up with was $25,069,275.30. |
| 10:02:16 | 14 | Mr. Pennington, I'd like to break that down into two |
| 10:02:19 | 15 | aspects and talk about, first, the purchases of the horses and |
| 10:02:22 | 16 | then, the expenses paid for the horses.  So let's talk about the |
| 10:02:25 | 17 | purchases. |
| 10:02:26 | 18 | What records did you rely upon to document the |
| 10:02:29 | 19 | purchases of race horses in this conspiracy? |
| 10:02:34 | 20 | A.    We obtained records from Schvaneveldt Horse Sales in |
| 10:02:38 | 21 | California. |
| 10:02:38 | 22 | Q.    Let me interrupt you there.  That was Government's Exhibit |
| 10:02:41 | 23 | 227 at trial? |
| 10:02:42 | 24 | A.    Yes. |
| 10:02:42 | 25 | Q.    Schvaneveldt.  Next? |

| | | |
|---|---|---|
| 10:02:44 | 1 | A.   Los Alamitos at Pacific Coast, which was basically run by |
| 10:02:48 | 2 | the same organization. |
| 10:02:49 | 3 | Q.   Government's Exhibit 229? |
| 10:02:51 | 4 | A.   Yes. |
| 10:02:51 | 5 | Q.   Next? |
| 10:02:52 | 6 | A.   Heritage Place Auction House in Oklahoma City. |
| 10:02:55 | 7 | Q.   Government's Exhibit 230? |
| 10:02:56 | 8 | A.   Correct. |
| 10:02:57 | 9 | Q.   Next. |
| 10:02:58 | 10 | A.   Ruidoso Downs Sales Company in Ruidoso, New Mexico. |
| 10:03:02 | 11 | Q.   Government's Exhibit 231? |
| 10:03:03 | 12 | A.   Correct. |
| 10:03:04 | 13 | Q.   Next? |
| 10:03:05 | 14 | A.   Eclipse Horse Sales in Grand Prairie, Texas. |
| 10:03:09 | 15 | Q.   Government's Exhibit 237? |
| 10:03:10 | 16 | A.   Yes. |
| 10:03:11 | 17 | Q.   Next? |
| 10:03:11 | 18 | A.   And then, we had several private sales and they were William |
| 10:03:19 | 19 | Morschauser and Bill Price and Lucky Seven Ranch. |
| 10:03:22 | 20 | Q.   The evidence on Mr. Morschauser was 322? |
| 10:03:26 | 21 | A.   Yes. |
| 10:03:26 | 22 | Q.   The evidence on Lucky Seven was 241? |
| 10:03:29 | 23 | A.   Correct. |
| 10:03:29 | 24 | Q.   And that was also the testimony Mr. Russell Stooks, correct? |
| 10:03:32 | 25 | A.   Yes. |

10:03:33  1    Q.    Okay.  And then, Mr. Bill Price also testified and his

10:03:37  2    records were Government's Exhibit 367?

10:03:39  3    A.    Correct.

10:03:40  4    Q.    So when you look at these records, what do they consist of?

10:03:47  5    A.    You had -- in the beginning, you had certain people that

10:03:50  6    were used to bid and/or in charge of the purchase of the horses

10:03:55  7    like, for example, first, it was Ramiro Villarreal, and then,

10:03:59  8    later on, Carlos Nayen became involved and kind of took that

10:04:03  9    position where he was directing various purchases of the horses.

10:04:08  10   And then, also, the method of payment that was used to purchase

10:04:12  11   the horses.

10:04:14  12   Q.    If you will, could you just refresh the Court's memory on

10:04:17  13   what methods of payment that you looked at, based on these

10:04:21  14   records, to track the sales of these horses?

10:04:24  15   A.    Yes.  For example, in the early timeframe, we know that

10:04:29  16   Ramiro Villarreal was using Basic Enterprise Company in Mexico to

10:04:34  17   send money to the various auction houses.

10:04:37  18   Q.    And we'd ask the Court about the testimony of Mr. Hernando

10:04:40  19   Guerra?

10:04:40  20   A.    And also by Mauricio Paez.  Hernando Guerra was used by

10:04:46  21   Ramiro Villarreal to send money to purchase horses for the

10:04:49  22   organization.  And then, you had Carlos Nayen became involved,

10:04:57  23   and companies that were used when he became involved was ADT,

10:05:01  24   Petro Servicios, Mr. Francisco Colorado-Cessa, a Grupo Aduanero,

10:05:09  25   PIIG.  And then, they had currency was used to -- as part of the

10:05:22   1   purchase.  And then, they had structured deposits into the

10:05:29   2   various different Heritage Place bank accounts.

10:05:34   3   Q.   Did that also include Mr. Del Rayo's payment for the sale of

10:05:40   4   Blues Ferrari?

10:05:41   5   A.   That's another one.  Mr. Del Rayo provided $310,000.

10:05:47   6   Q.   And when you add up the amounts of purchases from the

10:05:50   7   various records, as we've just described, both public sales and

10:05:54   8   private sales, as well as the entities that you identified,

10:05:59   9   making those purchases through those records, what is the total

10:06:01  10   amount you come up with for the purchases of horses?

10:06:04  11   A.   $16,275,011.16.

10:06:12  12   Q.   Now, you, meaning law enforcement, subpoenaed the account of

10:06:17  13   the American Quarter Horse Association; is that correct?

10:06:20  14   A.   Yes.

10:06:21  15   Q.   And I believe that was Government's Exhibit 226, but I may

10:06:23  16   be mistaken on that.  And there was a spreadsheet in which both

10:06:27  17   you and Detective Schutt testified to as tracking 500 or so

10:06:33  18   horses associated with this organization.

10:06:35  19   A.   Correct.

10:06:36  20   Q.   From that 500 horses the amount that you just stated, the

10:06:40  21   sale prices, the amount that you just stated?

10:06:43  22   A.   Yes.  From that spreadsheet is where these figures come

10:06:47  23   from.

10:06:48  24   Q.   Did you have other horses that you did not include in that

10:06:51  25   amount and that was not provided to the probation officer as a

10:06:56  1  conservative estimate of the amount of horses going through this

10:06:59  2  organization?

10:07:00  3  A.    Correct.  And also just for clarification, this $16 million

10:07:04  4  is not the total that was expended on the horses just on the

10:07:09  5  spreadsheet.  There were several payments of I wouldn't say

10:07:17  6  unknown, but maybe we didn't have the receipt that was attached

10:07:20  7  to it to finally balance it out to zero; therefore, I did not use

10:07:24  8  that in the computation of the $16 million, so that would be

10:07:27  9  additional funds.

10:07:28  10  Q.    Now, let's talk about horses that you felt were tied to the

10:07:32  11  organization some way but did not provide to the probation office

10:07:36  12  to calculate the relevant conduct.

10:07:38  13        How many other horses did you associate through the

10:07:43  14  AQHA records through this organization?

10:07:44  15  A.    When we issued subpoenas to the auction houses, we issued

10:07:47  16  subpoenas to AQHA.  We got records based -- and we sent names of

10:07:53  17  members that we believe associated with this organization and

10:07:57  18  assisted them.  They provided us a lot of records, a lot of

10:08:01  19  horses.  I'm going to say probably excess of 700, maybe excess of

10:08:05  20  750 horses.

10:08:07  21  Q.    So of that 750, you were able to confirm 500?

10:08:12  22  A.    Yes.  We culled down some of them for various reasons.

10:08:17  23  Q.    And so, on the other 200, 250, why did you not include those

10:08:20  24  in your calculation?

10:08:22  25  A.    Various reasons.  It may be that the payment didn't come

10:08:28   1   from a certain group of people that we wanted to concentrate on.

10:08:36   2   Maybe the whereabouts of the horse, you know, was unknown.  It's

10:08:39   3   just different reasons why they were excluded.

10:08:41   4   Q.   But that horse or those horses at least had some ties to the

10:08:46   5   organization?

10:08:47   6   A.   We believe they did and so did the auction houses because we

10:08:50   7   received the records.

10:08:52   8   Q.   So can you give me, example, let's say you look at an AQHA

10:08:59   9   form that had Carlos Nayen's name on it.  Why would you not use

10:09:04   10   something like that in the calculation of a horse?

10:09:05   11   A.   If we couldn't determine exactly how it was purchased, we

10:09:08   12   couldn't determine the funds used to purchase it, the whereabouts

10:09:14   13   of it, it really had no other documentation as to that horse, we

10:09:17   14   may have excluded that horse.

10:09:19   15   Q.   Were you able to make a determination on those 250 horses as

10:09:24   16   to the average price of those horses?

10:09:27   17   A.   Yes.  Look at the records as Mr. Schutt was going through

10:09:31   18   it, I think the prices ranged from anywhere from 3,000 to 20,000.

10:09:35   19   Q.   So taking an average of, say, $5,000 out of 250 horses, how

10:09:41   20   much money is that?

10:09:42   21   A.   $1.25 million.

10:09:44   22   Q.   So that $1.25 million is not part of the calculus of the

10:09:50   23   $16,275,000 some-odd dollars?

10:09:52   24   A.   No.  It is not.

10:09:55   25   Q.   So with respect to the value of the purchases of the horses,

| | | |
|---|---|---|
| 10:10:00 | 1 | are you competent that 16 million-plus is a very conservative |
| 10:10:03 | 2 | figure? |
| 10:10:03 | 3 | A.   Yes. |
| 10:10:07 | 4 | Q.   Is it your opinion that the actual value of the purchases of |
| 10:10:09 | 5 | the horses by this organization is in excess of that amount? |
| 10:10:13 | 6 | A.   Yes. |
| 10:10:13 | 7 | Q.   Now, let's talk about the expenses.  Probation office |
| 10:10:18 | 8 | calculated expenses to the tune of $8,794,264.21.  To come to |
| 10:10:28 | 9 | that figure, Special Agent, what did you consider in terms of |
| 10:10:31 | 10 | records to arrive at that figure? |
| 10:10:33 | 11 | A.   We used records from basically 12 sources.  We kind of |
| 10:10:44 | 12 | limited based on the records that we had, which included the |
| 10:10:49 | 13 | breeding fees to Corona Cartel and Mr. Jess Perry, which came |
| 10:10:57 | 14 | from records of Celina Molina. |
| 10:11:00 | 15 | Q.   That's Government's Exhibit 302? |
| 10:11:02 | 16 | A.   Correct. |
| 10:11:08 | 17 | Q.   Okay. |
| 10:11:12 | 18 | A.   Records of the Lazy E. |
| 10:11:13 | 19 | Q.   Government's Exhibit 239? |
| 10:11:15 | 20 | A.   Yes. |
| 10:11:15 | 21 | Q.   Okay. |
| 10:11:16 | 22 | A.   Records from Vessels. |
| 10:11:18 | 23 | Q.   Government's Exhibit 243? |
| 10:11:19 | 24 | A.   Yes.  Records in the Southwest Stallion Station. |
| 10:11:23 | 25 | Q.   Government's Exhibit 233 and 266? |

10:11:26  1    A.    Correct.  Records obtained from Paul Jones Racing.

10:11:31  2    Q.    Government's Exhibit 242 and 259?

10:11:33  3    A.    Those are going to be the bank records that we subpoenaed in

10:11:35  4    conjunction with Paul Jones Racing.  JGA Racing.

10:11:44  5    Q.    Government's Exhibit 313?

10:11:45  6    A.    Yes.  The expenses to and through Francisco Colorado as

10:11:51  7    Special Agent Michael Fernald analyzed those accounts.

10:11:55  8    Q.    Government's Exhibit 252.

10:11:58  9    A.    Expenses to and through Huitron Homes.

10:12:01  10   Q.    That's the Wells Fargo accounts, correct?

10:12:03  11   A.    Correct.

10:12:03  12   Q.    Government's Exhibit 256?

10:12:05  13   A.    Yes.  Expenses to and through Adan Farias.

10:12:09  14   Q.    That's Government's Exhibit 274?

10:12:11  15   A.    And then, we had Currency Transaction Reports reflecting

10:12:18  16   payments that I think it was Victor Lopez made to Equine Sports

10:12:23  17   Medicine and Surgery, embryo transfer services.  And then, we had

10:12:30  18   expenses to and through Jose Trevino that, again, was conducted

10:12:34  19   by the financial analysis that Special Agent Michael Fernald

10:12:37  20   conducted.

10:12:38  21   Q.    And so, is that how you get to the amounts we previously

10:12:43  22   stated, the eight-plus million?

10:12:44  23   A.    As a matter of fact, Michael Fernald actually called to my

10:12:48  24   attention approximately 200-and-some-odd thousands that I had

10:12:53  25   left off, which should bring the total to $9,061,364.21.

| | | |
|---|---|---|
| 10:12:59 | 1 | Q.   And where did that extra -- |
| 10:13:01 | 2 | A.   That was part of the analysis that Special Agent Fernald did |
| 10:13:05 | 3 | on Francisco Colorado. |
| 10:13:07 | 4 | Q.   Did you also consider that a conservative figure with |
| 10:13:11 | 5 | respect to expenses? |
| 10:13:12 | 6 | A.   Yes. |
| 10:13:12 | 7 | Q.   Okay.  And what expenses did you identify but not consider |
| 10:13:19 | 8 | or use in your calculus to get to the $9 million? |
| 10:13:22 | 9 | A.   We know that there was a number of vet expenses out there |
| 10:13:26 | 10 | that we did not use.  We did not go and subpoena every vet.  For |
| 10:13:30 | 11 | example, Elgin Vet, we did not use their records.  There was |
| 10:13:33 | 12 | other additional vets that we did not use.  We know -- |
| 10:13:36 | 13 | Q.   Let me stop you there.  For example, Elgin Vet, was there |
| 10:13:40 | 14 | documents recovered from the Huitron search warrants that |
| 10:13:42 | 15 | indicated they were using the Elgin Vet for horse expenses? |
| 10:13:45 | 16 | A.   Yes. |
| 10:13:46 | 17 | Q.   All right.  And the other vets included Equine Sports |
| 10:13:48 | 18 | Medicine and New Mexico and Los Alamitos? |
| 10:13:53 | 19 | A.   Correct.  They had vets in New Mexico.  They had vets in |
| 10:13:57 | 20 | California that were being used.  We did not -- I don't believe |
| 10:14:00 | 21 | we subpoenaed -- we did not use those records.  We know that they |
| 10:14:05 | 22 | were training horses in Ruidoso, New Mexico at the facility at |
| 10:14:09 | 23 | Ruidoso Downs.  I do not believe that we got those records nor |
| 10:14:13 | 24 | did we count those expenses into the computation.  Same thing |
| 10:14:19 | 25 | with Los Alamitos, except for the ones that I mentioned. |

| | | |
|---|---|---|
| 10:14:24 | 1 | Q.   Did you count the transportation expenses for horses within |
| 10:14:28 | 2 | the United States? |
| 10:14:28 | 3 | A.   No.  I did not. |
| 10:14:29 | 4 | Q.   Did you find records and receipts in both the e-mails, the |
| 10:14:33 | 5 | computers, and the search warrants indicating they were paying |
| 10:14:37 | 6 | transporters to move horses within the United States? |
| 10:14:39 | 7 | A.   Yes.  There was records. |
| 10:14:46 | 8 | Q.   Did you include ferry fees? |
| 10:14:49 | 9 | A.   No, sir. |
| 10:14:49 | 10 | Q.   A number of horses were transported across the border to |
| 10:14:53 | 11 | Mexico.  Did you discover fees associated with the inspection and |
| 10:14:58 | 12 | veterinary certification for those transportation of horses? |
| 10:15:01 | 13 | A.   Yes. |
| 10:15:02 | 14 | Q.   Did you include those fees? |
| 10:15:03 | 15 | A.   No. |
| 10:15:05 | 16 | Q.   Now, there was some evidence with respect to various |
| 10:15:08 | 17 | horsemen's accounts.  Those are accounts at racetracks for owners |
| 10:15:11 | 18 | and trainers.  Did you include those expenses and fees? |
| 10:15:15 | 19 | A.   Only, for example, the money that went into Huitron Homes |
| 10:15:18 | 20 | and then, into the horsemen's account, those funds were, in fact, |
| 10:15:23 | 21 | counted.  Other funds that went into the horsemen's account used |
| 10:15:27 | 22 | to pay various different things were not accounted. |
| 10:15:30 | 23 | Q.   There was some testimony, introduction of records as it |
| 10:15:35 | 24 | related to Yearsley Bloodstock Insurance.  To what extent did you |
| 10:15:39 | 25 | not count some of those expenses? |

10:15:42  1   A.   If it was included in the analysis done by Special Agent

10:15:47  2   Michael Fernald with -- as it relates to Jose Trevino where he

10:15:52  3   wrote checks and paid Nancy Yearsley, it was included.  When you

10:15:56  4   had payments that went through Fernando Garcia, Garcia Bloodstock

10:16:01  5   by Hernando Guerra, other things, those funds were not included.

10:16:08  6   Q.   Did you include expenses as related to the accounts for, you

10:16:14  7   mentioned, Garcia Bloodstock, but how about Poker Ranch, LLC?

10:16:20  8   A.   No.  I don't believe we did.

10:16:22  9   Q.   Okay.  Legacy Ranch?

10:16:23  10  A.   No.

10:16:24  11  Q.   Okay.  So taking those that you did not consider, can you

10:16:27  12  now give the Court a estimate of the value -- of total value of

10:16:32  13  those funds that you did not consider and provide to the

10:16:35  14  probation officer for the calculation of the total expenses?

10:16:49  15  A.   It would be approximately somewhere between 900 to a million

10:16:53  16  or over a million dollars that we did not.

10:16:58  17  Q.   So would you classify the amount that you came up with the

10:17:01  18  expenses as a conservative amount?

10:17:04  19  A.   Yes, I would.

10:17:04  20  Q.   I want to turn your attention, specifically, Mr.

10:17:11  21  Colorado-Cessa's objections one and two, and we'll get to three

10:17:15  22  in a second.  The probation office held him accountable only for

10:17:19  23  $10,134,082.73.

10:17:23  24       Where did you get that figure from with respect to,

10:17:28  25  again, purchases, first?

| | | |
|---|---|---|
| 10:17:33 | 1 | A.   From the money from Colorado-Cessa through personal checks, |
| 10:17:37 | 2 | through ADT wire transfers, through other funds, through the |
| 10:17:48 | 3 | Arian Jaff Quick Loans funds, the one he associated with -- from |
| 10:17:52 | 4 | sales, excluding PIIG, was $8,616,069.  Through PIIG was |
| 10:18:08 | 5 | $802,135.  And then, the expenses which, again, come from the |
| 10:18:12 | 6 | analysis of Michael Fernald was $715,878.50, which gets us to the |
| 10:18:19 | 7 | $10,134,082.73. |
| 10:18:24 | 8 | Q.   And I believe you testified at trial, we had a slide, a |
| 10:18:27 | 9 | demonstrative exhibit that showed Mr. Cessa was responsible for |
| 10:18:32 | 10 | purchasing 121 horses.  Do you recall that? |
| 10:18:34 | 11 | A.   Yes. |
| 10:18:34 | 12 | Q.   Now, when you count up the purchase price and the expenses |
| 10:18:40 | 13 | that you just testified to, would you classify that as a |
| 10:18:43 | 14 | conservative amount of the money he's directly accountable for or |
| 10:18:48 | 15 | a liberal amount? |
| 10:18:49 | 16 | A.   Conservative. |
| 10:18:50 | 17 | Q.   Okay.  And what expenses did you not include and report to |
| 10:18:53 | 18 | the probation office that you believe should be held accountable |
| 10:18:56 | 19 | for Mr. Colorado-Cessa? |
| 10:18:57 | 20 | A.   Of the 121 horses that were purchased at various auctions, |
| 10:19:02 | 21 | we know that a number of those horses were placed at various |
| 10:19:05 | 22 | different trainers in Ruidoso, New Mexico, at Los Alamitos, |
| 10:19:10 | 23 | California, other places in California, at the Southwest Stallion |
| 10:19:15 | 24 | Station ranch in Elgin, Texas.  With other horses purchased |
| 10:19:20 | 25 | through -- with funds through, like, Basic Enterprises or Grupo |

10:19:24  1  Aduanero, those horses were all housed or boarded under the

10:19:29  2  control of Carlos Nayen, and he directed the payments for the

10:19:32  3  boarding, care, training of those type horses, and those expenses

10:19:37  4  are not included in this $10 million figure you just mentioned.

10:19:41  5  Q.   So as a horse purchaser, would you find it reasonable to

10:19:47  6  assume since you purchased a horse, you're going to have to take

10:19:49  7  care of it, train it, and race it?

10:19:51  8  A.   Correct.

10:19:52  9  Q.   And so, did you locate any expenses with respect -- or hold

10:19:56  10  Mr. Cessa accountable for any of those expenses in your report to

10:20:00  11  the probation office?

10:20:01  12  A.   He got held accountable just for the wire transfers and the

10:20:04  13  moneys that Mr. Fernald traced directly from ADT to various

10:20:08  14  different locations.  It does not include the other horses being

10:20:13  15  housed with the other organization horses, and then, all those

10:20:19  16  expenses were actually grouped together in their type of payment.

10:20:24  17        For example, the horses that were purchased and sent to

10:20:28  18  Southwest Stallion Station under the control of Carlos Nayen, on

10:20:33  19  occasion, were paid for with some of the funds from Alfonso Del

10:20:37  20  Rayo-Mora, and they were applied to all the different accounts at

10:20:40  21  the direction of Carlos Nayen.

10:20:43  22  Q.   And so, when you factor in that -- those expenses for those

10:20:50  23  121 horses, what amount could Mr. Francisco Colorado-Cessa be

10:20:57  24  held accountable for the expenses of the horses, in addition to

10:20:59  25  what you calculate for the purchases in the previous 715,000

10:21:04  1  expenses?

10:21:05  2  A.   Including the analysis of the expenses for the ranch in

10:21:10  3  Oklahoma, there would be an additional $8,300,000, approximately.

10:21:21  4  Q.   And, again, that amount was not held accountable to Mr.

10:21:25  5  Colorado-Cessa, correct?

10:21:25  6  A.   Correct.

10:21:26  7  Q.   Now, with respect to the 121 horses purchased by Mr.

10:21:30  8  Colorado-Cessa, how many of those did you locate under his sole

10:21:35  9  care and custody, control in the United States upon arrest and

10:21:40  10 search warrants?

10:21:41  11 A.   Of the 121, I think he only had maybe three or four at

10:21:57  12 Southwest Stallion.

10:22:02  13 Q.   And who was arranging for the payment for those expenses?

10:22:06  14 A.   Early on, it was Carlos Nayen, and then, I think at the end,

10:22:10  15 I think that bill continued to grow.  I don't think it was paid

10:22:14  16 towards the end.

10:22:15  17 Q.   Now, Special Agent Pennington, I want to turn your attention

10:22:18  18 to Mr. Colorado-Cessa's objection sort of contained within one

10:22:25  19 and two about his knowledge of the SUA proceeds.  And you were

10:22:29  20 present during both the testimony and, also, the interview of Mr.

10:22:34  21 Juan Carlos Hinojosa, correct?

10:22:35  22 A.   Yes.

10:22:36  23 Q.   If you will, Ms. Fernald talked about it briefly when she

10:22:40  24 was talking to Mr. Segura.  Could you briefly talk about the $6

10:22:45  25 million that Mr. Hinojosa talked about with respect to the Zeta

| | | |
|---|---|---|
| 10:22:49 | 1 | payment to capitalize ADT? |
| 10:22:51 | 2 | A.   Yes. |
| 10:22:52 | 3 | Q.   And just in general, talk about what Mr. Hinojosa told the |
| 10:22:58 | 4 | jury, as well as you in the interviews, regarding all the |
| 10:23:01 | 5 | payments that were made to Francisco Colorado. |
| 10:23:05 | 6 | A.   After meeting Francisco Colorado and Efrain Torres, "Zeta |
| 10:23:12 | 7 | 14," there was discussion in which Mr. Colorado wanted funds to |
| 10:23:17 | 8 | put into his business -- businesses and Mr. Hinojosa, during our |
| 10:23:24 | 9 | initial interview, was actually able to identify ADT Petro |
| 10:23:27 | 10 | Servicios as one of the businesses. |
| 10:23:29 | 11 | MR. SANCHEZ:  Your Honor, sorry to cut him off, but I'm |
| 10:23:31 | 12 | going to object at this point.  Mr. Hinojosa testified at trial. |
| 10:23:36 | 13 | The actual source of the information came in that was subject to |
| 10:23:39 | 14 | cross-examination.  I think we should be looking to that record |
| 10:23:45 | 15 | of what he actually said at trial both on direct and through |
| 10:23:49 | 16 | cross, instead of just getting a summary of information that came |
| 10:23:53 | 17 | at trial and through who knows how many different interviews that |
| 10:23:57 | 18 | this man had with Mr. Hinojosa.  For that reason, I'm objecting. |
| 10:24:02 | 19 | THE COURT:  You're not withdrawing your objection, are |
| 10:24:04 | 20 | you? |
| 10:24:04 | 21 | MR. SANCHEZ:  Pardon? |
| 10:24:05 | 22 | THE COURT:  You're not withdrawing your objection, are |
| 10:24:08 | 23 | you? |
| 10:24:08 | 24 | MR. SANCHEZ:  No. |
| 10:24:09 | 25 | THE COURT:  Then the objection -- your objection is |

| | | |
|---|---|---|
| 10:24:11 | 1 | overruled.  He has the right to put what he wants in the record |
| 10:24:14 | 2 | in light of your objection, sir.  You may proceed. |
| 10:24:20 | 3 | Q.   (BY MR. GARDNER) So you talked about 6 million.  Could you |
| 10:24:22 | 4 | talk about the 12 million? |
| 10:24:23 | 5 | A.   Yes.  Twelve million was funneled through -- from, again, |
| 10:24:27 | 6 | Efrain Torres through Francisco Colorado to be used for the |
| 10:24:32 | 7 | campaign of the governor-elect Herrera during that timeframe. |
| 10:24:38 | 8 | Q.   And so, what was the total amount that Mr. Hinojosa |
| 10:24:43 | 9 | testified to and/or your interview that he provided to Mr. |
| 10:24:47 | 10 | Colorado-Cessa from Zeta money? |
| 10:24:49 | 11 | A.   It would be $18 million plus a suitcase of cash. |
| 10:24:54 | 12 | Q.   So, again, to be conservative, 18 million from Mr. Hinojosa? |
| 10:24:58 | 13 | A.   Correct. |
| 10:24:58 | 14 | Q.   And what evidence or information did you get from Hinojosa |
| 10:25:03 | 15 | regarding Mr. Colorado-Cessa's use of his aircraft in conjunction |
| 10:25:07 | 16 | with the illegal activities of the Zetas? |
| 10:25:09 | 17 | A.   That's another thing he had mentioned is that part of this 6 |
| 10:25:12 | 18 | million was used to purchase a King Air aircraft.  And then, as |
| 10:25:22 | 19 | things progressed and Mr. Torres and Mr. Colorado became close |
| 10:25:27 | 20 | associates and friends, they then also used the aircraft to |
| 10:25:31 | 21 | transport cocaine. |
| 10:25:36 | 22 | Q.   And is that transportation from Mexico into the United |
| 10:25:40 | 23 | States or? |
| 10:25:41 | 24 | A.   No.  I believe it's just in Mexico. |
| 10:25:43 | 25 | Q.   And, again, who did this cocaine belong to? |

| | | |
|---|---|---|
| 10:25:46 | 1 | A.    Zeta cocaine. |
| 10:25:48 | 2 | Q.    Now, we heard or had some testimony early on, outside the |
| 10:25:53 | 3 | presence of the jury, and from other witnesses about Mr. Cessa's |
| 10:25:56 | 4 | ranch called Flor de Maria.  What did Mr. Hinojosa provide you as |
| 10:26:01 | 5 | to who was the owner of that ranch? |
| 10:26:04 | 6 | A.    The ranch basically -- I think the conversation was that |
| 10:26:13 | 7 | could belong to Efrain Torres if proper payments were not made to |
| 10:26:19 | 8 | Efrain Torres. |
| 10:26:22 | 9 | Q.    And do you believe he was referring back to the earlier |
| 10:26:25 | 10 | payments of the $18 million? |
| 10:26:27 | 11 | A.    Yes. |
| 10:26:29 | 12 | Q.    So the next -- in extent, was the ranch put up as |
| 10:26:35 | 13 | collateral? |
| 10:26:35 | 14 | A.    That's my understanding. |
| 10:26:37 | 15 | Q.    One more question with respect to the base offense level, |
| 10:26:51 | 16 | the knowledge of SUA proceeds. |
| 10:26:55 | 17 |         There was a slide, I believe, that was in my closing |
| 10:26:58 | 18 | argument that we talked about the last two horse sales at |
| 10:27:01 | 19 | Heritage Place.  How many -- or what was the amount, the total |
| 10:27:06 | 20 | amount of money spent on the purchases of the horse at those last |
| 10:27:09 | 21 | two sales? |
| 10:27:23 | 22 |         THE COURT:  The sales were where? |
| 10:27:26 | 23 |         MR. GARDNER:  Heritage Place, your Honor, Oklahoma. |
| 10:27:30 | 24 | A.    It was over like $1.2 million, I believe.  It was the |
| 10:27:35 | 25 | November sale in 2011 where the funds were sent to Heritage Place |

10:27:41  1   by Arian Jaff and his company called Quick Loans in the amount of

10:27:46  2   $733,000, and then, at the Heritage Place January 2012, where

10:27:53  3   they had seven horses purchased -- or, actually, it's five horses

10:27:56  4   and two foals in utero for a total of approximately $280,000.  So

10:28:05  5   those two combined, over a million dollars.

10:28:09  6   Q.   (BY MR. GARDNER) And of those horses at those two sales, how

10:28:11  7   many remained in Mr. Colorado's name and what was the amounts of

10:28:14  8   those two?

10:28:15  9   A.   I believe, actually, only two of those horses.  As the ones

10:28:19 10   in November, I believe, were placed into the name of Luis Aguirre

10:28:24 11   and then, transferred to Jose Trevino in January of 2012.  And

10:28:30 12   then, the ones in the January 2012, only two of the horses, one

10:28:39 13   costing $8,200 and one costing $11,500, were placed in the name

10:28:44 14   of Francisco Colorado.  The other horses, I believe, were

10:28:47 15   transferred and taken to Jose Trevino's ranch in Lexington,

10:28:51 16   Oklahoma.

10:28:52 17   Q.   I'd like to turn your attention to Mr. Colorado-Cessa's

10:28:55 18   objection number three in which he claims he should be a minor

10:28:58 19   participant.

10:29:00 20        What evidence did you rely on to show that if she's not

10:29:05 21   a leader, organizer or manager, at the least, he is an average

10:29:09 22   participant?

10:29:10 23   A.   Number one, he provided -- of the 16 million he provided to

10:29:16 24   use to purchase the horses, the funds through Colorado-Cessa

10:29:20 25   exceeded over half of that in excess of 9 million.  There was

10:29:25  1   multiple purchases.  You had wire transfers.  You had personal

10:29:30  2   checks.  You had the ADT wires.  You had him going through Arian

10:29:35  3   Jaff at a very high interest rate.

10:29:40  4   Q.   And, again --

10:29:41  5   A.   You also had him going -- I'm sorry.

10:29:43  6   Q.   Sorry.  With respect to the moneys obtained from Mr. Jaff,

10:29:46  7   Mr. Colorado-Cessa sends that to Heritage Place under his own

10:29:49  8   name?

10:29:49  9   A.   No.

10:29:50  10  Q.   And whose name was it under?

10:29:51  11  A.   It was under Arian Jaff, part of it.  The other part was

10:29:55  12  under Quick Loans.

10:29:55  13  Q.   And with respect to the 121 horses, what percentage of the

10:30:01  14  entire organization's horses that you've identified does that

10:30:05  15  represent?

10:30:12  16  A.   Probably at least a fifth.

10:30:15  17  Q.   And could you characterize the value of these horses with

10:30:22  18  respect to or as it relates to the value of all of the

10:30:27  19  organization's horses?

10:30:29  20  A.   The higher-valued horses were actually purchased with funds

10:30:33  21  through Mr. Colorado-Cessa.

10:30:36  22  Q.   And what was the length of time that you observed Mr.

10:30:39  23  Colorado-Cessa's involvement with the Zeta organization, total

10:30:45  24  time period?

10:30:45  25  A.   2004, 2005 to the time of his arrest.

| | | |
|---|---|---|
| 10:30:50 | 1 | Q.    Okay.  And what about with respect to the verifiable |
| 10:30:53 | 2 | purchases of horses here in the United States? |
| 10:30:55 | 3 | A.    They started in 2008. |
| 10:30:56 | 4 | Q.    Till the time he was arrested in 2012? |
| 10:30:59 | 5 | A.    Yes. |
| 10:30:59 | 6 | Q.    And we have a number of purchases.  Approximately how many |
| 10:31:04 | 7 | purchases or auctions did Mr. Colorado-Cessa participate in in |
| 10:31:08 | 8 | terms of auction? |
| 10:31:10 | 9 | A.    I don't believe any.  I don't know that he actually showed |
| 10:31:13 | 10 | up and bid on any horse. |
| 10:31:14 | 11 | Q.    I'm sorry.  That was an in-artful question. |
| 10:31:16 | 12 | A.    Okay. |
| 10:31:16 | 13 | Q.    How many auctions were funds from either ADT or |
| 10:31:22 | 14 | Colorado-Cessa provided for the sale of horses or purchase of |
| 10:31:25 | 15 | horses? |
| 10:31:38 | 16 | A.    I want to say at least eight. |
| 10:31:45 | 17 | Q.    Now, who is Francisco Silva-Ramos? |
| 10:31:49 | 18 | A.    He was a business associate of Francisco Colorado, and he |
| 10:31:54 | 19 | was the man that was placed in front of Bonanza Racing. |
| 10:32:00 | 20 | Q.    And recall your attention to Government's Exhibit 380 was a |
| 10:32:03 | 21 | map.  Where did it indicate that Mr. Francisco Silva-Ramos |
| 10:32:07 | 22 | resided in relation to Mr. Colorado-Cessa? |
| 10:32:09 | 23 | A.    Just around the corner, like two houses away. |
| 10:32:22 | 24 | Q.    Special Agent, I'd now like to turn your attention to the |
| 10:32:25 | 25 | objection lodged by Mr. Eusevio Huitron. |

10:32:28  1          THE COURT:  We're going to give the court reporter a

10:32:30  2  break.

10:32:30  3          MR. GARDNER:  Thank you, sir.

10:32:32  4          THE COURT:  Ten-minute break.

10:44:18  5          (Recess.)

10:44:20  6          THE COURT:  You may proceed.

10:44:20  7  Q.   (BY MR. GARDNER) Special Agent Pennington, before the break,

10:44:23  8  if you'd turn to the objection lodged for Mr. Eusevio Huitron,

10:44:27  9  objection number one, non-scoring objection.  So I'll turn to

10:44:30  10  objection number two regarding laundered funds about the

10:44:34  11  proceeds.

10:44:35  12          If you will, could you recall the testimony of Mr.

10:44:39  13  "Poncho" Cuellar with respect to a courier making a joke?

10:44:44  14  A.   Yes.

10:44:44  15  Q.   Could you inform the Court, for the record, what that joke

10:44:48  16  was?

10:44:49  17  A.   The courier went to visit Mr. Huitron, I believe, to drop

10:44:53  18  off some money, made a joke about acquiring some cocaine, and

10:44:59  19  that joke quickly made its way back through "42."  "Poncho"

10:45:04  20  Cuellar -- basically admonishing "Poncho" Cuellar and the courier

10:45:09  21  from making a joke.

10:45:10  22  Q.   And that testimony, do you recall the Court's attention,

10:45:13  23  came from "Poncho" Cuellar, right?

10:45:15  24  A.   I believe it was.

10:45:15  25  Q.   Mario Alfonso Cuellar?

| | | |
|---|---|---|
| 10:45:18 | 1 | A.   Yes. |
| 10:45:18 | 2 | THE COURT:  Save some of the testimony, the Court's |
| 10:45:22 | 3 | reviewed notes that I made during the trial, and, of course, the |
| 10:45:31 | 4 | transcript of trial has been available to everybody. |
| 10:45:35 | 5 | MR. GARDNER:  I may save that for argument then, Judge. |
| 10:45:37 | 6 | THE COURT:  You may. |
| 10:45:38 | 7 | MR. ESPER:  For the record, I would object to that, |
| 10:45:40 | 8 | that that was not Mr. Cuellar that testified to that statement. |
| 10:45:44 | 9 | THE COURT:  All right. |
| 10:45:47 | 10 | Q.   (BY MR. GARDNER) Now, I want to talk about Government's |
| 10:45:50 | 11 | Exhibit 256, which was the Huitron Homes accounts.  Could you -- |
| 10:45:56 | 12 | and, again, this sort of goes to objection number two and three, |
| 10:46:00 | 13 | three being the sophisticated laundering. |
| 10:46:06 | 14 | Could you please inform the Court of the method in |
| 10:46:09 | 15 | which the money was deposited into the Huitron Homes account and |
| 10:46:13 | 16 | how it was distributed out of that account? |
| 10:46:14 | 17 | A.   Yes.  A very large -- |
| 10:46:16 | 18 | THE COURT:  I'm not interested in any evidence on |
| 10:46:20 | 19 | sophistication.  All of those objections are overruled. |
| 10:46:24 | 20 | MR. GARDNER:  Yes, your Honor. |
| 10:46:26 | 21 | Q.   (BY MR. GARDNER) Let's go to objection number four, then, |
| 10:46:28 | 22 | which would be the minor role.  I'm sorry, let's go back. |
| 10:46:32 | 23 | There was a non-testifying individual that the |
| 10:46:36 | 24 | government interviewed in connection with this case.  Do you |
| 10:46:40 | 25 | recall that individual? |

| | | |
|---|---|---|
| 10:46:40 | 1 | A.    Yes, I do. |
| 10:46:41 | 2 | Q.    And does that individual wish for his information to be |
| 10:46:44 | 3 | disclosed in open court? |
| 10:46:46 | 4 | A.    No.  He does -- well, the information, yes.  The identity, |
| 10:46:49 | 5 | no. |
| 10:46:50 | 6 | Q.    Yes, sir.  Why does he or she not wish for that identity to |
| 10:46:54 | 7 | be disclosed? |
| 10:46:54 | 8 | A.    Concerned for safety. |
| 10:46:55 | 9 | Q.    Could you please explain for the Court the role of that |
| 10:46:58 | 10 | individual within the Zeta organization? |
| 10:47:02 | 11 | A.    Yes.  The person had personal knowledge of "40," "42," Jose |
| 10:47:10 | 12 | Trevino, Francisco Colorado-Cessa, Fernando Garcia, Eusevio |
| 10:47:17 | 13 | Huitron, and a number of other folks in this organization and |
| 10:47:25 | 14 | conspiracy, and dealt with them on a regular basis. |
| 10:47:29 | 15 | Q.    And with respect to Eusevio Huitron, what did this |
| 10:47:35 | 16 | confidential source provide you with information regarding Mr. |
| 10:47:37 | 17 | Huitron's connection to Miguel Angel Trevino-Morales, also known |
| 10:47:43 | 18 | as "40"? |
| 10:47:44 | 19 | A.    That they met in Nuevo Laredo, Mexico, I believe in Mexico, |
| 10:47:50 | 20 | and they were discussing the horses of "Mamito." |
| 10:47:53 | 21 | Q.    And was this individual present during the meeting between |
| 10:47:57 | 22 | Eusevio Huitron and "40"? |
| 10:47:59 | 23 | A.    Yes. |
| 10:47:59 | 24 | Q.    And what did this individual explain with respect -- or was |
| 10:48:04 | 25 | this individual asked whether or not all the cooperating -- I'm |

| | | |
|---|---|---|
| 10:48:08 | 1 | sorry.  All the defendants in this case had knowledge that they |
| 10:48:11 | 2 | were dealing with the Zetas? |
| 10:48:13 | 3 | A.   Yes.  I believe the statement was everybody knew, and if |
| 10:48:20 | 4 | they didn't, they were told that this was "40's" money, so they |
| 10:48:24 | 5 | knew to be careful. |
| 10:48:25 | 6 | Q.   Now, were there -- also with respect to the knowledge, were |
| 10:48:33 | 7 | there a number of computers seized from the Huitron place of |
| 10:48:38 | 8 | business? |
| 10:48:39 | 9 | A.   Yes.  Exactly where, I don't recall, but yes, there was some |
| 10:48:43 | 10 | seized. |
| 10:48:43 | 11 | Q.   That's Government's Exhibit 364 ATXA through RR, correct? |
| 10:48:48 | 12 | A.   Yes. |
| 10:48:48 | 13 | Q.   And with respect to pictures demonstrating a connection to |
| 10:48:53 | 14 | the Zetas, could you recall that? |
| 10:48:55 | 15 | A.   I know there were a lot of pictures on there.  There was a |
| 10:48:58 | 16 | picture of the Z.  There was pictures of -- yes. |
| 10:49:01 | 17 | Q.   Severed heads, bodies? |
| 10:49:03 | 18 | A.   Yes. |
| 10:49:03 | 19 | Q.   Those pictures weren't introduced at trial, correct? |
| 10:49:06 | 20 | A.   They were not. |
| 10:49:06 | 21 | Q.   Okay.  Now, going to the objection number four, which is the |
| 10:49:10 | 22 | minor role.  How many number of transactions can you estimate |
| 10:49:16 | 23 | that Mr. Eusevio Huitron conducted, either through his Huitron |
| 10:49:22 | 24 | Homes accounts or through his horsemen's accounts, as it relates |
| 10:49:27 | 25 | to this organization? |

10:49:29   1          MR. ESPER:  Your Honor, I'm going to object.  I think

10:49:31   2   that testimony regarding that heard by the Court as to those

10:49:33   3   deposits, and I don't think Mr. Huitron -- this particular Mr.

10:49:36   4   Huitron made any.

10:49:39   5          THE COURT:  Well, if you'll limit your questions to the

10:49:44   6   activities of Mr. Eusevio Huitron, I will permit the question and

10:49:54   7   answer.

10:49:56   8   Q.   (BY MR. GARDNER) What is the number of horses that you

10:49:58   9   estimated that Eusevio Huitron trained on behalf of this

10:50:01  10   organization?

10:50:04  11   A.   I want to say in excess of 40 during the timeframe.

10:50:08  12   Q.   And when you say timeframe, could you list for the Court the

10:50:13  13   information you have regarding the timeframe in which Mr. Eusevio

10:50:18  14   Huitron was involved in this organization?

10:50:20  15   A.   Right.  He was one of the trainers, I believe, of Tempting

10:50:25  16   Dash in 2008 timeframe, 2009 timeframe.  And then, in July of

10:50:32  17   2010, June 2010, a number of the horses were taken to his ranch

10:50:37  18   to be trained.  Prior to that, he was training horses for

10:50:40  19   "Mamito."  And then, he also, I believe, continued training

10:50:47  20   horses through the spring of 2012.

10:50:53  21   Q.   And was that training horses under Mr. Fernando Garcia in

10:50:57  22   New Mexico?

10:50:58  23   A.   Yes.

10:50:58  24   Q.   Okay.  Is that where he broke his leg?

10:51:01  25   A.   Yes.

10:51:02  1   Q.   Now, also, turning your -- or recalling your attention to

10:51:07  2   Government's Exhibit 65A, it's a detailed folder of the

10:51:11  3   distribution of funds and horses per nominees.

10:51:15  4          Could you reintroduce or talk about all those documents

10:51:19  5   in that folder?  Could you recall the documents in that folder,

10:51:24  6   how it relates to Mr. Eusevio Huitron taking care of various

10:51:28  7   horses for various nominees?

10:51:29  8   A.   Without re-seeing the exhibit.

10:51:30  9          MR. ESPER:  Excuse me, your Honor, I'm going to object.

10:51:33  10  There was no evidence that that was Mr. Eusevio Huitron's writing

10:51:36  11  or that the folder was attributable to him.  It was found in a

10:51:40  12  search of offices of Huitron Homes.  Not attributable to Eusevio

10:51:46  13  Huitron.

10:51:50  14          MR. GARDNER:  Your Honor, the majority of that folder

10:51:52  15  pertained to the training of horses in which other evidence

10:51:55  16  indicated Mr. Huitron did.

10:51:59  17          THE COURT:  The Court's primarily concerned with the

10:52:02  18  number of horses and the money.  So if you'll go off to those

10:52:07  19  two, we might could shorten the hearing.

10:52:10  20          MR. GARDNER:  Yes, sir.

10:52:11  21          THE COURT:  It's the money that went through Mr.

10:52:14  22  Huitron to train the more than 40 horses.

10:52:17  23          MR. GARDNER:  Yes, sir, your Honor.

10:52:19  24  Q.   (BY MR. GARDNER) Special Agent Pennington, I'd like to turn

10:52:21  25  your attention now as well as to testimony with respect to the

10:52:24  1   asset forfeiture proceeding here, as well.

10:52:28  2          Now, you have a copy of the superseding indictment in

10:52:30  3   front of you?

10:52:31  4   A.   Yes, I do.

10:52:31  5   Q.   I'd like you to look at page 21 of the superseding

10:52:34  6   indictment.  Lists a number of financial accounts.  Paragraphs 2

10:52:41  7   through 7?

10:52:42  8   A.   Yes.

10:52:43  9   Q.   Okay.  Were those financial accounts analyzed during the

10:52:47  10  money-laundering investigation?

10:52:47  11  A.   Yes, they were.

10:52:48  12  Q.   Can you generally describe these accounts?

10:52:50  13  A.   Number two is going to be the Huitron Homes bank account,

10:52:55  14  Wells Fargo.  Then you had Garcia Bloodstock Racing at Wells

10:53:00  15  Fargo.  Carlos Nayen, Carmina, LLC at Wells Fargo, Poker Ranch at

10:53:06  16  Wells Fargo, another Poker Ranch at Wells Fargo, and Bank of

10:53:10  17  America, LA Horses account.

10:53:12  18  Q.   Were these bank accounts controlled by various nominees or

10:53:14  19  entities associated with the organization?

10:53:16  20  A.   Yes.

10:53:16  21  Q.   And what were your findings based on the analysis of these

10:53:21  22  accounts?

10:53:21  23  A.   These accounts were used by members of the organization to

10:53:25  24  funnel funds and to help the conspiracy.

10:53:29  25  Q.   Okay.  Were they used to facilitate and further the

10:53:33   1   money-laundering conspiracy?

10:53:33   2   A.   Yes.

10:53:34   3   Q.   I'd like you to look at page 22 of the superseding

10:53:37   4   indictment.  And were the accounts listed in paragraphs 13

10:53:41   5   through 19 analyzed as part of the same investigation?

10:53:46   6   A.   Yes, they were.

10:53:47   7   Q.   Okay.  And, again, without listing each account there, are

10:53:50   8   they generally accounts that Ruidoso Downs and Los Alamitos,

10:53:54   9   controlled by nominees or persons or entities associated with the

10:53:58  10   money-laundering conspiracy?

10:53:59  11   A.   Yes.  These were the, for lack of a better word, horsemen's

10:54:03  12   accounts at the various different racing entities.

10:54:05  13   Q.   Okay.  What were the findings based on the analysis of these

10:54:07  14   accounts?

10:54:08  15   A.   Each person associated with the racing of these horses

10:54:12  16   controlled by the organization had to establish the horsemen's

10:54:15  17   account in order to funnel funds through for entry fees,

10:54:18  18   training, winnings, that type stuff.  So each of the --

10:54:20  19           THE COURT:  Slow down a little.

10:54:22  20   A.   Oh, I'm sorry.  Each of these were used to, again, funnel

10:54:27  21   money into for race winnings, payments of expenses, race entries,

10:54:33  22   payment of jockeys, that type of stuff.

10:54:35  23   Q.   (BY MR. GARDNER) And turning your attention now to the

10:54:38  24   horses contained on pages 24 through 44, were they used or

10:54:44  25   involved -- were they used to facilitate or involved in the

10:54:47  1   money-laundering conspiracy based on your analysis?

10:54:48  2   A.    Yes.

10:54:50  3   Q.    And how so?

10:54:52  4   A.    A number of these horses were purchased through the various

10:54:55  5   auctions we've talked about.  We also had a number of horses that

10:54:59  6   were bred into the organization in which horses that were already

10:55:05  7   purchased through the different auctions were bred to a number of

10:55:09  8   high-dollar stud horses, like First Down Dash, Corona Cartel, Mr.

10:55:14  9   Jess Perry, just to name a few.  And then, the -- as the babies

10:55:20  10  were born, a number of these were seized from the ranch in

10:55:24  11  Lexington, Oklahoma.

10:55:26  12  Q.    Approximately how many horses total were seized?

10:55:28  13  A.    Approximately 489, I believe, were seized.

10:55:33  14  Q.    And of those horses, were they in the course of your

10:55:37  15  investigation controlled or directed by "40," "42," and members

10:55:41  16  of the Zeta organization?

10:55:42  17  A.    Yes.

10:55:43  18  Q.    Where were these horses found?

10:55:45  19  A.    They were found in Lexington, Oklahoma, Elgin, Texas,

10:55:50  20  Ruidoso, New Mexico, and California.

10:55:54  21  Q.    Were they located at private ranches or various locations?

10:55:58  22  A.    Various locations, including private ranches.

10:56:00  23  Q.    Now, the 490 horses listed in the superseding indictment,

10:56:04  24  how many have been sold by the government at auction or private

10:56:08  25  sale, according to the Court's interlocutory sale orders?

10:56:11  1  A.   I believe around 480-some have been sold.  I know that we're

10:56:17  2  still in possession of five horses.  Now, I believe four embryos,

10:56:26  3  all the other horses have been sold with exception of a couple --

10:56:29  4  I think they were -- one returned to a rightful owner.  Something

10:56:34  5  else had to -- the other two, I believe, given to a family member

10:56:37  6  of the Trevinos.

10:56:38  7  Q.   So if I were to tell you 484, you would not dispute that as

10:56:42  8  number of horses already sold?

10:56:44  9  A.   No.  That's real close.

10:56:46  10  Q.   Okay.  What were the gross proceeds from those sales?

10:56:49  11  A.   It's going to be right around $9 million to date.

10:56:52  12  Q.   In fact, doing any of the expenses that the government has

10:56:56  13  outlaid for the care of those horses, what's the net proceeds to

10:56:59  14  date?

10:56:59  15  A.   I think it's going to be somewhere between $6.5 and $7

10:57:03  16  million.

10:57:03  17  Q.   Now, I'd like to turn your attention to the two airplanes

10:57:06  18  listed on page 22 of the indictment.  You testified to this

10:57:12  19  already with respect to the airplanes as discussed by Mr.

10:57:17  20  Hinojosa and will be discussed by Special Agent Lawson.  Were

10:57:20  21  those airplanes assets of ADT?

10:57:22  22  A.   Yes.

10:57:24  23  Q.   And with respect to the Hawker, when was the 2005 Hawker

10:57:28  24  purchased?

10:57:28  25  A.   The Hawker was actually purchased in 2012.  It was a number

10:57:36  1   of payments come through UBS, ADT's accounts to purchase a

10:57:44  2   particular plane.  And we actually perfected the warrants and, in

10:57:51  3   fact, flew the planes prior to the title being issued to the name

10:57:55  4   of Francisco Colorado and/or ADT.

10:57:57  5   Q.   What was the approximate purchase price of that plane?  If I

10:58:03  6   were to give you 4.5 million, would you dispute that amount?

10:58:06  7   A.   No.  I would not.

10:58:07  8   Q.   What were the source of these payments by Mr. Colorado?

10:58:10  9   A.   They were the funds through UBS.

10:58:12  10  Q.   And where is that plane currently?

10:58:13  11  A.   At Houston Hobby.

10:58:15  12  Q.   And who is it under the control of?

10:58:18  13  A.   OFAC has it frozen.  I'm not sure who's actually

10:58:23  14  maintaining, maintenance or --

10:58:24  15  Q.   But it's essentially seized by the U.S. Treasury Department

10:58:28  16  office or an aspect of control?

10:58:30  17  A.   That is correct.

10:58:30  18  Q.   Now, talk about the 2005 King Air purchase.  When was that

10:58:34  19  purchase?

10:58:35  20  A.   There was a contract entered into in October of 2005, I

10:58:42  21  believe is the date, which called for a $3 million down payment

10:58:48  22  and then, monthly payments for the next five years of $35,000 a

10:58:52  23  month as kind of a lease purchase agreement.  Francisco Colorado

10:58:59  24  was the guarantee of that money.  And then, in October of 2011,

10:59:05  25  that plane was actually deeded to Francisco Colorado and ADT.

| 10:59:10 | 1 | Q.   So where do the source of the payments for the lease option |
| 10:59:13 | 2 | to purchase come from? |
| 10:59:15 | 3 | A.   We had Charlie Hinojosa basically state that part of that |
| 10:59:23 | 4 | six million was used to purchase King Air.  And then, the |
| 10:59:30 | 5 | payments, I believe, Mr. Fernald through his analysis of records |
| 10:59:34 | 6 | received through reciprocal discovery showed a number of payments |
| 10:59:38 | 7 | in 2011 that were made to ALE in conjunction with that plane. |
| 10:59:45 | 8 | Q.   And did those payments come from ADT Petro Servicios? |
| 10:59:50 | 9 | A.   Yes.  I believe they did. |
| 10:59:51 | 10 | Q.   And where is that plane currently? |
| 10:59:53 | 11 | A.   It is at Houston Hobby. |
| 10:59:56 | 12 | Q.   So were both of these planes ultimately purchased or |
| 10:59:59 | 13 | transferred to Mr. Colorado-Cessa during the timeframe of the |
| 11:00:02 | 14 | conspiracy listed in the superseding indictment? |
| 11:00:04 | 15 | A.   Yes. |
| 11:00:04 | 16 | Q.   May I have one moment, your Honor? |
| 11:00:07 | 17 | THE COURT:  You may. |
| 11:00:14 | 18 | MR. GARDNER:  Your Honor, pass the witness. |
| 11:00:23 | 19 | CROSS-EXAMINATION |
| 11:00:25 | 20 | BY MR. LECHTENBERGER: |
| 11:00:25 | 21 | Q.   Agent Pennington, do you have any direct evidence of cash |
| 11:00:27 | 22 | payments of horses by Jose Trevino as a payer, in other words, |
| 11:00:37 | 23 | sir? |
| 11:00:37 | 24 | A.   No, sir. |
| 11:00:38 | 25 | Q.   Do you have any evidence of direct check payments of horses |

11:00:43  1   directly by Jose Trevino?

11:00:46  2   A.   There are a couple of horses that were -- where a check was

11:00:53  3   written by Jose Trevino to other people and a horse was

11:00:57  4   transferred to his name.  There's several of those occasions.

11:01:00  5   Q.   Can you give me an approximate amount of what that is?

11:01:03  6   A.   A total, no.  If you want to go horse by horse, I can give

11:01:09  7   you an idea of some of those examples.

11:01:10  8   Q.   Based on your last response, though, when you answered my

11:01:15  9   question in regards to Jose Trevino being the payer, can you give

11:01:19 10   me a ballpark idea?  Was it less than 500,000?  Was it more than

11:01:23 11   500,000?  And if you don't know, that's okay, also.

11:01:28 12   A.   I do not know.

11:01:29 13   Q.   Fair enough, Agent.  I'll move on.

11:01:31 14        Do you have any evidence -- direct evidence as to any

11:01:34 15   type of credit card payments of horses by Jose Trevino?

11:01:37 16   A.   Yes.  I believe one horse for $5,000.

11:01:41 17   Q.   That's all I have, Judge.  Thank you.

11:01:43 18        THE COURT:  Yes, sir.

11:01:47 19        MR. SANCHEZ:  No questions, your Honor.

11:01:49 20        MR. WOMACK:  No questions.

11:01:52 21        MR. PARRAS:  No questions.

11:01:53 22        MR. ESPER:  I do, your Honor.

11:01:54 23        THE COURT:  All right.

11:01:54 24

11:01:55 25

                              CROSS-EXAMINATION

BY MR. ESPER:

Q.   Mr. Pennington, the witness that you referred to who

testified at trial was actually Mr. Guadalajara; is that correct?

A.   Okay.  Without seeing and going back to notes, I couldn't be

sure which one it was.  But that would not -- I would not dispute

that.

Q.   This is the guy who made the joke about sending a courier

and made a joke to Mr. Huitron about where the kilos of cocaine?

A.   Correct.

Q.   And that somehow, this information got back to "40" and was

relayed to you or was related to him by Mr. Cuellar, correct?

A.   Correct.

Q.   And that this courier got chastised or reprimanded for

making such a comment, correct?

A.   Yes.

Q.   And do you know, and if you recall, whether or not, outside

the presence of the jury, I confronted Mr. Guadalajara with his

interview by Agent Lawson and he never made such a statement?  Do

you recall that testimony?

A.   No.

Q.   You don't?  Okay.

         Now, you say there's another confidential source who

didn't testify at trial but that you have interviewed, correct?

A.   Correct.

| | | |
|---|---|---|
| 11:03:02 | 1 | Q.   And this confidential source, I believe your testimony was |
| 11:03:06 | 2 | that he saw Mr. Huitron in Nuevo Laredo talking to "40" at some |
| 11:03:13 | 3 | unknown time. |
| 11:03:14 | 4 | A.   I don't know if I referred to as a he or she, but the person |
| 11:03:18 | 5 | was present during a conversation between Huitron and "40." |
| 11:03:23 | 6 | Q.   And they were talking about horses, correct? |
| 11:03:25 | 7 | A.   Correct.  "Mamito's" horses. |
| 11:03:27 | 8 | Q.   Pardon me? |
| 11:03:28 | 9 | A.   "Mamito's" horses. |
| 11:03:29 | 10 | Q.   Okay.  And what timeframe are we talking about that this |
| 11:03:33 | 11 | person relayed to you, if you know? |
| 11:03:37 | 12 | A.   Within the last year. |
| 11:03:38 | 13 | Q.   So it would have been 2012? |
| 11:03:44 | 14 | A.   I can't give you specific dates. |
| 11:03:46 | 15 | Q.   Okay.  So within the last twelve calendar months? |
| 11:03:51 | 16 | A.   I believe that's correct. |
| 11:03:53 | 17 | Q.   Okay.  And shortly before his arrest, is that what you're |
| 11:03:57 | 18 | saying? |
| 11:03:57 | 19 | A.   Before whose arrest? |
| 11:03:59 | 20 | Q.   Mr. Huitron's arrest. |
| 11:04:02 | 21 | A.   Okay.  Repeat the question. |
| 11:04:03 | 22 | Q.   Okay.  The confidential source -- |
| 11:04:05 | 23 | THE COURT:  Was it before Mr. Huitron got arrested? |
| 11:04:08 | 24 | A.   The information came after Mr. Huitron was arrested. |
| 11:04:11 | 25 | Q.   (BY MR. ESPER) Okay. |

11:04:12  1   A.   That I received the information.

11:04:13  2   Q.   Yes.  And the information was that they saw Mr. Huitron

11:04:16  3   talking to "40" some time before April or June of 2011, whenever

11:04:24  4   he was arrested?

11:04:26  5   A.   2012.  Yes.  The meeting took place, I want to say, back in

11:04:31  6   2009, 2010 --

11:04:33  7   Q.   Okay.

11:04:34  8   A.   -- timeframe.

11:04:34  9   Q.   So back during the three or four years preceding trial in

11:04:39  10  this case, correct?

11:04:40  11  A.   Correct.

11:04:40  12  Q.   All right.  And they were talking about a horse --

11:04:44  13  "Mamito's" horses?

11:04:45  14  A.   Yes.

11:04:45  15  Q.   Okay.  They weren't talking about drug dealing, were they?

11:04:48  16  A.   That wasn't mentioned.

11:04:50  17  Q.   Okay.  But what was mentioned was -- this person to you in a

11:04:55  18  debriefing was that everybody knew what "40" did, or if they

11:05:01  19  didn't know, they'd better be careful, something to that effect?

11:05:04  20  A.   No.  The source told the people if they didn't know, the

11:05:08  21  source told the people whose money it was so they would be

11:05:12  22  careful.  So, therefore, the source said everyone knew.

11:05:15  23  Q.   Okay.  So this source is making assumptions, then, that

11:05:18  24  everybody knew whose money was paying for these horses and

11:05:22  25  trainers's fees?

| | | |
|---|---|---|
| 11:05:23 | 1 | A.   Or he would tell -- or the person would tell them. |
| 11:05:26 | 2 | Q.   Okay.  That's all I have, your Honor. |
| 11:05:32 | 3 | RE-DIRECT EXAMINATION |
| 11:05:32 | 4 | BY MR. GARDNER: |
| 11:05:34 | 5 | Q.   Mr. Lechtenberger asked you whether or not any cash or |
| 11:05:36 | 6 | checks were provided by Mr. Jose Trevino for horses.  I believe |
| 11:05:41 | 7 | your response was no, correct? |
| 11:05:43 | 8 | A.   Correct. |
| 11:05:45 | 9 | Q.   And I know everyone's loathe to hear this again, but how |
| 11:05:49 | 10 | much money did Mr. Jose Trevino pay for 35 mares? |
| 11:05:52 | 11 | A.   Nothing. |
| 11:05:53 | 12 | Q.   Nothing.  And what's the value of those 35 mares? |
| 11:05:57 | 13 | A.   I want to say approximately two million. |
| 11:05:59 | 14 | Q.   And were those 35 mares put in Mr. Jose Trevino's name? |
| 11:06:03 | 15 | A.   Yes, or his company's name. |
| 11:06:05 | 16 | Q.   Okay.  That's all I have, your Honor. |
| 11:06:11 | 17 | THE COURT:  Anything further? |
| 11:06:12 | 18 | MR. LECHTENBERGER:  No, your Honor. |
| 11:06:13 | 19 | THE COURT:  All right. |
| 11:06:15 | 20 | MR. SANCHEZ:  No, your Honor. |
| 11:06:15 | 21 | THE COURT:  Any further questions? |
| 11:06:17 | 22 | MR. ESPER:  Just one, your Honor. |
| 11:06:18 | 23 | RE-CROSS EXAMINATION |
| 11:06:19 | 24 | BY MR. ESPER: |
| 11:06:19 | 25 | Q.   You say Mr. Huitron trained 40 horses? |

| | | |
|---|---|---|
| 11:06:24 | 1 | A.   He was participating, I believe, in training probably more |
| 11:06:27 | 2 | than that.  And the reason I say that is we've got records on the |
| 11:06:30 | 3 | number of horses that were taken to his ranch in 2010.  And then, |
| 11:06:35 | 4 | he also assisted in training -- there's like 20 or some horses in |
| 11:06:40 | 5 | Ruidoso in 2012 that he participated in.  So it could be well in |
| 11:06:44 | 6 | excess of 40. |
| 11:06:45 | 7 | Q.   Okay.  And the context of this conspiracy, there was about |
| 11:06:48 | 8 | 500 horses, are there not? |
| 11:06:50 | 9 | A.   Yes. |
| 11:06:50 | 10 | Q.   Okay.  And he was about -- had approximately 40? |
| 11:06:54 | 11 | A.   I'm probably -- |
| 11:06:56 | 12 | Q.   More or less? |
| 11:06:56 | 13 | A.   Probably more than that. |
| 11:06:57 | 14 | Q.   Few more than that? |
| 11:06:58 | 15 | A.   More than that. |
| 11:06:59 | 16 | Q.   That area.  Correct.  That's all. |
| 11:07:05 | 17 | THE COURT:  You may step down.  You may call your next |
| 11:07:11 | 18 | witness. |
| 11:07:11 | 19 | MR. GARDNER:  Your Honor, the government calls Special |
| 11:07:14 | 20 | Agent Scott Lawson. |
| 11:07:24 | 21 | THE COURT:  Be sworn, please. |
| 11:07:25 | 22 | (Witness sworn.) |
| 11:07:39 | 23 | THE COURT:  Please state your full name and spell your |
| 11:07:40 | 24 | last. |
| 11:07:41 | 25 | THE WITNESS:  My name is Scott Lawson.  Last name is |

| | | |
|---|---|---|
| 11:07:45 | 1 | L-A-W-S-O-N. |
| 11:07:48 | 2 | THE COURT:  It's your witness. |
| 11:07:49 | 3 | SCOTT LAWSON, called by the Government, duly sworn. |
| 11:07:49 | 4 | DIRECT EXAMINATION |
| 11:07:49 | 5 | BY MR. GARDNER: |
| 11:07:50 | 6 | Q.   Thank you, your Honor. |
| 11:07:51 | 7 | Special Agent Lawson, I'd like to first address Jose |
| 11:07:53 | 8 | Trevino's objection number two relating to his PSI, paragraphs 43 |
| 11:08:00 | 9 | and 91 with respect to his knowledge of controlled substance. |
| 11:08:04 | 10 | Could you reiterate the information provided by Jose |
| 11:08:07 | 11 | Vasquez, Jr. in terms of direct cash payments made by his |
| 11:08:11 | 12 | organization to Jose Trevino? |
| 11:08:14 | 13 | A.   Yes, sir.  Jose Vasquez, Jr. had a driver deliver $100,000 |
| 11:08:20 | 14 | cash to Jose Trevino in a Wal-Mart parking lot in Grand Prairie, |
| 11:08:24 | 15 | Texas. |
| 11:08:24 | 16 | Q.   And how was Mr. Jose Vasquez, Jr. directed to do that? |
| 11:08:28 | 17 | A.   By "Poncho" Cuellar. |
| 11:08:30 | 18 | Q.   Now, did you also have the occasion to interview an |
| 11:08:34 | 19 | individual named Hector Rodriguez, incarcerated in the Dallas |
| 11:08:37 | 20 | federal prison system? |
| 11:08:39 | 21 | A.   I did. |
| 11:08:40 | 22 | Q.   And what information did Mr. Hector Rodriguez provide with |
| 11:08:43 | 23 | respect to Mr. Jose Trevino's knowledge of the Zeta controlled |
| 11:08:47 | 24 | substances operation? |
| 11:08:49 | 25 | A.   Rodriguez stated that he would meet Jose Trevino in parking |

| | | |
|---|---|---|
| 11:08:53 | 1 | lots in the Dallas, Texas area and deliver bags of cash to Jose |
| 11:08:58 | 2 | Trevino. |
| 11:08:59 | 3 | Q.   And where were those bags of cash going? |
| 11:09:02 | 4 | A.   Back to Mexico. |
| 11:09:03 | 5 | Q.   And where did Mr. Hector Rodriguez obtain that cash from? |
| 11:09:06 | 6 | A.   From the sale of cocaine. |
| 11:09:08 | 7 | Q.   Was Mr. Hector Rodriguez familiar with "40"? |
| 11:09:11 | 8 | A.   He was. |
| 11:09:12 | 9 | Q.   Okay.  And what was the relationship between Mr. Hector |
| 11:09:14 | 10 | Rodriguez and "40"? |
| 11:09:16 | 11 | A.   Hector Rodriguez had met "40" years prior, and then, he |
| 11:09:21 | 12 | became a cocaine distributor for him in, I want to say, around |
| 11:09:25 | 13 | 2006 or 7. |
| 11:09:27 | 14 | Q.   Before the timeframe alleged in our conspiracy? |
| 11:09:30 | 15 | A.   That's correct. |
| 11:09:31 | 16 | Q.   And he was arrested around that timeframe and incarcerated |
| 11:09:34 | 17 | in the Dallas area, correct? |
| 11:09:36 | 18 | A.   That's correct. |
| 11:09:36 | 19 | Q.   Now, you were also present during interviews with respect to |
| 11:09:39 | 20 | the cooperating source that Mr. Pennington talked about, correct? |
| 11:09:42 | 21 | A.   That is correct. |
| 11:09:43 | 22 | Q.   Now, could you relate to the Court what information that |
| 11:09:46 | 23 | individual provided with respect to Jose Trevino's knowledge of |
| 11:09:50 | 24 | his brother's activities? |
| 11:09:52 | 25 | A.   That individual, as well as "Poncho" Cuellar, stated that |

11:09:56   1   Jose Trevino would be driven to Piedras Negras with spreadsheets

11:10:01   2   of monthly expenses, and then, there he would meet with his

11:10:05   3   brother Miguel and Omar and discuss the expenses and how the

11:10:08   4   expenses should be paid for the horse operation.  That individual

11:10:12   5   also stated that Jose had a Mexican TelCel telephone to

11:10:18   6   communicate with Miguel Trevino.  And through Tyler Graham, we

11:10:24   7   were able to discover that Victor Lopez brought a phone from

11:10:27   8   Nuevo Laredo for the sole purpose of delivering that phone to

11:10:30   9   Jose Trevino.

11:10:31   10   Q.   And that was the phone that you were able to look at and

11:10:34   11   determine how many numbers were on there, correct?

11:10:36   12   A.   That particular phone, we had Tyler Graham look at and then,

11:10:41   13   report back to us.  On the day of the arrest of Jose Trevino, I

11:10:44   14   found a Mexican TelCel, either the same one or very similar

11:10:50   15   circumstance.

11:10:51   16   Q.   Now, do you recall the testimony of TFO Johnny Sosa?

11:10:54   17   A.   I do.

11:10:55   18   Q.   Now, there was one question that I didn't ask him, and it

11:10:57   19   related to a cellphone found in a Jose Trevino residence in Balch

11:11:02   20   Springs?

11:11:02   21   A.   That's correct.  During the timeframe of Jaime Zapata's

11:11:06   22   death in Mexico, U.S. law enforcement conducted several

11:11:09   23   knock-and-talks with Zeta associates, and one happened to be at

11:11:13   24   Jose Trevino's house that was led by TFO Sosa in Dallas.  Consent

11:11:19   25   to search the house was granted by Mr. Trevino, and one of the

11:11:22   1   things located was a Mexican TelCel with only one number

11:11:27   2   programmed.

11:11:30   3   Q.   Now, this cooperating individual, what did he or she explain

11:11:34   4   to you as Jose Trevino's role in the money-laundering

11:11:39   5   organization?

11:11:41   6   A.   He or she described Jose Trevino as the leader on the U.S.

11:11:44   7   side of the money-laundering operation.  Jose Trevino had

11:11:50   8   approximately 17 employees at the time of the takedown.  They all

11:11:54   9   called Jose "Don Jose."  Cooperating source informed us that Jose

11:11:59   10  instructed his employees to call him Don Jose.  Also described

11:12:03   11  where arguments among members of the conspiracy about whether a

11:12:07   12  horse should be retired or race in the future.

11:12:10   13  Q.   Let me hold you up there because that sort of goes to

11:12:12   14  objection number four as leader/organizer.  I still want to stick

11:12:15   15  on the knowledge of his money coming from the Zeta drug

11:12:20   16  organization.

11:12:20   17         Were you also present during an interview of a witness

11:12:23   18  named -- with a code name "Pitufo"?

11:12:26   19  A.   I was.

11:12:27   20  Q.   Does that individual wish his true name be held confidential

11:12:31   21  for fear of reprisals in Mexico?

11:12:33   22  A.   That's correct.

11:12:34   23  Q.   And with respect to "Pitufo's" information, what did he --

11:12:38   24  did he identify that he knew Jose Trevino?

11:12:40   25  A.   He did.

11:12:40  1   Q.   And what information did he provide with respect to Jose

11:12:44  2   Trevino's knowledge of the Zetas's drug-trafficking organization?

11:12:48  3   A.   He described that he had met Jose in Dallas, in Houston, and

11:12:52  4   that they had talked about possible stash locations for

11:12:56  5   narcotics.

11:12:56  6   Q.   What timeframe was this, do you recall?

11:13:02  7   A.   I do not recall the time.

11:13:06  8   Q.   And if you will, could you explain your information, your

11:13:10  9   knowledge of Victor Lopez's association with the Zeta

11:13:13  10  drug-trafficking organization and as it relates to Jose Trevino?

11:13:16  11  A.   Yes, sir.  Victor Lopez was identified in an undercover

11:13:20  12  money drop to a U.S. undercover.  We identified him then, and

11:13:25  13  then, we began to track him as he delivered funds to Southwest

11:13:29  14  Stallion Station in Elgin, Texas.  Shortly thereafter, we had a

11:13:34  15  consensually monitored phone in which Victor Lopez began to make

11:13:38  16  multiple calls in reference to moneys owed to various locations

11:13:42  17  and to money going to Jose Trevino and to Mexico.

11:13:46  18       At one point, Victor Lopez sent some money to Tyler

11:13:50  19  Graham at Southwest Stallion Station and asked Tyler Graham to

11:13:53  20  forward that money to Jose Trevino, and Tyler refused because he

11:13:56  21  had a large bill owed by these associates.  Shortly thereafter,

11:14:02  22  Victor Lopez booked a one-day turnaround flight from Laredo,

11:14:05  23  Texas to Oklahoma City and then, back to Laredo, all in a 24-hour

11:14:10  24  period.  Surveillance captured Victor Lopez meeting with Jose

11:14:15  25  Trevino in Oklahoma City airport parking garage.  This meeting

| 11:14:18 | 1 | lasted five minutes.  And our source of information is that |

```
11:14:18   1   lasted five minutes.  And our source of information is that

11:14:21   2   Victor took the money that Tyler wouldn't give to Jose.

11:14:24   3           Upon completion of this meeting, law enforcement had

11:14:26   4   Jose Trevino stopped -- traffic-stopped in Oklahoma City and

11:14:30   5   Victor Lopez --

11:14:31   6   Q.   I don't want to cut you off too much.  We've heard all that.

11:14:34   7   Tell me about Victor Lopez being stopped.  Didn't come out in

11:14:38   8   trial.  What happened in that instance?

11:14:39   9   A.   Victor Lopez was also detained at the airport in Dallas on

11:14:43  10   his connection back to Laredo.  So we have Jose stopped and

11:14:46  11   Victor stopped simultaneously.  Victor Lopez self-reported back

11:14:50  12   to the Zetas when he got to Mexico, because he thought that was

11:14:53  13   the right thing to do, that he had been detained.  Jose Trevino

11:14:56  14   complained to the CS that Victor had called on his own detention

11:15:02  15   and had him traffic-stopped in Oklahoma City, and Victor Lopez

11:15:06  16   was murdered approximately three weeks after the traffic stop.

11:15:10  17   Q.   And did the cooperating source indicate that he relayed Jose

11:15:14  18   Trevino's message to his brothers "40" and "42"?

11:15:18  19   A.   Yes.

11:15:18  20   Q.   And did the cooperating source indicate that Victor Lopez

11:15:21  21   was murdered by the Zetas based on the information provided by

11:15:24  22   Jose Trevino?

11:15:25  23   A.   Yes.  The cooperating source was actually on the phone with

11:15:28  24   the leader of the hit team that was looking for Victor Lopez.

11:15:31  25   Q.   And the leader of the hit team, what did he relay to the
```

11:15:33   1   cooperating source?

11:15:35   2   A.   He relayed that the leader of the hit team was "Yo Yo,"

11:15:39   3   Ricardo De La Vega, which was also Victor Lopez's cousin.  And he

11:15:43   4   relaid that they wish they could tell him to run but they

11:15:46   5   couldn't and that they were going to have to kill him.

11:15:49   6   Q.   Now, although the Court heard this at pretrial, there was a

11:15:53   7   series of texts obtained from Alexandra Trevino's computer?

11:15:59   8   A.   Yes.

11:15:59   9   Q.   What did those texts contain to indicate the family's

11:16:04  10   knowledge of the brother's drug activities?

11:16:06  11   A.   Sure.  Alex was texting who we believe to be her fiance at

11:16:11  12   the time, and basically the text relayed that she was very happy

11:16:16  13   that they chose her direct family to give this business to.  And

11:16:21  14   then, shortly thereafter, she referenced the horses and she said

11:16:24  15   that her aunts were upset that they weren't picked, but that her

11:16:27  16   and her dad were hard-working and that they chose that family to

11:16:29  17   give this business to.

11:16:31  18              THE COURT:  You asked about a brother in your question.

11:16:34  19   Were you talking about somebody else?

11:16:38  20              MR. GARDNER:  No, your Honor.  I was referring to "40"

11:16:40  21   and "42," correct?  Brothers.

11:16:43  22              THE WITNESS:  Yes, sir.  That's what I understood.

11:16:44  23              MR. GARDNER:  I apologize.  I should have been more

11:16:45  24   clear.

11:16:46  25   Q.   (BY MR. GARDNER) Were you also present obviously during the

11:16:50  1  testimony but the interviews of an individual that we all know as

11:16:54  2  "Mamito"?

11:16:54  3  A.   I was.

11:16:55  4  Q.   And what information did he say with respect to Tempting

11:16:59  5  Dash?

11:16:59  6  A.   "Mamito" described that he had wanted Tempting Dash and

11:17:04  7  asked Ramiro to pick up Tempting Dash at auction for him.  That

11:17:08  8  "40," Miguel Trevino, took Tempting Dash.  He described the

11:17:11  9  course of Tempting Dash running in Texas, and eventually

11:17:14  10  described that he was ordered to give Tempting Dash to Jose

11:17:17  11  Trevino.

11:17:18  12  Q.   And was that also confirmed by the calls on Villarreal's T3

11:17:25  13  intercept, produced as Government's Exhibit 381A and 381B?

11:17:28  14  A.   Yes, sir.  That's correct.

11:17:30  15  Q.   Okay.  Now, the Court has indicated that the sophisticated

11:17:35  16  laundering objection information, I just want to talk about a

11:17:42  17  couple of things to indicate -- I'm sorry.  Let me just go

11:17:46  18  forward to objection number four, which he objects on paragraph

11:17:49  19  No. 5 to being leader, organizer, supervisor.

11:17:52  20        Could you inform the Court with respect to the method

11:17:56  21  in which horses were transferred and renamed in terms of

11:18:02  22  backdated sales?

11:18:03  23  A.   Sure.  As stated previously in trial, a large number of

11:18:07  24  horses were bought, and in the middle, beginning to middle stages

11:18:10  25  of this conspiracy, only the best were transferred to Jose.  Jose

11:18:14  1  did not have the funds to buy the best horses, so they would be

11:18:18  2  transferred to him in his name.   The contract's backdated to show

11:18:23  3  that Jose bought it before a race in which one of these horses

11:18:27  4  earned money, but in theory, in reality, he did not receive --

11:18:32  5  did not pay the seller till after the horse won.

11:18:35  6  Q.   And so, how many horses did you track that were transferred

11:18:39  7  from various nominees to Jose Trevino between winning a qualifier

11:18:45  8  or winning a trials race and qualifying for a final large payout

11:18:50  9  race?

11:18:50  10  A.   I believe it was six.

11:18:55  11  Q.   Now, you mentioned something earlier, before I cut you off,

11:18:59  12  with decision to retire or continue to race a certain horse.

11:19:04  13  That horse was Mr. Piloto, correct?

11:19:06  14  A.   That's correct.

11:19:06  15  Q.   Could you describe what Mr. Graham testified to as well as

11:19:12  16  information from the CS regarding decision to race or retire Mr.

11:19:14  17  Piloto?

11:19:15  18  A.   There was some disagreement among Jose and his inner circle

11:19:19  19  about whether to race or retire Mr. Piloto.   Most in the horse

11:19:24  20  industry thought they should retire him because they knew they

11:19:26  21  had bribed that race and that the horse wasn't that good.   So

11:19:30  22  Jose wanted to continue to race Mr. Piloto, and CS-1 and some of

11:19:37  23  the others giving opinions believed that they should retire Mr.

11:19:39  24  Piloto and begin to breed him immediately.

11:19:42  25        Jose ultimately won that decision because he was the

| 11:19:44 | 1 | leader on the U.S. side.  And Mr. Piloto was sent to California |

11:19:44  1   leader on the U.S. side.  And Mr. Piloto was sent to California
11:19:48  2   to continue training.  But Piloto ultimately received an injury
11:19:52  3   and did not race again after Ruidoso.
11:19:56  4   Q.   Now, you also referenced earlier a bit of the consensual
11:20:00  5   calls, consensual phone provided to Mr. Tyler Graham at
11:20:04  6   Government's Exhibit 360A.  Could you refresh, for the record,
11:20:08  7   the call between Tyler Graham and Fernando Garcia with respect to
11:20:13  8   don't tell Jose?
11:20:14  9   A.   Sure.  It was after one of the many auctions that the
11:20:18  10  associates attended and Tyler was asking Fernando Garcia which
11:20:22  11  horses they purchased, you know, what the bloodlines were, how
11:20:25  12  much they paid, whose name, that kind of thing.  And Fernando was
11:20:28  13  a little slow to answer, and finally, Fernando told Tyler what
11:20:31  14  horses they bought and he said, but don't tell Jose I told you.
11:20:35  15  You know how he is.
11:20:38  16  Q.   With respect to his daughter and wife Zulema and Alexandra,
11:20:44  17  what activities did Mr. Jose Trevino conduct that indicated he
11:20:47  18  was directing them in this case?
11:20:51  19  A.   He employed them through one of his three shell companies
11:20:55  20  and directed them to carry out different administrative duties to
11:20:59  21  include signing faxes, sending bills, and those types of things.
11:21:03  22  Q.   Who is Rodolfo Trevino?
11:21:05  23  A.   That is another brother of Jose Trevino.
11:21:07  24  Q.   And what activities did Jose Trevino take with regards to
11:21:11  25  directing him?

11:21:12  1    A.   Rodolfo was kind of assigned to be the chief laborer, if you

11:21:17  2    will, at the ranch.  He kind of was over some of the other

11:21:21  3    laborers, and he was provided a doublewide trailer to live in on

11:21:27  4    the ranch.

11:21:27  5    Q.   With respect to Ms. Shalyn Bliss, she testified as the vet,

11:21:30  6    and Ms. Sharon Moore as the accountant.  Did Jose Trevino

11:21:33  7    exercise sort of a supervisory or direction -- provide direction

11:21:39  8    over those two individuals?

11:21:40  9    A.   Yes.  And Shalyn Bliss testified that things had happened in

11:21:43  10   the normal course of a veterinarian's work, such as inviting

11:21:48  11   sellers of veterinarian drugs that she would invite them to the

11:21:52  12   ranch, and Jose would run them off and he made the decisions on

11:21:54  13   the ranch.

11:21:55  14   Q.   I'd like to turn your attention to Francisco Colorado's

11:22:00  15   objections one and two.  We heard from Special Agent Pennington

11:22:04  16   with respect to 18 million testified to, information provided by

11:22:10  17   Mr. Hinojosa.

11:22:13  18        Did the cooperating source provide information as to

11:22:16  19   other moneys provided to Mr. Colorado-Cessa from the Zeta

11:22:20  20   organization?

11:22:21  21   A.   The cooperating source provided information to an additional

11:22:25  22   12 million sent to Cessa, described that Miguel Trevino put it in

11:22:30  23   an 18-wheeler in Mexico and asked the cooperating source to

11:22:34  24   call --

11:22:35  25             MR. SANCHEZ:   Judge, again, I'm going to object on the

11:22:37  1  same grounds of hearsay.  And I understand there may not be full

11:22:40  2  rights of confrontation, but now we're not even getting a name or

11:22:43  3  any information that we can use to impeach this faceless person

11:22:48  4  that was testifying through Mr. Lawson.

11:22:52  5        THE COURT:  Well, I'll permit you to do your best.  The

11:22:56  6  Court's certainly aware it doesn't hold much credibility with

11:23:01  7  non-identifiable people, but they're entitled to make their

11:23:05  8  record just like you are, sir.

11:23:08  9  Q.   (BY MR. GARDNER) And how was that money designated to be

11:23:10  10  distributed?

11:23:12  11  A.   It was two loads, one of two million, one of 10 million.

11:23:16  12  And the $2 million load was what was actually used for the

11:23:19  13  Ruidoso $2.2 million purchase in September of 2010 by Francisco

11:23:24  14  Colorado.  The 10 million was instructed to hold, and was

11:23:28  15  eventually estimated that 6 million of that was used on horses,

11:23:32  16  and the remaining four was safeguarded with Francisco Colorado.

11:23:38  17  Q.   With respect to the CS, what information did this individual

11:23:41  18  provide regarding Francisco Colorado-Cessa's knowledge and

11:23:45  19  involvement for the Zeta drug-trafficking organization?

11:23:48  20  A.   He advised that Francisco Colorado was the godfather of

11:23:55  21  "Zeta 14's" son.  They met through a mutual love of horses

11:23:57  22  several years ago, that they established ADT together, that

11:24:04  23  Francisco Colorado was present in multiple horse races in Mexico

11:24:07  24  when Miguel Trevino and Heriberto Lazcano and "Mamito" and that

11:24:13  25  they were together on several occasions.

11:24:16  1    Q.   And following the death of Efrain Torres, what did this

11:24:19  2    individual provide you with respect to Colorado Cessa's

11:24:24  3    accounting to the Zeta drug-trafficking organization?

11:24:27  4    A.   Through this CS and multiple informants to include Charlie

11:24:32  5    Hinojosa and "Pitufo," we were told about a meeting in Tampico

11:24:36  6    shortly after "14's" death that Colorado was summoned to go to to

11:24:40  7    account for the moneys that he had had with "Zeta 14."

11:24:46  8    Q.   And was that also the meeting testified to by "Mamito"?

11:24:50  9    A.   That's correct.

11:24:53 10    Q.   And did the CS provide you any information with respect to

11:24:57 11    the use of Mr. Colorado's ranch by the Zetas?

11:25:01 12    A.   The CS stated shortly after that meeting that the CS was

11:25:06 13    present when "40," "42" and "Mamito" showed up at Flor de Maria

11:25:11 14    in Tuxpan.  They wanted to see Colorado's horses and his cattle

11:25:16 15    and talk about maybe using the ranch for some of their own

11:25:19 16    animals.

11:25:20 17    Q.   And if you will, although it was in a prior proceeding,

11:25:23 18    could you, again, illuminate the Court as to the actions by the

11:25:27 19    Mexican law enforcement on Flor de Maria Ranch in the killing and

11:25:31 20    gun battle with drug-trafficking organizations?

11:25:33 21    A.   Sure.  In early 2012, I believe March or April, Mexican

11:25:40 22    military had a gun battle with many members of the Zetas on

11:25:43 23    Francisco Colorado's ranch in which a high-ranking class boss was

11:25:48 24    killed.

11:25:48 25    Q.   I'm also referring you back -- you've already mentioned a

11:25:51  1   little bit but Government's Exhibit 381A and 381B, the T3 calls

11:25:55  2   from Ramiro Villarreal.  What mention of Colorado-Cessa were on

11:25:59  3   those calls?

11:26:03  4   A.   I remember just very briefly that Colorado's name was

11:26:07  5   mentioned in reference to horses, but I would have to review to

11:26:11  6   give you more context on that.

11:26:14  7   Q.   Now, with respect to the meeting, was it indicated that

11:26:18  8   Colorado-Cessa, according to objections by Mr. Cessa, that he was

11:26:23  9   paying off a debt and, therefore, out of the organization during

11:26:27  10  that meeting?

11:26:28  11  A.   No.

11:26:28  12  Q.   What was the indication with respect to his debt owed to the

11:26:32  13  Zetas?

11:26:33  14  A.   There was an indication that Miguel knew that "Chispa" had a

11:26:38  15  lot of Zeta money invested with Colorado.  When I say "Chispa,"

11:26:42  16  that's "Zeta 14."  A nickname for "Zeta 14."  And that he was

11:26:46  17  called to account for what moneys he had with "Zeta 14."  There

11:26:51  18  was some debt that Francisco Colorado had lost money in betting

11:26:56  19  on horses with various persons, and "Zeta 14" had allowed

11:27:01  20  Colorado to invest in cocaine loads to make up money for those

11:27:06  21  debts.

11:27:08  22  Q.   And the Court's heard the testimony of "Mamito," but just

11:27:12  23  briefly, what did "Mamito" testify as to the annual gross income

11:27:17  24  of the Zeta drug-trafficking organization per year?

11:27:20  25  A.   He estimated between 350 and 500 million a year.

11:27:25   1   Q.   And, again, with respect to the testimony of Jose Vasquez,

11:27:28   2   Jr., how much per month was coming from Dallas?

11:27:31   3   A.   Just in Jose Vasquez's sale in Dallas, Texas, it was 20 to

11:27:35   4   25 million per month.

11:27:37   5   Q.   Now, I want to turn to the information provided by this

11:27:41   6   "Pitufo."  He was he able to identify members of Colorado-Cessa's

11:27:41   7   family?

11:27:44   8   A.   He was.

11:27:45   9   Q.   And was he able to identify how Mr. Colorado-Cessa met his

11:27:48   10  current wife?

11:27:53   11  A.   He mentioned that his wife's family was associated with -- I

11:28:03   12  can't remember enough specifics to go into that.

11:28:05   13  Q.   Was it associated with another drug cartel individual?

11:28:08   14  A.   Yes.

11:28:10   15  Q.   If I were to use a term "Efrain Torres," would that refresh

11:28:13   16  your memory?

11:28:14   17  A.   That's correct.

11:28:15   18  Q.   And "Pitufo," what did he testify with respect to any funds

11:28:19   19  that he knew coming from the Zetas to Francisco Colorado-Cessa?

11:28:23   20  A.   "Pitufo" stated that Lazcano sent "Pitufo" himself with $50

11:28:28   21  million to give to Francisco Colorado.

11:28:31   22  Q.   What was the $50 million for?

11:28:32   23  A.   To buy machinery to gain further contracts with Pemex.

11:28:36   24  Q.   So taking the amount by "Pitufo," Hinojosa and the CS

11:28:41   25  together, how much is that total?

11:28:42   1   A.   Approximately $80 million.

11:28:44   2   Q.   And all that come from the Zeta drug-trafficking

11:28:49   3   organization?

11:28:49   4   A.   That's correct.

11:28:55   5   Q.   And what information did "Pitufo" provide you with respect

11:28:58   6   to who truly owned ADT?

11:29:00   7   A.   "Pitufo" stated that ADT was 80 percent Los Zeta and 20

11:29:06   8   percent Francisco Colorado.

11:29:08   9   Q.   And did Mr. "Pitufo" identify or know of one Francisco

11:29:15   10   Silva-Ramos?

11:29:17   11   A.   I don't remember specifically talking about Ramos with

11:29:20   12   "Pitufo."

11:29:21   13   Q.   And if you will, could you please explain to the Court what

11:29:24   14   this "Pitufo" explained to you regarding the use of

11:29:27   15   Colorado-Cessa's assets to move both cocaine and money from the

11:29:31   16   sale of drugs?

11:29:32   17   A.   Yes.  He said through Colorado's various companies to

11:29:36   18   include Tesco and PIIG, that they had boats and planes, and that

11:29:41   19   two of Mr. Cessa's tugboats were used to go to Panama to pick up

11:29:45   20   kilogram -- multi-ton kilogram loads of cocaine.  He also said

11:29:49   21   they would use Cessa's plane to go pick up samples, and when we

11:29:52   22   questioned what a sample was, he said 50 kilograms of cocaine.

11:29:56   23   Q.   And these barges and tugs, were they boats owned or operated

11:30:02   24   by ADT, according to Mr. Pitufo?

11:30:05   25   A.   He named two specific boats and I don't believe he said ADT.

| | |
|---|---|
| 11:30:11 | 1 |
| 11:30:14 | 2 |

11:30:11  1   I believe he gave them another company, PIIG or something like

11:30:14  2   that.

11:30:15  3   Q.   And to your knowledge, is that company associated with

11:30:18  4   Francisco Colorado-Cessa?

11:30:18  5   A.   That's correct.

11:30:19  6   Q.   Now I'd like to turn your attention to Defendant Fernando

11:30:24  7   Garcia.  His objection number one in paragraph 32 that he did not

11:30:29  8   become aware of this organization or a member until fall of 2010.

11:30:34  9        When did information come to you regarding Fernando

11:30:38  10  Garcia's first involvement in this organization?

11:30:42  11  A.   I debriefed Tyler Graham in March of 2010, and he already

11:30:47  12  knew of Fernando Garcia coming to check on Tempting Dash with

11:30:51  13  Carlos Nayen in approximately January of 2010.

11:30:54  14  Q.   Okay.  And at that point, Tempting Dash, who was the

11:30:57  15  registered owner of Tempting Dash?

11:30:58  16  A.   By January of '10, it was in Jose Trevino's name.

11:31:02  17  Q.   Now I also refer your attention to Government's Exhibit 226.

11:31:05  18  That's the AQHA records.  When did it indicate that Mr. Fernando

11:31:10  19  Garcia obtained the horse known as Mr. Piloto?

11:31:15  20  A.   He obtained Mr. Piloto in the spring of 2010, I believe.

11:31:20  21  Q.   And, again, who did he obtain that horse from?

11:31:23  22  A.   From a member of the conspiracy, Ramiro Villarreal.

11:31:27  23  Q.   Now, although they're non-scoring, objection number two is,

11:31:30  24  again, paragraph 34 and that Mr. Garcia did not join the

11:31:35  25  conspiracy, he was a picker of quarter horses.  Do you recall --

| | |
|---|---|
| 11:31:42 | 1 |
| 11:31:48 | 2 |
| 11:31:49 | 3 |
| 11:31:53 | 4 |
| 11:31:53 | 5 |
| 11:31:56 | 6 |
| 11:31:58 | 7 |
| 11:31:59 | 8 |
| 11:32:02 | 9 |
| 11:32:05 | 10 |
| 11:32:09 | 11 |
| 11:32:09 | 12 |
| 11:32:13 | 13 |
| 11:32:19 | 14 |
| 11:32:22 | 15 |
| 11:32:26 | 16 |
| 11:32:31 | 17 |
| 11:32:34 | 18 |
| 11:32:34 | 19 |
| 11:32:36 | 20 |
| 11:32:38 | 21 |
| 11:32:42 | 22 |
| 11:32:47 | 23 |
| 11:32:51 | 24 |
| 11:32:54 | 25 |

1  let me back that up.  Had not joined the conspiracy until late in

2  picking quarter horses.  And he also mentioned about him

3  completing his college degree or proceeding to complete a college

4  degree.

5         Have you looked at the transcripts of Mr. Fernando

6  Garcia's degree projects?

7  A.   Yes, sir.

8  Q.   Prior to his arrest, when was the last time he actually took

9  a course at the University of Arizona?

10  A.   This isn't approximate, but it's like seven years since his

11  last class.

12  Q.   So progressing towards a degree is a broad stretch?

13  A.   In my estimation, that's not progressing towards a degree.

14  Q.   Now, I want to turn your attention to the same objection as

15  of March 2010.  Could you explain information you received during

16  the course of this investigation as to Fernando Garcia's role as

17  related with Carlos Nayen?

18  A.   Yes, sir.

19  Q.   Of their relationship?

20  A.   In the very beginning of the investigation, he was described

21  as a translator for Carlos Nayen, but that quickly evolved into

22  the money man for Carlos Nayen.  And basically all the U.S.-based

23  companies who didn't have a Spanish speaker, Fernando became the

24  go-to guy, and that progressed into everybody, and on the outside

25  e-mailing their bills to Fernando and then, Fernando sending it

```
11:32:58   1   to "Yo Yo" in Nuevo Laredo.
11:33:00   2   Q.   When you say U.S.-based companies, could you just provide a
11:33:02   3   few examples?
11:33:03   4   A.   Sure.  Southwest Stallion Station, communicated with
11:33:06   5   Fernando to get paid.  I have indirect knowledge that Elgin
11:33:11   6   Veterinary Hospital did.  Jeff Tebow, when they needed stuff at
11:33:14   7   Heritage Place, they talked to Fernando.  Many of the auction
11:33:21   8   houses and different companies that provided services all
11:33:24   9   described Fernando as who they talked to.
11:33:29   10           When Tyler Graham needed money at Southwest Stallion
11:33:33   11   Station and we were setting up cover deals, he talked to
11:33:36   12   Fernando.
11:33:40   13   Q.   With respect to defendant's objection number three on
11:33:44   14   paragraph 40 regarding Mr. Piloto, for the Court's attention,
11:33:47   15   Government's Exhibit 140 as well as Exhibit 226, the AQHA
11:33:52   16   transfer to Ramiro Villarreal, 140 was backdated contracts.
11:33:58   17   Where were those contracts found again?
11:34:00   18   A.   We found them on Fernando's computer in New Mexico.  We
11:34:05   19   found two backdated contracts in the Huitron Homes search
11:34:13   20   warrant.  That's what I recall currently.
11:34:15   21   Q.   Were you also able to refer to the Nancy Yearsley Insurance
11:34:20   22   documents?
11:34:21   23   A.   I was.
11:34:21   24   Q.   And what did those documents together indicate with respect
11:34:26   25   to the sale or transfer of Piloto from Ramiro Villarreal to
```

11:34:32   1   Fernando Garcia to Jose Trevino?

11:34:33   2   A.   The Yearsley document showed a couple of things.   That

11:34:36   3   Fernando was speaking for the organization on multiple horses in

11:34:39   4   May 2010, and that he was still dealing with Nancy on Piloto

11:34:45   5   after the backdating contract showed that it belonged to Jose

11:34:48   6   Trevino.

11:34:49   7   Q.   And with respect to the transfer of that horse, did CS-1

11:34:54   8   provide information that Fernando Garcia approached Carlos Nayen

11:34:58   9   about the sale of that horse?

11:34:59   10   A.   He did.   He stated that although the horse was an

11:35:03   11   organization horse from the beginning, that Fernando kind of

11:35:05   12   helped train and break it, and then, when it won a qualifier,

11:35:09   13   Fernando obviously didn't want to take it out of his name.   You

11:35:12   14   know, there's a certain allure about having your name on a horse

11:35:14   15   running for $2 million, and he thought he did the work and was

11:35:17   16   justified in keeping the horse.

11:35:19   17         So he complained that he was being forced to give that

11:35:22   18   horse to Jose Trevino.

11:35:25   19   Q.   Now, turning your -- oh, one thing.   On the backdated

11:35:28   20   contract, who's the notary between -- the verification of that

11:35:31   21   contract between Fernando Garcia and Jose Trevino?

11:35:34   22   A.   Jessica Huitron.

11:35:35   23   Q.   And is she located here in Austin, Texas?

11:35:38   24   A.   Yes, sir.   And the sale, supposedly, in New Mexico.

11:35:41   25   Q.   Now, turning your attention to Defendant Garcia's objections

11:35:46   1   four and five on paragraph 75 and 90, in terms of the amount

11:35:49   2   accountable, again, this goes to the length of time he's in the

11:35:52   3   conspiracy.

11:35:53   4           With respect to Government's Exhibits 323A through TT,

11:35:57   5   the Yearsley documents, what indications were in those documents

11:36:02   6   of Fernando Garcia's lengthy involvement in this conspiracy?

11:36:06   7   A.   Well, it's dated all the way back to the middle of 2010,

11:36:11   8   Fernando was dealing with Nancy on several organizational horses

11:36:14   9   that were in his name and many that were not in his name.  Some

11:36:17  10   that were in Jose Trevino's name.  Fernando looked like the owner

11:36:23  11   to Yearsley.

11:36:23  12   Q.   And when was the first instance of that, dealings with

11:36:27  13   Yearsley Insurance?

11:36:30  14   A.   I want to say July of '10, but I may be off a little bit on

11:36:34  15   that.

11:36:35  16   Q.   And was Fernando Garcia in the e-mails and business records

11:36:39  17   of Yearsley Bloodstock with respect to the September '10 Ruidoso

11:36:43  18   sale?

11:36:44  19   A.   He was.

11:36:44  20   Q.   And what was the amount of horses purchased at that sale?

11:36:47  21   A.   $2.2 million.

11:36:49  22   Q.   Were there documents contained within that exhibit from the

11:36:55  23   Heritage Place sale indicating Fernando Garcia was involved in

11:36:58  24   that?

11:36:58  25   A.   Yes.

| | | |
|---|---|---|
| 11:36:59 | 1 | Q.   And were there documents from the 2010 sale at Los Alamitos |
| 11:37:05 | 2 | indicating Fernando Garcia was responsible for all those horses? |
| 11:37:07 | 3 | A.   There was. |
| 11:37:09 | 4 | Q.   Now, again, with respect to Mr. Fernando Garcia's |
| 11:37:12 | 5 | involvement, what horse expenses was he paying just at Southwest |
| 11:37:17 | 6 | Stallion Station alone? |
| 11:37:21 | 7 | A.   Fernando was overpaying -- by the end of 2011, Fernando was |
| 11:37:26 | 8 | paying for like 150 of the organization's horses at Southwest |
| 11:37:29 | 9 | Stallion Station. |
| 11:37:30 | 10 | Q.   And do you recall, approximately, the bill that was racked |
| 11:37:33 | 11 | up for the care and breeding of those horses? |
| 11:37:36 | 12 | A.   There in the middle of breeding season, it would be over |
| 11:37:39 | 13 | 100,000 a month.  During offseason, when he's just storing the |
| 11:37:43 | 14 | horses, it would be smaller, around 30,000. |
| 11:37:46 | 15 | Q.   So Mr. Garcia claims he should be held accountable for only |
| 11:37:50 | 16 | $510,900. |
| 11:37:53 | 17 | I want to turn your attention to Government's Exhibit |
| 11:37:54 | 18 | 106A through E.  Do you recall those are the catalogs, the sales |
| 11:37:58 | 19 | catalogs? |
| 11:37:59 | 20 | A.   Yes, sir. |
| 11:37:59 | 21 | Q.   What do those catalogs again indicate? |
| 11:38:03 | 22 | A.   Those catalogs pretty much memorialize the organization's |
| 11:38:09 | 23 | actions at auction for three years.  It was the sales catalog |
| 11:38:14 | 24 | from all the auctions that the group attended, and they were in |
| 11:38:18 | 25 | Fernando's possession and he had circled which horses and with |

11:38:21  1  notes that the organization bought over the course of 2010

11:38:24  2  through 2012.

11:38:26  3  Q.   So this corresponds with the more than nine million up to 16

11:38:31  4  million horse purchases as testified to by Special Agent

11:38:35  5  Pennington?

11:38:35  6  A.   Yes, sir.

11:38:36  7  Q.   Now, were you also able -- in addition to the exhibits, did

11:38:42  8  you personally conduct surveillance on which you observed

11:38:46  9  Fernando Garcia operating as a member of this organization?

11:38:49  10  A.   Yes.  Several times.

11:38:50  11  Q.   Was that multiple times?

11:38:51  12  A.   Yes, sir.

11:38:53  13  Q.   I think you mentioned it earlier but, again, referring to

11:38:55  14  the CS, what did this individual say Fernando Garcia's role was

11:39:00  15  with regards to expenses in the U.S.?

11:39:04  16  A.   That all bills were to be sent to Fernando.  All horse

11:39:07  17  registration paperworks were to be maintained by Fernando, and he

11:39:11  18  was to oversee that portion of it.

11:39:14  19  Q.   Now I want to refer your attention to Government's Exhibit

11:39:17  20  360, which was a recorded call concerning the cash delivery in

11:39:22  21  January of 2011.  Briefly explain the circumstances surrounding

11:39:25  22  that arrangement.

11:39:27  23  A.   Just briefly, they owed Tyler Graham approximately $35,000.

11:39:32  24  They said they had the money in Laredo, but they had no way to

11:39:35  25  get it to him.  So we sent an undercover to pick up the money.

11:39:39   1   Fernando provided the telephone number to Tyler of Victor Lopez.

11:39:43   2   We did a successful money pick-up in Laredo, and at the

11:39:47   3   conclusion of that, we had Tyler call Fernando and talk about the

11:39:50   4   success of the money drop.  And Fernando in the conversation said

11:39:54   5   it went well and that was a good way to do it and Fernando

11:39:57   6   agreed.

11:40:01   7   Q.   Now, there was also an incident on the sale of Blues

11:40:05   8   Ferrari.  And I don't have the exhibit number for the photo

11:40:08   9   presented by Mr. Del Rayo, but what role did Fernando Garcia play

11:40:12   10   with respect to the extorted money from Mr. Del Rayo?

11:40:16   11   A.   According to CS-1, that basically Fernando's role was to

11:40:20   12   help baby-sit Alfonso Del Rayo as he had just been released from

11:40:25   13   captivity and was forced to fly to the United States and buy

11:40:28   14   Blues Ferrari.  There's pictures of Fernando standing by Alfonso

11:40:32   15   Del Rayo, who has a cast like on his hand and bruises on his

11:40:36   16   face.  And according to CS-1, everybody there baby-sitting

11:40:40   17   Alfonso Del Rayo was aware of his captivity by the Zetas.

11:40:45   18   Q.   According to Government's Exhibit 359A through B.

11:40:55   19       With respect to Bonanza Racing, what activities did

11:40:59   20   Fernando Garcia perform on behalf of Bonanza Racing Stables?

11:41:02   21   A.   He was a self-declared manager of Bonanza Stables on the

11:41:06   22   U.S. side.  Oversaw that the horses were trained, paid for.  He

11:41:12   23   was the guarantee-er of the purchase of most of those horses at

11:41:16   24   auction, and upon his arrest, stated that he was a manager for

11:41:21   25   Francisco Colorado.

11:41:23   1   Q.   And Mr. Fernando Garcia's objection, he states there's no
11:41:26   2   factual basis for accounting Mr. Garcia for any of the expenses
11:41:30   3   for any of the horses not personally owned by himself.
11:41:34   4          Refer your attention to Government's Exhibit 364, New
11:41:38   5   Mexico A through DDD.  Were those Fernando Garcia's computers?
11:41:43   6   A.   Yes, sir.  That's his computers that we obtained in New
11:41:46   7   Mexico.
11:41:46   8   Q.   Okay.  And what information with respect to expenses was
11:41:49   9   contained on that computer?
11:41:51  10   A.   On that computer, I found countless bills from horse
11:41:55  11   haulers, veterinarians, trainers, breeding facilities, and
11:41:59  12   several of them weren't even addressed to Fernando.  They would
11:42:02  13   be addressed to Nayen, or Jose, or various places.  But Fernando
11:42:06  14   was in possession of all those bills.
11:42:08  15   Q.   And through Special Agent Bill Johnston, DEA, were Fernando
11:42:14  16   Garcia's e-mail accounts obtained, Government's Exhibit 358D,
11:42:18  17   Fernie004?
11:42:19  18   A.   That's correct.
11:42:20  19   Q.   Did that e-mail have much of the same attachments as found
11:42:22  20   on his computer?
11:42:23  21   A.   Yes.  There's several of those bills that Fernando had.  He
11:42:26  22   was e-mailing to "Yo Yo" in Mexico.
11:42:29  23   Q.   And with respect to not paying expenses, could you briefly
11:42:33  24   recount for the Court the $51,000 that Fernando Garcia arranged
11:42:38  25   to be wired to Heritage Place auction house?

| | | |
|---|---|---|
| 11:42:40 | 1 | A.   Sure.   There was an auction in January of 2012.   The group |
| 11:42:45 | 2 | paid most of the bill, but they left 51,000 outstanding.   "Yo Yo" |
| 11:42:50 | 3 | delivered money to Jose Canales in Laredo, Texas via Victor |
| 11:42:56 | 4 | Lopez.   That money was structured into Heritage Place's account, |
| 11:43:01 | 5 | structured deposits of $9,000 to equal 51,000.   And then, those |
| 11:43:06 | 6 | deposit slips were e-mailed to Fernando, and Fernando e-mailed |
| 11:43:09 | 7 | those to Heritage Place. |
| 11:43:10 | 8 | Q.   Now, defense objection number one is a legal objection, so |
| 11:43:16 | 9 | I'll pass on to objection number seven with respect to his |
| 11:43:18 | 10 | leadership role. |
| 11:43:19 | 11 | Could you briefly discuss his leadership role with |
| 11:43:24 | 12 | respect to Eusevio Huitron in March 2012? |
| 11:43:28 | 13 | A.   Sure.   There's two separate occasions when Fernando was |
| 11:43:32 | 14 | pretty much running the Ruidoso barn for the organization's |
| 11:43:35 | 15 | horses, but the second occasion was in the spring of 2012. |
| 11:43:39 | 16 | Fernando had brought Jose -- excuse me, Eusevio Huitron back into |
| 11:43:43 | 17 | the organization and brought him to New Mexico to train for their |
| 11:43:47 | 18 | horses.   Huitron broke his leg from a work accident and was taken |
| 11:43:54 | 19 | to the hospital and the bill was provided.   The bill mentioned |
| 11:43:57 | 20 | that it would be private pay, and Fernando had the bill and he |
| 11:44:00 | 21 | e-mailed the bill to "Yo Yo" in Mexico. |
| 11:44:04 | 22 | Q.   Now, you mentioned briefly the 51,000 transfer, Government's |
| 11:44:09 | 23 | Exhibit 358D.   Did you interview Mr. Canales? |
| 11:44:12 | 24 | A.   I did. |
| 11:44:13 | 25 | Q.   And what did Mr. Canales say how he was -- that payment was |

| | |
|---|---|
| 11:44:17 | 1 |
| 11:44:18 | 2 |
| 11:44:24 | 3 |
| 11:44:29 | 4 |
| 11:44:34 | 5 |
| 11:44:37 | 6 |
| 11:44:43 | 7 |
| 11:44:46 | 8 |
| 11:44:49 | 9 |
| 11:44:54 | 10 |
| 11:44:58 | 11 |
| 11:45:01 | 12 |
| 11:45:06 | 13 |
| 11:45:10 | 14 |
| 11:45:11 | 15 |
| 11:45:14 | 16 |
| 11:45:20 | 17 |
| 11:45:23 | 18 |
| 11:45:27 | 19 |
| 11:45:28 | 20 |
| 11:45:32 | 21 |
| 11:45:35 | 22 |
| 11:45:40 | 23 |
| 11:45:44 | 24 |
| 11:45:49 | 25 |

arranged for?

A.    He said he was instructed by Carlos Nayen to send the money to Heritage Place and that he was told to give proof to Fernando Garcia, and that's why he e-mailed Fernando the deposit receipts.

Q.    Now, turning your attention back to the AQHA records, Exhibit 226.  With respect to the transfer of the 35 mares, what information came from those AQHA records to indicate Fernando Garcia was exercising control over those horses?

A.    Sure.  Those 35 mares were all placed in Luis Aguirre's name and sold to Jose Trevino for a written -- a check was written, it was never negotiated.  Anyway, those horses, in theory, had nothing to do with Fernando Garcia, and he took the 35 transfer requests to the American Quarter Horse Association in Amarillo, Texas.

Q.    Turning your attention to Government's Exhibit 358E, which is the e-mail address from horses.quarter.racing, as testified by Bill Johnson with respect to destroying the phones.  Could you indicate that aspect in relation to his leadership responsibilities?

A.    Sure.  It was after the raid in Los Alamitos racetrack in California, there was multiple e-mails between "Yo Yo" in Mexico to Fernando Garcia, you know, what's going on, fill us in, tell us what's happening.  And eventually, there was an e-mail to Fernando saying, destroy all your devices, all your phones, and basically get rid of -- you know, we're scared, we're worried,

11:45:53  1   destroy everything.

11:45:55  2   Q.   Now, with respect to contact in Mexico, was there an

11:45:59  3   occasion when Tyler Graham mentioned that Carlos Nayen had visa

11:46:03  4   problems and Fernando Garcia assumed his role?

11:46:06  5   A.   That's correct.  There was a time when we didn't see Carlos

11:46:10  6   in the United States for approximately ten, eleven months, and at

11:46:14  7   that time, Fernando oversaw everything in the United States.

11:46:16  8   Q.   With respect to the objections, Special Agent, that's all I

11:46:21  9   have.  I just want to turn your attention briefly to the asset

11:46:24  10  forfeiture section.  Handing you a copy of the superseding

11:46:33  11  indictment.

11:46:34  12        Now, you testified earlier that when you added the

11:46:37  13  information for Mr. Hinojosa to the information from the CS and

11:46:43  14  "Pitufo," you came up with $80 million, correct?

11:46:45  15  A.   That's correct.

11:46:45  16  Q.   And just so I'm clear, when did "Pitufo" state the $50

11:46:50  17  million was delivered to Colorado-Cessa?

11:46:51  18  A.   Between 2008, 2009.

11:46:53  19  Q.   During the timeframe of this conspiracy?

11:46:54  20  A.   Yes, sir.

11:46:57  21  Q.   Now, I want to refer your attention for the asset forfeiture

11:47:00  22  portion to page 45 and 46.

11:47:02  23        THE COURT:  Let's go over that one more time.

11:47:04  24        MR. GARDNER:  Yes, sir.

11:47:07  25        THE COURT:  Read me back -- despite your hayfever, read

11:47:11  1   me back the last question and answer, please.

11:47:42  2                (Last question and answer read back.)

11:47:43  3                THE COURT:  All right.  You may proceed.

11:47:44  4                MR. GARDNER:  Thank you, your Honor.

11:47:52  5   Q.   (BY MR. GARDNER) You have the superseding indictment in

11:47:54  6   front of you?

11:47:54  7   A.   I do.

11:47:55  8   Q.   With respect to the real property listed on pages 45 and 46,

11:48:01  9   did you become familiar with that property?

11:48:02  10  A.   Yes, sir, I did.

11:48:03  11  Q.   And how so?

11:48:05  12  A.   Well, we were originally provided intelligence that Jose

11:48:09  13  Trevino had bought this property, so we did a few surveillances,

11:48:11  14  overhead photos.  But the most familiar I became is the date of

11:48:15  15  arrest when we led this search and seizure and arrest at Jose

11:48:18  16  Trevino's property.

11:48:19  17  Q.   Okay.  Did you determine that these two properties through

11:48:22  18  your investigation were purchased by Jose Trevino?

11:48:25  19  A.   That's correct.

11:48:26  20  Q.   For what purpose?

11:48:27  21  A.   To further his horse-breeding, money-laundering operation.

11:48:32  22  Q.   All right.  Just because there's actually three addresses

11:48:39  23  associated with that property, correct?

11:48:40  24  A.   That's correct.

11:48:41  25  Q.   And one is just a small little shack or portion.  But just

11:48:45  1   for the record, the three properties are located 17840 84th

11:48:51  2   Street, Lexington, Cleveland County, Oklahoma is paragraph 1;

11:48:55  3   paragraph 2, 17850 84th Street, Lexington, Cleveland County,

11:49:02  4   Oklahoma; paragraph 3, 17860 84th Street, Lexington, Cleveland

11:49:06  5   County, Oklahoma.  And even though they're separate physical

11:49:09  6   addresses, did they encompass a single piece of property?

11:49:13  7   A.   That's correct.

11:49:16  8   Q.   And based on the course of your investigation, were these --

11:49:19  9        THE COURT:  Does that include the second ranch that --

11:49:25  10  he was buying at the time of all of this broke that the gentleman

11:49:31  11  never got back?

11:49:32  12       MR. GARDNER:  Yes, sir.  That includes two ranches, the

11:49:34  13  Bill Pilgrim parcel and the other previously purchased parcel

11:49:39  14  totalling about 168.

11:49:40  15  Q.   (BY MR. GARDNER) Would that be --

11:49:40  16  A.   Yes, sir.  The Pilgrim parcel, there was still some money to

11:49:43  17  be paid, but he had paid approximately $400,000.

11:49:49  18  Q.   (BY MR. GARDNER) And just for the record, your Honor, that's

11:49:51  19  Exhibit No. 32 for the Bill Pilgrim purchase contract.

11:49:56  20       THE COURT:  All right.

11:49:57  21  Q.   (BY MR. GARDNER) Based on the course of your investigation,

11:49:59  22  were these properties used to facilitate and further the

11:50:01  23  money-laundering conspiracy?

11:50:01  24  A.   That correct.

11:50:02  25  Q.   And could you just briefly give the Court examples of how

11:50:05   1   these properties were used in furtherance of that?

11:50:08   2   A.   Yes, sir.  They just had several barns for breeding stud

11:50:13   3   horses to recipient mares or to the quality mares, and then,

11:50:18   4   there was several boarding facilities for the recipient mares to

11:50:22   5   carry the foals to term.  There was all kinds of tractors and

11:50:28   6   things to maintain the property, to spread feed, and to do the

11:50:33   7   daily tours around the property.

11:50:35   8   Q.   And ultimately at the point where you received a search

11:50:40   9   warrant, how many horses, organizational horses did you seize

11:50:43   10   from those properties?

11:50:48   11   A.   It was over 400 just in Lexington.

11:50:51   12   Q.   Okay.  So the vast majority of the 484 have currently been

11:50:56   13   sold?

11:50:56   14   A.   That's correct.

11:50:56   15   Q.   Now, turning your attention to the farm and ranch equipment

11:50:59   16   located on pages 23 and 24, you briefly testified to it, but with

11:51:06   17   respect to how they're listed there, where did that information

11:51:10   18   come from?

11:51:10   19   A.   On the day of the arrest, we did an inventory of all

11:51:14   20   property located on the premises.

11:51:17   21   Q.   Okay.  So this list here on pages 23 and 24 is an inventory

11:51:20   22   of the property as you found it on June 12, 2012?

11:51:24   23   A.   That's correct.

11:51:26   24   Q.   And, again, although you mentioned it, just so I'm sure I'm

11:51:29   25   clear on the record for this particular portion of the

11:51:32  1  proceeding, how were those vehicles and equipment used in the

11:51:35  2  facilitation and furtherance of the money-laundering conspiracy?

11:51:38  3  A.   They're used to further the care of the horses and, you

11:51:42  4  know, to further the conspiracy.

11:51:45  5  Q.   Turning your attention to the currency seized from Mr.

11:51:49  6  Eusevio Huitron's residence located on page 22, currency in the

11:51:54  7  amount of $12,758, was that seized from Eusevio Huitron's

11:52:00  8  residence?

11:52:01  9  A.   From the residence, yes, sir.

11:52:02  10  Q.   Can you describe the circumstances of that seizure?

11:52:04  11  A.   The consent search began after the arrest of Eusevio, and he

11:52:11  12  granted consent to the search of his residence.  Inside the room

11:52:15  13  of his son Adrian Huitron, in a dresser there was found various

11:52:20  14  bundles of cash, including approximately 1,500 in a wallet that

11:52:25  15  totalled approximately $12,000.

11:52:27  16  Q.   And why is it your belief that that money came from the

11:52:30  17  money-laundering conspiracy?

11:52:32  18  A.   When Adrian was asked where the money came from, he

11:52:36  19  explained that it was from the monthly fees of boarding horses.

11:52:41  20  Q.   And at that time, was Eusevio Huitron boarding and training

11:52:47  21  horses belonging to the organization?

11:52:48  22  A.   That's correct.

11:52:48  23  Q.   I'll pass the witness, your Honor.

11:52:56  24       MR. LECHTENBERGER:  May I have 45 seconds with my

11:52:58  25  client, Judge?

| | | |
|---|---|---|
| 11:52:59 | 1 | THE COURT:  Yes. |
| 11:53:11 | 2 | MR. LECHTENBERGER:  That was under 45 seconds.  No |
| 11:53:14 | 3 | questions, Agent. |
| 11:53:16 | 4 | THE COURT:  I anticipate more than 45 seconds of cross? |
| 11:53:21 | 5 | MR. SANCHEZ:  A little bit more, your Honor. |
| 11:53:22 | 6 | THE COURT:  All right.  Well, we can't -- |
| 11:53:27 | 7 | MR. SANCHEZ:  Did you say we -- |
| 11:53:29 | 8 | THE COURT:  We can't exhaust the court reporter.  It |
| 11:53:31 | 9 | looks like we're going to go on.  You may step down, sir.  So |
| 11:53:35 | 10 | we'll recess till 1:30.  Let me try to get a handle on some |
| 11:53:40 | 11 | things.  We've got one more witness. |
| 11:53:43 | 12 | MR. GARDNER:  He will only address -- |
| 11:53:45 | 13 | THE COURT:  Well, I don't -- he'll be what he is. |
| 11:53:49 | 14 | MR. GARDNER:  Yes. |
| 11:53:50 | 15 | THE COURT:  So I'm not concerned about that.  So we've |
| 11:53:54 | 16 | got one other.  We've got -- what I'm really trying to figure out |
| 11:54:03 | 17 | as to whether we're going to reach Mr. Ramirez or not, Mr. |
| 11:54:08 | 18 | Harris, I don't know. |
| 11:54:12 | 19 | MR. HARRIS:  I hope so. |
| 11:54:12 | 20 | THE COURT:  If you have a tent where you could sleep in |
| 11:54:14 | 21 | our beautiful outdoors, don't give it away.  All right.  Recess |
| 11:54:19 | 22 | till 1:30. |
| 13:27:03 | 23 | (Lunch recess.) |
| 13:27:11 | 24 | THE COURT:  You're still under oath. |
| 13:27:13 | 25 | THE WITNESS:  Yes, your Honor. |

CROSS-EXAMINATION

BY MR. SANCHEZ:

Q.   Thank you, your Honor.

         Mr. Lawson, I want to talk to you about a couple of things.  I want to start by, first, were you referring to this CI, CI-1?  I just want to get a -- something I can refer to.  The one that gave information about the 12 million and broken up into two, two million and 10 million, was that CI-1?

A.   That's correct.

Q.   Okay.  So I want to ask you about CI-1 first.  And I guess what you were saying is CI-1 is the one that told you that the roughly 10 million listed in the PSR that Francisco Colorado paid, that's -- it's paid back and the information that you're relying on is CI-1?

A.   That's part of the information.  Yes, sir.

Q.   So CI-1, I want to ask you, is he cooperating with the government because he's, in fact, in custody?

A.   He is in custody.

Q.   Okay.  And so, is he in custody because he has a federal case?

A.   Yes.

Q.   More than one federal case?

         MR. GARDNER:  Your Honor, at this point, I would object to any further description that might serve to identify the identity of this individual.  I think we're getting a little

| | | |
|---|---|---|
| 13:28:55 | 1 | close to that line. |
| 13:28:56 | 2 | MR. SANCHEZ:  I'm -- |
| 13:28:58 | 3 | THE COURT:  Does it make any difference if he's got 30 |
| 13:29:01 | 4 | cases or one? |
| 13:29:03 | 5 | MR. SANCHEZ:  Well. |
| 13:29:05 | 6 | THE COURT:  Let's go. |
| 13:29:06 | 7 | MR. SANCHEZ:  I want to know how many -- I want to be |
| 13:29:08 | 8 | able to impeach him, and it does make a difference if he's trying |
| 13:29:11 | 9 | to give information in order to reduce his sentence.  I do think |
| 13:29:16 | 10 | that's relevant. |
| 13:29:18 | 11 | THE COURT:  Then ask him that.  It doesn't make any |
| 13:29:20 | 12 | difference if it's one or ten.  If it's -- |
| 13:29:23 | 13 | MR. SANCHEZ:  I'd also like to ask what kind of |
| 13:29:26 | 14 | sentence he's facing, what his range is, in order to try to judge |
| 13:29:28 | 15 | his credibility as far as the information that he's giving, |
| 13:29:32 | 16 | whether -- what's he looking at.  If he's looking at -- |
| 13:29:34 | 17 | THE COURT:  Do you have a crystal ball to look at |
| 13:29:38 | 18 | whatever the Judge is going to do one way or the other? |
| 13:29:41 | 19 | MR. SANCHEZ:  Your Honor, when it comes to the record, |
| 13:29:42 | 20 | I think it's important because a person that's facing a two-year |
| 13:29:46 | 21 | sentence versus a person that's facing a 50-year sentence has |
| 13:29:50 | 22 | more incentive to make things up and that's the -- |
| 13:29:54 | 23 | THE COURT:  That's all right.  I never have met a CI |
| 13:29:56 | 24 | with a two-year sentence.  So let's go on.  Maybe we will learn |
| 13:29:59 | 25 | something. |

13:30:00    1    Q.   (BY MR. SANCHEZ) Do you know whether the CI has been

13:30:03    2    sentenced?

13:30:04    3    A.   He has not.

13:30:05    4    Q.   Do you know what kind of range of punishment he's facing?

13:30:10    5    A.   I haven't seen the PSI, but I understand that it's

13:30:14    6    substantial.

13:30:15    7    Q.   What do you mean by substantial?

13:30:19    8    A.   I believe ten to life comes to mind.

13:30:24    9    Q.   Ten to life is what the statutory range is, or is that what

13:30:29   10    the guideline range is?

13:30:32   11        THE COURT:  If he hadn't seen the PSI, I don't know if

13:30:35   12    he can answer that question.  If he has seen the PSI, you'd

13:30:38   13    better have the judge's permission to have seen the PSI.

13:30:43   14    Q.   (BY MR. SANCHEZ) Do you know what the government is offering

13:30:47   15    him in exchange for the information that he's providing?

13:30:54   16    A.   I know they have made a statement that they will let the

13:30:58   17    judge know of his cooperation.

13:31:00   18    Q.   Have they recommended a certain reduction to his sentence?

13:31:08   19    A.   I don't think I've heard legal terms of, you know, what

13:31:11   20    rule, or anything, they're going to try to use toward the

13:31:16   21    defendant.

13:31:16   22    Q.   So you don't know whether the government's recommending some

13:31:20   23    sort of reduction to his sentence?

13:31:22   24    A.   I understand there's going to be some form of

13:31:24   25    recommendation.

13:31:26   1   Q.   What's your understanding?  Is it a percentage of what is

13:31:29   2   calculated by the guidelines, or is it a certain number of years

13:31:33   3   off?

13:31:34   4   A.   I do not have an understanding because the best I

13:31:38   5   understand, we're still waiting on what information is going to

13:31:41   6   be used, if it's going to help any other cases, that type of

13:31:43   7   thing.

13:31:49   8   Q.   How many times have you sat down and met with this

13:31:53   9   particular individual?

13:31:56   10  A.   Probably eight.

13:31:59   11  Q.   And those eight times, were reports written about that

13:32:02   12  meeting?

13:32:04   13  A.   Yes.

13:32:10   14  Q.   When was the first time -- and I'm not talking about a date.

13:32:15   15  Just in relation to those eight meetings, when was the first time

13:32:18   16  he provided this information about this alleged $12 million

13:32:22   17  payment?

13:32:28   18  A.   I'd be guessing a little.  I'm going to say the third time.

13:32:31   19  Q.   So he did not provide it the first or the second time?

13:32:37   20  A.   No.  As I said in the trial, my general rule in debriefing

13:32:42   21  any defendant is to be very generic the first time or two and get

13:32:45   22  a broad picture, and then, you come back for specific details.

13:32:49   23  Q.   Other than those eight times that you sat in, how many other

13:32:52   24  times has he sat in either before or after your meetings?

13:32:57   25  A.   With other interviewers?

| | | |
|---|---|---|
| 13:33:00 | 1 | Q.   With other interviewers. |
| 13:33:01 | 2 | A.   I know of one.  At the most, two.  I think just one without |
| 13:33:08 | 3 | me. |
| 13:33:10 | 4 | Q.   Has he provided other information about Francisco Colorado |
| 13:33:14 | 5 | in those nine to ten interviews? |
| 13:33:17 | 6 | A.   Yes. |
| 13:33:19 | 7 |        MR. SANCHEZ:  Your Honor, at this time, we'd ask to |
| 13:33:20 | 8 | have copies, whether they're redacted or not, of those interviews |
| 13:33:24 | 9 | to be able to further impeach this faceless person's credibility. |
| 13:33:28 | 10 | And also, to see if there's any favorable information that he's |
| 13:33:31 | 11 | giving about our client.  If this gentleman's going to be taking |
| 13:33:37 | 12 | the bad things that he said about our client and leaving out some |
| 13:33:40 | 13 | of the better things, then that's obviously a problem for us.  So |
| 13:33:44 | 14 | we'd ask for a redacted copy of these reports of his interviews. |
| 13:33:51 | 15 |        MR. GARDNER:  Your Honor, I have the reports right |
| 13:33:54 | 16 | here.  I would offer them to the Court in camera to determine |
| 13:33:56 | 17 | whether Mr. Scott Lawson, who authored some of the reports, is |
| 13:34:01 | 18 | not testifying as truthfully to those reports. |
| 13:34:03 | 19 |        THE COURT:  Let's mark that. |
| 13:34:06 | 20 |        MR. SANCHEZ:  And, your Honor, if I can respond to |
| 13:34:09 | 21 | that. |
| 13:34:09 | 22 |        THE COURT:  Well, let's -- you, of course, can respond. |
| 13:34:14 | 23 |        MR. SANCHEZ:  What I'm afraid of is if the Court then |
| 13:34:17 | 24 | has information about our client that's in those reports and we |
| 13:34:20 | 25 | don't have access to it and we're never given an opportunity to |

| | | |
|---|---|---|
| 13:34:23 | 1 | rebut them, then that's a problem for us, as well.  So I would |
| 13:34:30 | 2 | object to -- |
| 13:34:31 | 3 | THE COURT:  Like the government does not have an |
| 13:34:33 | 4 | opportunity to rebut the records that were made all by your |
| 13:34:38 | 5 | client's company because it's in Mexico? |
| 13:34:41 | 6 | MR. SANCHEZ:  Your Honor, those records were provided |
| 13:34:44 | 7 | in April of this year.  They've had -- |
| 13:34:47 | 8 | THE COURT:  I'm just illustrating exactly the problem |
| 13:34:51 | 9 | that's in this case, illustrated throughout this record.  I'll |
| 13:34:56 | 10 | take that now.  Counsel makes a good point with regard to the |
| 13:35:23 | 11 | fact that I've already disclosed on the record or will disclose |
| 13:35:29 | 12 | on the record exactly what I had reviewed in preparation for the |
| 13:35:35 | 13 | sentencings that hopefully will take place in this century, and |
| 13:35:51 | 14 | it will not be any of these.  It will take quite a bit of time |
| 13:36:08 | 15 | for you to review that, that material. |
| 13:36:20 | 16 | Put a rubber band on it and let's call it -- |
| 13:36:24 | 17 | MR. GARDNER:  Your Honor, if that's going to be the |
| 13:36:25 | 18 | case, I would request the Court not to take into any |
| 13:36:29 | 19 | consideration the information provided by CS-1 in terms of |
| 13:36:32 | 20 | sentencing.  Rather than have this procedural aid or to disclose |
| 13:36:37 | 21 | either redacted portions of the reports that may identify the |
| 13:36:42 | 22 | confidential source, we'll withdraw any of that testimony and ask |
| 13:36:45 | 23 | the Court not to consider that information. |
| 13:36:50 | 24 | MR. SANCHEZ:  I'm okay with that, your Honor. |
| 13:36:52 | 25 | THE COURT:  Okay.  Well, I wasn't going to pay any |

13:36:55  1    attention to it, anyway, so it was a draw.

13:37:00  2          All right.  But still -- well, if we're withdrawing it,

13:37:05  3    then I'll allow you to withdraw the unnumbered exhibit at this

13:37:13  4    time because this case has plenty of exhibits.

13:37:15  5          MR. SANCHEZ:  And, your Honor, I'm going to go into the

13:37:18  6    next source of information, but can we approach briefly instead

13:37:23  7    of putting -- I want to put something on the record, not in open

13:37:26  8    court.

13:37:28  9          (At the bench, on the record.)

13:37:36  10         MR. SANCHEZ:  The next source of information is

13:37:41  11   "Pitufo," and it was one of the possible witnesses at trial.  We

13:37:49  12   know his name but I want to -- and I cleared it with Doug that

13:37:54  13   we're talking about the same person.  So before I ask this --

13:37:59  14         THE COURT:  I won't know.

13:38:03  15         MR. DEGEURIN:  That's right.

13:38:03  16         MR. SANCHEZ:  Right.  So I don't know how you want to

13:38:05  17   handle it.  Whether we'll just stipulate that "Pitufo" is, in

13:38:08  18   fact, a person named Salvador Puga-Quintanilla or if you wanted

13:38:13  19   me to ask the agent that.

13:38:16  20         MR. GARDNER:  I'll stipulate to that, your Honor.

13:38:17  21         THE COURT:  Okay.  Tell me, again, the name.  You

13:38:20  22   referred to him as "Pitufo" so the record is clear.

13:38:23  23         MR. SANCHEZ:  Okay.

13:38:24  24         THE COURT:  Salvador what?

13:38:25  25         MR. SANCHEZ:  Salvador Puga.  And Puga is P-U-G-A.

13:38:29  1   Quintanilla, Q-U-I-N-T-A-N-I -- I'm going to give up at that --

13:38:37  2         MR. GARDNER:  Your Honor, just as part of that, we

13:38:38  3   would ask the Court to seal that portion of the transcript.

13:38:40  4         THE COURT:  Yeah.  This part of the transcript will be

13:38:43  5   sealed and it's a closed conversation, and the court reporter's

13:38:49  6   listening to it right now so.

13:38:51  7         MR. GARDNER:  Your Honor, as part of Special Agent

13:38:55  8   Lawson's preparation for "Pitufo," I'll represent to the Court he

13:38:59  9   has reviewed no reports prepared by any other agents with respect

13:39:03 10   to Mr. "Pitufo."  He has prepared the reports with respect to his

13:39:07 11   interview by "Pitufo."

13:39:09 12         THE COURT:  At any time?

13:39:10 13         MR. GARDNER:  At any time.  The only information came

13:39:12 14   from when Mr. "Pitufo" was up in our offices, during the course

13:39:15 15   of the trial, when we talked to him in anticipation of using him

13:39:18 16   as a witness.  So we have no written reports or written notes by

13:39:21 17   that agent or any other agent with regards to those interviews on

13:39:25 18   the occasion during the course of the trial.

13:39:28 19         MR. SANCHEZ:  I assumed that, anyway, and so, I wasn't

13:39:31 20   going to ask those questions.

13:39:35 21         MR. ESPER:  Judge, what I want to ask is, is that CI-1

13:39:38 22   the same -- is represented by the same lawyer that represented

13:39:39 23   the other?

13:39:41 24         MR. GARDNER:  Sure.  I'll make that representation that

13:39:42 25   he's not.

| | | |
|---|---|---|
| 13:39:43 | 1 | MR. ESPER:  That he is? |
| 13:39:44 | 2 | MR. GARDNER:  He's not. |
| 13:39:45 | 3 | MR. ESPER:  Oh, okay. |
| 13:39:45 | 4 | THE COURT:  But you can ask. |
| 13:39:47 | 5 | MR. ESPER:  Thought I'd get it out.  Thought I'd flush |
| 13:39:49 | 6 | it out now. |
| 13:40:06 | 7 | THE COURT:  You may proceed. |
| 13:40:08 | 8 | Q.  (BY MR. SANCHEZ) I want to ask you some questions now about |
| 13:40:10 | 9 | the source of information that you labeled as "Pitufo." |
| 13:40:12 | 10 | A.  Sure. |
| 13:40:13 | 11 | Q.  And "Pitufo," he's a Mexican citizen? |
| 13:40:17 | 12 | A.  He is. |
| 13:40:18 | 13 | Q.  He was actually here in Austin getting ready to testify back |
| 13:40:23 | 14 | in April or May of this year in this case? |
| 13:40:25 | 15 | A.  That's correct. |
| 13:40:27 | 16 | Q.  That was a decision the government made not to put him on as |
| 13:40:30 | 17 | a witness during the trial? |
| 13:40:31 | 18 | A.  That's correct. |
| 13:40:32 | 19 | Q.  But "Pitufo" has actually been cooperating down in Mexico |
| 13:40:37 | 20 | for some length of time? |
| 13:40:38 | 21 | A.  That's correct. |
| 13:40:39 | 22 | Q.  And "Pitufo," you're aware of he was arrested first in 2007 |
| 13:40:46 | 23 | and then, again, in 2008 down in Mexico? |
| 13:40:49 | 24 | A.  I know he's been arrested in the past. |
| 13:40:51 | 25 | Q.  Were you aware that he's -- since 2008, he's been working |

| | | |
|---|---|---|
| 13:40:55 | 1 | with the Mexican Attorney General earning 5,000 a month? |
| 13:40:59 | 2 | A.   I don't know if he has a salary or anything of that nature. |
| 13:41:02 | 3 | Q.   Were you aware that in addition to the $5,000 a month, he |
| 13:41:06 | 4 | was receiving room and board under the care of the Mexican |
| 13:41:10 | 5 | Attorney General? |
| 13:41:13 | 6 | A.   I don't believe in my time with "Pitufo "that we discussed |
| 13:41:17 | 7 | his arrangements in Mexico. |
| 13:41:18 | 8 | Q.   Were you aware that "Pitufo" has testified in over 83 cases |
| 13:41:25 | 9 | and a lot of those cases have now been reversed, and the |
| 13:41:29 | 10 | reversals have hinged on the lack of credibility as to "Pitufo"? |
| 13:41:35 | 11 | A.   I'm not aware to the fact as you stated. |
| 13:41:39 | 12 | Q.   Were you aware that in Mexico, the procedure is the first |
| 13:41:44 | 13 | time you give a proffer in order to have and to maintain some |
| 13:41:48 | 14 | sort of immunity from what you're proffering, you need to discuss |
| 13:41:53 | 15 | everything that you have ever done illegal? |
| 13:41:56 | 16 | A.   I'm not aware of Mexico's proffer situation. |
| 13:41:59 | 17 | Q.   You know that "Pitufo" first proffered -- his first proffer |
| 13:42:02 | 18 | where he listed everything he did was back in 2008? |
| 13:42:05 | 19 | A.   Not aware of that. |
| 13:42:06 | 20 | Q.   Are you aware that "Pitufo" hasn't done or claims to not |
| 13:42:09 | 21 | have done anything illegal since 2008? |
| 13:42:12 | 22 | A.   I'm not aware of that. |
| 13:42:14 | 23 | Q.   Are you aware that "Pitufo" gave a sworn declaration in |
| 13:42:18 | 24 | Mexico against Francisco Colorado in 2012 for the first time? |
| 13:42:25 | 25 | A.   I'm not aware to any specific legal things he's done in |

13:42:28   1   Mexico.

13:42:29   2   Q.   Were you aware that in this sworn declaration, he never made

13:42:34   3   mention of this $50 million?

13:42:36   4   A.   Not aware of a sworn declaration, so I would not be aware of

13:42:40   5   anything in a sworn declaration.

13:42:44   6   Q.   Were you aware that "Pitufo" has testified that he has

13:42:57   7   worked for numerous different cartels at the same time, even

13:43:01   8   though they are at war with each other?

13:43:04   9   A.   I'm not aware of that.

13:43:09   10  Q.   Are you aware that there's been a large scale investigation

13:43:17   11  into "Pitufo" and other similar cooperating witnesses down in

13:43:23   12  Mexico?

13:43:23   13  A.   No.

13:43:32   14  Q.   Are you aware where "Pitufo" claimed to have lived in?

13:43:37   15  A.   I'm sorry?

13:43:37   16  Q.   Are you -- do you know where he says he lived?

13:43:41   17  A.   Like any time in the past or?

13:43:44   18  Q.   During the year of 2008 when he -- or 2009, when he claims

13:43:48   19  to have been part of the $50 million payment?

13:43:52   20  A.   I do remember him discussing different areas of Mexico he

13:43:56   21  was responsible for at different times but not specifically, no.

13:44:00   22  Q.   Do you know what he was arrested for, what he was charged

13:44:04   23  and convicted of?  If I say possession of a gun and aggravated

13:44:12   24  kidnapping, would that ring a bell?

13:44:14   25  A.   I remember something about a gun, not the kidnapping.

13:44:18   1   Q.   Do you know that he actually testified and admitted that he

13:44:21   2   was a gang -- in a gang, a leader of a gang that committed

13:44:26   3   aggravated kidnappings in Mexico City?

13:44:31   4   A.   From what I recall, "Pitufo" said that he was comfortable

13:44:34   5   doing what he did because he did not participate in kidnappings.

13:44:39   6   Q.   Are you aware that he testified to the opposite of that?

13:44:42   7   A.   No.  I'm not aware of any particular of "Pitufo's"

13:44:52   8   testimony.

13:45:16   9        MR. SANCHEZ:  Your Honor, at this point I would pass

13:45:18   10  the witness.  But one thing that I want to point out to the Court

13:45:20   11  is that we were not aware through the process of objections and

13:45:26   12  responses and replies to those objections to the PSR that any

13:45:30   13  information about "Pitufo" would come in at the sentencing.  And

13:45:34   14  the reason why I'm pointing that out is that had we known that,

13:45:37   15  we would have been prepared to introduce more evidence about

13:45:42   16  "Pitufo," as opposed to simply asking, "did you know" or "are you

13:45:45   17  aware" questions.

13:45:47   18       I'm not sure how the Court is going to handle any of

13:45:50   19  this information.

13:45:54   20       THE COURT:  Of course, the reason that you didn't get

13:46:00   21  that information is just the way things go, and that is probation

13:46:04   22  officer prepares the presentence investigation, the parties

13:46:10   23  object to it, the parties respond.  It's not unusual at all for

13:46:14   24  people to be called as a witness that aren't even mentioned in

13:46:18   25  the report.  But I have no idea -- you know, I don't have a

| | | |
|---|---|---|
| 13:46:28 | 1 | clever way to erase what I hear, but I don't even know how to |
| 13:46:34 | 2 | spell "Pitufo."  So I don't think it's going to be of great |
| 13:46:37 | 3 | influence. |
| 13:46:38 | 4 | I'm far more concerned with the evidence I heard in |
| 13:46:42 | 5 | this trial.  Sworn testimony by the witnesses in this trial.  So |
| 13:46:47 | 6 | that's the best I can do to help your concern. |
| 13:46:50 | 7 | MR. SANCHEZ:  Well, I'll pass witness, your Honor. |
| 13:46:52 | 8 | THE COURT:  All right. |
| 13:46:56 | 9 | MR. SANCHEZ:  Thank you, your Honor. |
| 13:46:57 | 10 | CROSS-EXAMINATION |
| 13:46:57 | 11 | BY MR. WOMACK: |
| 13:46:59 | 12 | Q.   Special Agent Lawson? |
| 13:46:59 | 13 | A.   Good afternoon. |
| 13:47:00 | 14 | Q.   Going along with what his Honor just said, your sworn |
| 13:47:03 | 15 | testimony at the trial was that Fernando Garcia first comes into |
| 13:47:07 | 16 | this conspiracy in the fall of 2010, correct? |
| 13:47:15 | 17 | A.   I don't recall if I said the fall of 2010. |
| 13:47:18 | 18 | Q.   If we remember it that way, that is what you said, wasn't |
| 13:47:20 | 19 | it? |
| 13:47:20 | 20 | A.   I'm sorry? |
| 13:47:22 | 21 | Q.   If the Judge -- |
| 13:47:24 | 22 | THE COURT:  That may be the greatest question I've ever |
| 13:47:26 | 23 | heard. |
| 13:47:28 | 24 | MR. WOMACK:  Thank you.  I appreciate it, your Honor. |
| 13:47:30 | 25 | THE COURT:  Why don't you try another one. |

13:47:32  1   Q.   (BY MR. WOMACK) Do you recall that you said it was around

13:47:34  2   the fall or September of 2010 that you first have Fernando Garcia

13:47:39  3   actively involved with these alleged coconspirators?

13:47:42  4   A.   I can recall that was the first time I saw him on the

13:47:45  5   surveillance.  But I know that I was referred to him by Tyler

13:47:48  6   Graham before I saw him on surveillance.

13:47:50  7   Q.   And what you have Tyler Graham talking about is that there

13:47:56  8   were horses at Southwest Stallion Station, and that it

13:48:00  9   appeared -- it was pretty clear that Fernando Garcia was making

13:48:06  10  sure these horses were taken care of and they were paid for.

13:48:09  11  Bills were paid?

13:48:10  12  A.   Yes.

13:48:11  13  Q.   And you know from your investigation that there's no

13:48:13  14  evidence that Fernando Garcia was using his meager funds to pay

13:48:18  15  for the horses for Mr. Colorado-Cessa or Mr. Trevino.  You know

13:48:22  16  that?

13:48:22  17  A.   No.  He wasn't using his funds.

13:48:25  18  Q.   And from your investigation, you know that throughout this

13:48:30  19  two years or so, 2010 up to 2012 that Mr. Garcia appeared to be

13:48:35  20  actively involved with these other codefendants.  He never made

13:48:39  21  over $80,000 a year, did he?

13:48:42  22  A.   I'm not sure what he was being paid.

13:48:44  23  Q.   Okay.  From your investigation, though, it looked like he

13:48:46  24  was getting around $80,000 or less a year.

13:48:49  25  A.   I haven't seen any numbers to what Fernando made.

| | | |
|---|---|---|
| 13:48:53 | 1 | Q.   You've seen his tax returns. |
| 13:48:55 | 2 | A.   I have not seen his tax returns. |
| 13:48:56 | 3 | Q.   Okay.  So during the course of what you have seen, you're |
| 13:49:01 | 4 | not aware that Mr. Garcia was only making -- I'm not saying it |
| 13:49:06 | 5 | was bad money, but he was making $80,000 or less per year? |
| 13:49:09 | 6 | A.   I'm not aware of that. |
| 13:49:10 | 7 | Q.   Okay.  You have not seen where he's been given any |
| 13:49:13 | 8 | exorbitant fees by Mr. Colorado-Cessa? |
| 13:49:17 | 9 | A.   No.  I haven't seen. |
| 13:49:19 | 10 | Q.   Or where he was given any exorbitant amount of money from |
| 13:49:22 | 11 | any person, correct? |
| 13:49:23 | 12 | A.   I've seen him flying on Cessa's jets and on his boats in |
| 13:49:27 | 13 | Mexico. |
| 13:49:27 | 14 | Q.   You don't know anything about him being on a boat in Mexico, |
| 13:49:30 | 15 | do you? |
| 13:49:30 | 16 | A.   I do. |
| 13:49:31 | 17 | Q.   That's never come up at trial. |
| 13:49:32 | 18 | A.   I didn't say it came up at trial.  I said I knew that. |
| 13:49:34 | 19 | Q.   You didn't just forget to tell the jury that, did you? |
| 13:49:39 | 20 | A.   No.  There's a lot there -- |
| 13:49:44 | 21 | THE COURT:  You let him ask the questions, but you can |
| 13:49:47 | 22 | answer them. |
| 13:49:48 | 23 | THE WITNESS:  Yes, sir. |
| 13:49:49 | 24 | Q.   (BY MR. WOMACK) And we did have pictures, I believe, of Mr. |
| 13:49:52 | 25 | Garcia once getting on this private plane, someone's private |

13:49:56   1   plane flying around America.  Do you recall that?

13:49:58   2   A.   What's the question?

13:49:59   3   Q.   You did see at trial there was a photograph of Mr. Garcia --

13:50:02   4   A.   I did.

13:50:02   5   Q.   -- getting on a private plane that was flying within the

13:50:04   6   United States?

13:50:04   7   A.   Yes.

13:50:05   8   Q.   Okay.  And you testified with regards to Mr. Huitron, you

13:50:18   9   were asked about Fernando Garcia having a leadership role?

13:50:21   10  A.   Yes.

13:50:21   11  Q.   And you said that you thought it was a leadership role

13:50:24   12  because you said, in your words, he brought back Mr. Huitron to

13:50:28   13  work for some of these men, correct?

13:50:30   14  A.   That was a piece of why I said he had a leadership role.

13:50:33   15  Q.   And when you say brought back, you don't mean that he went

13:50:36   16  out and actively recruited Mr. Huitron or cajoled him to come

13:50:40   17  back and work for anyone, did you?  You don't mean that, do you?

13:50:43   18  A.   I believe he invited him and -- Carlos Nayen invited Huitron

13:50:47   19  to come into New Mexico.

13:50:48   20  Q.   But you have no evidence of Mr. -- of Fernando Garcia doing

13:50:52   21  that, do you?

13:50:55   22  A.   I believe there's a call where he tells Tyler that we have

13:50:59   23  Huitron in New Mexico.

13:51:02   24  Q.   So you have a call, you think, where Fernando Garcia tells

13:51:07   25  Tyler Graham at Southwest Station, we think Mr. Huitron is going

| | | |
|---|---|---|
| 13:51:10 | 1 | to be training a horse? |
| 13:51:11 | 2 | A.   Be training horses in New Mexico. |
| 13:51:14 | 3 | Q.   Okay.  And, of course, you know from your investigation as |
| 13:51:16 | 4 | it came out at trial, Mr. Huitron is a highly regarded trainer |
| 13:51:20 | 5 | that people would want to have training their horses. |
| 13:51:23 | 6 | A.   Before this case, I didn't see anybody outside of Texas use |
| 13:51:26 | 7 | Huitron. |
| 13:51:28 | 8 | Q.   But he was still highly regarded within Texas? |
| 13:51:30 | 9 | A.   He was pretty decently regarded in Texas. |
| 13:51:33 | 10 | Q.   Okay.  And so, what you have is Fernando Garcia talking to |
| 13:51:40 | 11 | Tyler Graham saying, hey, Mr. Huitron is going to be training |
| 13:51:43 | 12 | some horses, correct? |
| 13:51:44 | 13 | A.   Our horses. |
| 13:51:46 | 14 | Q.   You had no evidence of Fernando Garcia telling Mr. Huitron |
| 13:51:51 | 15 | how to train horses, do you? |
| 13:51:53 | 16 | A.   No. |
| 13:51:54 | 17 | Q.   You don't have any evidence of Fernando Garcia ordering |
| 13:51:59 | 18 | anyone to do anything, do you, as far as directing how they |
| 13:52:03 | 19 | operate? |
| 13:52:11 | 20 | A.   Not necessarily ordering. |
| 13:52:25 | 21 | Q.   Sir, no further questions.  Thank you. |
| 13:52:28 | 22 | THE COURT:  Mr. Esper. |
| 13:52:30 | 23 | CROSS-EXAMINATION |
| 13:52:30 | 24 | BY MR. ESPER: |
| 13:52:32 | 25 | Q.   Just a couple of questions, Agent. |

| | | |
|---|---|---|
| 13:52:34 | 1 | You said you suggested that when Mr. Huitron went to |
| 13:52:38 | 2 | New Mexico, he had been invited or drawn back into training |
| 13:52:45 | 3 | horses, correct? |
| 13:52:46 | 4 | A.   That's correct. |
| 13:52:46 | 5 | Q.   And your investigation revealed that he obviously had been |
| 13:52:50 | 6 | terminated by this group prior to that time? |
| 13:52:53 | 7 | A.   Yeah.  They would use a trainer, get tired of him, go |
| 13:52:57 | 8 | somewhere and then, come back. |
| 13:52:58 | 9 | Q.   Vacillate back and forth? |
| 13:53:03 | 10 | A.   Yes. |
| 13:53:03 | 11 | Q.   Okay.  That's all I have. |
| 13:53:06 | 12 | THE COURT:  Any redirect? |
| 13:53:07 | 13 | MR. GARDNER:  Redirect, your Honor, briefly. |
| 13:53:09 | 14 | RE-DIRECT EXAMINATION |
| 13:53:09 | 15 | BY MR. GARDNER: |
| 13:53:11 | 16 | Q.   Special Agent Lawson, with respect to the information by |
| 13:53:13 | 17 | "Pitufo" and Hinojosa, that's $68 million absent the information |
| 13:53:18 | 18 | on the CS we're asking the Court not to consider, correct? |
| 13:53:22 | 19 | A.   That's correct. |
| 13:53:22 | 20 | Q.   All right.  That information is not being supplied to the |
| 13:53:27 | 21 | probation office for the $10 million loss calculation |
| 13:53:30 | 22 | attributable to Colorado-Cessa? |
| 13:53:32 | 23 | A.   That's correct. |
| 13:53:33 | 24 | Q.   That is based on the records introduced at trial? |
| 13:53:35 | 25 | A.   That's correct. |

| | | |
|---|---|---|
| 13:53:36 | 1 | Q.   I guess the point is, is the information that "Pitufo" |
| 13:53:40 | 2 | supplied, does that corroborate all the information adduced at |
| 13:53:43 | 3 | trial from other witnesses? |
| 13:53:43 | 4 | A.   Yes. |
| 13:53:44 | 5 | Q.   Did it confirm your investigation? |
| 13:53:45 | 6 | A.   Yes. |
| 13:53:47 | 7 | Q.   I forgot a couple of things on the asset forfeiture portion. |
| 13:53:53 | 8 | So if I could ask you to look at your superseding indictment |
| 13:53:55 | 9 | again for me, please. |
| 13:53:57 | 10 | A.   Sure. |
| 13:53:57 | 11 | Q.   With respects to the pages 21 and 22, the business and bank |
| 13:54:03 | 12 | accounts, were those analyzed as part of the money-laundering |
| 13:54:06 | 13 | investigation? |
| 13:54:06 | 14 | A.   They were. |
| 13:54:07 | 15 | Q.   And could you just generally describe those accounts?  And I |
| 13:54:13 | 16 | apologize.  The financial accounts listed from paragraph eight, |
| 13:54:17 | 17 | nine, 10, 11 and 12. |
| 13:54:21 | 18 | A.   Paragraph eight through 12 are accounts owned by Jose |
| 13:54:25 | 19 | Trevino or in the name of one of his shell companies. |
| 13:54:28 | 20 | Q.   Okay.  And were those accounts used as part of this |
| 13:54:33 | 21 | money-laundering conspiracy to facilitate and further the actual |
| 13:54:35 | 22 | conspiracy itself? |
| 13:54:36 | 23 | A.   They were. |
| 13:54:37 | 24 | Q.   Just for the court record, those accounts were introduced at |
| 13:54:41 | 25 | trial, subpoenaed bank records 250A, B, C and D; correct? |

13:54:46  1   A.   Correct.

13:54:46  2   Q.   Now, looking at page 21 of the superseding indictment, Count

13:54:51  3   No. 1, was that also analyzed as part of this investigation?

13:54:54  4   A.   It was.

13:54:55  5   Q.   And, again, it was pretty obvious it's a Francisco

13:55:00  6   Colorado-Cessa account, correct?

13:55:01  7   A.   Yes, sir.

13:55:01  8   Q.   In the amount of $648?

13:55:03  9   A.   Yes.

13:55:04  10  Q.   Was that account also analyzed and determined to be part of

13:55:08  11  the facilitation or furtherance of the money-laundering

13:55:10  12  conspiracy?

13:55:11  13  A.   Yes, sir.  The check for $2.2 million came out of that

13:55:14  14  account.

13:55:15  15  Q.   And finally, based on the investigation, what other agents

13:55:19  16  have relayed to you on the financial information, did you

13:55:23  17  determine or agents determine that the source of the funds used

13:55:26  18  to buy the two farms in Lexington, Oklahoma were the source of

13:55:31  19  either drug proceeds or extorted funds?

13:55:33  20  A.   Yes, sir.  We traced the money that Alfonso Del Rayo sent

13:55:39  21  through Tyler Graham to Jose Trevino was used to purchase the

13:55:41  22  first ranch.  And the November 11 sale at Heritage Place where

13:55:45  23  Jose watched four horses through the sale and was used to

13:55:49  24  purchase the second half of the ranch.

13:55:50  25  Q.   And so, the question with respect to the ranch, had Jose

13:55:53   1   Trevino not received the extorted funds from Alfonso Del Rayo,

13:55:57   2   would he have been able to purchase that ranch?

13:55:59   3   A.     No.

13:55:59   4   Q.     And had Jose Trevino not sold his own horses at auction for

13:56:03   5   inflated prices, would he have been able to purchase the second

13:56:06   6   portion of that ranch?

13:56:07   7   A.     No.

13:56:07   8   Q.     May I have one moment, your Honor?

13:56:09   9           THE COURT:   Yes, sir.

13:56:30   10           MR. GARDNER:   That's all I have, your Honor.

13:56:33   11           THE COURT:   Any further questions from defense counsel?

13:56:37   12   You may step down, sir.

13:56:39   13           THE WITNESS:   Thank you.

13:56:42   14           MR. GARDNER:   No further witnesses, your Honor.

13:56:44   15           THE COURT:   Any rebuttal witnesses?

13:56:47   16           MR. SANCHEZ:   No, your Honor.

13:56:48   17           MR. LECHTENBERGER:   None, your Honor.

13:56:50   18           MR. SANCHEZ:   Your Honor, I mentioned this when Mr.

13:56:52   19   Segura was going to -- or did testify and I don't think I

13:56:55   20   actually did it.   The updated Exhibit C, I gave a copy to the

13:57:00   21   government.   I just want to provide it for the Court.

13:57:04   22           THE COURT:   Now, he had two volumes.   You've got it

13:57:08   23   combined to one for me?   Thank you.

13:57:11   24           MR. SANCHEZ:   Yeah.   The second volume was never

13:57:13   25   addressed during direct and cross.   So it was actually not

13:57:16   1   something that --

13:57:18   2        THE COURT:  So let's do the Defendant Colorado-Cessa

13:57:23   3   Sentencing Exhibit 1.

13:57:30   4        MR. SANCHEZ:  So it's clear, this is -- I know it won't

13:57:33   5   replace it in the record, but, in other words, this is just

13:57:35   6   updates to Exhibit C that's already in the record, attached to

13:57:38   7   our original objection.

13:57:40   8        THE COURT:  Were your original objections filed?  My

13:57:44   9   copy is not.  You might want to check that.

13:57:50  10        MR. SANCHEZ:  I'll check it.

13:57:52  11        THE COURT:  The other stuff I got from y'all were --

13:57:55  12   always was filed.  But I didn't see a file mark on the one.  It

13:57:58  13   may have come directly from you as a courtesy copy and,

13:58:03  14   therefore, did go past the clerk's office.

13:58:05  15        MR. SANCHEZ:  What happened was we e-mailed what we

13:58:07  16   could to the probation office, and then, we sent originals --

13:58:11  17   they're much greater volume to the probation, government and the

13:58:14  18   Court to have original copies.  But we will file that after this

13:58:18  19   or make sure that it was filed.

13:58:20  20        MR. DEGEURIN:  That was my decision at the time, Judge,

13:58:23  21   and I may have -- I always give it to the probation officer, not

13:58:26  22   to the Court.

13:58:27  23        THE COURT:  Well, that's the way it's normally done.

13:58:29  24   But when he said it's on record, I wanted to make sure.  Just

13:58:32  25   check on it, if it is, file it.  And if you need to file it under

| | | |
|---|---|---|
| 13:58:37 | 1 | seal, make appropriate application for it. |
| 13:58:39 | 2 | MR. SANCHEZ:  Yes, your Honor. |
| 13:58:42 | 3 | THE COURT:  All right.  Any further evidence by anybody |
| 13:58:45 | 4 | with regard to the objections to the presentence investigation |
| 13:58:50 | 5 | regarding the guideline calculation? |
| 13:58:53 | 6 | MR. GARDNER:  Nothing from the government, your Honor. |
| 13:58:54 | 7 | THE COURT:  All right. |
| 13:58:56 | 8 | MR. WOMACK:  No, your Honor. |
| 13:58:57 | 9 | MR. ESPER:  No, your Honor. |
| 13:58:58 | 10 | MR. LECHTENBERGER:  None, your Honor. |
| 13:59:02 | 11 | THE COURT:  All right.  Then the Court calls Jose |
| 13:59:05 | 12 | Trevino-Morales. |
| 13:59:36 | 13 | *        *        * |
| 13:59:36 | 14 | THE COURT:  Mr. Lechtenberger. |
| 13:59:38 | 15 | MR. LECHTENBERGER:  Yes, your Honor. |
| 13:59:39 | 16 | THE COURT:  I want to get the record straight because |
| 13:59:41 | 17 | there's a couple of funny things that went on. |
| 13:59:44 | 18 | At one period of time, Mr. Finn and Ms. Williams, or |
| 13:59:53 | 19 | through Mr. Finn's office, forwarded an e-mail of objection or an |
| 13:59:58 | 20 | objection to the probation department and then, orally said that |
| 14:00:03 | 21 | he was not going to file it, and it was not filed; but it was |
| 14:00:14 | 22 | considered by the probation officer because at the time of his |
| 14:00:17 | 23 | original report, that's all he had. |
| 14:00:20 | 24 | And then, I've received from you, which I'm going to |
| 14:00:24 | 25 | hand to the clerk, but it's simply an e-mail from you indicating |

14:00:28   1   that those objections, whatever they were, were withdrawn and

14:00:31   2   replaced with the ones that you filed.  Is that correct?

14:00:35   3              MR. LECHTENBERGER:  Yes, sir.  That is.

14:00:36   4              THE COURT:  Okay.  I just wanted to make sure of that

14:00:38   5   as we proceeded on.

14:00:39   6              MR. LECHTENBERGER:  I had coordinated that with your

14:00:42   7   U.S. probation officer, and I understood that was the preferred

14:00:44   8   process by the Court.

14:00:45   9              THE COURT:  And it was appropriate.

14:00:47  10              MR. LECHTENBERGER:  Yes, sir.

14:00:48  11              THE COURT:  It's just I want the record to so reflect.

14:00:52  12              All right.  The probation department -- Mr. Trevino,

14:00:57  13   have you gone over with your lawyer the presentence

14:01:00  14   investigation?

14:01:01  15              DEFENDANT TREVINO-MORALES:  Yes, sir.

14:01:02  16              THE COURT:  The probation department determined under

14:01:12  17   the guidelines a maximum base 43, with a criminal history of I,

14:01:18  18   for a range of way over the statutory maximum of 240 months.

14:01:31  19              I have no objections from the government.  I have five

14:01:37  20   objections from the defense.  First, that the base should be

14:01:44  21   between one million-seven-plus for a level of 16, which would --

14:01:53  22   when you add the enhancements that are admitted would end up

14:01:57  23   being a 24, and a guideline range of 78 to 97 months, contesting

14:02:16  24   the 20 million-plus guideline.  We've heard all of the evidence

14:02:22  25   on that.

14:02:22  1      And then, an objection on 2S1.(1)(b)(1) contesting that

14:02:32  2  Mr. Trevino did not know he was dealing with drug money.  I won't

14:02:36  3  even hear arguments on that.  I'll overrule that.  Sophisticated

14:02:41  4  laundering, I've already overruled.  So, counsel, I'd like to

14:02:48  5  hear your argument on base and the role.

14:02:50  6      MR. LECHTENBERGER:  Your Honor, probably the best

14:02:51  7  argument I could make is what Agent Pennington said.  Having been

14:02:57  8  here and hearing the Court address some of the unnamed

14:03:01  9  codefendants/confidential informants, it seems to me that what

14:03:06  10  Agent Pennington said effective amount, give or take, of $2

14:03:11  11  million, that dovetails exactly into what I've said in objection

14:03:14  12  number one.  I obviously anticipate the government will say that

14:03:16  13  relevant conduct is in play, that we need to consider what other

14:03:20  14  codefendants have said.  They may have used the word "conspiracy"

14:03:24  15  with you.

14:03:24  16      But at the end of the argument, Judge, I think the best

14:03:27  17  way to approach this is a hard and fast number, which we have,

14:03:30  18  could either be 1.734 million, which is what I've suggested in

14:03:34  19  one or what Agent Pennington said in redirect by Mr. Gardner of

14:03:40  20  $2 million.

14:03:44  21      THE COURT:  Well, what do I do with the fact that we've

14:03:47  22  got over $16 million in purchases, over $8 million, whether

14:03:57  23  conservative or not, in expenses and all the horses end up with

14:04:00  24  Mr. Trevino?

14:04:04  25      MR. LECHTENBERGER:  As far as the expenses, if I could

14:04:06  1  go in reverse order, Judge, a lot of those expenses, from what

14:04:09  2  I've read, had to do with horse dentistry, with upkeep, with

14:04:14  3  veterinarian care.  I would argue that most of those, if not all

14:04:18  4  of those expenses actually were legitimate in regards to

14:04:23  5  fundamentally maintaining a horse stable in a professional

14:04:26  6  capacity.

14:04:26  7          THE COURT:  Well, let's just throw out the idea, then,

14:04:28  8  that we know that the expenses were paid.  We know -- I say we.

14:04:34  9  I'm sure you've reviewed the transcript.

14:04:36  10          MR. LECHTENBERGER:  Yes, sir.

14:04:37  11          THE COURT:  We know how they were paid over the period

14:04:40  12  of time.  But on the government's argument, notwithstanding that

14:04:48  13  whatever they're going to argue, it seems to me that it's a whole

14:04:53  14  lot closer to $20 million than 1.7.  And all of the evidence that

14:04:59  15  I heard at trial is that Mr. Trevino ended up with the better

14:05:05  16  horses from scratch, that is, from nothing that he had into a big

14:05:12  17  ranch with all the horses on it.

14:05:17  18          Notwithstanding all of the other arguments that good

14:05:21  19  lawyers have made, those two factors I wanted to give you an

14:05:27  20  opportunity to make your best argument on.

14:05:31  21          MR. LECHTENBERGER:  Judge, could I have a moment?

14:05:32  22          THE COURT:  Yes, sir.

14:05:50  23          MR. LECHTENBERGER:  Your Honor, the best way I can

14:05:52  24  phrase it, I believe that with the evidence that I've read that I

14:06:00  25  understand, not being at trial, but having gone through the

14:06:02  1   transcript, is a lot of the witnesses in my opinion perhaps did

14:06:07  2   not have meritorious testimony, and obviously the twelve folks on

14:06:11  3   the jury saw otherwise.  But from a credibility standpoint,

14:06:16  4   what's been brought up by some of the co-counsels here, I don't

14:06:19  5   think lends itself to credibility of necessarily these

14:06:22  6   individuals saying these things.

14:06:23  7          I note that Mr. Trevino -- hopefully was brought out

14:06:27  8   through testimony that Mr. Trevino has been around horses at a

14:06:30  9   young age from five years old.  I think one of the character

14:06:34  10  letters did talk about that.  So, again, full circle here, Judge,

14:06:38  11  probably the best way I could phrase it is that I don't

14:06:41  12  necessarily think that the $20 million represents fairly and

14:06:45  13  accurately what his relevant conduct is, notwithstanding what the

14:06:48  14  codefendants have said, or the coconspirators, or the witnesses

14:06:52  15  for the government.

14:06:54  16         THE COURT:  I'll hear from the government on the

14:06:56  17  objection.

14:06:57  18         MR. GARDNER:  On the amount, your Honor, the Court has

14:07:00  19  heard and seen the exhibits that came into evidence, both the

14:07:04  20  course of trial and here today.  And I'm just looking at my

14:07:08  21  notes, majority of the expenses were all for the benefit of the

14:07:11  22  horses maintained by Jose Trevino's ranch, including 3.9 million

14:07:16  23  of his own, 1.2 million, Southwest Stallion Station.  I believe

14:07:20  24  the Court heard that most of the horses there were maintained by

14:07:23  25  Jose Trevino.  And, also, as the Court is well aware, that over

| | | |
|---|---|---|
| 14:07:27 | 1 | 400 horses of this organization's stock were in Mr. Jose |
| 14:07:32 | 2 | Trevino's possession. |
| 14:07:34 | 3 | And finally, I'd like to point out, Judge, I don't |
| 14:07:36 | 4 | think there's any dispute that Jose Trevino is -- being the blood |
| 14:07:38 | 5 | brother of the leader of the entire Zetas organization was the |
| 14:07:41 | 6 | leader on this side of the border managing the horses.  I think |
| 14:07:44 | 7 | the fact that, as the Court noted, he gets the most valuable |
| 14:07:47 | 8 | horses transferred into his name, that indicates that he is the |
| 14:07:52 | 9 | director, if you will, for the United States subsidiary of the |
| 14:07:56 | 10 | Zetas money-laundering organization. |
| 14:07:58 | 11 | And, again, I think with the testimony of Special Agent |
| 14:08:01 | 12 | Pennington today, that 25 million is a very conservative number. |
| 14:08:06 | 13 | And as Mr. Lechtenberger points out, we are asking the Court to |
| 14:08:10 | 14 | consider not only as directly attributable to Jose Trevino, the |
| 14:08:14 | 15 | government's opinion is over $20 million, but as the leader of |
| 14:08:18 | 16 | the organization, 1.3, he should be accountable for all of it. |
| 14:08:24 | 17 | THE COURT:  All right.  How about role?  No, no.  He |
| 14:08:31 | 18 | hasn't had the opportunity yet. |
| 14:08:33 | 19 | MR. GARDNER:  Oh. |
| 14:08:35 | 20 | THE COURT:  Do you wish to argue role? |
| 14:08:39 | 21 | MR. LECHTENBERGER:  Judge, I think I'm going to stand |
| 14:08:41 | 22 | with what I've said before to you. |
| 14:08:43 | 23 | THE COURT:  All right.  Do you have anything else that |
| 14:08:45 | 24 | you want to say on the role? |
| 14:08:47 | 25 | MR. GARDNER:  Not with respect to the objections, your |

14:08:49   1   Honor.

14:08:51   2            THE COURT:  Well, I have no trouble at all from the

14:08:53   3   evidence, particularly in the trial, that the evidence before me

14:08:56   4   that hasn't been ruled out that the appropriate factual finding

14:09:09   5   with regard to the calculated base is easily over 20 million, and

14:09:13   6   I overrule that objection.  The objection under 2S1.(1)(b)(1),

14:09:19   7   I've already overruled.  Sophisticated laundering objection, I've

14:09:24   8   already ruled.

14:09:26   9            On role, Mr. Trevino obviously exercised leadership

14:09:33   10  over his wife and his daughter, who also have been involved in

14:09:38   11  this lawsuit.  His brother and at least, what, 13, 14 employees

14:09:46   12  running the property, keeping the house.  I have no trouble

14:09:53   13  finding the role.  I'll overrule that objection, which leaves the

14:10:00   14  calculation of the probation officer as it is.

14:10:10   15           Do you know of any legal reason, sir, we shouldn't

14:10:13   16  proceed with sentencing?

14:10:14   17           MR. LECHTENBERGER:  No, sir.  No legal reason, your

14:10:16   18  Honor.

14:10:16   19           MR. GARDNER:  Nor does the government, your Honor.

14:10:17   20           THE COURT:  Mr. Trevino, you have the right to say

14:10:19   21  anything that you wish.  You do not -- you're not required to say

14:10:23   22  anything, but you have that opportunity and I would offer to you

14:10:27   23  now.

14:10:27   24           DEFENDANT TREVINO-MORALES:  Thank you, your Honor.

14:10:28   25  I appreciate your opportunity you give me today.  On my

14:10:32  1   behalf, I want to say that I'm very sorry to be in here.  I've

14:10:41  2   been embarrassed already.  And that I want to say that according

14:10:47  3   to this -- if I might start from this Tempting Dash, the horse

14:10:53  4   that I bought for my wife and myself, and that from there on,

14:10:58  5   anything that I touch includes winning from race tracks to a

14:11:03  6   horse that I sold.  It all includes winning $4.2 million thrown

14:11:10  7   in from September 2009 until to date; and that from there, I make

14:11:18  8   expenses towards taking care of animals, breeding the animals,

14:11:22  9   feeding the animals.

14:11:24  10          And those $4.2 million, 2.6 were race earnings.  And

14:11:32  11  like I said, I'm very sorry.  And that it was in the trial that

14:11:39  12  I'm a Zeta.  It was proved in trial that I don't have any

14:11:43  13  aggressive conduct to anybody.  It was proved at trial that all I

14:11:48  14  did was working.  Since all my life, I've been doing like twelve

14:11:53  15  years prior to this 2009, building schools for the state of Texas

14:11:58  16  from elementary all the way to college through different

14:12:01  17  companies.  So I was pretty much and still am real proud of that,

14:12:09  18  building for the future of the kids of our country, and I always

14:12:17  19  tell my kids to be proud of that and take advantage of what we

14:12:19  20  built.

14:12:23  21          And that I feel, too, that my defense compromised my

14:12:29  22  defense.  The only attorney that I have -- only one contract

14:12:32  23  between Mr. David Finn, who I know that he fails me a lot because

14:12:37  24  out of 53 over witnesses, he only crossed eight.  And he kind of

14:12:45  25  believed that his assistant was no part of his legal firm to

14:12:49    1    trial this case for him.  When I hired him to do that and he put

14:12:53    2    all responsibility on the assistant and he only -- I mean, I can

14:12:59    3    say that in ten months prior to trial, he only come and visit me

14:13:02    4    ten times, none of them with any discovery at all.  None of them

14:13:07    5    with any straight to my defense.  I just want to bring it up to

14:13:12    6    your attention, your Honor.

14:13:13    7          Thank you for listening to me.  But I think I was

14:13:17    8    misrepresented big time.  And that I was in my right to present

14:13:25    9    my witnesses, which we submitted on the 15th of April, and by the

14:13:29    10    18th, I provided funds to Mr. Finn to bring those witnesses to

14:13:36    11    trial.  On the April the 30th at 5:55 p.m., your Honor, I asked

14:13:44    12    defense if we're ready for witnesses, and they confirmed that.

14:13:51    13    And at Mr. Gardner request, he said that -- he asked my defense

14:13:56    14    to provide the witness list -- final witness list due to the

14:14:00    15    extensity of witnesses, which I believe they provide to Mr.

14:14:08    16    Gardner.

14:14:08    17          But on May the 1st, they rest, and I was denied my

14:14:14    18    right to testify on the stand and my witnesses -- I authorized

14:14:21    19    Ms. Williams to draw up the witness list.  I believe that was

14:14:24    20    about 25 to 30 witness because the witness already the government

14:14:30    21    called, and there were some of them on my list.  But I don't

14:14:37    22    understand why they deny my right to present my witness in my

14:14:40    23    defense and my right to testify on my defense, on my behalf.  And

14:14:45    24    that I was told that some of my witnesses were going to testify

14:14:54    25    against me, according to Mr. Gardner, which I don't know.

14:14:58  1            And I'm going to try -- I still want you, this court --

14:15:04  2   come to this -- I'm prepared in closing arguments --

14:15:04  3            MR. LECHTENBERGER:  Don't tell him --

14:15:08  4            DEFENDANT TREVINO-MORALES:  I'm sorry.

14:15:08  5            THE COURT:  That's all right, sir.

14:15:11  6            DEFENDANT TREVINO-MORALES:  And I think he was right.

14:15:12  7   He didn't come prepared for this trial, Mr. Finn, and I'm sorry

14:15:15  8   about that.  I'm very sorry that if any bad behavior from my

14:15:21  9   brothers, I apologize for that, too.

14:15:25  10            THE COURT:  Counsel.

14:15:29  11            MR. LECHTENBERGER:  Judge, our position has been that

14:15:31  12   Jose Trevino is not Miguel Trevino.  Jose Trevino is not Omar

14:15:36  13   Trevino.  In fact, even in the PSR, unfortunately, in paragraph

14:15:42  14   111, it even mentions Jose Trevino's older brother Juan Trevino.

14:15:51  15   At the end of the day, I know that during the trial, from what

14:15:55  16   I've read, Jose Trevino was touched each and every moment by the

14:15:59  17   same paintbrush by the government.  But I can tell you that my

14:16:06  18   reading and what I know about this man is that he's no Zeta.

14:16:11  19            In fact, your Honor, I believe the opposite is true.

14:16:13  20   And by way of example, I'll give you a couple of points here.

14:16:19  21   What we know from Jose Trevino is that he's law-abiding.  He

14:16:25  22   comes to this country in his early 30s, he complies with the law,

14:16:29  23   he becomes a U.S. citizen.  And I'm sure that this court has

14:16:32  24   heard many, many illegal immigration cases.  That's not the case

14:16:35  25   with Jose.

| | |
|---|---|
| 14:16:35 | 1 |
| 14:16:41 | 2 |
| 14:16:43 | 3 |
| 14:16:50 | 4 |
| 14:16:53 | 5 |
| 14:16:56 | 6 |
| 14:17:01 | 7 |
| 14:17:05 | 8 |
| 14:17:08 | 9 |
| 14:17:13 | 10 |
| 14:17:16 | 11 |
| 14:17:21 | 12 |
| 14:17:21 | 13 |
| 14:17:24 | 14 |
| 14:17:31 | 15 |
| 14:17:35 | 16 |
| 14:17:38 | 17 |
| 14:17:42 | 18 |
| 14:17:45 | 19 |
| 14:17:49 | 20 |
| 14:17:55 | 21 |
| 14:17:58 | 22 |
| 14:18:00 | 23 |
| 14:18:05 | 24 |
| 14:18:12 | 25 |

1    We know that he, like many of us, goes out and gets a
2  gun permit, and he does that through the state of Texas.  He does
3  it in a legal proceeding, the way it's supposed to be done.  We
4  know that he has no criminal history, and I think that's
5  significant.  This court, as you probably do on a weekly basis,
6  if not on a daily basis, you see Criminal History Category V, VI.
7  Not the situation with this man.  We know from his letters and I
8  thought the letters were very, very poignant.  I thought they
9  were to the point.  I thought they even tug at some of the
10  heartstrings.  And I thought that the letters were, quite
11  frankly, about as forthright and honest as I've seen in a long
12  time.

13    We know that he's married, he has four children.  He's
14  a soccer coach.  He goes to high school with his daughter.  His
15  family, although they have been ostracized, they're in the back
16  row, they're watching us right now.  And I've made the conscious
17  decision not to call any witnesses just for the sake of brevity
18  as well as because I think that my argument holds weight with the
19  Court.  But they are here to show their support, notwithstanding
20  the fact that Miguel is incarcerated by the Mexican federales,
21  coming into the U.S. soon.  Omar is still on the loose.  That's
22  not Jose.

23    We know through the letters that he takes people on
24  fishing trips, that he gives needy families $300, that he tries
25  to do the right thing each and every day.  And if you consider,

14:18:16  1   your Honor, even in the light most favorable to the government at

14:18:20  2   this time got started in 2008, I mean, the man's 46.  He's a

14:18:24  3   little younger than myself.  So the vast majority of his life,

14:18:27  4   he's been law-abiding.  Now, does that excuse his conduct?

14:18:32  5   Absolutely not, and I'm not trying to excuse his conduct.  I'm

14:18:35  6   just trying to give the Court a little bit better perspective.

14:18:37  7          I want to close this way, Judge.  I want to close this

14:18:44  8   way.  I think the true picture of Jose Trevino is what we've seen

14:18:48  9   in the letters and some of the adjectives that I've pointed out

14:18:51 10   and I had to write them down and to read them back to the Court.

14:18:55 11   Humble, honest, trustworthy, hard-working, loyal, caring.  I

14:19:02 12   mean, any type of benevolent adjective that you can hear, that's

14:19:06 13   in those letters, and that's the true picture of this man.

14:19:11 14          I anticipate the government will ask you for the

14:19:13 15   maximum.  I anticipate Mr. Gardner will give a very eloquent

14:19:17 16   closing and say, give him 240 months, send a message to the

14:19:20 17   United States.  Send a message to Omar.  Send a message to

14:19:26 18   Miguel.  And you very well may do that, your Honor, but I'm going

14:19:30 19   to ask you to take a chance and go against the grain here a

14:19:33 20   little bit.

14:19:33 21          What I put in my sentencing memorandum was to the

14:19:35 22   point, succinct.  I'm going to ask you to give him ten years, 120

14:19:40 23   months.  Under all the just punishments that I've seen in all my

14:19:45 24   short career being a lawyer, for this man right now, ten will do

14:19:51 25   the trick.  That's all I have, Judge.

14:19:54  1          DEFENDANT TREVINO-MORALES:  If I might, your Honor,

14:19:57  2   with all respect, here's the letter that I sent to Mr. Finn.

14:20:07  3          MR. LECHTENBERGER:  I'll take care of that.

14:20:08  4          DEFENDANT TREVINO-MORALES:  Asking for help, begging

14:20:10  5   for help and they're notarized there from Miguel, and he never

14:20:14  6   respond to me.

14:20:19  7          MR. LECHTENBERGER:  I'll take care of that.

14:20:21  8          DEFENDANT TREVINO-MORALES:  I need my family.  Thank

14:20:25  9   you.

14:20:27  10         THE COURT:  Mr. Gardner.

14:20:28  11         MR. GARDNER:  Mr. Lechtenberger's right.  The

14:20:30  12  government is asking for 240 months, not because his guidelines

14:20:33  13  set that but the Court also thinks -- the government also thinks

14:20:36  14  the Court has plenty of grounds under 3553 to grant a 20-year

14:20:40  15  sentence.  When Mr. Lechtenberger says I'm painting Mr. Jose

14:20:45  16  Trevino with the same brush, I'll carry that analogy a little

14:20:49  17  farther because they come from the same bucket of paint.

14:20:51  18         The ability of this defendant to take that money,

14:20:55  19  knowing how it was earned and the price of blood in which it's

14:20:59  20  covered with, fully justifies this court imposing a 20-year

14:21:03  21  sentence, the statutory max.  So whether it's a guideline

14:21:06  22  sentence or it's a variance, the fact that the source and his

14:21:09  23  relationship to the brothers and the activity that he undertook

14:21:13  24  with that money here in the United States, on behalf of his

14:21:15  25  brothers, fully justifies a 20-year sentence.  That's all we

14:21:18  1  have, your Honor.

14:21:20  2          THE COURT:  Probation have anything they wish to state?

14:21:22  3          PROBATION OFFICER:  No, your Honor.

14:21:23  4          THE COURT:  Does anybody else wish to speak at this

14:21:25  5  sentencing?

14:21:26  6          Anything further?  Mr. Trevino?  Mr. Lechtenberger?

14:21:33  7          MR. LECHTENBERGER:  No.  I think we've said what we

14:21:35  8  needed to say.  Thank you, Judge.

14:21:36  9          THE COURT:  Mr. Trevino, nobody in this court has

14:21:40 10  alleged that you are a Zeta.  Nobody's charged you with being a

14:21:46 11  Zeta.  You're charged with moving money of the Zetas, and there's

14:21:54 12  no question in my mind that that was done.  The evidence was

14:22:00 13  pretty overwhelming.  I don't think there was -- there were

14:22:07 14  probably non-credible people but little non-credible evidence.

14:22:11 15  Didn't even take the jury a long time to convict those that they

14:22:15 16  convicted.

14:22:17 17          The thing that bothers me the most is, did you have a

14:22:24 18  chance to say no?  There are other people in that category that

14:22:33 19  are involved in this lawsuit, and that's one of the things that

14:22:38 20  bothers me the most.  But you did have the opportunity to say no.

14:22:43 21  You just didn't.  And you ended up involving your own family.

14:22:52 22  And whether you knew about these murders or not, whether you knew

14:23:00 23  about all of the other things that were going on, you were the

14:23:04 24  funnel for most of it, and you ended up with all of the horses,

14:23:08 25  and it's just beyond comprehension that you could do all that on

14:23:14   1   your own, as was the defense that you put forward.

14:23:18   2           And I sentence you to 240 months in the custody of the

14:23:23   3   Bureau of Prisons, followed by a three-year term of supervised

14:23:41   4   release.  I place the conditions of supervision in the standing

14:23:46   5   order of this district for all supervision.  In addition to that,

14:23:53   6   the following special conditions.  First off, I find there's a

14:24:01   7   low risk, if any, of future substance abuse, and I waive

14:24:05   8   mandatory drug testing conditions.

14:24:10   9           You will provide the probation officer access to any

14:24:15  10   requested financial information that the probation officer

14:24:19  11   requests.  And you will execute any release to obtain financial

14:24:25  12   information that's requested by the probation officer.  You will

14:24:30  13   disclose all assets and liabilities to the probation officer.

14:24:34  14   You will not transfer, sell, give away, or otherwise convey, any

14:24:38  15   asset without first consulting the probation officer.

14:24:43  16           You will submit your person, property, house,

14:24:46  17   residence, vehicle, papers, computers as defined by state and

14:24:51  18   federal law and other electronic communication, or data storage

14:24:55  19   devices, or media to a search conducted by a United States

14:24:59  20   probation officer.  Failure to submit to such a search may be

14:25:04  21   grounds for revocation of release.  The defendant shall warn any

14:25:08  22   occupant that the premises that the -- that the premises may be

14:25:14  23   searched, the condition -- subject to this condition.  Any search

14:25:17  24   must be conducted at a reasonable time and in a reasonable

14:25:22  25   manner.  And the probation officer may conduct such a search when

14:25:25  1   he or she has a reasonable suspicion that you may have violated a

14:25:28  2   condition of supervision or a violation of law.

14:25:35  3          Because of the length of the sentence and the harm to

14:25:40  4   the family, I will waive the fine in the case.  But I do have to

14:25:45  5   assess a $100 mandatory assessment under the Victims of Crime

14:25:52  6   Act.

14:25:53  7          Counsel, I've had the probation department go through

14:26:00  8   the indictment, and, of course, I will read the forfeiture if you

14:26:14  9   wish.  But what I suggest is we just attach a copy of the

14:26:19  10  forfeiture to the judgment and not read it today, but that's your

14:26:28  11  choice.  I can read it if you wish.

14:26:30  12          MR. LECHTENBERGER:  No.  Your proposition is --

14:26:36  13          THE COURT:  Then I'll give this to the clerk.  And I on

14:26:40  14  the forfeiture declare all of Jose Trevino-Morales' interest in

14:26:45  15  his property as forfeited to the United States.

14:26:52  16          I neglected to do one thing and that was to state that

14:26:57  17  in addition to the presentence report and the supplemental

14:27:00  18  report, I did receive, of course, the downward departure variance

14:27:04  19  request, which I reviewed and the letters I reviewed.

14:27:17  20          MR. GARDNER:  Your Honor, I just want --

14:27:18  21          THE COURT:  Mr. Trevino, I'm going to give you a

14:27:20  22  letter, which merely tells you what the law is, and your lawyer

14:27:27  23  will, of course, tell you what the law is.  But I'm required to

14:27:34  24  tell you that you have 14 days to tell your lawyer to file a

14:27:40  25  notice of appeal if you wish to appeal any part of this case,

14:27:45   1   either the conviction, or sentence, or whatnot.  You must tell

14:27:48   2   him within 14 days so he could file the notice of appeal.

14:27:51   3            Do you understand that?

14:27:52   4            DEFENDANT TREVINO-MORALES:  Yes, sir.  Thank you.

14:27:53   5            MR. GARDNER:  Your Honor, just clarification on the

14:27:54   6   list that you provided for the record.  Was that the superseding

14:27:57   7   indictment containing all of the asset and forfeiture, substitute

14:28:01   8   money judgment?

14:28:03   9            PROBATION OFFICER:  Yes, sir.

14:28:05   10            MR. GARDNER:  Okay.  Just wanted to make sure it was

14:28:07   11   the complete thing that's included in the superseding indictment.

14:28:10   12            PROBATION OFFICER:  In the e-mail.

14:28:11   13            MR. GARDNER:  Thank you.

14:28:12   14            THE COURT:  Well, why don't the two of you look at it.

14:28:14   15   I'm going to make that suggestion to all.  Counsel for the other

14:28:49   16   defendants, I have the same list, but, of course, it has your

14:28:54   17   client's name on it.  The only difference between the one that

14:28:59   18   counsel are looking at over here.

14:29:04   19            MR. WOMACK:  Sir, we have a copy of it.

14:29:06   20            THE COURT:  That's what I thought.  You got it with the

14:29:08   21   probation officer.

14:29:10   22            DEFENDANT TREVINO-MORALES:  Your Honor, I've been --

14:29:12   23            THE COURT:  Wait, wait.  Don't tell me anything.  Tell

14:29:14   24   your lawyer, please.

14:29:15   25            MR. LECHTENBERGER:  You can't talk.  The Judge is

14:29:20   1   right.

14:29:20   2           DEFENDANT TREVINO-MORALES:  I'm sorry.

14:29:49   3           MR. GARDNER:  Your Honor, with respect to the Court's

14:29:51   4   Exhibit regarding the forfeiture, a couple of comments.

14:29:55   5   Essentially we provided Mr. Hellums the combined properties as

14:29:58   6   relates to Mr. Jose-Trevino, which we're fine with.  And under

14:30:03   7   two, there's the real property located at 163 Rianna Woods in

14:30:07   8   Dale.  That is Mr. Jesus and Mr. "Chevo" Huitron's property, and

14:30:14   9   the government is not seeking that forfeiture, based on Mr. Jesus

14:30:17  10   Huitron's acquittal.  So we would abandon that forfeiture.

14:30:21  11           THE COURT:  All right.

14:30:22  12           MR. GARDNER:  Of most concern to the government, your

14:30:24  13   Honor, page 47 of the -- 47, 48 of the government's superseding

14:30:30  14   indictment, the government is asking for money judgment and

14:30:33  15   substitute assets, and that is not included within the document

14:30:37  16   the Court proposed to submit.  So we would ask that the money

14:30:41  17   judgment for page 47 and the substituted assets for page 48 be

14:30:45  18   included as part of the asset forfeiture portion of this lawsuit.

14:30:51  19           THE COURT:  It would be helpful if you would have asked

14:30:54  20   before today.  This list is only to list the properties that Jose

14:31:24  21   Trevino's interest are part of.

14:31:28  22           MR. GARDNER:  Yes, sir.

14:31:28  23           THE COURT:  That's all.  Now, if you have your motion

14:31:33  24   to substitute.

14:31:34  25           MR. GARDNER:  To seek a money judgment for the amount

14:31:37  1    of the total.  And I may better let the asset forfeiture

14:31:40  2    attorneys argue this if the Court wants to hear argument.

14:31:43  3              THE COURT:  Well, I got a motion in one of these cases

14:31:46  4    but not in the others.

14:31:49  5              MS. CRUZ-ZAPATA:  May I address the Court, your Honor?

14:31:50  6              THE COURT:  I think you best.

14:31:53  7              MS. CRUZ-ZAPATA:  Your Honor, I'm Diana Cruz-Zapata.

14:31:58  8    I'm one of the asset forfeiture AUSAs in the U.S. Attorney's

14:32:02  9    Office.

14:32:02  10             When the defense counsel waived a jury on all

14:32:05  11   properties, including in it -- and then, the money judgment is to

14:32:09  12   be determined in front of the Court in a hearing such as this.

14:32:13  13   So that is the reason why we did not file motion for money

14:32:16  14   judgment ahead of time, in order to present evidence for the

14:32:20  15   Court now to make that determination.

14:32:25  16             THE COURT:  Well, you're very helpful.  What is the

14:32:30  17   money judgment for substitution of the interest of the

14:32:35  18   properties?

14:32:36  19             MS. CRUZ-ZAPATA:  The money judgment is a calculation,

14:32:38  20   your Honor, of all the proceeds and the property involved.

14:32:40  21             THE COURT:  Correct.  Somebody ought to tell me what it

14:32:42  22   is.

14:32:43  23             MS. CRUZ-ZAPATA:  Okay.  Well, the money judgment in

14:32:45  24   terms of what the calculations are includes the 25 million that

14:32:50  25   we assert is in the PSR, along with the -- it's above the 50

14:32:56  1   million that has been testified to today with regards to the

14:33:00  2   confidential informant named "Pitufo."  And the substitute assets

14:33:04  3   applies when -- if the money judgment is granted by the Court,

14:33:08  4   then we could go after substitute assets in order to apply

14:33:11  5   towards the money judgment.  But that's what the money judgment

14:33:14  6   represents, your Honor.

14:33:15  7         THE COURT:  Well, but the parties have the right to

14:33:18  8   contest that, and at this point in time, they don't even know

14:33:23  9   what to contest because the Court doesn't know what you're asking

14:33:25  10  for.

14:33:26  11        MS. CRUZ-ZAPATA:  I apologize to the Court --

14:33:28  12        THE COURT:  You don't have to apologize to the Court.

14:33:30  13  You filed one thing in Mr. Colorado-Cessa's for specific things

14:33:37  14  to do with the airplanes, but you did not file anything in any of

14:33:41  15  the other cases that I'm aware.

14:33:43  16        MS. CRUZ-ZAPATA:  I filed -- that's a civil case

14:33:45  17  against Mr. Colorado-Cessa's assets, civil asset forfeiture case.

14:33:50  18  So that's separate and apart, in that regard, from this case.

14:33:54  19        However, your Honor, we did file on the defendants that

14:33:58  20  have pled guilty, we have filed motions for preliminary order and

14:34:02  21  money judgments on those.  But with regards to the defendants

14:34:05  22  that went to trial, we did not file anything at this point

14:34:08  23  because of the hearing that we're having today.

14:35:12  24        THE COURT:  Mr. Trevino, if you wish, you can have a

14:35:14  25  seat.

14:35:14  1          DEFENDANT TREVINO-MORALES:  Thank you, sir.

14:35:16  2          MR. LECHTENBERGER:  Could I also sit down, Judge, or do

14:35:18  3  you want me to stand?

14:35:19  4          THE COURT:  Yes, sir.

14:35:20  5          MR. LECHTENBERGER:  Thank you, Judge.

14:35:24  6          THE COURT:  About as long as it takes an oak tree to

14:35:28  7  grow.

14:36:08  8          Mr. Lechtenberger.

14:36:10  9          MR. LECHTENBERGER:  Sir.

14:36:11  10         THE COURT:  The government is seeking a motion for an

14:36:14  11  entry of a money judgment in all of the cases wherein the

14:36:17  12  defendants pled guilty of $60 million.  I suspect that it's like

14:36:26  13  many of these judgments that we have in the pornography cases for

14:36:34  14  $100 million that's never going to be paid, but that's what they

14:36:41  15  have requested as a result of the plea agreement.

14:36:49  16         And it is -- it's a motion that in the event that the

14:36:52  17  properties aren't obtained in the interest of the defendant and

14:37:03  18  not obtained by the government, then this would be a money

14:37:07  19  judgment that would protect up to $60 million.  It's a joint and

14:37:14  20  several liability with all the defendants who have been convicted

14:37:17  21  in this case or who have pled guilty.

14:37:24  22         So surprise to me, as well as surprise to you.  If you

14:37:27  23  wish, I can schedule a supplemental hearing if you need time to

14:37:32  24  take that, or you can, of course, agree to it as a joint and

14:37:38  25  several liability to the others.

14:37:43  1           MR. LECHTENBERGER:  Would it be sufficient if I went

14:37:46  2    with the third option, your Honor, and objected under procedural

14:37:48  3    and substantive grounds as to any $60 million joint and several

14:37:53  4    liability?  Or would that entail having a formal hearing again,

14:37:58  5    which I would like to avoid?

14:38:01  6           I understand that if you overrule my request and go

14:38:05  7    ahead and order the 60 million joint and several, and I

14:38:09  8    understand how the forfeiture provisions have worked, however, I

14:38:12  9    just have a real issue with a $60 million -- he does his 20

14:38:17  10   years, he gets out on supervised release, and then, the Financial

14:38:21  11   Litigation Unit out of Washington, D.C. comes after him.  And

14:38:24  12   then, for the rest of his life, if he lives to be 100 years old,

14:38:28  13   will always have this over him.

14:38:30  14          THE COURT:  Well, that's certainly a theoretical

14:38:34  15   possibility.  I've never seen the unit do anything.  But that's

14:38:41  16   the way it -- that's the alternative.

14:38:44  17          What says the government?  The government want a

14:38:49  18   separate hearing to where they can justify the $60 million as a

14:38:54  19   substitute judgment?  Or is the government satisfied with just

14:38:59  20   the objection by the defendant?

14:39:00  21          MS. CRUZ-ZAPATA:  We stand by the objection by the

14:39:03  22   defendant, your Honor.  And just so it's clear on the record that

14:39:06  23   the money judgment was included in the notice of forfeiture of

14:39:10  24   the indictment.

14:39:10  25          THE COURT:  No.  I understand that.

14:39:11  1          MS. CRUZ-ZAPATA:  Okay.  It was in all the evidence

14:39:14  2    that we have, your Honor, so we're not going to separate it.

14:39:17  3          THE COURT:  All right.  Then I will enter, over the

14:39:20  4    objection of the defendant, the money judgment of 60 million,

14:39:24  5    which will be a joint and several liability with all defendants

14:39:30  6    convicted in this case.

14:39:35  7          Counsel, I assume that Mr. Trevino, if you want to ask

14:39:39  8    him, he's going to want to be as close to Dallas as possible?

14:39:44  9          MR. LECHTENBERGER:  Yes, sir.  In fact, you read my

14:39:45  10   mind again, your Honor.  Number five in my sentencing memorandum,

14:39:48  11   I ask for BOP placement somewhere preferably in Texas.

14:39:52  12         THE COURT:  Seagoville is the closest.

14:39:54  13         MR. LECHTENBERGER:  That would be perfect, your Honor.

14:39:56  14         THE COURT:  You understand, Mr. Trevino, I don't have

14:39:57  15   the authority to order them to put you there.  My judgment is,

14:40:02  16   though, that they will put you there, and they'll put you there

14:40:05  17   as soon as, wherever you go, they make a determination you're not

14:40:08  18   a danger to yourself or anybody else, they'll get you as close to

14:40:13  19   your family.  So hopefully you'll get to see Seagoville, but if

14:40:18  20   you don't get Seagoville, don't get mad.  Get with your

14:40:21  21   counselor, tell them about your family, and I'm sure they'll get

14:40:25  22   you to Seagoville very quickly.

14:40:28  23         DEFENDANT TREVINO-MORALES:  Thank you, sir.  And I

14:40:29  24   apologize to the Court and thank you.

14:40:31  25         THE COURT:  All right.

14:40:33 1          MR. LECHTENBERGER:  Your Honor, one last thing.

14:40:34 2          Just for purposes of any type of appeal, I understand

14:40:38 3 the 240 months and how the Court got to that, but I would object

14:40:41 4 procedurally and substantive as to the reasonableness of the

14:40:44 5 sentence.  That's all I have to say.

14:40:45 6          THE COURT:  Okay.  And the objection is overruled.  But

14:40:47 7 you didn't read -- I didn't read your mind well enough.  I'm

14:40:51 8 going to seal the presentence investigation.  Nobody can come in

14:40:54 9 and read about Mr. Trevino or his family.  It becomes part of the

14:40:59 10 record if there is an appeal.

14:41:04 11          MR. LECHTENBERGER:  Thanks, Judge.

14:41:05 12          THE COURT:  And I'm going to attach the addendum there,

14:41:09 13 and the government may, of course, use theirs for official

14:41:12 14 purposes.

14:41:16 15          All right.  I remand Mr. Trevino.  Thank you, counsel.

14:41:21 16          MR. LECHTENBERGER:  Can I stand down, your Honor?

14:41:22 17          THE COURT:  You may.

14:41:23 18          MR. LECHTENBERGER:  Thank you, sir.

19          (End of proceedings.)

20

21

22

23

24

25

1                          * * * * * *

2

3

4    UNITED STATES DISTRICT COURT)

5    WESTERN DISTRICT OF TEXAS    )

6

7        I, LILY I. REZNIK, Official Court Reporter, United States

8    District Court, Western District of Texas, do certify that the

9    foregoing is a correct transcript from the record of proceedings

10   in the above-entitled matter.

11       I certify that the transcript fees and format comply with

12   those prescribed by the Court and Judicial Conference of the

13   United States.

14       WITNESS MY OFFICIAL HAND this the 23rd day of October, 2013.

15

16

17                              /s/Lily I. Reznik
                                LILY I. REZNIK, CRR, RMR
18                              Official Court Reporter
                                United States District Court
19                              Austin Division
                                501 W. 5th Street, Suite 4153
20                              Austin, Texas 78701
                                (512)391-8792
21                              Certification No. 4481
                                Expires:  12-31-14
22

23

24

25