```
 1                    UNITED STATES DISTRICT COURT
                       WESTERN DISTRICT OF TEXAS
 2                          AUSTIN DIVISION

 3   UNITED STATES OF AMERICA    ) Docket No. A 12-CR-210(6) SS
                                 )
 4   vs.                         ) Austin, Texas
                                 )
 5   FRANCISCO ANTONIO           )
     COLORADO-CESSA              ) September 5, 2013
 6

 7                     TRANSCRIPT OF SENTENCING
                    BEFORE THE HONORABLE SAM SPARKS
 8
     APPEARANCES:
 9
     For the United States:      Mr. Daniel M. Castillo
10                               Ms. Michelle E. Fernald
                                 Mr. Douglas W. Gardner
11                               Assistant U.S. Attorneys
                                 816 Congress Avenue, Suite 1000
12                               Austin, Texas 78701

13                               Ms. Diana Cruz-Zapata
                                 Assistant U.S. Attorney
14                               601 NW Loop 410, Suite 600
                                 San Antonio, Texas 78216
15
     For the Defendant           Mr. Mike DeGeurin
16                               Mr. M. Andres Sanchez-Ross
                                 Foreman, DeGeurin & DeGeurin
17                               300 Main Street
                                 Houston, Texas 77002
18
                                 Mr. John Parras
19                               Republic Bank Building
                                 1018 Preston, Floor 2
20                               Houston, Texas 77002

21   Interpreter:                Ms. Cristina Helmerichs

22   Court Reporter:             Ms. Lily Iva Reznik, CRR, RMR
                                 501 West 5th Street, Suite 4153
23                               Austin, Texas 78701
                                 (512)391-8792
24

25   Proceedings reported by computerized stenography, transcript
     produced by computer.
```

```
1                        I N D E X

2                        Direct     Cross      Redirect   Recross
     Witnesses:
3

4    Ramon Segura-Flores    7          17

5    Steven Pennington     26         58,60      63         63

6    Scott Lawson          65         98,110

7                                     114        115

8

9                        E X H I B I T S

10                                               Offered    Admitted

11   Government's

12    (None.)

13

14   Defendant's

15   #1                                          119        119

16

17

18

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 08:58:38 | 1 | THE COURT:  The Court calls 12-CR-210, <u>United States</u> |
| 08:58:41 | 2 | <u>vs. Jose Trevino-Morales</u> for announcements. |
| 08:58:44 | 3 | MR. GARDNER:  Your Honor, good morning. |
| 08:58:46 | 4 | Doug Gardner, Michelle Fernald, and Ms. Diana |
| 08:58:49 | 5 | Cruz-Zapata and Daniel Castillo for the asset forfeiture for the |
| 08:58:53 | 6 | United States. |
| 08:58:55 | 7 | MR. LECHTENBERGER:  Your Honor, Kirk Lechtenberger for |
| 08:58:57 | 8 | Mr. Trevino. |
| 08:59:02 | 9 | THE COURT:  I still have a question mark as to all |
| 08:59:06 | 10 | other counsel.  I still have no information from Mr. Trevino |
| 08:59:11 | 11 | whether or not he wished to sever his relationship with Mr. Finn |
| 08:59:17 | 12 | and Ms. Williams.  Would you educate me on that? |
| 08:59:21 | 13 | MR. LECHTENBERGER:  Would you like Mr. Trevino to |
| 08:59:23 | 14 | address the Court sufficiently?  Or would it be just sufficient |
| 08:59:25 | 15 | for me to tell you? |
| 08:59:26 | 16 | THE COURT:  As an officer of this court. |
| 08:59:28 | 17 | MR. LECHTENBERGER:  Fair enough. |
| 08:59:29 | 18 | Mr. Trevino has told me -- and I've told Mr. Finn and |
| 08:59:30 | 19 | Ms. Williams -- that he no longer wants to have anything to do |
| 08:59:34 | 20 | with him, your Honor. |
| 08:59:35 | 21 | THE COURT:  Mr. Finn, and, Ms. Williams, if you'll file |
| 08:59:38 | 22 | a motion to withdraw, I will sign them. |
| 08:59:43 | 23 | MS. WILLIAMS:  Do you want us to file another motion to |
| 08:59:44 | 24 | withdraw, your Honor?  We have one on file that you denied. |
| 08:59:46 | 25 | THE COURT:  I denied that one because of the presence |

| | | |
|---|---|---|
| 08:59:48 | 1 | of the sentencing date.  Yes.  Just file a second motion, I'll be |
| 08:59:51 | 2 | glad to sign anytime.  And you're excused from further attendance |
| 08:59:56 | 3 | today, if you wish, or you can stay -- |
| 08:59:59 | 4 | MS. WILLIAMS:  Thank you, your Honor. |
| 08:59:59 | 5 | THE COURT:  -- in the courtroom.  All right.  Thank |
| 09:00:04 | 6 | you, sir. |
| 09:00:06 | 7 | Francisco Antonio Colorado-Cessa. |
| 09:00:11 | 8 | MR. DEGEURIN:  Your Honor, Mike DeGeurin and Andres |
| 09:00:15 | 9 | Sanchez for Mr. Colorado.  We also have Andy Parker and John |
| 09:00:20 | 10 | Parras with me. |
| 09:00:22 | 11 | THE COURT:  All right. |
| 09:00:24 | 12 | Fernando Solis. |
| 09:00:27 | 13 | MR. WOMACK:  Good morning, your Honor. |
| 09:00:28 | 14 | Guy Womack for Mr. Garcia. |
| 09:00:29 | 15 | THE COURT:  Mr. Womack. |
| 09:00:30 | 16 | Mr. Lopez, I will call later.  And Eusevio |
| 09:00:39 | 17 | Maldonado-Huitron. |
| 09:00:41 | 18 | MR. ESPER:  Good morning, Judge Sparks. |
| 09:00:42 | 19 | Richard Esper for Mr. Huitron.  We're ready. |
| 09:00:46 | 20 | THE COURT:  Counsel, the way I anticipate that we will |
| 09:00:49 | 21 | proceed in sentencing, by the way, you can see that there are no |
| 09:00:54 | 22 | available seats.  We've attempted to set up the jury room, but |
| 09:01:02 | 23 | we've had some wiring difficulties.  Of course, still have a new |
| 09:01:09 | 24 | courthouse, but that was very poorly done, and we have not been |
| 09:01:15 | 25 | able to redo that.  So the overflow is sitting with audio in the |

09:01:24   1   ceremonial courtroom on the first row.  We're going to have some

09:01:30   2   preliminary proceedings that deal with objections to the

09:01:35   3   presentence investigation that has gone on on these defendants,

09:01:40   4   and they will take into consideration four of those that are to

09:01:45   5   be sentenced today.

09:01:48   6           But when your family member has been sentenced, I'm

09:01:54   7   going to ask you if you will give your seat to the family members

09:01:58   8   of the next person that is to be sentenced -- and the security

09:02:05   9   people will help you with that, if necessary -- and that way, you

09:02:09  10   can assure that family members of each of the defendants at this

09:02:17  11   sentencing can be present.

09:02:18  12           I intend to take up the objections of Mr. Trevino, Mr.

09:02:29  13   Colorado-Cessa, Mr. Garcia, and Mr. Huitron together because it's

09:02:35  14   my understanding because I know the defense of the prosecution

09:02:39  15   intends to present evidence on these objections.  But let's take

09:02:43  16   into consideration first, is it Lechtenberger?

09:02:54  17           MR. LECHTENBERGER:  Yes, your Honor.  That's close

09:02:55  18   enough.

09:02:55  19           THE COURT:  How is it?

09:02:59  20           MR. LECHTENBERGER:  Lechtenberger, your Honor.

09:03:00  21           THE COURT:  Lechtenberger.  Do you intend to present

09:03:09  22   any evidence?

09:03:11  23           MR. LECHTENBERGER:  No, your Honor, other than what

09:03:12  24   I've already stated in writing.

09:03:17  25           THE COURT:  Mr. DeGeurin, do you intend to present any

09:03:20    1    evidence?

09:03:22    2            MR. DEGEURIN:  We do, your Honor.

09:03:23    3            THE COURT:  All right.  Mr. Womack, do you wish to

09:03:27    4    introduce evidence on your objections?  And we're talking about

09:03:30    5    the objection on the case.

09:03:32    6            MR. WOMACK:  No, your Honor.

09:03:35    7            THE COURT:  And, Mr. Esper?

09:03:37    8            MR. ESPER:  Your Honor, my objections in my sentencing

09:03:39    9    memorandum cover everything.

09:03:40   10            THE COURT:  I have all of that.  I'm just wondering if

09:03:42   11    you --

09:03:42   12            MR. ESPER:  No.

09:03:43   13            THE COURT:  All right.  Mr. DeGeurin, you may call your

09:03:46   14    witness.  Now, this is on the base.

09:03:53   15            MR. DEGEURIN:  Your Honor, I announced that we were

09:03:55   16    going to put on evidence because I was told by Mr. Gardner this

09:03:57   17    morning, he's going to call three witnesses.  The witness that

09:04:00   18    we're going to call is in rebuttal to them.

09:04:02   19            THE COURT:  Well, it's not in rebuttal.  You made the

09:04:05   20    objection.  If you have any witnesses, call them now.

09:04:09   21            MR. DEGEURIN:  All right.  Call Ramon Segura.  Your

09:04:14   22    Honor, Mr. Andres Sanchez, with the Court's permission, is going

09:04:18   23    to handle the objections.  If we can work together on this, I'd

09:04:23   24    appreciate it.

09:04:24   25            THE COURT:  It depends on what working together is.

09:04:27   1          MR. DEGEURIN:  Well, I mean, we're not going to both

09:04:28   2   ask questions to the witness.

09:04:29   3          THE COURT:  Right.  I knew that.

09:04:34   4          If you'll come forward, please, sir.  This is the clerk

09:04:46   5   of the Court.  She's going to administer an oath to you.

09:04:53   6          (Witness sworn.)

09:05:17   7          THE COURT:  Just relax.  Don't pay any attention to

09:05:19   8   that microphone.  It will pick up with everything you say.  And I

09:05:23   9   want you to tell me your full name and spell your last name.

09:05:31  10          THE WITNESS:  My name is Ramon Segura-Flores.  My first

09:05:41  11   name is R-A-M-O-N.  And my last name is Segura, S-E-G-U-R-A.

09:05:56  12          THE COURT:  It's your witness.

09:05:59  13          MR. SANCHEZ:  Thank you, your Honor.

09:05:59  14          And Mr. Segura appears in the video and he gives an

09:06:03  15   introduction as to who he is in the video.  Just so the Court's

09:06:08  16   aware.  Some of that information's already in the record.

09:06:12  17          THE COURT:  I'll take up individually all of the

09:06:15  18   materials that we have reviewed or I have reviewed.  And I've had

09:06:21  19   the video reviewed.

09:05:57  20      RAMON SEGURA-FLORES, called by the Defendant, duly sworn.

09:05:57  21                      DIRECT EXAMINATION

09:06:24  22   BY MR. SANCHEZ:

09:06:24  23   Q.   Mr. Segura, can you introduce yourself and as far as what is

09:06:29  24   your role when it comes to ADT?

09:06:54  25   A.   My duties are I do all the followup work on all the projects

| | | |
|---|---|---|
| 09:07:22 | 1 | that ADT has.  I make sure payments are made.  I make sure I |
| 09:07:27 | 2 | follow up on contract fulfillment, I follow up on all invoices, |
| 09:07:31 | 3 | contracts, and other documents.  I'm full partner according to |
| 09:07:35 | 4 | the charter of the corporation.  So my job is primarily to track |
| 09:07:41 | 5 | the income and the contract fulfillment of the agency. |
| 09:07:45 | 6 | Q.   And when did you start working at ADT? |
| 09:07:56 | 7 | A.   As I said, I'm one of the founding partners of the firm as |
| 09:08:00 | 8 | of May 15, 2001. |
| 09:08:02 | 9 | Q.   And I want to talk about two sets of information.  First, I |
| 09:08:09 | 10 | want to talk about, roughly, 38 transactions that occurred |
| 09:08:14 | 11 | between 2008 and 2012; and then, later, I want to talk to you |
| 09:08:20 | 12 | about your role in purchasing machinery throughout your time at |
| 09:08:26 | 13 | ADT but, also, specifically, between the years 2003 and 2007. |
| 09:08:37 | 14 | Did you have an opportunity to go through and look at, |
| 09:08:42 | 15 | roughly, 38 transactions beginning in August of 2008? |
| 09:08:52 | 16 | A.   Yes. |
| 09:08:55 | 17 | Q.   And what was the first transaction that you looked at? |
| 09:09:11 | 18 | A.   The first transaction was for the $350,000 -- can I look |
| 09:09:15 | 19 | at -- |
| 09:09:16 | 20 | Q.   Yes, please.  Refer to your notes if you need to. |
| 09:09:20 | 21 | And, your Honor, what he's looking at was provided with |
| 09:09:24 | 22 | our original objections.  He's got a little bit more information. |
| 09:09:27 | 23 | We've provided the same copy that he now has to the government, |
| 09:09:34 | 24 | and we'll, in other words, exchange that for the set that we |
| 09:09:36 | 25 | included with our original objections. |

| | | |
|---|---|---|
| 09:09:46 | 1 | THE COURT:  So what you're telling me is there are |
| 09:09:49 | 2 | additions to what was presented to the probation department, |
| 09:09:54 | 3 | which I've reviewed. |
| 09:09:56 | 4 | MR. SANCHEZ:  That's correct, your Honor. |
| 09:09:57 | 5 | THE COURT:  All right. |
| 09:09:58 | 6 | MR. SANCHEZ:  Minimal additions, but a full copy will |
| 09:10:00 | 7 | replace the original copy at -- when we're done here today. |
| 09:10:03 | 8 | THE COURT:  All right, sir. |
| 09:10:06 | 9 | Q.   (BY MR. SANCHEZ) So what was the first series of |
| 09:10:08 | 10 | transactions that you looked at? |
| 09:10:48 | 11 | A.   The first transaction I looked at was the American Express |
| 09:10:51 | 12 | checks and what I did -- my first step in the analysis is I tried |
| 09:10:56 | 13 | to confirm the level traceability of these checks.  These checks |
| 09:11:01 | 14 | were issued from an American Express bank that was held here in |
| 09:11:03 | 15 | the U.S. using the ADT and account at Bancomer.  This Bancomer |
| 09:11:21 | 16 | account is the one that the clients who make their payments |
| 09:11:25 | 17 | regarding those jobs have been completed, the clients pay into |
| 09:11:28 | 18 | that account. |
| 09:11:29 | 19 | Q.   And what is the -- who is the primary client of ADT? |
| 09:11:40 | 20 | A.   Pemex. |
| 09:11:41 | 21 | Q.   And so, were you able to see that money was deposited from |
| 09:11:45 | 22 | Pemex into the Bancomer account and then, from Bancomer into the |
| 09:11:49 | 23 | American Express account? |
| 09:12:02 | 24 | A.   That's correct.  We traced the movement of the funds, and it |
| 09:12:24 | 25 | was verified that Pemex made the payments in the Bancomer, and |

09:12:28   1   the Bancomer account was transferred to the American Express

09:12:32   2   account.

09:12:33   3   Q.   At any point, did you receive any information to suggest

09:12:38   4   that cash was deposited into that Bancomer account and then, cash

09:12:44   5   -- or that money was eventually sent to American Express?

09:12:58   6   A.   No.  All the funds that were transferred were funds that had

09:13:20   7   been deposited by Petroleos Mexicanos due to invoices that had

09:13:25   8   been sent because of the projects had been completed.  There were

09:13:28   9   no funds transferred to the American Express account that came

09:13:32  10   from cash deposits.

09:13:34  11   Q.   I want to jump forward to September of 2009.  Did you have

09:13:40  12   the chance to look at, specifically, a check from Laredo National

09:13:45  13   Bank in the amount of $30,000?

09:14:04  14   A.   Yes.  That's correct.

09:14:07  15   Q.   And can you explain to us, ultimately, what did you find to

09:14:11  16   be the source of that funds of the $30,000?  And can you explain

09:14:15  17   the process, how it ended up in Laredo National Bank?

09:14:55  18   A.   They were -- there's some transfers that were made from an

09:14:58  19   ADT account due to payments made by Pemex because of jobs that

09:15:03  20   had been completed and invoiced for that time.

09:15:08  21   Q.   And the next check in September 10th -- or, sorry, September

09:15:12  22   of 2010, I'm going to skip over that, your Honor, because that

09:15:16  23   one we went over in trial, and there's actually a trial exhibit

09:15:19  24   specifically to that.

09:15:21  25           The next one I want to talk to you about is a wire from

09:15:25   1   Monex to a Felipe Quintero in the amount of $90,000.  Did you

09:15:30   2   analyze the source of the money for that $90,000?

09:16:01   3   A.   Yes, I -- yes.  I was able to look at those.  I did the same

09:16:36   4   -- I traced it just like I had in another situation.  This

09:16:39   5   transfer of funds was initiated from ADT Petro Servicios because

09:16:44   6   of work done for its client Pemex, which was then directly

09:16:47   7   transferred to Mr. Quintero's account because of the work he had

09:16:51   8   done at the direction of ADT.

09:16:54   9   Q.   And is everything that you're testifying about, are there

09:17:00   10  supporting documents in the binder in front of you?

09:17:11   11  A.   Correct.

09:17:14   12  Q.   Did you do the same thing for the next few transactions in

09:17:19   13  2010 and in the beginning of 2011?

09:17:31   14  A.   That's correct.

09:17:32   15  Q.   I want to talk about a transaction in April of 2005 -- or,

09:17:38   16  sorry, 2011 from the UBS account.  There's a $300,000 wire

09:17:57   17  transfer from the UBS account to Mola Racing.  Do you recall

09:18:02   18  that?

09:18:10   19  A.   Yes.  I remember it clearly.

09:18:12   20  Q.   To determine the source of funds for that particular

09:18:16   21  transfer, did you analyze the UBS accounts and the money going

09:18:20   22  into the UBS accounts?

09:18:35   23  A.   Yes.  That's correct.

09:18:36   24  Q.   And what did you find?

09:19:01   25  A.   Those were funds that came from ADT Petro Servicios that

09:19:06  1  were then transferred to UBS.  UBS was -- the UBS account was an

09:19:09  2  investment account.  These funds came through payments made by

09:19:15  3  ADT Petro Servicios' primary client Pemex for services provided.

09:19:25  4  Q.  Again, the transactions in 2011 -- in September of 2011, did

09:19:31  5  you do the same analysis that you did about those transactions

09:19:36  6  similar to the analysis that we've talked about so far?

09:19:53  7  A.  That's correct.

09:19:54  8  Q.  And were the source of the funds ultimately Pemex?

09:20:06  9  A.  That's correct.

09:20:07  10 Q.  I want to talk to you briefly about a transaction on October

09:20:13  11 4th of 2011.  Do you remember that transaction?  It's the

09:20:28  12 transaction from PIIG Del Noreste?

09:20:31  13 A.  What's the amount?

09:20:33  14 Q.  $802,135?

09:20:42  15 A.  Yes.  Correct.

09:20:44  16 Q.  Can you tell us about that particular transaction?

09:21:22  17 A.  What we were able to determine was the funds that were in

09:21:24  18 the PIIG Northeast account, we did a tracing of those funds and

09:21:28  19 were able to determine that the funds in the PIIG Northeast

09:21:30  20 account came from ADT Petro Servicios' funds because these were

09:21:37  21 then deposited into account No. 9898735, which had been -- which

09:21:43  22 was the account that had been designated for Pemex to make

09:21:46  23 payment for those services rendered.

09:21:51  24 Q.  Moving on, did you look at two loans that ADT obtained in

09:22:02  25 November of 2011 or two loan payments?

09:22:16    1    A.    Yes.

09:22:16    2    Q.    And I want to talk to you specifically about the four

09:22:23    3    repayments of that loan or those loans and other associated loans

09:22:29    4    beginning in November of 2011, December of 2011, February of 2012

09:22:35    5    and April of 2012.

09:22:50    6    A.    Okay.

09:22:51    7    Q.    Those repayments to that loan or for that loan, were those

09:22:57    8    the source of funds for those repayments, were they -- what was

09:23:03    9    the source of those funds, in other words?

09:23:22   10    A.    What is the loan amount that you're referring to?

09:23:24   11    Q.    The total loan amount would be around $1.7 million.  But I'm

09:23:37   12    specifically asking about the $733,000 that was paid directly

09:23:44   13    from the loaner to an auction house?

09:24:06   14    A.    Yes.  You're referring to the Arian Jaff loans.

09:24:12   15    Q.    That's correct.

09:24:51   16    A.    Yes.  Those payments were made -- or those credits were paid

09:24:57   17    by funds that came from the ADT Petro Servicios account,

09:25:02   18    specifically, the account No. 9898735, which is the account to

09:25:07   19    which our largest client Pemex was to make all of its payments.

09:25:12   20    The funds were -- came from -- the initial funds from the loan

09:25:17   21    had come from a Santander account that was held by Mr. Arian

09:25:43   22    Jaff.  And this just highlights how most of the income from ADT

09:25:50   23    Petro Servicios comes from our largest client Pemex which are

09:25:55   24    payments made into the Bilbao Bank -- Bancomer into account No.

09:26:00   25    9898735.

09:26:04  1          THE COURT:  Now, let's wait for a question.  I've

09:26:07  2   allowed a lot of leading questions up until now because of the

09:26:13  3   translation, but now he's starting to make arguments.

09:26:16  4          Now, the second thing is, when you said payments by a

09:26:22  5   loaner, that's payments by one who made the loan as far as the

09:26:29  6   English language is concerned.  Can you tell me the name of who

09:26:33  7   you're referring to?  It's not a borrower, or is it a borrower?

09:26:42  8   Did he mean the borrower?

09:26:42  9          MR. SANCHEZ:  Your Honor, if you'll recall from the

09:26:43  10  trial, in November of 2011, there was a payment made to one of

09:26:48  11  the auction houses.  I think it was Los Alamitos.

09:26:52  12         THE COURT:  It was part of the horses for a million,

09:26:55  13  700,000 or something.

09:26:56  14         MR. SANCHEZ:  No, your Honor.

09:26:57  15         There was a total loan that ADT took out for $1.7

09:27:01  16  million.  700,000 of that, instead of going directly to ADT, went

09:27:06  17  directly to an auction house.  So not -- what I was trying to get

09:27:12  18  or I think we got was -- I mean, the loan payment I don't think

09:27:16  19  is disputed that there's the money that the loan was paid out

09:27:21  20  essentially from a bank that went to the auction house, that's

09:27:23  21  not proceeds of illegal activity.

09:27:26  22         THE COURT:  Well, I understand your argument.  I'm just

09:27:28  23  asking you, what entity sent -- I don't know what this gentleman

09:27:34  24  testified to.  I don't know what a loaner is.  I would think a

09:27:39  25  loaner is somebody that loans money.

| | | |
|---|---|---|
| 09:27:41 | 1 | MR. SANCHEZ:  And that's exactly how I was using it in |
| 09:27:43 | 2 | the entity -- |
| 09:27:44 | 3 | THE COURT:  All right.  So it was a borrower from ADT |
| 09:27:47 | 4 | that was the borrower. |
| 09:27:49 | 5 | MR. SANCHEZ:  Yes. |
| 09:27:49 | 6 | THE COURT:  All right. |
| 09:27:51 | 7 | MS. FERNALD:  It's Arian Jaff, your Honor. |
| 09:27:53 | 8 | MR. SANCHEZ:  And I believe -- |
| 09:27:54 | 9 | THE COURT:  All right. |
| 09:27:55 | 10 | MR. SANCHEZ:  -- Mr. Segura said that, Arian Jaff. |
| 09:28:03 | 11 | Q.   (BY MR. SANCHEZ) Did you for the remaining -- and, your |
| 09:28:10 | 12 | Honor, I'd ask to lead just so we avoid having to go through the |
| 09:28:15 | 13 | 15 or so -- |
| 09:28:15 | 14 | THE COURT:  Nobody's made any objections.  As long as |
| 09:28:18 | 15 | he's responsive, I'll allow you to lead because -- just because. |
| 09:28:27 | 16 | Q.   (BY MR. SANCHEZ) The remaining transactions, did you do a |
| 09:28:30 | 17 | similar analysis with those transactions? |
| 09:28:40 | 18 | A.   That's correct. |
| 09:28:43 | 19 | Q.   And those transactions, were you able to also determine the |
| 09:28:47 | 20 | source of the funds to be from Pemex? |
| 09:28:59 | 21 | A.   That's correct. |
| 09:29:04 | 22 | Q.   Hold on.  Let me -- |
| 09:29:05 | 23 | A.   The account No. 9898735. |
| 09:29:11 | 24 | Q.   In total, was the total amount of transactions you looked at |
| 09:29:17 | 25 | just over $10 million? |

09:29:27    1    A.    That's correct.

09:29:30    2    Q.    You talked about that a majority of your -- of ADT's income

09:29:35    3    came from wire transfers from Pemex.  Did ADT receive any cash?

09:29:43    4          THE INTERPRETER:  The interpreter requests, did ADT

09:29:45    5    receive what?

09:29:47    6          MR. SANCHEZ:  Cash.

09:29:58    7    A.    No.

09:30:01    8    Q.    (BY MR. SANCHEZ) I want to now switch a little bit of the

09:30:12    9    focus to can you tell us what was your role during 2002, 2003 up

09:30:21   10    to 2007 in regards to obtaining the machinery necessary for ADT

09:30:28   11    to fulfill their contracts?

09:31:19   12    A.    My job was in Pemex regarding that -- within ADT regarding

09:31:24   13    that was I was the one that worked on all the proposals and bids

09:31:28   14    in response to requests for bids by Pemex regarding specific jobs

09:31:34   15    within the -- hearing they would specify the type of materials,

09:31:39   16    the amount of manpower, and the machinery that would be necessary

09:31:41   17    for that project.

09:32:33   18          I was the one that would look at all these RFPs.  I

09:32:36   19    would then analyze one-by-one what would be the need, what we

09:32:40   20    would require to be able to compete on these bids.  I would

09:32:43   21    determine and look at whether we would need to buy or rent the

09:32:47   22    machinery necessary.  I was fully aware of every single bid that

09:32:52   23    we let out or that we participated in.  Starting in 2001, I

09:32:56   24    handled each and every one of them.  I would study the RFPs.  I

09:33:01   25    would then look at what would be required of us, what machine we

| | | |
|---|---|---|
| 09:33:04 | 1 | would need, and equipment we would need.  I would decide -- I was |
| 09:33:08 | 2 | involved in deciding whether it would be bought or rented, what |
| 09:33:11 | 3 | kind of investments we would need to be able to fulfill that |
| 09:33:13 | 4 | project. |
| 09:33:14 | 5 | Q.   During that time period, if ADT acquired equipment through a |
| 09:33:23 | 6 | $6 million cash loan, would you know about it? |
| 09:33:37 | 7 | A.   Absolutely.  Categorically, I would have been aware of it |
| 09:33:48 | 8 | because I handled each one of the authorizations for the funds |
| 09:33:52 | 9 | necessary to make those kinds of acquisitions. |
| 09:33:55 | 10 | Q.   Did that ever occur? |
| 09:34:00 | 11 | A.   Never.  No. |
| 09:34:10 | 12 | Q.   I'll pass witness, your Honor. |
| 09:34:13 | 13 | THE COURT:  Any of the defense lawyers wish to question |
| 09:34:15 | 14 | this witness? |
| 09:34:17 | 15 | MR. WOMACK:  No, sir. |
| 09:34:18 | 16 | MR. ESPER:  I have none. |
| 09:34:19 | 17 | MR. LECHTENBERGER:  No, sir. |
| 09:34:21 | 18 | THE COURT:  Does the government? |
| 09:34:23 | 19 | CROSS-EXAMINATION |
| 09:34:23 | 20 | BY MS. FERNALD: |
| 09:34:24 | 21 | Q.   Mr. Segura, good morning. |
| 09:34:26 | 22 | A.   Good morning. |
| 09:34:28 | 23 | Q.   You began working with Colorado-Cessa in May of 2001.  Is |
| 09:34:42 | 24 | that what you testified to? |
| 09:34:59 | 25 | A.   ADT, Petro Servicios was founded and chartered on May 15th, |

09:35:04   1   2001, and I was one of the founding members of that firm.

09:35:08   2   Q.   And you are part owner of ADT, correct?

09:35:18   3   A.   Founding member.

09:35:20   4   Q.   How much?

09:35:20   5   A.   Founding partner.

09:35:22   6          THE INTERPRETER:   Interpreter's correction.

09:35:24   7   Q.   (BY MS. FERNALD) I'm sorry?  What percentage of ADT do you

09:35:26   8   own?

09:35:36   9   A.   .04 percent.

09:35:42   10          THE COURT:   What was that answer?

09:35:43   11          THE INTERPRETER:   .04 percent.

09:35:49   12   Q.   (BY MS. FERNALD) The primary client for ADT Petro Servicios

09:35:54   13   is Pemex; is that correct?

09:36:01   14   A.   That's correct.

09:36:04   15   Q.   What percentage of business or income is Pemex to ADT?

09:36:17   16   A.   Ninety percent.

09:36:19   17   Q.   So without the Pemex contracts, ADT would not function on

09:36:24   18   the level that it does, correct?

09:36:36   19   A.   That's correct.

09:36:38   20   Q.   When ADT was formed in 2001, would it be fair to say that it

09:36:44   21   was a small company?

09:37:11   22   A.   When it was established, when it was founded, it was a

09:37:14   23   brand-new company.  Any new company starts from zero.  All the

09:37:17   24   companies start at zero.

09:37:19   25   Q.   Correct.  And you knew Colorado-Cessa even prior to the

| | | |
|---|---|---|
| 09:37:25 | 1 | formation of ADT, correct? |
| 09:37:36 | 2 | A.   That's correct.  Yes. |
| 09:37:38 | 3 | Q.   In fact, he was pretty much broke prior to the formation of |
| 09:37:42 | 4 | ADT Petro Servicios, correct? |
| 09:38:02 | 5 | A.   He was doing projects with equipment he had. |
| 09:38:12 | 6 | Q.   Mr. Segura, have you reviewed the financial statements that |
| 09:38:17 | 7 | were submitted to UBS for loans by Mr. Colorado-Cessa? |
| 09:38:35 | 8 | A.   Yes. |
| 09:38:36 | 9 | Q.   Do you have any financial statements from 2001 to 2008? |
| 09:38:55 | 10 | A.   Can you repeat that again?  I didn't understand. |
| 09:39:03 | 11 | Q.   My apology.  Do you have financial statements for ADT from |
| 09:39:06 | 12 | 2001 through 2007? |
| 09:39:13 | 13 | A.   Yes. |
| 09:39:14 | 14 | Q.   Do you have them present in that notebook? |
| 09:39:18 | 15 | A.   No. |
| 09:39:21 | 16 | Q.   And where are those financial statements? |
| 09:39:26 | 17 | A.   At the firm. |
| 09:39:28 | 18 | Q.   Do you have them present here in the United States? |
| 09:39:35 | 19 | A.   No. |
| 09:39:38 | 20 | Q.   I want to direct your attention to the 38 transactions that |
| 09:39:42 | 21 | you referred to.  The notebook that is in front of you refers to |
| 09:39:54 | 22 | the 38 transactions; is that correct? |
| 09:40:02 | 23 | A.   True. |
| 09:40:03 | 24 | Q.   Did you obtain those documents for Mr. Colorado-Cessa here |
| 09:40:08 | 25 | today? |

| | | |
|---|---|---|
| 09:40:18 | 1 | A.   Yes. |
| 09:40:19 | 2 | Q.   And where did you get those documents from? |
| 09:40:29 | 3 | A.   All those -- those documents belong to the firm, to the |
| 09:40:34 | 4 | company. |
| 09:40:34 | 5 | Q.   Did you go to the banks and get the documents? |
| 09:40:43 | 6 | A.   No. |
| 09:40:43 | 7 | Q.   Did you obtain the wires or the checks from Pemex for the |
| 09:40:48 | 8 | underlying funds that came through these accounts? |
| 09:41:02 | 9 | A.   I got that from the company. |
| 09:41:05 | 10 | Q.   Do you have the wires from Pemex and the checks and/or the |
| 09:41:10 | 11 | checks from Pemex showing the underlying source of these funds? |
| 09:41:36 | 12 | A.   That's correct.  These are the documents I received from the |
| 09:41:56 | 13 | company, which include the invoices, the statements, and then, |
| 09:42:00 | 14 | when we did the trace of the transfers showing where these funds |
| 09:42:03 | 15 | came from and to -- where the funds into the account came from. |
| 09:42:14 | 16 | Q.   When ADT -- |
| 09:42:15 | 17 | A.   Can I clarify something? |
| 09:42:17 | 18 | Q.   Yes.  Please. |
| 09:42:29 | 19 | A.   Also included is documentation that was provided by the |
| 09:42:31 | 20 | attorneys, right?  But the majority of this is from the company. |
| 09:42:41 | 21 | Q.   Thank you very much. |
| 09:42:45 | 22 |      The funds from Pemex when they paid ADT, did Pemex wire |
| 09:42:55 | 23 | any of those funds into accounts in the United States? |
| 09:43:08 | 24 | A.   Never. |
| 09:43:09 | 25 | Q.   Where did they -- what country did they wire their funds |

```
09:43:12   1   into?
09:43:19   2   A.   In Mexico.
09:43:21   3   Q.   Are you, Mr. Segura, are you aware of all of
09:43:41   4   Colorado-Cessa's business activities?
09:44:06   5   A.   I am aware of all the activities and transactions of ADT
09:44:18   6   Petro Servicios.  Mr. Colorado-Cessa and I are aware of
09:44:22   7   everything that happens with ADT Petro Servicios.  We do the
09:44:26   8   followup, we do the project analysis, and we do the results
09:44:29   9   analysis.
09:44:33  10   Q.   Are you aware of the government entity of Ministry of Public
09:44:38  11   Service in Mexico?
09:44:51  12   A.   I don't know the institution you're referring to.
09:44:55  13        THE COURT:  You say the government Ministry of what?
09:44:59  14   A.   Public Services?
09:45:00  15   Q.   (BY MS. FERNALD) Public Service.  To repeat for the
09:45:03  16   translator, Mexican Ministry of Public Service.
09:45:19  17   A.   There is no ministries in.
09:45:27  18   Q.   Are you aware that the --
09:45:29  19   A.   In Mexico, we don't have ministries.  There are secretary --
09:45:34  20   there's the secretaries like the one for communications and
09:45:39  21   transportation.  Maybe that's what you're talking about?  Just to
09:46:00  22   try and clarify, at the cabinet level, whether you want to call
09:46:03  23   it a ministry or a secretary, there is no public service entity.
09:46:07  24   There's nothing that's the equivalent of communications and
09:46:10  25   transportation.
```

09:46:11  1    Q.    So if the Ministry of Public Service in Mexico stated that

09:46:16  2    Pemex was the most corrupt entity in the federal government, you

09:46:21  3    would dispute that?

09:46:41  4    A.    That's not something that I can give an opinion on.  I --

09:46:49  5    what I do is I focus on my work and making sure my business runs.

09:46:53  6    Q.    Are you aware that there are articles in the newspaper

09:46:56  7    reflecting a reorganization as of date with Pemex because of the

09:47:02  8    corruption at Pemex?

09:47:57  9    A.    With regards to the Pemex, all I do with Pemex is I am aware

09:48:03  10   of every public RFP that comes out.  I analyze those RFPs.  I

09:48:09  11   prepare the bids.  I participate in the bidding process.  I make

09:48:16  12   sure that whatever project is awarded, that we complete that

09:48:18  13   project, and then, I invoice.  Regarding that governmental

09:48:22  14   entity, you also hear a lot of positive things about the good

09:48:27  15   things they've done in the environmental sphere, about their good

09:48:30  16   use of the newest technology, about their success in deep water

09:48:34  17   drilling.  A lot of things are said about that entity.

09:48:39  18   Q.    In 2011, are you aware that the Texas -- excuse me.  The

09:48:44  19   Mexican Ministry of Public Administration stated that ADT had

09:48:48  20   falsified documents and charged Pemex for non-performed work?

09:49:56  21   A.    There's a lawsuit that we won that was a case brought by the

09:50:02  22   Public Administration Secretary.  We won that case.  We showed

09:50:06  23   that there were no false billings done.  It was a process that

09:50:10  24   held things up for a year and a half.  While the things was being

09:50:14  25   handled, we were awarded or granted the first en paro.  The

09:50:20  1   government agency has, again, filed new allegations, but they
09:50:24  2   have not been able to demonstrate that any false information or
09:50:28  3   document invoices were presented.
09:50:30  4   Q.   In fact, that lawsuit tied up or delayed some of the
09:50:35  5   payments from Pemex, correct?
09:50:48  6   A.   No.   None.
09:50:50  7   Q.   Did it --
09:50:55  8   A.   No, because according to the law, any contract that is in
09:51:40  9   force at that time continues functioning.   So if the contract was
09:51:45  10  already in force, we continued invoicing, we continued providing
09:51:48  11  the services.   Pemex continues paid.   The sanction that is
09:51:52  12  applied during the process is that while everything is ongoing,
09:51:57  13  we cannot participate in any future projects or bids.   So.
09:52:04  14  Q.   Thank you.   Thank you.
09:52:11  15       You stated earlier that you were aware of all of
09:52:15  16  Colorado-Cessa's business activities.
09:52:53  17  A.   What I'm fully aware of is everything that has to do with
09:52:56  18  ADT Petro Servicios.   As to each one of its invoices or the
09:53:00  19  projects that are being undertaken as to the payment, I am aware
09:53:05  20  of all of that, and I work with Mr. Colorado-Cessa in that
09:53:09  21  regard, making sure that the work is being done and that the
09:53:13  22  results are being paid.
09:53:15  23  Q.   Are you aware of a $6 million loan from Efrain Torres, "Zeta
09:53:20  24  14," to Francisco Colorado-Cessa?
09:53:36  25  A.   No.

09:53:37   1   Q.   Are you aware that that money was to be used to buy

09:53:40   2   machinery for ADT Petro Servicios?

09:54:08   3   A.   I'm going to stop here just because I have more to say, but

09:54:59   4   all of the invoices that were presented for the payment of

09:55:02   5   machinery from ADT Petro Servicios was paid from the account

09:55:08   6   wherein we received the moneys from Pemex.  That was the account

09:55:12   7   and those were the funds that were used to generate all of our

09:55:16   8   income, to buy all of our machinery, to undertake and complete

09:55:19   9   all of the projects.  And that was all generated from the ADT was

09:55:24  10   all -- came into and came out of ADT account, which received its

09:55:28  11   funds from Pemex.  I know this because that was my responsibility

09:55:32  12   to pay all of those invoices and expenses.

09:56:06  13          And $6 million?  You could see that that would be

09:56:11  14   easily detected.  I want to tell you that all the machinery was

09:56:16  15   paid from the ADT account.  All of the income that we generated

09:56:20  16   and received was paid into the ADT account through Pemex, and

09:56:24  17   that all of the invoices were paid from that ADT account.

09:56:28  18   Q.   Mr. Segura, are you aware of a $12 million loan payment to

09:56:37  19   Colorado-Cessa from the Zetas in order to bribe public officials

09:56:43  20   so that ADT could get Pemex contracts?  I don't want to --

09:57:48  21   A.   If you would allow me, please.

09:57:49  22          THE COURT:  Well, the question is a "Yes" or "No."  Are

09:57:55  23   you aware or are you not aware?  That's all that's being asked at

09:57:58  24   this point.

09:58:03  25   A.   Was I aware or not aware?

09:58:05   1          THE COURT:  Of an alleged loan of $12 million.  "Yes"

09:58:11   2   or "No"?

09:58:12   3   A.   No.  I was not.

09:58:13   4          THE COURT:  All right.

09:58:13   5   Q.   (BY MS. FERNALD) Are you aware of a $50 million loan payment

09:58:17   6   by the Zetas to Francisco Colorado-Cessa?

09:58:28   7   A.   No.

09:58:30   8   Q.   When is the last time that you've had any contact with

09:58:33   9   Francisco Colorado-Cessa?

09:58:42   10  A.   I have daily.

09:58:44   11  Q.   And have since he's been incarcerated?

09:58:49   12  A.   Yes.

09:58:50   13  Q.   Mr. Segura, have you ever been involved in any fraudulent

09:58:56   14  activities with ADT Petro Servicios and/or Colorado-Cessa?

09:59:11   15  A.   Never participated.

09:59:13   16  Q.   And, Mr. Segura, finally, have you ever been involved in any

09:59:18   17  criminal activity with ADT Petro Servicios, Francisco

09:59:25   18  Colorado-Cessa, or any activities on behalf of either the company

09:59:31   19  or Mr. Colorado-Cessa?

09:59:47   20  A.   No.

09:59:48   21  Q.   I remind you that you're under oath.

09:59:52   22  A.   Yes, ma'am.

09:59:55   23  Q.   Pass the witness.

09:59:59   24         MR. SANCHEZ:  Nothing, your Honor.

10:00:00   25         THE COURT:  No further?  You may step down, sir.

```
10:00:16   1        MR. SANCHEZ:  Your Honor, we don't have any further
10:00:18   2   witnesses at this time.  We'd ask, if necessary, to put on a
10:00:20   3   witness in rebuttal, depending on what the government puts on.
10:00:24   4        THE COURT:  The government may call their first
10:00:26   5   witness.
10:00:26   6        MR. GARDNER:  Your Honor, government calls Special
10:00:28   7   Agent Steve Pennington.
10:00:52   8             (Witness sworn.)
10:00:55   9        THE COURT:  Please state your full name and spell your
10:00:57  10   last.
10:00:57  11        THE WITNESS:  Steve Pennington, P-E-N-N-I-N-G-T-O-N.
10:01:02  12      STEVE PENNINGTON, called by the Government, duly sworn.
10:01:02  13                     DIRECT EXAMINATION
10:01:02  14   BY MR. GARDNER:
10:01:03  15   Q.   Thank you, your Honor.
10:01:04  16        You are Special Agent Steve Pennington, one of the case
10:01:07  17   agents in this case, with the IRS Criminal Investigative
10:01:10  18   Division, correct?
10:01:10  19   A.   Correct.
10:01:11  20   Q.   All right.  And you're here to answer questions as to
10:01:15  21   certain objections lodged by Mr. Trevino, Mr. Colorado-Cessa and
10:01:21  22   Mr. Huitron; is that correct?
10:01:23  23   A.   Correct.
10:01:23  24   Q.   All right.  You're not going to address all the objections
10:01:26  25   that's also going to be addressed by Special Agent Lawson and
```

10:01:29    1    Special Agent Fernald, correct?

10:01:30    2    A.   Correct.

10:01:30    3    Q.   All right.  So I will identify which objection, which

10:01:33    4    defendant I would ask you to address.

10:01:35    5         So let's start with Jose Trevino-Morales' objection.

10:01:40    6    One which is the base offense level and money amounts.  And does

10:01:44    7    your testimony with regard to this also address Francisco Antonio

10:01:50    8    Colorado-Cessa objection one and objection two, to some extent?

10:01:53    9    A.   Yes.

10:01:53   10    Q.   Okay.  So, Mr. Trevino-Morales' first objection is lodged on

10:01:59   11    the base offense level that he's held accountable to in

10:02:03   12    paragraphs 71 and 90 of the presentence report.  That amount that

10:02:08   13    the probation officer came up with was $25,069,275.30.

10:02:16   14         Mr. Pennington, I'd like to break that down into two

10:02:19   15    aspects and talk about, first, the purchases of the horses and

10:02:22   16    then, the expenses paid for the horses.  So let's talk about the

10:02:25   17    purchases.

10:02:26   18         What records did you rely upon to document the

10:02:29   19    purchases of race horses in this conspiracy?

10:02:34   20    A.   We obtained records from Schvaneveldt Horse Sales in

10:02:38   21    California.

10:02:38   22    Q.   Let me interrupt you there.  That was Government's Exhibit

10:02:41   23    227 at trial?

10:02:42   24    A.   Yes.

10:02:42   25    Q.   Schvaneveldt.  Next?

| | | |
|---|---|---|
| 10:02:44 | 1 | A.    Los Alamitos at Pacific Coast, which was basically run by |
| 10:02:48 | 2 | the same organization. |
| 10:02:49 | 3 | Q.    Government's Exhibit 229? |
| 10:02:51 | 4 | A.    Yes. |
| 10:02:51 | 5 | Q.    Next? |
| 10:02:52 | 6 | A.    Heritage Place Auction House in Oklahoma City. |
| 10:02:55 | 7 | Q.    Government's Exhibit 230? |
| 10:02:56 | 8 | A.    Correct. |
| 10:02:57 | 9 | Q.    Next. |
| 10:02:58 | 10 | A.    Ruidoso Downs Sales Company in Ruidoso, New Mexico. |
| 10:03:02 | 11 | Q.    Government's Exhibit 231? |
| 10:03:03 | 12 | A.    Correct. |
| 10:03:04 | 13 | Q.    Next? |
| 10:03:05 | 14 | A.    Eclipse Horse Sales in Grand Prairie, Texas. |
| 10:03:09 | 15 | Q.    Government's Exhibit 237? |
| 10:03:10 | 16 | A.    Yes. |
| 10:03:11 | 17 | Q.    Next? |
| 10:03:11 | 18 | A.    And then, we had several private sales and they were William |
| 10:03:19 | 19 | Morschauser and Bill Price and Lucky Seven Ranch. |
| 10:03:22 | 20 | Q.    The evidence on Mr. Morschauser was 322? |
| 10:03:26 | 21 | A.    Yes. |
| 10:03:26 | 22 | Q.    The evidence on Lucky Seven was 241? |
| 10:03:29 | 23 | A.    Correct. |
| 10:03:29 | 24 | Q.    And that was also the testimony Mr. Russell Stooks, correct? |
| 10:03:32 | 25 | A.    Yes. |

```
10:03:33   1   Q.   Okay.  And then, Mr. Bill Price also testified and his
10:03:37   2   records were Government's Exhibit 367?
10:03:39   3   A.   Correct.
10:03:40   4   Q.   So when you look at these records, what do they consist of?
10:03:47   5   A.   You had -- in the beginning, you had certain people that
10:03:50   6   were used to bid and/or in charge of the purchase of the horses
10:03:55   7   like, for example, first, it was Ramiro Villarreal, and then,
10:03:59   8   later on, Carlos Nayen became involved and kind of took that
10:04:03   9   position where he was directing various purchases of the horses.
10:04:08  10   And then, also, the method of payment that was used to purchase
10:04:12  11   the horses.
10:04:14  12   Q.   If you will, could you just refresh the Court's memory on
10:04:17  13   what methods of payment that you looked at, based on these
10:04:21  14   records, to track the sales of these horses?
10:04:24  15   A.   Yes.  For example, in the early timeframe, we know that
10:04:29  16   Ramiro Villarreal was using Basic Enterprise Company in Mexico to
10:04:34  17   send money to the various auction houses.
10:04:37  18   Q.   And we'd ask the Court about the testimony of Mr. Hernando
10:04:40  19   Guerra?
10:04:40  20   A.   And also by Mauricio Paez.  Hernando Guerra was used by
10:04:46  21   Ramiro Villarreal to send money to purchase horses for the
10:04:49  22   organization.  And then, you had Carlos Nayen became involved,
10:04:57  23   and companies that were used when he became involved was ADT,
10:05:01  24   Petro Servicios, Mr. Francisco Colorado-Cessa, a Grupo Aduanero,
10:05:09  25   PIIG.  And then, they had currency was used to -- as part of the
```

10:05:22   1   purchase.  And then, they had structured deposits into the

10:05:29   2   various different Heritage Place bank accounts.

10:05:34   3   Q.   Did that also include Mr. Del Rayo's payment for the sale of

10:05:40   4   Blues Ferrari?

10:05:41   5   A.   That's another one.  Mr. Del Rayo provided $310,000.

10:05:47   6   Q.   And when you add up the amounts of purchases from the

10:05:50   7   various records, as we've just described, both public sales and

10:05:54   8   private sales, as well as the entities that you identified,

10:05:59   9   making those purchases through those records, what is the total

10:06:01  10   amount you come up with for the purchases of horses?

10:06:04  11   A.   $16,275,011.16.

10:06:12  12   Q.   Now, you, meaning law enforcement, subpoenaed the account of

10:06:17  13   the American Quarter Horse Association; is that correct?

10:06:20  14   A.   Yes.

10:06:21  15   Q.   And I believe that was Government's Exhibit 226, but I may

10:06:23  16   be mistaken on that.  And there was a spreadsheet in which both

10:06:27  17   you and Detective Schutt testified to as tracking 500 or so

10:06:33  18   horses associated with this organization.

10:06:35  19   A.   Correct.

10:06:36  20   Q.   From that 500 horses the amount that you just stated, the

10:06:40  21   sale prices, the amount that you just stated?

10:06:43  22   A.   Yes.  From that spreadsheet is where these figures come

10:06:47  23   from.

10:06:48  24   Q.   Did you have other horses that you did not include in that

10:06:51  25   amount and that was not provided to the probation officer as a

10:06:56  1   conservative estimate of the amount of horses going through this

10:06:59  2   organization?

10:07:00  3   A.   Correct.  And also just for clarification, this $16 million

10:07:04  4   is not the total that was expended on the horses just on the

10:07:09  5   spreadsheet.  There were several payments of I wouldn't say

10:07:17  6   unknown, but maybe we didn't have the receipt that was attached

10:07:20  7   to it to finally balance it out to zero; therefore, I did not use

10:07:24  8   that in the computation of the $16 million, so that would be

10:07:27  9   additional funds.

10:07:28  10  Q.   Now, let's talk about horses that you felt were tied to the

10:07:32  11  organization some way but did not provide to the probation office

10:07:36  12  to calculate the relevant conduct.

10:07:38  13       How many other horses did you associate through the

10:07:43  14  AQHA records through this organization?

10:07:44  15  A.   When we issued subpoenas to the auction houses, we issued

10:07:47  16  subpoenas to AQHA.  We got records based -- and we sent names of

10:07:53  17  members that we believe associated with this organization and

10:07:57  18  assisted them.  They provided us a lot of records, a lot of

10:08:01  19  horses.  I'm going to say probably excess of 700, maybe excess of

10:08:05  20  750 horses.

10:08:07  21  Q.   So of that 750, you were able to confirm 500?

10:08:12  22  A.   Yes.  We culled down some of them for various reasons.

10:08:17  23  Q.   And so, on the other 200, 250, why did you not include those

10:08:20  24  in your calculation?

10:08:22  25  A.   Various reasons.  It may be that the payment didn't come

10:08:28   1   from a certain group of people that we wanted to concentrate on.

10:08:36   2   Maybe the whereabouts of the horse, you know, was unknown.  It's

10:08:39   3   just different reasons why they were excluded.

10:08:41   4   Q.   But that horse or those horses at least had some ties to the

10:08:46   5   organization?

10:08:47   6   A.   We believe they did and so did the auction houses because we

10:08:50   7   received the records.

10:08:52   8   Q.   So can you give me, example, let's say you look at an AQHA

10:08:59   9   form that had Carlos Nayen's name on it.  Why would you not use

10:09:04  10   something like that in the calculation of a horse?

10:09:05  11   A.   If we couldn't determine exactly how it was purchased, we

10:09:08  12   couldn't determine the funds used to purchase it, the whereabouts

10:09:14  13   of it, it really had no other documentation as to that horse, we

10:09:17  14   may have excluded that horse.

10:09:19  15   Q.   Were you able to make a determination on those 250 horses as

10:09:24  16   to the average price of those horses?

10:09:27  17   A.   Yes.  Look at the records as Mr. Schutt was going through

10:09:31  18   it, I think the prices ranged from anywhere from 3,000 to 20,000.

10:09:35  19   Q.   So taking an average of, say, $5,000 out of 250 horses, how

10:09:41  20   much money is that?

10:09:42  21   A.   $1.25 million.

10:09:44  22   Q.   So that $1.25 million is not part of the calculus of the

10:09:50  23   $16,275,000 some-odd dollars?

10:09:52  24   A.   No.  It is not.

10:09:55  25   Q.   So with respect to the value of the purchases of the horses,

10:10:00  1  are you competent that 16 million-plus is a very conservative

10:10:03  2  figure?

10:10:03  3  A.   Yes.

10:10:07  4  Q.   Is it your opinion that the actual value of the purchases of

10:10:09  5  the horses by this organization is in excess of that amount?

10:10:13  6  A.   Yes.

10:10:13  7  Q.   Now, let's talk about the expenses.  Probation office

10:10:18  8  calculated expenses to the tune of $8,794,264.21.  To come to

10:10:28  9  that figure, Special Agent, what did you consider in terms of

10:10:31  10  records to arrive at that figure?

10:10:33  11  A.   We used records from basically 12 sources.  We kind of

10:10:44  12  limited based on the records that we had, which included the

10:10:49  13  breeding fees to Corona Cartel and Mr. Jess Perry, which came

10:10:57  14  from records of Celina Molina.

10:11:00  15  Q.   That's Government's Exhibit 302?

10:11:02  16  A.   Correct.

10:11:08  17  Q.   Okay.

10:11:12  18  A.   Records of the Lazy E.

10:11:13  19  Q.   Government's Exhibit 239?

10:11:15  20  A.   Yes.

10:11:15  21  Q.   Okay.

10:11:16  22  A.   Records from Vessels.

10:11:18  23  Q.   Government's Exhibit 243?

10:11:19  24  A.   Yes.  Records in the Southwest Stallion Station.

10:11:23  25  Q.   Government's Exhibit 233 and 266?

| | | |
|---|---|---|
| 10:11:26 | 1 | A.   Correct.  Records obtained from Paul Jones Racing. |
| 10:11:31 | 2 | Q.   Government's Exhibit 242 and 259? |
| 10:11:33 | 3 | A.   Those are going to be the bank records that we subpoenaed in |
| 10:11:35 | 4 | conjunction with Paul Jones Racing.  JGA Racing. |
| 10:11:44 | 5 | Q.   Government's Exhibit 313? |
| 10:11:45 | 6 | A.   Yes.  The expenses to and through Francisco Colorado as |
| 10:11:51 | 7 | Special Agent Michael Fernald analyzed those accounts. |
| 10:11:55 | 8 | Q.   Government's Exhibit 252. |
| 10:11:58 | 9 | A.   Expenses to and through Huitron Homes. |
| 10:12:01 | 10 | Q.   That's the Wells Fargo accounts, correct? |
| 10:12:03 | 11 | A.   Correct. |
| 10:12:03 | 12 | Q.   Government's Exhibit 256? |
| 10:12:05 | 13 | A.   Yes.  Expenses to and through Adan Farias. |
| 10:12:09 | 14 | Q.   That's Government's Exhibit 274? |
| 10:12:11 | 15 | A.   And then, we had Currency Transaction Reports reflecting |
| 10:12:18 | 16 | payments that I think it was Victor Lopez made to Equine Sports |
| 10:12:23 | 17 | Medicine and Surgery, embryo transfer services.  And then, we had |
| 10:12:30 | 18 | expenses to and through Jose Trevino that, again, was conducted |
| 10:12:34 | 19 | by the financial analysis that Special Agent Michael Fernald |
| 10:12:37 | 20 | conducted. |
| 10:12:38 | 21 | Q.   And so, is that how you get to the amounts we previously |
| 10:12:43 | 22 | stated, the eight-plus million? |
| 10:12:44 | 23 | A.   As a matter of fact, Michael Fernald actually called to my |
| 10:12:48 | 24 | attention approximately 200-and-some-odd thousands that I had |
| 10:12:53 | 25 | left off, which should bring the total to $9,061,364.21. |

```
10:12:59   1   Q.   And where did that extra --
10:13:01   2   A.   That was part of the analysis that Special Agent Fernald did
10:13:05   3   on Francisco Colorado.
10:13:07   4   Q.   Did you also consider that a conservative figure with
10:13:11   5   respect to expenses?
10:13:12   6   A.   Yes.
10:13:12   7   Q.   Okay.  And what expenses did you identify but not consider
10:13:19   8   or use in your calculus to get to the $9 million?
10:13:22   9   A.   We know that there was a number of vet expenses out there
10:13:26  10   that we did not use.  We did not go and subpoena every vet.  For
10:13:30  11   example, Elgin Vet, we did not use their records.  There was
10:13:33  12   other additional vets that we did not use.  We know --
10:13:36  13   Q.   Let me stop you there.  For example, Elgin Vet, was there
10:13:40  14   documents recovered from the Huitron search warrants that
10:13:42  15   indicated they were using the Elgin Vet for horse expenses?
10:13:45  16   A.   Yes.
10:13:46  17   Q.   All right.  And the other vets included Equine Sports
10:13:48  18   Medicine and New Mexico and Los Alamitos?
10:13:53  19   A.   Correct.  They had vets in New Mexico.  They had vets in
10:13:57  20   California that were being used.  We did not -- I don't believe
10:14:00  21   we subpoenaed -- we did not use those records.  We know that they
10:14:05  22   were training horses in Ruidoso, New Mexico at the facility at
10:14:09  23   Ruidoso Downs.  I do not believe that we got those records nor
10:14:13  24   did we count those expenses into the computation.  Same thing
10:14:19  25   with Los Alamitos, except for the ones that I mentioned.
```

10:14:24  1   Q.   Did you count the transportation expenses for horses within

10:14:28  2   the United States?

10:14:28  3   A.   No.  I did not.

10:14:29  4   Q.   Did you find records and receipts in both the e-mails, the

10:14:33  5   computers, and the search warrants indicating they were paying

10:14:37  6   transporters to move horses within the United States?

10:14:39  7   A.   Yes.  There was records.

10:14:46  8   Q.   Did you include ferry fees?

10:14:49  9   A.   No, sir.

10:14:49  10  Q.   A number of horses were transported across the border to

10:14:53  11  Mexico.  Did you discover fees associated with the inspection and

10:14:58  12  veterinary certification for those transportation of horses?

10:15:01  13  A.   Yes.

10:15:02  14  Q.   Did you include those fees?

10:15:03  15  A.   No.

10:15:05  16  Q.   Now, there was some evidence with respect to various

10:15:08  17  horsemen's accounts.  Those are accounts at racetracks for owners

10:15:11  18  and trainers.  Did you include those expenses and fees?

10:15:15  19  A.   Only, for example, the money that went into Huitron Homes

10:15:18  20  and then, into the horsemen's account, those funds were, in fact,

10:15:23  21  counted.  Other funds that went into the horsemen's account used

10:15:27  22  to pay various different things were not accounted.

10:15:30  23  Q.   There was some testimony, introduction of records as it

10:15:35  24  related to Yearsley Bloodstock Insurance.  To what extent did you

10:15:39  25  not count some of those expenses?

| | | |
|---|---|---|
| 10:15:42 | 1 | A.   If it was included in the analysis done by Special Agent |
| 10:15:47 | 2 | Michael Fernald with -- as it relates to Jose Trevino where he |
| 10:15:52 | 3 | wrote checks and paid Nancy Yearsley, it was included.  When you |
| 10:15:56 | 4 | had payments that went through Fernando Garcia, Garcia Bloodstock |
| 10:16:01 | 5 | by Hernando Guerra, other things, those funds were not included. |
| 10:16:08 | 6 | Q.   Did you include expenses as related to the accounts for, you |
| 10:16:14 | 7 | mentioned, Garcia Bloodstock, but how about Poker Ranch, LLC? |
| 10:16:20 | 8 | A.   No.  I don't believe we did. |
| 10:16:22 | 9 | Q.   Okay.  Legacy Ranch? |
| 10:16:23 | 10 | A.   No. |
| 10:16:24 | 11 | Q.   Okay.  So taking those that you did not consider, can you |
| 10:16:27 | 12 | now give the Court a estimate of the value -- of total value of |
| 10:16:32 | 13 | those funds that you did not consider and provide to the |
| 10:16:35 | 14 | probation officer for the calculation of the total expenses? |
| 10:16:49 | 15 | A.   It would be approximately somewhere between 900 to a million |
| 10:16:53 | 16 | or over a million dollars that we did not. |
| 10:16:58 | 17 | Q.   So would you classify the amount that you came up with the |
| 10:17:01 | 18 | expenses as a conservative amount? |
| 10:17:04 | 19 | A.   Yes, I would. |
| 10:17:04 | 20 | Q.   I want to turn your attention, specifically, Mr. |
| 10:17:11 | 21 | Colorado-Cessa's objections one and two, and we'll get to three |
| 10:17:15 | 22 | in a second.  The probation office held him accountable only for |
| 10:17:19 | 23 | $10,134,082.73. |
| 10:17:23 | 24 |      Where did you get that figure from with respect to, |
| 10:17:28 | 25 | again, purchases, first? |

10:17:33   1   A.   From the money from Colorado-Cessa through personal checks,

10:17:37   2   through ADT wire transfers, through other funds, through the

10:17:48   3   Arian Jaff Quick Loans funds, the one he associated with -- from

10:17:52   4   sales, excluding PIIG, was $8,616,069.  Through PIIG was

10:18:08   5   $802,135.  And then, the expenses which, again, come from the

10:18:12   6   analysis of Michael Fernald was $715,878.50, which gets us to the

10:18:19   7   $10,134,082.73.

10:18:24   8   Q.   And I believe you testified at trial, we had a slide, a

10:18:27   9   demonstrative exhibit that showed Mr. Cessa was responsible for

10:18:32   10  purchasing 121 horses.  Do you recall that?

10:18:34   11  A.   Yes.

10:18:34   12  Q.   Now, when you count up the purchase price and the expenses

10:18:40   13  that you just testified to, would you classify that as a

10:18:43   14  conservative amount of the money he's directly accountable for or

10:18:48   15  a liberal amount?

10:18:49   16  A.   Conservative.

10:18:50   17  Q.   Okay.  And what expenses did you not include and report to

10:18:53   18  the probation office that you believe should be held accountable

10:18:56   19  for Mr. Colorado-Cessa?

10:18:57   20  A.   Of the 121 horses that were purchased at various auctions,

10:19:02   21  we know that a number of those horses were placed at various

10:19:05   22  different trainers in Ruidoso, New Mexico, at Los Alamitos,

10:19:10   23  California, other places in California, at the Southwest Stallion

10:19:15   24  Station ranch in Elgin, Texas.  With other horses purchased

10:19:20   25  through -- with funds through, like, Basic Enterprises or Grupo

10:19:24  1   Aduanero, those horses were all housed or boarded under the

10:19:29  2   control of Carlos Nayen, and he directed the payments for the

10:19:32  3   boarding, care, training of those type horses, and those expenses

10:19:37  4   are not included in this $10 million figure you just mentioned.

10:19:41  5   Q.   So as a horse purchaser, would you find it reasonable to

10:19:47  6   assume since you purchased a horse, you're going to have to take

10:19:49  7   care of it, train it, and race it?

10:19:51  8   A.   Correct.

10:19:52  9   Q.   And so, did you locate any expenses with respect -- or hold

10:19:56  10  Mr. Cessa accountable for any of those expenses in your report to

10:20:00  11  the probation office?

10:20:01  12  A.   He got held accountable just for the wire transfers and the

10:20:04  13  moneys that Mr. Fernald traced directly from ADT to various

10:20:08  14  different locations.  It does not include the other horses being

10:20:13  15  housed with the other organization horses, and then, all those

10:20:19  16  expenses were actually grouped together in their type of payment.

10:20:24  17       For example, the horses that were purchased and sent to

10:20:28  18  Southwest Stallion Station under the control of Carlos Nayen, on

10:20:33  19  occasion, were paid for with some of the funds from Alfonso Del

10:20:37  20  Rayo-Mora, and they were applied to all the different accounts at

10:20:40  21  the direction of Carlos Nayen.

10:20:43  22  Q.   And so, when you factor in that -- those expenses for those

10:20:50  23  121 horses, what amount could Mr. Francisco Colorado-Cessa be

10:20:57  24  held accountable for the expenses of the horses, in addition to

10:20:59  25  what you calculate for the purchases in the previous 715,000

10:21:04  1  expenses?

10:21:05  2  A.    Including the analysis of the expenses for the ranch in

10:21:10  3  Oklahoma, there would be an additional $8,300,000, approximately.

10:21:21  4  Q.    And, again, that amount was not held accountable to Mr.

10:21:25  5  Colorado-Cessa, correct?

10:21:25  6  A.    Correct.

10:21:26  7  Q.    Now, with respect to the 121 horses purchased by Mr.

10:21:30  8  Colorado-Cessa, how many of those did you locate under his sole

10:21:35  9  care and custody, control in the United States upon arrest and

10:21:40  10  search warrants?

10:21:41  11  A.    Of the 121, I think he only had maybe three or four at

10:21:57  12  Southwest Stallion.

10:22:02  13  Q.    And who was arranging for the payment for those expenses?

10:22:06  14  A.    Early on, it was Carlos Nayen, and then, I think at the end,

10:22:10  15  I think that bill continued to grow.  I don't think it was paid

10:22:14  16  towards the end.

10:22:15  17  Q.    Now, Special Agent Pennington, I want to turn your attention

10:22:18  18  to Mr. Colorado-Cessa's objection sort of contained within one

10:22:25  19  and two about his knowledge of the SUA proceeds.  And you were

10:22:29  20  present during both the testimony and, also, the interview of Mr.

10:22:34  21  Juan Carlos Hinojosa, correct?

10:22:35  22  A.    Yes.

10:22:36  23  Q.    If you will, Ms. Fernald talked about it briefly when she

10:22:40  24  was talking to Mr. Segura.  Could you briefly talk about the $6

10:22:45  25  million that Mr. Hinojosa talked about with respect to the Zeta

10:22:49   1   payment to capitalize ADT?

10:22:51   2   A.   Yes.

10:22:52   3   Q.   And just in general, talk about what Mr. Hinojosa told the

10:22:58   4   jury, as well as you in the interviews, regarding all the

10:23:01   5   payments that were made to Francisco Colorado.

10:23:05   6   A.   After meeting Francisco Colorado and Efrain Torres, "Zeta

10:23:12   7   14," there was discussion in which Mr. Colorado wanted funds to

10:23:17   8   put into his business -- businesses and Mr. Hinojosa, during our

10:23:24   9   initial interview, was actually able to identify ADT Petro

10:23:27   10  Servicios as one of the businesses.

10:23:29   11          MR. SANCHEZ:  Your Honor, sorry to cut him off, but I'm

10:23:31   12  going to object at this point.  Mr. Hinojosa testified at trial.

10:23:36   13  The actual source of the information came in that was subject to

10:23:39   14  cross-examination.  I think we should be looking to that record

10:23:45   15  of what he actually said at trial both on direct and through

10:23:49   16  cross, instead of just getting a summary of information that came

10:23:53   17  at trial and through who knows how many different interviews that

10:23:57   18  this man had with Mr. Hinojosa.  For that reason, I'm objecting.

10:24:02   19          THE COURT:  You're not withdrawing your objection, are

10:24:04   20  you?

10:24:04   21          MR. SANCHEZ:  Pardon?

10:24:05   22          THE COURT:  You're not withdrawing your objection, are

10:24:08   23  you?

10:24:08   24          MR. SANCHEZ:  No.

10:24:09   25          THE COURT:  Then the objection -- your objection is

10:24:11   1   overruled.  He has the right to put what he wants in the record

10:24:14   2   in light of your objection, sir.  You may proceed.

10:24:20   3   Q.   (BY MR. GARDNER) So you talked about 6 million.  Could you

10:24:22   4   talk about the 12 million?

10:24:23   5   A.   Yes.  Twelve million was funneled through -- from, again,

10:24:27   6   Efrain Torres through Francisco Colorado to be used for the

10:24:32   7   campaign of the governor-elect Herrera during that timeframe.

10:24:38   8   Q.   And so, what was the total amount that Mr. Hinojosa

10:24:43   9   testified to and/or your interview that he provided to Mr.

10:24:47   10  Colorado-Cessa from Zeta money?

10:24:49   11  A.   It would be $18 million plus a suitcase of cash.

10:24:54   12  Q.   So, again, to be conservative, 18 million from Mr. Hinojosa?

10:24:58   13  A.   Correct.

10:24:58   14  Q.   And what evidence or information did you get from Hinojosa

10:25:03   15  regarding Mr. Colorado-Cessa's use of his aircraft in conjunction

10:25:07   16  with the illegal activities of the Zetas?

10:25:09   17  A.   That's another thing he had mentioned is that part of this 6

10:25:12   18  million was used to purchase a King Air aircraft.  And then, as

10:25:22   19  things progressed and Mr. Torres and Mr. Colorado became close

10:25:27   20  associates and friends, they then also used the aircraft to

10:25:31   21  transport cocaine.

10:25:36   22  Q.   And is that transportation from Mexico into the United

10:25:40   23  States or?

10:25:41   24  A.   No.  I believe it's just in Mexico.

10:25:43   25  Q.   And, again, who did this cocaine belong to?

```
10:25:46   1    A.    Zeta cocaine.
10:25:48   2    Q.    Now, we heard or had some testimony early on, outside the
10:25:53   3    presence of the jury, and from other witnesses about Mr. Cessa's
10:25:56   4    ranch called Flor de Maria.  What did Mr. Hinojosa provide you as
10:26:01   5    to who was the owner of that ranch?
10:26:04   6    A.    The ranch basically -- I think the conversation was that
10:26:13   7    could belong to Efrain Torres if proper payments were not made to
10:26:19   8    Efrain Torres.
10:26:22   9    Q.    And do you believe he was referring back to the earlier
10:26:25   10   payments of the $18 million?
10:26:27   11   A.    Yes.
10:26:29   12   Q.    So the next -- in extent, was the ranch put up as
10:26:35   13   collateral?
10:26:35   14   A.    That's my understanding.
10:26:37   15   Q.    One more question with respect to the base offense level,
10:26:51   16   the knowledge of SUA proceeds.
10:26:55   17          There was a slide, I believe, that was in my closing
10:26:58   18   argument that we talked about the last two horse sales at
10:27:01   19   Heritage Place.  How many -- or what was the amount, the total
10:27:06   20   amount of money spent on the purchases of the horse at those last
10:27:09   21   two sales?
10:27:23   22          THE COURT:  The sales were where?
10:27:26   23          MR. GARDNER:  Heritage Place, your Honor, Oklahoma.
10:27:30   24   A.    It was over like $1.2 million, I believe.  It was the
10:27:35   25   November sale in 2011 where the funds were sent to Heritage Place
```

10:27:41  1  by Arian Jaff and his company called Quick Loans in the amount of

10:27:46  2  $733,000, and then, at the Heritage Place January 2012, where

10:27:53  3  they had seven horses purchased -- or, actually, it's five horses

10:27:56  4  and two foals in utero for a total of approximately $280,000.  So

10:28:05  5  those two combined, over a million dollars.

10:28:09  6  Q.   (BY MR. GARDNER) And of those horses at those two sales, how

10:28:11  7  many remained in Mr. Colorado's name and what was the amounts of

10:28:14  8  those two?

10:28:15  9  A.   I believe, actually, only two of those horses.  As the ones

10:28:19  10  in November, I believe, were placed into the name of Luis Aguirre

10:28:24  11  and then, transferred to Jose Trevino in January of 2012.  And

10:28:30  12  then, the ones in the January 2012, only two of the horses, one

10:28:39  13  costing $8,200 and one costing $11,500, were placed in the name

10:28:44  14  of Francisco Colorado.  The other horses, I believe, were

10:28:47  15  transferred and taken to Jose Trevino's ranch in Lexington,

10:28:51  16  Oklahoma.

10:28:52  17  Q.   I'd like to turn your attention to Mr. Colorado-Cessa's

10:28:55  18  objection number three in which he claims he should be a minor

10:28:58  19  participant.

10:29:00  20       What evidence did you rely on to show that if she's not

10:29:05  21  a leader, organizer or manager, at the least, he is an average

10:29:09  22  participant?

10:29:10  23  A.   Number one, he provided -- of the 16 million he provided to

10:29:16  24  use to purchase the horses, the funds through Colorado-Cessa

10:29:20  25  exceeded over half of that in excess of 9 million.  There was

10:29:25   1   multiple purchases.  You had wire transfers.  You had personal

10:29:30   2   checks.  You had the ADT wires.  You had him going through Arian

10:29:35   3   Jaff at a very high interest rate.

10:29:40   4   Q.   And, again --

10:29:41   5   A.   You also had him going -- I'm sorry.

10:29:43   6   Q.   Sorry.  With respect to the moneys obtained from Mr. Jaff,

10:29:46   7   Mr. Colorado-Cessa sends that to Heritage Place under his own

10:29:49   8   name?

10:29:49   9   A.   No.

10:29:50  10   Q.   And whose name was it under?

10:29:51  11   A.   It was under Arian Jaff, part of it.  The other part was

10:29:55  12   under Quick Loans.

10:29:55  13   Q.   And with respect to the 121 horses, what percentage of the

10:30:01  14   entire organization's horses that you've identified does that

10:30:05  15   represent?

10:30:12  16   A.   Probably at least a fifth.

10:30:15  17   Q.   And could you characterize the value of these horses with

10:30:22  18   respect to or as it relates to the value of all of the

10:30:27  19   organization's horses?

10:30:29  20   A.   The higher-valued horses were actually purchased with funds

10:30:33  21   through Mr. Colorado-Cessa.

10:30:36  22   Q.   And what was the length of time that you observed Mr.

10:30:39  23   Colorado-Cessa's involvement with the Zeta organization, total

10:30:45  24   time period?

10:30:45  25   A.   2004, 2005 to the time of his arrest.

10:30:50  1    Q.   Okay.  And what about with respect to the verifiable

10:30:53  2    purchases of horses here in the United States?

10:30:55  3    A.   They started in 2008.

10:30:56  4    Q.   Till the time he was arrested in 2012?

10:30:59  5    A.   Yes.

10:30:59  6    Q.   And we have a number of purchases.  Approximately how many

10:31:04  7    purchases or auctions did Mr. Colorado-Cessa participate in in

10:31:08  8    terms of auction?

10:31:10  9    A.   I don't believe any.  I don't know that he actually showed

10:31:13  10   up and bid on any horse.

10:31:14  11   Q.   I'm sorry.  That was an in-artful question.

10:31:16  12   A.   Okay.

10:31:16  13   Q.   How many auctions were funds from either ADT or

10:31:22  14   Colorado-Cessa provided for the sale of horses or purchase of

10:31:25  15   horses?

10:31:38  16   A.   I want to say at least eight.

10:31:45  17   Q.   Now, who is Francisco Silva-Ramos?

10:31:49  18   A.   He was a business associate of Francisco Colorado, and he

10:31:54  19   was the man that was placed in front of Bonanza Racing.

10:32:00  20   Q.   And recall your attention to Government's Exhibit 380 was a

10:32:03  21   map.  Where did it indicate that Mr. Francisco Silva-Ramos

10:32:07  22   resided in relation to Mr. Colorado-Cessa?

10:32:09  23   A.   Just around the corner, like two houses away.

10:32:22  24   Q.   Special Agent, I'd now like to turn your attention to the

10:32:25  25   objection lodged by Mr. Eusevio Huitron.

| | | |
|---|---|---|
| 10:32:28 | 1 | THE COURT:  We're going to give the court reporter a |
| 10:32:30 | 2 | break. |
| 10:32:30 | 3 | MR. GARDNER:  Thank you, sir. |
| 10:32:32 | 4 | THE COURT:  Ten-minute break. |
| 10:44:18 | 5 | (Recess.) |
| 10:44:20 | 6 | THE COURT:  You may proceed. |
| 10:44:20 | 7 | Q.   (BY MR. GARDNER) Special Agent Pennington, before the break, |
| 10:44:23 | 8 | if you'd turn to the objection lodged for Mr. Eusevio Huitron, |
| 10:44:27 | 9 | objection number one, non-scoring objection.  So I'll turn to |
| 10:44:30 | 10 | objection number two regarding laundered funds about the |
| 10:44:34 | 11 | proceeds. |
| 10:44:35 | 12 | If you will, could you recall the testimony of Mr. |
| 10:44:39 | 13 | "Poncho" Cuellar with respect to a courier making a joke? |
| 10:44:44 | 14 | A.   Yes. |
| 10:44:44 | 15 | Q.   Could you inform the Court, for the record, what that joke |
| 10:44:48 | 16 | was? |
| 10:44:49 | 17 | A.   The courier went to visit Mr. Huitron, I believe, to drop |
| 10:44:53 | 18 | off some money, made a joke about acquiring some cocaine, and |
| 10:44:59 | 19 | that joke quickly made its way back through "42."  "Poncho" |
| 10:45:04 | 20 | Cuellar -- basically admonishing "Poncho" Cuellar and the courier |
| 10:45:09 | 21 | from making a joke. |
| 10:45:10 | 22 | Q.   And that testimony, do you recall the Court's attention, |
| 10:45:13 | 23 | came from "Poncho" Cuellar, right? |
| 10:45:15 | 24 | A.   I believe it was. |
| 10:45:15 | 25 | Q.   Mario Alfonso Cuellar? |

```
10:45:18   1   A.   Yes.

10:45:18   2          THE COURT:  Save some of the testimony, the Court's

10:45:22   3   reviewed notes that I made during the trial, and, of course, the

10:45:31   4   transcript of trial has been available to everybody.

10:45:35   5          MR. GARDNER:  I may save that for argument then, Judge.

10:45:37   6          THE COURT:  You may.

10:45:38   7          MR. ESPER:  For the record, I would object to that,

10:45:40   8   that that was not Mr. Cuellar that testified to that statement.

10:45:44   9          THE COURT:  All right.

10:45:47  10   Q.   (BY MR. GARDNER) Now, I want to talk about Government's

10:45:50  11   Exhibit 256, which was the Huitron Homes accounts.  Could you --

10:45:56  12   and, again, this sort of goes to objection number two and three,

10:46:00  13   three being the sophisticated laundering.

10:46:06  14          Could you please inform the Court of the method in

10:46:09  15   which the money was deposited into the Huitron Homes account and

10:46:13  16   how it was distributed out of that account?

10:46:14  17   A.   Yes.  A very large --

10:46:16  18          THE COURT:  I'm not interested in any evidence on

10:46:20  19   sophistication.  All of those objections are overruled.

10:46:24  20          MR. GARDNER:  Yes, your Honor.

10:46:26  21   Q.   (BY MR. GARDNER) Let's go to objection number four, then,

10:46:28  22   which would be the minor role.  I'm sorry, let's go back.

10:46:32  23          There was a non-testifying individual that the

10:46:36  24   government interviewed in connection with this case.  Do you

10:46:40  25   recall that individual?
```

| | | |
|---|---|---|
| 10:46:40 | 1 | A.   Yes, I do. |
| 10:46:41 | 2 | Q.   And does that individual wish for his information to be |
| 10:46:44 | 3 | disclosed in open court? |
| 10:46:46 | 4 | A.   No.  He does -- well, the information, yes.  The identity, |
| 10:46:49 | 5 | no. |
| 10:46:50 | 6 | Q.   Yes, sir.  Why does he or she not wish for that identity to |
| 10:46:54 | 7 | be disclosed? |
| 10:46:54 | 8 | A.   Concerned for safety. |
| 10:46:55 | 9 | Q.   Could you please explain for the Court the role of that |
| 10:46:58 | 10 | individual within the Zeta organization? |
| 10:47:02 | 11 | A.   Yes.  The person had personal knowledge of "40," "42," Jose |
| 10:47:10 | 12 | Trevino, Francisco Colorado-Cessa, Fernando Garcia, Eusevio |
| 10:47:17 | 13 | Huitron, and a number of other folks in this organization and |
| 10:47:25 | 14 | conspiracy, and dealt with them on a regular basis. |
| 10:47:29 | 15 | Q.   And with respect to Eusevio Huitron, what did this |
| 10:47:35 | 16 | confidential source provide you with information regarding Mr. |
| 10:47:37 | 17 | Huitron's connection to Miguel Angel Trevino-Morales, also known |
| 10:47:43 | 18 | as "40"? |
| 10:47:44 | 19 | A.   That they met in Nuevo Laredo, Mexico, I believe in Mexico, |
| 10:47:50 | 20 | and they were discussing the horses of "Mamito." |
| 10:47:53 | 21 | Q.   And was this individual present during the meeting between |
| 10:47:57 | 22 | Eusevio Huitron and "40"? |
| 10:47:59 | 23 | A.   Yes. |
| 10:47:59 | 24 | Q.   And what did this individual explain with respect -- or was |
| 10:48:04 | 25 | this individual asked whether or not all the cooperating -- I'm |

10:48:08  1  sorry.  All the defendants in this case had knowledge that they

10:48:11  2  were dealing with the Zetas?

10:48:13  3  A.   Yes.  I believe the statement was everybody knew, and if

10:48:20  4  they didn't, they were told that this was "40's" money, so they

10:48:24  5  knew to be careful.

10:48:25  6  Q.   Now, were there -- also with respect to the knowledge, were

10:48:33  7  there a number of computers seized from the Huitron place of

10:48:38  8  business?

10:48:39  9  A.   Yes.  Exactly where, I don't recall, but yes, there was some

10:48:43  10  seized.

10:48:43  11  Q.   That's Government's Exhibit 364 ATXA through RR, correct?

10:48:48  12  A.   Yes.

10:48:48  13  Q.   And with respect to pictures demonstrating a connection to

10:48:53  14  the Zetas, could you recall that?

10:48:55  15  A.   I know there were a lot of pictures on there.  There was a

10:48:58  16  picture of the Z.  There was pictures of -- yes.

10:49:01  17  Q.   Severed heads, bodies?

10:49:03  18  A.   Yes.

10:49:03  19  Q.   Those pictures weren't introduced at trial, correct?

10:49:06  20  A.   They were not.

10:49:06  21  Q.   Okay.  Now, going to the objection number four, which is the

10:49:10  22  minor role.  How many number of transactions can you estimate

10:49:16  23  that Mr. Eusevio Huitron conducted, either through his Huitron

10:49:22  24  Homes accounts or through his horsemen's accounts, as it relates

10:49:27  25  to this organization?

10:49:29    1            MR. ESPER:  Your Honor, I'm going to object.  I think

10:49:31    2    that testimony regarding that heard by the Court as to those

10:49:33    3    deposits, and I don't think Mr. Huitron -- this particular Mr.

10:49:36    4    Huitron made any.

10:49:39    5            THE COURT:  Well, if you'll limit your questions to the

10:49:44    6    activities of Mr. Eusevio Huitron, I will permit the question and

10:49:54    7    answer.

10:49:56    8    Q.   (BY MR. GARDNER) What is the number of horses that you

10:49:58    9    estimated that Eusevio Huitron trained on behalf of this

10:50:01   10    organization?

10:50:04   11    A.   I want to say in excess of 40 during the timeframe.

10:50:08   12    Q.   And when you say timeframe, could you list for the Court the

10:50:13   13    information you have regarding the timeframe in which Mr. Eusevio

10:50:18   14    Huitron was involved in this organization?

10:50:20   15    A.   Right.  He was one of the trainers, I believe, of Tempting

10:50:25   16    Dash in 2008 timeframe, 2009 timeframe.  And then, in July of

10:50:32   17    2010, June 2010, a number of the horses were taken to his ranch

10:50:37   18    to be trained.  Prior to that, he was training horses for

10:50:40   19    "Mamito."  And then, he also, I believe, continued training

10:50:47   20    horses through the spring of 2012.

10:50:53   21    Q.   And was that training horses under Mr. Fernando Garcia in

10:50:57   22    New Mexico?

10:50:58   23    A.   Yes.

10:50:58   24    Q.   Okay.  Is that where he broke his leg?

10:51:01   25    A.   Yes.

10:51:02    1    Q.   Now, also, turning your -- or recalling your attention to
10:51:07    2    Government's Exhibit 65A, it's a detailed folder of the
10:51:11    3    distribution of funds and horses per nominees.
10:51:15    4         Could you reintroduce or talk about all those documents
10:51:19    5    in that folder?  Could you recall the documents in that folder,
10:51:24    6    how it relates to Mr. Eusevio Huitron taking care of various
10:51:28    7    horses for various nominees?
10:51:29    8    A.   Without re-seeing the exhibit.
10:51:30    9         MR. ESPER:  Excuse me, your Honor, I'm going to object.
10:51:33   10    There was no evidence that that was Mr. Eusevio Huitron's writing
10:51:36   11    or that the folder was attributable to him.  It was found in a
10:51:40   12    search of offices of Huitron Homes.  Not attributable to Eusevio
10:51:46   13    Huitron.
10:51:50   14         MR. GARDNER:  Your Honor, the majority of that folder
10:51:52   15    pertained to the training of horses in which other evidence
10:51:55   16    indicated Mr. Huitron did.
10:51:59   17         THE COURT:  The Court's primarily concerned with the
10:52:02   18    number of horses and the money.  So if you'll go off to those
10:52:07   19    two, we might could shorten the hearing.
10:52:10   20         MR. GARDNER:  Yes, sir.
10:52:11   21         THE COURT:  It's the money that went through Mr.
10:52:14   22    Huitron to train the more than 40 horses.
10:52:17   23         MR. GARDNER:  Yes, sir, your Honor.
10:52:19   24    Q.   (BY MR. GARDNER) Special Agent Pennington, I'd like to turn
10:52:21   25    your attention now as well as to testimony with respect to the

| | | |
|---|---|---|
| 10:52:24 | 1 | asset forfeiture proceeding here, as well. |
| 10:52:28 | 2 | Now, you have a copy of the superseding indictment in |
| 10:52:30 | 3 | front of you? |
| 10:52:31 | 4 | A.   Yes, I do. |
| 10:52:31 | 5 | Q.   I'd like you to look at page 21 of the superseding |
| 10:52:34 | 6 | indictment.  Lists a number of financial accounts.  Paragraphs 2 |
| 10:52:41 | 7 | through 7? |
| 10:52:42 | 8 | A.   Yes. |
| 10:52:43 | 9 | Q.   Okay.  Were those financial accounts analyzed during the |
| 10:52:47 | 10 | money-laundering investigation? |
| 10:52:47 | 11 | A.   Yes, they were. |
| 10:52:48 | 12 | Q.   Can you generally describe these accounts? |
| 10:52:50 | 13 | A.   Number two is going to be the Huitron Homes bank account, |
| 10:52:55 | 14 | Wells Fargo.  Then you had Garcia Bloodstock Racing at Wells |
| 10:53:00 | 15 | Fargo.  Carlos Nayen, Carmina, LLC at Wells Fargo, Poker Ranch at |
| 10:53:06 | 16 | Wells Fargo, another Poker Ranch at Wells Fargo, and Bank of |
| 10:53:10 | 17 | America, LA Horses account. |
| 10:53:12 | 18 | Q.   Were these bank accounts controlled by various nominees or |
| 10:53:14 | 19 | entities associated with the organization? |
| 10:53:16 | 20 | A.   Yes. |
| 10:53:16 | 21 | Q.   And what were your findings based on the analysis of these |
| 10:53:21 | 22 | accounts? |
| 10:53:21 | 23 | A.   These accounts were used by members of the organization to |
| 10:53:25 | 24 | funnel funds and to help the conspiracy. |
| 10:53:29 | 25 | Q.   Okay.  Were they used to facilitate and further the |

10:53:33  1   money-laundering conspiracy?

10:53:33  2   A.   Yes.

10:53:34  3   Q.   I'd like you to look at page 22 of the superseding

10:53:37  4   indictment.   And were the accounts listed in paragraphs 13

10:53:41  5   through 19 analyzed as part of the same investigation?

10:53:46  6   A.   Yes, they were.

10:53:47  7   Q.   Okay.   And, again, without listing each account there, are

10:53:50  8   they generally accounts that Ruidoso Downs and Los Alamitos,

10:53:54  9   controlled by nominees or persons or entities associated with the

10:53:58 10   money-laundering conspiracy?

10:53:59 11   A.   Yes.   These were the, for lack of a better word, horsemen's

10:54:03 12   accounts at the various different racing entities.

10:54:05 13   Q.   Okay.   What were the findings based on the analysis of these

10:54:07 14   accounts?

10:54:08 15   A.   Each person associated with the racing of these horses

10:54:12 16   controlled by the organization had to establish the horsemen's

10:54:15 17   account in order to funnel funds through for entry fees,

10:54:18 18   training, winnings, that type stuff.   So each of the --

10:54:20 19          THE COURT:   Slow down a little.

10:54:22 20   A.   Oh, I'm sorry.   Each of these were used to, again, funnel

10:54:27 21   money into for race winnings, payments of expenses, race entries,

10:54:33 22   payment of jockeys, that type of stuff.

10:54:35 23   Q.   (BY MR. GARDNER) And turning your attention now to the

10:54:38 24   horses contained on pages 24 through 44, were they used or

10:54:44 25   involved -- were they used to facilitate or involved in the

| | | |
|---|---|---|
| 10:54:47 | 1 | money-laundering conspiracy based on your analysis? |
| 10:54:48 | 2 | A.   Yes. |
| 10:54:50 | 3 | Q.   And how so? |
| 10:54:52 | 4 | A.   A number of these horses were purchased through the various |
| 10:54:55 | 5 | auctions we've talked about.  We also had a number of horses that |
| 10:54:59 | 6 | were bred into the organization in which horses that were already |
| 10:55:05 | 7 | purchased through the different auctions were bred to a number of |
| 10:55:09 | 8 | high-dollar stud horses, like First Down Dash, Corona Cartel, Mr. |
| 10:55:14 | 9 | Jess Perry, just to name a few.  And then, the -- as the babies |
| 10:55:20 | 10 | were born, a number of these were seized from the ranch in |
| 10:55:24 | 11 | Lexington, Oklahoma. |
| 10:55:26 | 12 | Q.   Approximately how many horses total were seized? |
| 10:55:28 | 13 | A.   Approximately 489, I believe, were seized. |
| 10:55:33 | 14 | Q.   And of those horses, were they in the course of your |
| 10:55:37 | 15 | investigation controlled or directed by "40," "42," and members |
| 10:55:41 | 16 | of the Zeta organization? |
| 10:55:42 | 17 | A.   Yes. |
| 10:55:43 | 18 | Q.   Where were these horses found? |
| 10:55:45 | 19 | A.   They were found in Lexington, Oklahoma, Elgin, Texas, |
| 10:55:50 | 20 | Ruidoso, New Mexico, and California. |
| 10:55:54 | 21 | Q.   Were they located at private ranches or various locations? |
| 10:55:58 | 22 | A.   Various locations, including private ranches. |
| 10:56:00 | 23 | Q.   Now, the 490 horses listed in the superseding indictment, |
| 10:56:04 | 24 | how many have been sold by the government at auction or private |
| 10:56:08 | 25 | sale, according to the Court's interlocutory sale orders? |

10:56:11   1   A.   I believe around 480-some have been sold.  I know that we're

10:56:17   2   still in possession of five horses.  Now, I believe four embryos,

10:56:26   3   all the other horses have been sold with exception of a couple --

10:56:29   4   I think they were -- one returned to a rightful owner.  Something

10:56:34   5   else had to -- the other two, I believe, given to a family member

10:56:37   6   of the Trevinos.

10:56:38   7   Q.   So if I were to tell you 484, you would not dispute that as

10:56:42   8   number of horses already sold?

10:56:44   9   A.   No.  That's real close.

10:56:46   10  Q.   Okay.  What were the gross proceeds from those sales?

10:56:49   11  A.   It's going to be right around $9 million to date.

10:56:52   12  Q.   In fact, doing any of the expenses that the government has

10:56:56   13  outlaid for the care of those horses, what's the net proceeds to

10:56:59   14  date?

10:56:59   15  A.   I think it's going to be somewhere between $6.5 and $7

10:57:03   16  million.

10:57:03   17  Q.   Now, I'd like to turn your attention to the two airplanes

10:57:06   18  listed on page 22 of the indictment.  You testified to this

10:57:12   19  already with respect to the airplanes as discussed by Mr.

10:57:17   20  Hinojosa and will be discussed by Special Agent Lawson.  Were

10:57:20   21  those airplanes assets of ADT?

10:57:22   22  A.   Yes.

10:57:24   23  Q.   And with respect to the Hawker, when was the 2005 Hawker

10:57:28   24  purchased?

10:57:28   25  A.   The Hawker was actually purchased in 2012.  It was a number

10:57:36  1   of payments come through UBS, ADT's accounts to purchase a

10:57:44  2   particular plane.  And we actually perfected the warrants and, in

10:57:51  3   fact, flew the planes prior to the title being issued to the name

10:57:55  4   of Francisco Colorado and/or ADT.

10:57:57  5   Q.   What was the approximate purchase price of that plane?  If I

10:58:03  6   were to give you 4.5 million, would you dispute that amount?

10:58:06  7   A.   No.  I would not.

10:58:07  8   Q.   What were the source of these payments by Mr. Colorado?

10:58:10  9   A.   They were the funds through UBS.

10:58:12  10  Q.   And where is that plane currently?

10:58:13  11  A.   At Houston Hobby.

10:58:15  12  Q.   And who is it under the control of?

10:58:18  13  A.   OFAC has it frozen.  I'm not sure who's actually

10:58:23  14  maintaining, maintenance or --

10:58:24  15  Q.   But it's essentially seized by the U.S. Treasury Department

10:58:28  16  office or an aspect of control?

10:58:30  17  A.   That is correct.

10:58:30  18  Q.   Now, talk about the 2005 King Air purchase.  When was that

10:58:34  19  purchase?

10:58:35  20  A.   There was a contract entered into in October of 2005, I

10:58:42  21  believe is the date, which called for a $3 million down payment

10:58:48  22  and then, monthly payments for the next five years of $35,000 a

10:58:52  23  month as kind of a lease purchase agreement.  Francisco Colorado

10:58:59  24  was the guarantee of that money.  And then, in October of 2011,

10:59:05  25  that plane was actually deeded to Francisco Colorado and ADT.

| | | |
|---|---|---|
| 10:59:10 | 1 | Q.   So where do the source of the payments for the lease option |
| 10:59:13 | 2 | to purchase come from? |
| 10:59:15 | 3 | A.   We had Charlie Hinojosa basically state that part of that |
| 10:59:23 | 4 | six million was used to purchase King Air.  And then, the |
| 10:59:30 | 5 | payments, I believe, Mr. Fernald through his analysis of records |
| 10:59:34 | 6 | received through reciprocal discovery showed a number of payments |
| 10:59:38 | 7 | in 2011 that were made to ALE in conjunction with that plane. |
| 10:59:45 | 8 | Q.   And did those payments come from ADT Petro Servicios? |
| 10:59:50 | 9 | A.   Yes.  I believe they did. |
| 10:59:51 | 10 | Q.   And where is that plane currently? |
| 10:59:53 | 11 | A.   It is at Houston Hobby. |
| 10:59:56 | 12 | Q.   So were both of these planes ultimately purchased or |
| 10:59:59 | 13 | transferred to Mr. Colorado-Cessa during the timeframe of the |
| 11:00:02 | 14 | conspiracy listed in the superseding indictment? |
| 11:00:04 | 15 | A.   Yes. |
| 11:00:04 | 16 | Q.   May I have one moment, your Honor? |
| 11:00:07 | 17 | THE COURT:  You may. |
| 11:00:14 | 18 | MR. GARDNER:  Your Honor, pass the witness. |
| 11:00:23 | 19 | CROSS-EXAMINATION |
| 11:00:25 | 20 | BY MR. LECHTENBERGER: |
| 11:00:25 | 21 | Q.   Agent Pennington, do you have any direct evidence of cash |
| 11:00:27 | 22 | payments of horses by Jose Trevino as a payer, in other words, |
| 11:00:37 | 23 | sir? |
| 11:00:37 | 24 | A.   No, sir. |
| 11:00:38 | 25 | Q.   Do you have any evidence of direct check payments of horses |

| | | |
|---|---|---|
| 11:00:43 | 1 | directly by Jose Trevino? |
| 11:00:46 | 2 | A.    There are a couple of horses that were -- where a check was |
| 11:00:53 | 3 | written by Jose Trevino to other people and a horse was |
| 11:00:57 | 4 | transferred to his name.   There's several of those occasions. |
| 11:01:00 | 5 | Q.    Can you give me an approximate amount of what that is? |
| 11:01:03 | 6 | A.    A total, no.   If you want to go horse by horse, I can give |
| 11:01:09 | 7 | you an idea of some of those examples. |
| 11:01:10 | 8 | Q.    Based on your last response, though, when you answered my |
| 11:01:15 | 9 | question in regards to Jose Trevino being the payer, can you give |
| 11:01:19 | 10 | me a ballpark idea?   Was it less than 500,000?   Was it more than |
| 11:01:23 | 11 | 500,000?   And if you don't know, that's okay, also. |
| 11:01:28 | 12 | A.    I do not know. |
| 11:01:29 | 13 | Q.    Fair enough, Agent.   I'll move on. |
| 11:01:31 | 14 |       Do you have any evidence -- direct evidence as to any |
| 11:01:34 | 15 | type of credit card payments of horses by Jose Trevino? |
| 11:01:37 | 16 | A.    Yes.   I believe one horse for $5,000. |
| 11:01:41 | 17 | Q.    That's all I have, Judge.   Thank you. |
| 11:01:43 | 18 |       THE COURT:  Yes, sir. |
| 11:01:47 | 19 |       MR. SANCHEZ:  No questions, your Honor. |
| 11:01:49 | 20 |       MR. WOMACK:  No questions. |
| 11:01:52 | 21 |       MR. PARRAS:  No questions. |
| 11:01:53 | 22 |       MR. ESPER:  I do, your Honor. |
| 11:01:54 | 23 |       THE COURT:  All right. |
| 11:01:54 | 24 | |
| 11:01:55 | 25 | |

CROSS-EXAMINATION

BY MR. ESPER:

Q.   Mr. Pennington, the witness that you referred to who testified at trial was actually Mr. Guadalajara; is that correct?

A.   Okay.  Without seeing and going back to notes, I couldn't be sure which one it was.  But that would not -- I would not dispute that.

Q.   This is the guy who made the joke about sending a courier and made a joke to Mr. Huitron about where the kilos of cocaine?

A.   Correct.

Q.   And that somehow, this information got back to "40" and was relayed to you or was related to him by Mr. Cuellar, correct?

A.   Correct.

Q.   And that this courier got chastised or reprimanded for making such a comment, correct?

A.   Yes.

Q.   And do you know, and if you recall, whether or not, outside the presence of the jury, I confronted Mr. Guadalajara with his interview by Agent Lawson and he never made such a statement?  Do you recall that testimony?

A.   No.

Q.   You don't?  Okay.

     Now, you say there's another confidential source who didn't testify at trial but that you have interviewed, correct?

A.   Correct.

```
11:03:02   1   Q.   And this confidential source, I believe your testimony was
11:03:06   2   that he saw Mr. Huitron in Nuevo Laredo talking to "40" at some
11:03:13   3   unknown time.
11:03:14   4   A.   I don't know if I referred to as a he or she, but the person
11:03:18   5   was present during a conversation between Huitron and "40."
11:03:23   6   Q.   And they were talking about horses, correct?
11:03:25   7   A.   Correct.  "Mamito's" horses.
11:03:27   8   Q.   Pardon me?
11:03:28   9   A.   "Mamito's" horses.
11:03:29   10  Q.   Okay.  And what timeframe are we talking about that this
11:03:33   11  person relayed to you, if you know?
11:03:37   12  A.   Within the last year.
11:03:38   13  Q.   So it would have been 2012?
11:03:44   14  A.   I can't give you specific dates.
11:03:46   15  Q.   Okay.  So within the last twelve calendar months?
11:03:51   16  A.   I believe that's correct.
11:03:53   17  Q.   Okay.  And shortly before his arrest, is that what you're
11:03:57   18  saying?
11:03:57   19  A.   Before whose arrest?
11:03:59   20  Q.   Mr. Huitron's arrest.
11:04:02   21  A.   Okay.  Repeat the question.
11:04:03   22  Q.   Okay.  The confidential source --
11:04:05   23         THE COURT:  Was it before Mr. Huitron got arrested?
11:04:08   24  A.   The information came after Mr. Huitron was arrested.
11:04:11   25  Q.   (BY MR. ESPER) Okay.
```

11:04:12    1    A.    That I received the information.

11:04:13    2    Q.    Yes.  And the information was that they saw Mr. Huitron

11:04:16    3    talking to "40" some time before April or June of 2011, whenever

11:04:24    4    he was arrested?

11:04:26    5    A.    2012.  Yes.  The meeting took place, I want to say, back in

11:04:31    6    2009, 2010 --

11:04:33    7    Q.    Okay.

11:04:34    8    A.    -- timeframe.

11:04:34    9    Q.    So back during the three or four years preceding trial in

11:04:39   10    this case, correct?

11:04:40   11    A.    Correct.

11:04:40   12    Q.    All right.  And they were talking about a horse --

11:04:44   13    "Mamito's" horses?

11:04:45   14    A.    Yes.

11:04:45   15    Q.    Okay.  They weren't talking about drug dealing, were they?

11:04:48   16    A.    That wasn't mentioned.

11:04:50   17    Q.    Okay.  But what was mentioned was -- this person to you in a

11:04:55   18    debriefing was that everybody knew what "40" did, or if they

11:05:01   19    didn't know, they'd better be careful, something to that effect?

11:05:04   20    A.    No.  The source told the people if they didn't know, the

11:05:08   21    source told the people whose money it was so they would be

11:05:12   22    careful.  So, therefore, the source said everyone knew.

11:05:15   23    Q.    Okay.  So this source is making assumptions, then, that

11:05:18   24    everybody knew whose money was paying for these horses and

11:05:22   25    trainers's fees?

| | | |
|---|---|---|
| 11:05:23 | 1 | A.   Or he would tell -- or the person would tell them. |
| 11:05:26 | 2 | Q.   Okay.  That's all I have, your Honor. |
| 11:05:32 | 3 | RE-DIRECT EXAMINATION |
| 11:05:32 | 4 | BY MR. GARDNER: |
| 11:05:34 | 5 | Q.   Mr. Lechtenberger asked you whether or not any cash or |
| 11:05:36 | 6 | checks were provided by Mr. Jose Trevino for horses.  I believe |
| 11:05:41 | 7 | your response was no, correct? |
| 11:05:43 | 8 | A.   Correct. |
| 11:05:45 | 9 | Q.   And I know everyone's loathe to hear this again, but how |
| 11:05:49 | 10 | much money did Mr. Jose Trevino pay for 35 mares? |
| 11:05:52 | 11 | A.   Nothing. |
| 11:05:53 | 12 | Q.   Nothing.  And what's the value of those 35 mares? |
| 11:05:57 | 13 | A.   I want to say approximately two million. |
| 11:05:59 | 14 | Q.   And were those 35 mares put in Mr. Jose Trevino's name? |
| 11:06:03 | 15 | A.   Yes, or his company's name. |
| 11:06:05 | 16 | Q.   Okay.  That's all I have, your Honor. |
| 11:06:11 | 17 | THE COURT:  Anything further? |
| 11:06:12 | 18 | MR. LECHTENBERGER:  No, your Honor. |
| 11:06:13 | 19 | THE COURT:  All right. |
| 11:06:15 | 20 | MR. SANCHEZ:  No, your Honor. |
| 11:06:15 | 21 | THE COURT:  Any further questions? |
| 11:06:17 | 22 | MR. ESPER:  Just one, your Honor. |
| 11:06:18 | 23 | RE-CROSS EXAMINATION |
| 11:06:19 | 24 | BY MR. ESPER: |
| 11:06:19 | 25 | Q.   You say Mr. Huitron trained 40 horses? |

| | | |
|---|---|---|
| 11:06:24 | 1 | A.   He was participating, I believe, in training probably more |
| 11:06:27 | 2 | than that.  And the reason I say that is we've got records on the |
| 11:06:30 | 3 | number of horses that were taken to his ranch in 2010.  And then, |
| 11:06:35 | 4 | he also assisted in training -- there's like 20 or some horses in |
| 11:06:40 | 5 | Ruidoso in 2012 that he participated in.  So it could be well in |
| 11:06:44 | 6 | excess of 40. |
| 11:06:45 | 7 | Q.   Okay.  And the context of this conspiracy, there was about |
| 11:06:48 | 8 | 500 horses, are there not? |
| 11:06:50 | 9 | A.   Yes. |
| 11:06:50 | 10 | Q.   Okay.  And he was about -- had approximately 40? |
| 11:06:54 | 11 | A.   I'm probably -- |
| 11:06:56 | 12 | Q.   More or less? |
| 11:06:56 | 13 | A.   Probably more than that. |
| 11:06:57 | 14 | Q.   Few more than that? |
| 11:06:58 | 15 | A.   More than that. |
| 11:06:59 | 16 | Q.   That area.  Correct.  That's all. |
| 11:07:05 | 17 |         THE COURT:  You may step down.  You may call your next |
| 11:07:11 | 18 | witness. |
| 11:07:11 | 19 |         MR. GARDNER:  Your Honor, the government calls Special |
| 11:07:14 | 20 | Agent Scott Lawson. |
| 11:07:24 | 21 |         THE COURT:  Be sworn, please. |
| 11:07:25 | 22 |         (Witness sworn.) |
| 11:07:39 | 23 |         THE COURT:  Please state your full name and spell your |
| 11:07:40 | 24 | last. |
| 11:07:41 | 25 |         THE WITNESS:  My name is Scott Lawson.  Last name is |

| | | |
|---|---|---|
| 11:07:45 | 1 | L-A-W-S-O-N. |
| 11:07:48 | 2 | THE COURT:  It's your witness. |
| 11:07:49 | 3 | SCOTT LAWSON, called by the Government, duly sworn. |
| 11:07:49 | 4 | DIRECT EXAMINATION |
| 11:07:49 | 5 | BY MR. GARDNER: |
| 11:07:50 | 6 | Q.   Thank you, your Honor. |
| 11:07:51 | 7 | Special Agent Lawson, I'd like to first address Jose |
| 11:07:53 | 8 | Trevino's objection number two relating to his PSI, paragraphs 43 |
| 11:08:00 | 9 | and 91 with respect to his knowledge of controlled substance. |
| 11:08:04 | 10 | Could you reiterate the information provided by Jose |
| 11:08:07 | 11 | Vasquez, Jr. in terms of direct cash payments made by his |
| 11:08:11 | 12 | organization to Jose Trevino? |
| 11:08:14 | 13 | A.   Yes, sir.  Jose Vasquez, Jr. had a driver deliver $100,000 |
| 11:08:20 | 14 | cash to Jose Trevino in a Wal-Mart parking lot in Grand Prairie, |
| 11:08:24 | 15 | Texas. |
| 11:08:24 | 16 | Q.   And how was Mr. Jose Vasquez, Jr. directed to do that? |
| 11:08:28 | 17 | A.   By "Poncho" Cuellar. |
| 11:08:30 | 18 | Q.   Now, did you also have the occasion to interview an |
| 11:08:34 | 19 | individual named Hector Rodriguez, incarcerated in the Dallas |
| 11:08:37 | 20 | federal prison system? |
| 11:08:39 | 21 | A.   I did. |
| 11:08:40 | 22 | Q.   And what information did Mr. Hector Rodriguez provide with |
| 11:08:43 | 23 | respect to Mr. Jose Trevino's knowledge of the Zeta controlled |
| 11:08:47 | 24 | substances operation? |
| 11:08:49 | 25 | A.   Rodriguez stated that he would meet Jose Trevino in parking |

| | | |
|---|---|---|
| 11:08:53 | 1 | lots in the Dallas, Texas area and deliver bags of cash to Jose |
| 11:08:58 | 2 | Trevino. |
| 11:08:59 | 3 | Q.   And where were those bags of cash going? |
| 11:09:02 | 4 | A.   Back to Mexico. |
| 11:09:03 | 5 | Q.   And where did Mr. Hector Rodriguez obtain that cash from? |
| 11:09:06 | 6 | A.   From the sale of cocaine. |
| 11:09:08 | 7 | Q.   Was Mr. Hector Rodriguez familiar with "40"? |
| 11:09:11 | 8 | A.   He was. |
| 11:09:12 | 9 | Q.   Okay.  And what was the relationship between Mr. Hector |
| 11:09:14 | 10 | Rodriguez and "40"? |
| 11:09:16 | 11 | A.   Hector Rodriguez had met "40" years prior, and then, he |
| 11:09:21 | 12 | became a cocaine distributor for him in, I want to say, around |
| 11:09:25 | 13 | 2006 or 7. |
| 11:09:27 | 14 | Q.   Before the timeframe alleged in our conspiracy? |
| 11:09:30 | 15 | A.   That's correct. |
| 11:09:31 | 16 | Q.   And he was arrested around that timeframe and incarcerated |
| 11:09:34 | 17 | in the Dallas area, correct? |
| 11:09:36 | 18 | A.   That's correct. |
| 11:09:36 | 19 | Q.   Now, you were also present during interviews with respect to |
| 11:09:39 | 20 | the cooperating source that Mr. Pennington talked about, correct? |
| 11:09:42 | 21 | A.   That is correct. |
| 11:09:43 | 22 | Q.   Now, could you relate to the Court what information that |
| 11:09:46 | 23 | individual provided with respect to Jose Trevino's knowledge of |
| 11:09:50 | 24 | his brother's activities? |
| 11:09:52 | 25 | A.   That individual, as well as "Poncho" Cuellar, stated that |

| | |
|---|---|
| 11:09:56 | 1 |
| 11:10:01 | 2 |
| 11:10:05 | 3 |
| 11:10:08 | 4 |
| 11:10:12 | 5 |
| 11:10:18 | 6 |
| 11:10:24 | 7 |
| 11:10:27 | 8 |
| 11:10:30 | 9 |

1   Jose Trevino would be driven to Piedras Negras with spreadsheets

2   of monthly expenses, and then, there he would meet with his

3   brother Miguel and Omar and discuss the expenses and how the

4   expenses should be paid for the horse operation.  That individual

5   also stated that Jose had a Mexican TelCel telephone to

6   communicate with Miguel Trevino.  And through Tyler Graham, we

7   were able to discover that Victor Lopez brought a phone from

8   Nuevo Laredo for the sole purpose of delivering that phone to

9   Jose Trevino.

10  Q.   And that was the phone that you were able to look at and

11  determine how many numbers were on there, correct?

12  A.   That particular phone, we had Tyler Graham look at and then,

13  report back to us.  On the day of the arrest of Jose Trevino, I

14  found a Mexican TelCel, either the same one or very similar

15  circumstance.

16  Q.   Now, do you recall the testimony of TFO Johnny Sosa?

17  A.   I do.

18  Q.   Now, there was one question that I didn't ask him, and it

19  related to a cellphone found in a Jose Trevino residence in Balch

20  Springs?

21  A.   That's correct.  During the timeframe of Jaime Zapata's

22  death in Mexico, U.S. law enforcement conducted several

23  knock-and-talks with Zeta associates, and one happened to be at

24  Jose Trevino's house that was led by TFO Sosa in Dallas.  Consent

25  to search the house was granted by Mr. Trevino, and one of the

| | | |
|---|---|---|
| 11:11:22 | 1 | things located was a Mexican TelCel with only one number |
| 11:11:27 | 2 | programmed. |
| 11:11:30 | 3 | Q.   Now, this cooperating individual, what did he or she explain |
| 11:11:34 | 4 | to you as Jose Trevino's role in the money-laundering |
| 11:11:39 | 5 | organization? |
| 11:11:41 | 6 | A.   He or she described Jose Trevino as the leader on the U.S. |
| 11:11:44 | 7 | side of the money-laundering operation.  Jose Trevino had |
| 11:11:50 | 8 | approximately 17 employees at the time of the takedown.  They all |
| 11:11:54 | 9 | called Jose "Don Jose."  Cooperating source informed us that Jose |
| 11:11:59 | 10 | instructed his employees to call him Don Jose.  Also described |
| 11:12:03 | 11 | where arguments among members of the conspiracy about whether a |
| 11:12:07 | 12 | horse should be retired or race in the future. |
| 11:12:10 | 13 | Q.   Let me hold you up there because that sort of goes to |
| 11:12:12 | 14 | objection number four as leader/organizer.  I still want to stick |
| 11:12:15 | 15 | on the knowledge of his money coming from the Zeta drug |
| 11:12:20 | 16 | organization. |
| 11:12:20 | 17 |          Were you also present during an interview of a witness |
| 11:12:23 | 18 | named -- with a code name "Pitufo"? |
| 11:12:26 | 19 | A.   I was. |
| 11:12:27 | 20 | Q.   Does that individual wish his true name be held confidential |
| 11:12:31 | 21 | for fear of reprisals in Mexico? |
| 11:12:33 | 22 | A.   That's correct. |
| 11:12:34 | 23 | Q.   And with respect to "Pitufo's" information, what did he -- |
| 11:12:38 | 24 | did he identify that he knew Jose Trevino? |
| 11:12:40 | 25 | A.   He did. |

| | | |
|---|---|---|
| 11:12:40 | 1 | Q.   And what information did he provide with respect to Jose |
| 11:12:44 | 2 | Trevino's knowledge of the Zetas's drug-trafficking organization? |
| 11:12:48 | 3 | A.   He described that he had met Jose in Dallas, in Houston, and |
| 11:12:52 | 4 | that they had talked about possible stash locations for |
| 11:12:56 | 5 | narcotics. |
| 11:12:56 | 6 | Q.   What timeframe was this, do you recall? |
| 11:13:02 | 7 | A.   I do not recall the time. |
| 11:13:06 | 8 | Q.   And if you will, could you explain your information, your |
| 11:13:10 | 9 | knowledge of Victor Lopez's association with the Zeta |
| 11:13:13 | 10 | drug-trafficking organization and as it relates to Jose Trevino? |
| 11:13:16 | 11 | A.   Yes, sir.  Victor Lopez was identified in an undercover |
| 11:13:20 | 12 | money drop to a U.S. undercover.  We identified him then, and |
| 11:13:25 | 13 | then, we began to track him as he delivered funds to Southwest |
| 11:13:29 | 14 | Stallion Station in Elgin, Texas.  Shortly thereafter, we had a |
| 11:13:34 | 15 | consensually monitored phone in which Victor Lopez began to make |
| 11:13:38 | 16 | multiple calls in reference to moneys owed to various locations |
| 11:13:42 | 17 | and to money going to Jose Trevino and to Mexico. |
| 11:13:46 | 18 |       At one point, Victor Lopez sent some money to Tyler |
| 11:13:50 | 19 | Graham at Southwest Stallion Station and asked Tyler Graham to |
| 11:13:53 | 20 | forward that money to Jose Trevino, and Tyler refused because he |
| 11:13:56 | 21 | had a large bill owed by these associates.  Shortly thereafter, |
| 11:14:02 | 22 | Victor Lopez booked a one-day turnaround flight from Laredo, |
| 11:14:05 | 23 | Texas to Oklahoma City and then, back to Laredo, all in a 24-hour |
| 11:14:10 | 24 | period.  Surveillance captured Victor Lopez meeting with Jose |
| 11:14:15 | 25 | Trevino in Oklahoma City airport parking garage.  This meeting |

11:14:18   1   lasted five minutes.  And our source of information is that

11:14:21   2   Victor took the money that Tyler wouldn't give to Jose.

11:14:24   3           Upon completion of this meeting, law enforcement had

11:14:26   4   Jose Trevino stopped -- traffic-stopped in Oklahoma City and

11:14:30   5   Victor Lopez --

11:14:31   6   Q.  I don't want to cut you off too much.  We've heard all that.

11:14:34   7   Tell me about Victor Lopez being stopped.  Didn't come out in

11:14:38   8   trial.  What happened in that instance?

11:14:39   9   A.  Victor Lopez was also detained at the airport in Dallas on

11:14:43   10   his connection back to Laredo.  So we have Jose stopped and

11:14:46   11   Victor stopped simultaneously.  Victor Lopez self-reported back

11:14:50   12   to the Zetas when he got to Mexico, because he thought that was

11:14:53   13   the right thing to do, that he had been detained.  Jose Trevino

11:14:56   14   complained to the CS that Victor had called on his own detention

11:15:02   15   and had him traffic-stopped in Oklahoma City, and Victor Lopez

11:15:06   16   was murdered approximately three weeks after the traffic stop.

11:15:10   17   Q.  And did the cooperating source indicate that he relayed Jose

11:15:14   18   Trevino's message to his brothers "40" and "42"?

11:15:18   19   A.  Yes.

11:15:18   20   Q.  And did the cooperating source indicate that Victor Lopez

11:15:21   21   was murdered by the Zetas based on the information provided by

11:15:24   22   Jose Trevino?

11:15:25   23   A.  Yes.  The cooperating source was actually on the phone with

11:15:28   24   the leader of the hit team that was looking for Victor Lopez.

11:15:31   25   Q.  And the leader of the hit team, what did he relay to the

| | | |
|---|---|---|
| 11:15:33 | 1 | cooperating source? |
| 11:15:35 | 2 | A.   He relayed that the leader of the hit team was "Yo Yo," |
| 11:15:39 | 3 | Ricardo De La Vega, which was also Victor Lopez's cousin.  And he |
| 11:15:43 | 4 | relaid that they wish they could tell him to run but they |
| 11:15:46 | 5 | couldn't and that they were going to have to kill him. |
| 11:15:49 | 6 | Q.   Now, although the Court heard this at pretrial, there was a |
| 11:15:53 | 7 | series of texts obtained from Alexandra Trevino's computer? |
| 11:15:59 | 8 | A.   Yes. |
| 11:15:59 | 9 | Q.   What did those texts contain to indicate the family's |
| 11:16:04 | 10 | knowledge of the brother's drug activities? |
| 11:16:06 | 11 | A.   Sure.  Alex was texting who we believe to be her fiance at |
| 11:16:11 | 12 | the time, and basically the text relayed that she was very happy |
| 11:16:16 | 13 | that they chose her direct family to give this business to.  And |
| 11:16:21 | 14 | then, shortly thereafter, she referenced the horses and she said |
| 11:16:24 | 15 | that her aunts were upset that they weren't picked, but that her |
| 11:16:27 | 16 | and her dad were hard-working and that they chose that family to |
| 11:16:29 | 17 | give this business to. |
| 11:16:31 | 18 |         THE COURT:  You asked about a brother in your question. |
| 11:16:34 | 19 | Were you talking about somebody else? |
| 11:16:38 | 20 |         MR. GARDNER:  No, your Honor.  I was referring to "40" |
| 11:16:40 | 21 | and "42," correct?  Brothers. |
| 11:16:43 | 22 |         THE WITNESS:  Yes, sir.  That's what I understood. |
| 11:16:44 | 23 |         MR. GARDNER:  I apologize.  I should have been more |
| 11:16:45 | 24 | clear. |
| 11:16:46 | 25 | Q.   (BY MR. GARDNER) Were you also present obviously during the |

11:16:50   1    testimony but the interviews of an individual that we all know as

11:16:54   2    "Mamito"?

11:16:54   3    A.   I was.

11:16:55   4    Q.   And what information did he say with respect to Tempting

11:16:59   5    Dash?

11:16:59   6    A.   "Mamito" described that he had wanted Tempting Dash and

11:17:04   7    asked Ramiro to pick up Tempting Dash at auction for him.   That

11:17:08   8    "40," Miguel Trevino, took Tempting Dash.   He described the

11:17:11   9    course of Tempting Dash running in Texas, and eventually

11:17:14   10   described that he was ordered to give Tempting Dash to Jose

11:17:17   11   Trevino.

11:17:18   12   Q.   And was that also confirmed by the calls on Villarreal's T3

11:17:25   13   intercept, produced as Government's Exhibit 381A and 381B?

11:17:28   14   A.   Yes, sir.   That's correct.

11:17:30   15   Q.   Okay.   Now, the Court has indicated that the sophisticated

11:17:35   16   laundering objection information, I just want to talk about a

11:17:42   17   couple of things to indicate -- I'm sorry.   Let me just go

11:17:46   18   forward to objection number four, which he objects on paragraph

11:17:49   19   No. 5 to being leader, organizer, supervisor.

11:17:52   20        Could you inform the Court with respect to the method

11:17:56   21   in which horses were transferred and renamed in terms of

11:18:02   22   backdated sales?

11:18:03   23   A.   Sure.   As stated previously in trial, a large number of

11:18:07   24   horses were bought, and in the middle, beginning to middle stages

11:18:10   25   of this conspiracy, only the best were transferred to Jose.   Jose

| | | |
|---|---|---|
| 11:18:14 | 1 | did not have the funds to buy the best horses, so they would be |
| 11:18:18 | 2 | transferred to him in his name.  The contract's backdated to show |
| 11:18:23 | 3 | that Jose bought it before a race in which one of these horses |
| 11:18:27 | 4 | earned money, but in theory, in reality, he did not receive -- |
| 11:18:32 | 5 | did not pay the seller till after the horse won. |
| 11:18:35 | 6 | Q.   And so, how many horses did you track that were transferred |
| 11:18:39 | 7 | from various nominees to Jose Trevino between winning a qualifier |
| 11:18:45 | 8 | or winning a trials race and qualifying for a final large payout |
| 11:18:50 | 9 | race? |
| 11:18:50 | 10 | A.   I believe it was six. |
| 11:18:55 | 11 | Q.   Now, you mentioned something earlier, before I cut you off, |
| 11:18:59 | 12 | with decision to retire or continue to race a certain horse. |
| 11:19:04 | 13 | That horse was Mr. Piloto, correct? |
| 11:19:06 | 14 | A.   That's correct. |
| 11:19:06 | 15 | Q.   Could you describe what Mr. Graham testified to as well as |
| 11:19:12 | 16 | information from the CS regarding decision to race or retire Mr. |
| 11:19:14 | 17 | Piloto? |
| 11:19:15 | 18 | A.   There was some disagreement among Jose and his inner circle |
| 11:19:19 | 19 | about whether to race or retire Mr. Piloto.  Most in the horse |
| 11:19:24 | 20 | industry thought they should retire him because they knew they |
| 11:19:26 | 21 | had bribed that race and that the horse wasn't that good.  So |
| 11:19:30 | 22 | Jose wanted to continue to race Mr. Piloto, and CS-1 and some of |
| 11:19:37 | 23 | the others giving opinions believed that they should retire Mr. |
| 11:19:39 | 24 | Piloto and begin to breed him immediately. |
| 11:19:42 | 25 | Jose ultimately won that decision because he was the |

11:19:44  1   leader on the U.S. side.  And Mr. Piloto was sent to California
11:19:48  2   to continue training.  But Piloto ultimately received an injury
11:19:52  3   and did not race again after Ruidoso.
11:19:56  4   Q.   Now, you also referenced earlier a bit of the consensual
11:20:00  5   calls, consensual phone provided to Mr. Tyler Graham at
11:20:04  6   Government's Exhibit 360A.  Could you refresh, for the record,
11:20:08  7   the call between Tyler Graham and Fernando Garcia with respect to
11:20:13  8   don't tell Jose?
11:20:14  9   A.   Sure.  It was after one of the many auctions that the
11:20:18  10  associates attended and Tyler was asking Fernando Garcia which
11:20:22  11  horses they purchased, you know, what the bloodlines were, how
11:20:25  12  much they paid, whose name, that kind of thing.  And Fernando was
11:20:28  13  a little slow to answer, and finally, Fernando told Tyler what
11:20:31  14  horses they bought and he said, but don't tell Jose I told you.
11:20:35  15  You know how he is.
11:20:38  16  Q.   With respect to his daughter and wife Zulema and Alexandra,
11:20:44  17  what activities did Mr. Jose Trevino conduct that indicated he
11:20:47  18  was directing them in this case?
11:20:51  19  A.   He employed them through one of his three shell companies
11:20:55  20  and directed them to carry out different administrative duties to
11:20:59  21  include signing faxes, sending bills, and those types of things.
11:21:03  22  Q.   Who is Rodolfo Trevino?
11:21:05  23  A.   That is another brother of Jose Trevino.
11:21:07  24  Q.   And what activities did Jose Trevino take with regards to
11:21:11  25  directing him?

11:21:12  1   A.   Rodolfo was kind of assigned to be the chief laborer, if you

11:21:17  2   will, at the ranch.  He kind of was over some of the other

11:21:21  3   laborers, and he was provided a doublewide trailer to live in on

11:21:27  4   the ranch.

11:21:27  5   Q.   With respect to Ms. Shalyn Bliss, she testified as the vet,

11:21:30  6   and Ms. Sharon Moore as the accountant.  Did Jose Trevino

11:21:33  7   exercise sort of a supervisory or direction -- provide direction

11:21:39  8   over those two individuals?

11:21:40  9   A.   Yes.  And Shalyn Bliss testified that things had happened in

11:21:43  10  the normal course of a veterinarian's work, such as inviting

11:21:48  11  sellers of veterinarian drugs that she would invite them to the

11:21:52  12  ranch, and Jose would run them off and he made the decisions on

11:21:54  13  the ranch.

11:21:55  14  Q.   I'd like to turn your attention to Francisco Colorado's

11:22:00  15  objections one and two.  We heard from Special Agent Pennington

11:22:04  16  with respect to 18 million testified to, information provided by

11:22:10  17  Mr. Hinojosa.

11:22:13  18       Did the cooperating source provide information as to

11:22:16  19  other moneys provided to Mr. Colorado-Cessa from the Zeta

11:22:20  20  organization?

11:22:21  21  A.   The cooperating source provided information to an additional

11:22:25  22  12 million sent to Cessa, described that Miguel Trevino put it in

11:22:30  23  an 18-wheeler in Mexico and asked the cooperating source to

11:22:34  24  call --

11:22:35  25       MR. SANCHEZ:  Judge, again, I'm going to object on the

11:22:37  1  same grounds of hearsay.  And I understand there may not be full

11:22:40  2  rights of confrontation, but now we're not even getting a name or

11:22:43  3  any information that we can use to impeach this faceless person

11:22:48  4  that was testifying through Mr. Lawson.

11:22:52  5          THE COURT:  Well, I'll permit you to do your best.  The

11:22:56  6  Court's certainly aware it doesn't hold much credibility with

11:23:01  7  non-identifiable people, but they're entitled to make their

11:23:05  8  record just like you are, sir.

11:23:08  9  Q.   (BY MR. GARDNER) And how was that money designated to be

11:23:10  10  distributed?

11:23:12  11  A.   It was two loads, one of two million, one of 10 million.

11:23:16  12  And the $2 million load was what was actually used for the

11:23:19  13  Ruidoso $2.2 million purchase in September of 2010 by Francisco

11:23:24  14  Colorado.  The 10 million was instructed to hold, and was

11:23:28  15  eventually estimated that 6 million of that was used on horses,

11:23:32  16  and the remaining four was safeguarded with Francisco Colorado.

11:23:38  17  Q.   With respect to the CS, what information did this individual

11:23:41  18  provide regarding Francisco Colorado-Cessa's knowledge and

11:23:45  19  involvement for the Zeta drug-trafficking organization?

11:23:48  20  A.   He advised that Francisco Colorado was the godfather of

11:23:55  21  "Zeta 14's" son.  They met through a mutual love of horses

11:23:57  22  several years ago, that they established ADT together, that

11:24:04  23  Francisco Colorado was present in multiple horse races in Mexico

11:24:07  24  when Miguel Trevino and Heriberto Lazcano and "Mamito" and that

11:24:13  25  they were together on several occasions.

11:24:16  1   Q.   And following the death of Efrain Torres, what did this

11:24:19  2   individual provide you with respect to Colorado Cessa's

11:24:24  3   accounting to the Zeta drug-trafficking organization?

11:24:27  4   A.   Through this CS and multiple informants to include Charlie

11:24:32  5   Hinojosa and "Pitufo," we were told about a meeting in Tampico

11:24:36  6   shortly after "14's" death that Colorado was summoned to go to to

11:24:40  7   account for the moneys that he had had with "Zeta 14."

11:24:46  8   Q.   And was that also the meeting testified to by "Mamito"?

11:24:50  9   A.   That's correct.

11:24:53  10  Q.   And did the CS provide you any information with respect to

11:24:57  11  the use of Mr. Colorado's ranch by the Zetas?

11:25:01  12  A.   The CS stated shortly after that meeting that the CS was

11:25:06  13  present when "40," "42" and "Mamito" showed up at Flor de Maria

11:25:11  14  in Tuxpan.  They wanted to see Colorado's horses and his cattle

11:25:16  15  and talk about maybe using the ranch for some of their own

11:25:19  16  animals.

11:25:20  17  Q.   And if you will, although it was in a prior proceeding,

11:25:23  18  could you, again, illuminate the Court as to the actions by the

11:25:27  19  Mexican law enforcement on Flor de Maria Ranch in the killing and

11:25:31  20  gun battle with drug-trafficking organizations?

11:25:33  21  A.   Sure.  In early 2012, I believe March or April, Mexican

11:25:40  22  military had a gun battle with many members of the Zetas on

11:25:43  23  Francisco Colorado's ranch in which a high-ranking class boss was

11:25:48  24  killed.

11:25:48  25  Q.   I'm also referring you back -- you've already mentioned a

| | | |
|---|---|---|
| 11:25:51 | 1 | little bit but Government's Exhibit 381A and 381B, the T3 calls |
| 11:25:55 | 2 | from Ramiro Villarreal.  What mention of Colorado-Cessa were on |
| 11:25:59 | 3 | those calls? |
| 11:26:03 | 4 | A.   I remember just very briefly that Colorado's name was |
| 11:26:07 | 5 | mentioned in reference to horses, but I would have to review to |
| 11:26:11 | 6 | give you more context on that. |
| 11:26:14 | 7 | Q.   Now, with respect to the meeting, was it indicated that |
| 11:26:18 | 8 | Colorado-Cessa, according to objections by Mr. Cessa, that he was |
| 11:26:23 | 9 | paying off a debt and, therefore, out of the organization during |
| 11:26:27 | 10 | that meeting? |
| 11:26:28 | 11 | A.   No. |
| 11:26:28 | 12 | Q.   What was the indication with respect to his debt owed to the |
| 11:26:32 | 13 | Zetas? |
| 11:26:33 | 14 | A.   There was an indication that Miguel knew that "Chispa" had a |
| 11:26:38 | 15 | lot of Zeta money invested with Colorado.  When I say "Chispa," |
| 11:26:42 | 16 | that's "Zeta 14."  A nickname for "Zeta 14."  And that he was |
| 11:26:46 | 17 | called to account for what moneys he had with "Zeta 14."  There |
| 11:26:51 | 18 | was some debt that Francisco Colorado had lost money in betting |
| 11:26:56 | 19 | on horses with various persons, and "Zeta 14" had allowed |
| 11:27:01 | 20 | Colorado to invest in cocaine loads to make up money for those |
| 11:27:06 | 21 | debts. |
| 11:27:08 | 22 | Q.   And the Court's heard the testimony of "Mamito," but just |
| 11:27:12 | 23 | briefly, what did "Mamito" testify as to the annual gross income |
| 11:27:17 | 24 | of the Zeta drug-trafficking organization per year? |
| 11:27:20 | 25 | A.   He estimated between 350 and 500 million a year. |

```
11:27:25   1   Q.   And, again, with respect to the testimony of Jose Vasquez,
11:27:28   2   Jr., how much per month was coming from Dallas?
11:27:31   3   A.   Just in Jose Vasquez's sale in Dallas, Texas, it was 20 to
11:27:35   4   25 million per month.
11:27:37   5   Q.   Now, I want to turn to the information provided by this
11:27:41   6   "Pitufo."  He was he able to identify members of Colorado-Cessa's
11:27:41   7   family?
11:27:44   8   A.   He was.
11:27:45   9   Q.   And was he able to identify how Mr. Colorado-Cessa met his
11:27:48  10   current wife?
11:27:53  11   A.   He mentioned that his wife's family was associated with -- I
11:28:03  12   can't remember enough specifics to go into that.
11:28:05  13   Q.   Was it associated with another drug cartel individual?
11:28:08  14   A.   Yes.
11:28:10  15   Q.   If I were to use a term "Efrain Torres," would that refresh
11:28:13  16   your memory?
11:28:14  17   A.   That's correct.
11:28:15  18   Q.   And "Pitufo," what did he testify with respect to any funds
11:28:19  19   that he knew coming from the Zetas to Francisco Colorado-Cessa?
11:28:23  20   A.   "Pitufo" stated that Lazcano sent "Pitufo" himself with $50
11:28:28  21   million to give to Francisco Colorado.
11:28:31  22   Q.   What was the $50 million for?
11:28:32  23   A.   To buy machinery to gain further contracts with Pemex.
11:28:36  24   Q.   So taking the amount by "Pitufo," Hinojosa and the CS
11:28:41  25   together, how much is that total?
```

11:28:42   1   A.   Approximately $80 million.

11:28:44   2   Q.   And all that come from the Zeta drug-trafficking

11:28:49   3   organization?

11:28:49   4   A.   That's correct.

11:28:55   5   Q.   And what information did "Pitufo" provide you with respect

11:28:58   6   to who truly owned ADT?

11:29:00   7   A.   "Pitufo" stated that ADT was 80 percent Los Zeta and 20

11:29:06   8   percent Francisco Colorado.

11:29:08   9   Q.   And did Mr. "Pitufo" identify or know of one Francisco

11:29:15   10   Silva-Ramos?

11:29:17   11   A.   I don't remember specifically talking about Ramos with

11:29:20   12   "Pitufo."

11:29:21   13   Q.   And if you will, could you please explain to the Court what

11:29:24   14   this "Pitufo" explained to you regarding the use of

11:29:27   15   Colorado-Cessa's assets to move both cocaine and money from the

11:29:31   16   sale of drugs?

11:29:32   17   A.   Yes.   He said through Colorado's various companies to

11:29:36   18   include Tesco and PIIG, that they had boats and planes, and that

11:29:41   19   two of Mr. Cessa's tugboats were used to go to Panama to pick up

11:29:45   20   kilogram -- multi-ton kilogram loads of cocaine.   He also said

11:29:49   21   they would use Cessa's plane to go pick up samples, and when we

11:29:52   22   questioned what a sample was, he said 50 kilograms of cocaine.

11:29:56   23   Q.   And these barges and tugs, were they boats owned or operated

11:30:02   24   by ADT, according to Mr. Pitufo?

11:30:05   25   A.   He named two specific boats and I don't believe he said ADT.

11:30:11  1  I believe he gave them another company, PIIG or something like

11:30:14  2  that.

11:30:15  3  Q.    And to your knowledge, is that company associated with

11:30:18  4  Francisco Colorado-Cessa?

11:30:18  5  A.    That's correct.

11:30:19  6  Q.    Now I'd like to turn your attention to Defendant Fernando

11:30:24  7  Garcia.  His objection number one in paragraph 32 that he did not

11:30:29  8  become aware of this organization or a member until fall of 2010.

11:30:34  9        When did information come to you regarding Fernando

11:30:38  10 Garcia's first involvement in this organization?

11:30:42  11 A.    I debriefed Tyler Graham in March of 2010, and he already

11:30:47  12 knew of Fernando Garcia coming to check on Tempting Dash with

11:30:51  13 Carlos Nayen in approximately January of 2010.

11:30:54  14 Q.    Okay.  And at that point, Tempting Dash, who was the

11:30:57  15 registered owner of Tempting Dash?

11:30:58  16 A.    By January of '10, it was in Jose Trevino's name.

11:31:02  17 Q.    Now I also refer your attention to Government's Exhibit 226.

11:31:05  18 That's the AQHA records.  When did it indicate that Mr. Fernando

11:31:10  19 Garcia obtained the horse known as Mr. Piloto?

11:31:15  20 A.    He obtained Mr. Piloto in the spring of 2010, I believe.

11:31:20  21 Q.    And, again, who did he obtain that horse from?

11:31:23  22 A.    From a member of the conspiracy, Ramiro Villarreal.

11:31:27  23 Q.    Now, although they're non-scoring, objection number two is,

11:31:30  24 again, paragraph 34 and that Mr. Garcia did not join the

11:31:35  25 conspiracy, he was a picker of quarter horses.  Do you recall --

11:31:42  1  let me back that up.  Had not joined the conspiracy until late in

11:31:48  2  picking quarter horses.  And he also mentioned about him

11:31:49  3  completing his college degree or proceeding to complete a college

11:31:53  4  degree.

11:31:53  5          Have you looked at the transcripts of Mr. Fernando

11:31:56  6  Garcia's degree projects?

11:31:58  7  A.   Yes, sir.

11:31:59  8  Q.   Prior to his arrest, when was the last time he actually took

11:32:02  9  a course at the University of Arizona?

11:32:05  10  A.   This isn't approximate, but it's like seven years since his

11:32:09  11  last class.

11:32:09  12  Q.   So progressing towards a degree is a broad stretch?

11:32:13  13  A.   In my estimation, that's not progressing towards a degree.

11:32:19  14  Q.   Now, I want to turn your attention to the same objection as

11:32:22  15  of March 2010.  Could you explain information you received during

11:32:26  16  the course of this investigation as to Fernando Garcia's role as

11:32:31  17  related with Carlos Nayen?

11:32:34  18  A.   Yes, sir.

11:32:34  19  Q.   Of their relationship?

11:32:36  20  A.   In the very beginning of the investigation, he was described

11:32:38  21  as a translator for Carlos Nayen, but that quickly evolved into

11:32:42  22  the money man for Carlos Nayen.  And basically all the U.S.-based

11:32:47  23  companies who didn't have a Spanish speaker, Fernando became the

11:32:51  24  go-to guy, and that progressed into everybody, and on the outside

11:32:54  25  e-mailing their bills to Fernando and then, Fernando sending it

| | | |
|---|---|---|
| 11:32:58 | 1 | to "Yo Yo" in Nuevo Laredo. |
| 11:33:00 | 2 | Q.   When you say U.S.-based companies, could you just provide a |
| 11:33:02 | 3 | few examples? |
| 11:33:03 | 4 | A.   Sure.  Southwest Stallion Station, communicated with |
| 11:33:06 | 5 | Fernando to get paid.  I have indirect knowledge that Elgin |
| 11:33:11 | 6 | Veterinary Hospital did.  Jeff Tebow, when they needed stuff at |
| 11:33:14 | 7 | Heritage Place, they talked to Fernando.  Many of the auction |
| 11:33:21 | 8 | houses and different companies that provided services all |
| 11:33:24 | 9 | described Fernando as who they talked to. |
| 11:33:29 | 10 | When Tyler Graham needed money at Southwest Stallion |
| 11:33:33 | 11 | Station and we were setting up cover deals, he talked to |
| 11:33:36 | 12 | Fernando. |
| 11:33:40 | 13 | Q.   With respect to defendant's objection number three on |
| 11:33:44 | 14 | paragraph 40 regarding Mr. Piloto, for the Court's attention, |
| 11:33:47 | 15 | Government's Exhibit 140 as well as Exhibit 226, the AQHA |
| 11:33:52 | 16 | transfer to Ramiro Villarreal, 140 was backdated contracts. |
| 11:33:58 | 17 | Where were those contracts found again? |
| 11:34:00 | 18 | A.   We found them on Fernando's computer in New Mexico.  We |
| 11:34:05 | 19 | found two backdated contracts in the Huitron Homes search |
| 11:34:13 | 20 | warrant.  That's what I recall currently. |
| 11:34:15 | 21 | Q.   Were you also able to refer to the Nancy Yearsley Insurance |
| 11:34:20 | 22 | documents? |
| 11:34:21 | 23 | A.   I was. |
| 11:34:21 | 24 | Q.   And what did those documents together indicate with respect |
| 11:34:26 | 25 | to the sale or transfer of Piloto from Ramiro Villarreal to |

11:34:32   1   Fernando Garcia to Jose Trevino?

11:34:33   2   A.    The Yearsley document showed a couple of things.  That

11:34:36   3   Fernando was speaking for the organization on multiple horses in

11:34:39   4   May 2010, and that he was still dealing with Nancy on Piloto

11:34:45   5   after the backdating contract showed that it belonged to Jose

11:34:48   6   Trevino.

11:34:49   7   Q.    And with respect to the transfer of that horse, did CS-1

11:34:54   8   provide information that Fernando Garcia approached Carlos Nayen

11:34:58   9   about the sale of that horse?

11:34:59   10   A.    He did.  He stated that although the horse was an

11:35:03   11   organization horse from the beginning, that Fernando kind of

11:35:05   12   helped train and break it, and then, when it won a qualifier,

11:35:09   13   Fernando obviously didn't want to take it out of his name.  You

11:35:12   14   know, there's a certain allure about having your name on a horse

11:35:14   15   running for $2 million, and he thought he did the work and was

11:35:17   16   justified in keeping the horse.

11:35:19   17          So he complained that he was being forced to give that

11:35:22   18   horse to Jose Trevino.

11:35:25   19   Q.    Now, turning your -- oh, one thing.  On the backdated

11:35:28   20   contract, who's the notary between -- the verification of that

11:35:31   21   contract between Fernando Garcia and Jose Trevino?

11:35:34   22   A.    Jessica Huitron.

11:35:35   23   Q.    And is she located here in Austin, Texas?

11:35:38   24   A.    Yes, sir.  And the sale, supposedly, in New Mexico.

11:35:41   25   Q.    Now, turning your attention to Defendant Garcia's objections

| | | |
|---|---|---|
| 11:35:46 | 1 | four and five on paragraph 75 and 90, in terms of the amount |
| 11:35:49 | 2 | accountable, again, this goes to the length of time he's in the |
| 11:35:52 | 3 | conspiracy. |
| 11:35:53 | 4 | With respect to Government's Exhibits 323A through TT, |
| 11:35:57 | 5 | the Yearsley documents, what indications were in those documents |
| 11:36:02 | 6 | of Fernando Garcia's lengthy involvement in this conspiracy? |
| 11:36:06 | 7 | A.   Well, it's dated all the way back to the middle of 2010, |
| 11:36:11 | 8 | Fernando was dealing with Nancy on several organizational horses |
| 11:36:14 | 9 | that were in his name and many that were not in his name.  Some |
| 11:36:17 | 10 | that were in Jose Trevino's name.  Fernando looked like the owner |
| 11:36:23 | 11 | to Yearsley. |
| 11:36:23 | 12 | Q.   And when was the first instance of that, dealings with |
| 11:36:27 | 13 | Yearsley Insurance? |
| 11:36:30 | 14 | A.   I want to say July of '10, but I may be off a little bit on |
| 11:36:34 | 15 | that. |
| 11:36:35 | 16 | Q.   And was Fernando Garcia in the e-mails and business records |
| 11:36:39 | 17 | of Yearsley Bloodstock with respect to the September '10 Ruidoso |
| 11:36:43 | 18 | sale? |
| 11:36:44 | 19 | A.   He was. |
| 11:36:44 | 20 | Q.   And what was the amount of horses purchased at that sale? |
| 11:36:47 | 21 | A.   $2.2 million. |
| 11:36:49 | 22 | Q.   Were there documents contained within that exhibit from the |
| 11:36:55 | 23 | Heritage Place sale indicating Fernando Garcia was involved in |
| 11:36:58 | 24 | that? |
| 11:36:58 | 25 | A.   Yes. |

11:36:59  1  Q.   And were there documents from the 2010 sale at Los Alamitos

11:37:05  2  indicating Fernando Garcia was responsible for all those horses?

11:37:07  3  A.   There was.

11:37:09  4  Q.   Now, again, with respect to Mr. Fernando Garcia's

11:37:12  5  involvement, what horse expenses was he paying just at Southwest

11:37:17  6  Stallion Station alone?

11:37:21  7  A.   Fernando was overpaying -- by the end of 2011, Fernando was

11:37:26  8  paying for like 150 of the organization's horses at Southwest

11:37:29  9  Stallion Station.

11:37:30  10 Q.   And do you recall, approximately, the bill that was racked

11:37:33  11 up for the care and breeding of those horses?

11:37:36  12 A.   There in the middle of breeding season, it would be over

11:37:39  13 100,000 a month.   During offseason, when he's just storing the

11:37:43  14 horses, it would be smaller, around 30,000.

11:37:46  15 Q.   So Mr. Garcia claims he should be held accountable for only

11:37:50  16 $510,900.

11:37:53  17      I want to turn your attention to Government's Exhibit

11:37:54  18 106A through E.   Do you recall those are the catalogs, the sales

11:37:58  19 catalogs?

11:37:59  20 A.   Yes, sir.

11:37:59  21 Q.   What do those catalogs again indicate?

11:38:03  22 A.   Those catalogs pretty much memorialize the organization's

11:38:09  23 actions at auction for three years.   It was the sales catalog

11:38:14  24 from all the auctions that the group attended, and they were in

11:38:18  25 Fernando's possession and he had circled which horses and with

| | | |
|---|---|---|
| 11:38:21 | 1 | notes that the organization bought over the course of 2010 |
| 11:38:24 | 2 | through 2012. |
| 11:38:26 | 3 | Q.   So this corresponds with the more than nine million up to 16 |
| 11:38:31 | 4 | million horse purchases as testified to by Special Agent |
| 11:38:35 | 5 | Pennington? |
| 11:38:35 | 6 | A.   Yes, sir. |
| 11:38:36 | 7 | Q.   Now, were you also able -- in addition to the exhibits, did |
| 11:38:42 | 8 | you personally conduct surveillance on which you observed |
| 11:38:46 | 9 | Fernando Garcia operating as a member of this organization? |
| 11:38:49 | 10 | A.   Yes.  Several times. |
| 11:38:50 | 11 | Q.   Was that multiple times? |
| 11:38:51 | 12 | A.   Yes, sir. |
| 11:38:53 | 13 | Q.   I think you mentioned it earlier but, again, referring to |
| 11:38:55 | 14 | the CS, what did this individual say Fernando Garcia's role was |
| 11:39:00 | 15 | with regards to expenses in the U.S.? |
| 11:39:04 | 16 | A.   That all bills were to be sent to Fernando.  All horse |
| 11:39:07 | 17 | registration paperworks were to be maintained by Fernando, and he |
| 11:39:11 | 18 | was to oversee that portion of it. |
| 11:39:14 | 19 | Q.   Now I want to refer your attention to Government's Exhibit |
| 11:39:17 | 20 | 360, which was a recorded call concerning the cash delivery in |
| 11:39:22 | 21 | January of 2011.  Briefly explain the circumstances surrounding |
| 11:39:25 | 22 | that arrangement. |
| 11:39:27 | 23 | A.   Just briefly, they owed Tyler Graham approximately $35,000. |
| 11:39:32 | 24 | They said they had the money in Laredo, but they had no way to |
| 11:39:35 | 25 | get it to him.  So we sent an undercover to pick up the money. |

| | | |
|---|---|---|
| 11:39:39 | 1 | Fernando provided the telephone number to Tyler of Victor Lopez. |
| 11:39:43 | 2 | We did a successful money pick-up in Laredo, and at the |
| 11:39:47 | 3 | conclusion of that, we had Tyler call Fernando and talk about the |
| 11:39:50 | 4 | success of the money drop.  And Fernando in the conversation said |
| 11:39:54 | 5 | it went well and that was a good way to do it and Fernando |
| 11:39:57 | 6 | agreed. |
| 11:40:01 | 7 | Q.   Now, there was also an incident on the sale of Blues |
| 11:40:05 | 8 | Ferrari.  And I don't have the exhibit number for the photo |
| 11:40:08 | 9 | presented by Mr. Del Rayo, but what role did Fernando Garcia play |
| 11:40:12 | 10 | with respect to the extorted money from Mr. Del Rayo? |
| 11:40:16 | 11 | A.   According to CS-1, that basically Fernando's role was to |
| 11:40:20 | 12 | help baby-sit Alfonso Del Rayo as he had just been released from |
| 11:40:25 | 13 | captivity and was forced to fly to the United States and buy |
| 11:40:28 | 14 | Blues Ferrari.  There's pictures of Fernando standing by Alfonso |
| 11:40:32 | 15 | Del Rayo, who has a cast like on his hand and bruises on his |
| 11:40:36 | 16 | face.  And according to CS-1, everybody there baby-sitting |
| 11:40:40 | 17 | Alfonso Del Rayo was aware of his captivity by the Zetas. |
| 11:40:45 | 18 | Q.   According to Government's Exhibit 359A through B. |
| 11:40:55 | 19 | With respect to Bonanza Racing, what activities did |
| 11:40:59 | 20 | Fernando Garcia perform on behalf of Bonanza Racing Stables? |
| 11:41:02 | 21 | A.   He was a self-declared manager of Bonanza Stables on the |
| 11:41:06 | 22 | U.S. side.  Oversaw that the horses were trained, paid for.  He |
| 11:41:12 | 23 | was the guarantee-er of the purchase of most of those horses at |
| 11:41:16 | 24 | auction, and upon his arrest, stated that he was a manager for |
| 11:41:21 | 25 | Francisco Colorado. |

| | | |
|---|---|---|
| 11:41:23 | 1 | Q.   And Mr. Fernando Garcia's objection, he states there's no |
| 11:41:26 | 2 | factual basis for accounting Mr. Garcia for any of the expenses |
| 11:41:30 | 3 | for any of the horses not personally owned by himself. |
| 11:41:34 | 4 | Refer your attention to Government's Exhibit 364, New |
| 11:41:38 | 5 | Mexico A through DDD.  Were those Fernando Garcia's computers? |
| 11:41:43 | 6 | A.   Yes, sir.  That's his computers that we obtained in New |
| 11:41:46 | 7 | Mexico. |
| 11:41:46 | 8 | Q.   Okay.  And what information with respect to expenses was |
| 11:41:49 | 9 | contained on that computer? |
| 11:41:51 | 10 | A.   On that computer, I found countless bills from horse |
| 11:41:55 | 11 | haulers, veterinarians, trainers, breeding facilities, and |
| 11:41:59 | 12 | several of them weren't even addressed to Fernando.  They would |
| 11:42:02 | 13 | be addressed to Nayen, or Jose, or various places.  But Fernando |
| 11:42:06 | 14 | was in possession of all those bills. |
| 11:42:08 | 15 | Q.   And through Special Agent Bill Johnston, DEA, were Fernando |
| 11:42:14 | 16 | Garcia's e-mail accounts obtained, Government's Exhibit 358D, |
| 11:42:18 | 17 | Fernie004? |
| 11:42:19 | 18 | A.   That's correct. |
| 11:42:20 | 19 | Q.   Did that e-mail have much of the same attachments as found |
| 11:42:22 | 20 | on his computer? |
| 11:42:23 | 21 | A.   Yes.  There's several of those bills that Fernando had.  He |
| 11:42:26 | 22 | was e-mailing to "Yo Yo" in Mexico. |
| 11:42:29 | 23 | Q.   And with respect to not paying expenses, could you briefly |
| 11:42:33 | 24 | recount for the Court the $51,000 that Fernando Garcia arranged |
| 11:42:38 | 25 | to be wired to Heritage Place auction house? |

11:42:40  1   A.   Sure.  There was an auction in January of 2012.  The group

11:42:45  2   paid most of the bill, but they left 51,000 outstanding.  "Yo Yo"

11:42:50  3   delivered money to Jose Canales in Laredo, Texas via Victor

11:42:56  4   Lopez.  That money was structured into Heritage Place's account,

11:43:01  5   structured deposits of $9,000 to equal 51,000.  And then, those

11:43:06  6   deposit slips were e-mailed to Fernando, and Fernando e-mailed

11:43:09  7   those to Heritage Place.

11:43:10  8   Q.   Now, defense objection number one is a legal objection, so

11:43:16  9   I'll pass on to objection number seven with respect to his

11:43:18  10  leadership role.

11:43:19  11       Could you briefly discuss his leadership role with

11:43:24  12  respect to Eusevio Huitron in March 2012?

11:43:28  13  A.   Sure.  There's two separate occasions when Fernando was

11:43:32  14  pretty much running the Ruidoso barn for the organization's

11:43:35  15  horses, but the second occasion was in the spring of 2012.

11:43:39  16  Fernando had brought Jose -- excuse me, Eusevio Huitron back into

11:43:43  17  the organization and brought him to New Mexico to train for their

11:43:47  18  horses.  Huitron broke his leg from a work accident and was taken

11:43:54  19  to the hospital and the bill was provided.  The bill mentioned

11:43:57  20  that it would be private pay, and Fernando had the bill and he

11:44:00  21  e-mailed the bill to "Yo Yo" in Mexico.

11:44:04  22  Q.   Now, you mentioned briefly the 51,000 transfer, Government's

11:44:09  23  Exhibit 358D.  Did you interview Mr. Canales?

11:44:12  24  A.   I did.

11:44:13  25  Q.   And what did Mr. Canales say how he was -- that payment was

11:44:17   1   arranged for?

11:44:18   2   A.   He said he was instructed by Carlos Nayen to send the money

11:44:24   3   to Heritage Place and that he was told to give proof to Fernando

11:44:29   4   Garcia, and that's why he e-mailed Fernando the deposit receipts.

11:44:34   5   Q.   Now, turning your attention back to the AQHA records,

11:44:37   6   Exhibit 226.  With respect to the transfer of the 35 mares, what

11:44:43   7   information came from those AQHA records to indicate Fernando

11:44:46   8   Garcia was exercising control over those horses?

11:44:49   9   A.   Sure.  Those 35 mares were all placed in Luis Aguirre's name

11:44:54   10  and sold to Jose Trevino for a written -- a check was written, it

11:44:58   11  was never negotiated.  Anyway, those horses, in theory, had

11:45:01   12  nothing to do with Fernando Garcia, and he took the 35 transfer

11:45:06   13  requests to the American Quarter Horse Association in Amarillo,

11:45:10   14  Texas.

11:45:11   15  Q.   Turning your attention to Government's Exhibit 358E, which

11:45:14   16  is the e-mail address from horses.quarter.racing, as testified by

11:45:20   17  Bill Johnson with respect to destroying the phones.  Could you

11:45:23   18  indicate that aspect in relation to his leadership

11:45:27   19  responsibilities?

11:45:28   20  A.   Sure.  It was after the raid in Los Alamitos racetrack in

11:45:32   21  California, there was multiple e-mails between "Yo Yo" in Mexico

11:45:35   22  to Fernando Garcia, you know, what's going on, fill us in, tell

11:45:40   23  us what's happening.  And eventually, there was an e-mail to

11:45:44   24  Fernando saying, destroy all your devices, all your phones, and

11:45:49   25  basically get rid of -- you know, we're scared, we're worried,

| | | |
|---|---|---|
| 11:45:53 | 1 | destroy everything. |
| 11:45:55 | 2 | Q.   Now, with respect to contact in Mexico, was there an |
| 11:45:59 | 3 | occasion when Tyler Graham mentioned that Carlos Nayen had visa |
| 11:46:03 | 4 | problems and Fernando Garcia assumed his role? |
| 11:46:06 | 5 | A.   That's correct.  There was a time when we didn't see Carlos |
| 11:46:10 | 6 | in the United States for approximately ten, eleven months, and at |
| 11:46:14 | 7 | that time, Fernando oversaw everything in the United States. |
| 11:46:16 | 8 | Q.   With respect to the objections, Special Agent, that's all I |
| 11:46:21 | 9 | have.  I just want to turn your attention briefly to the asset |
| 11:46:24 | 10 | forfeiture section.  Handing you a copy of the superseding |
| 11:46:33 | 11 | indictment. |
| 11:46:34 | 12 |         Now, you testified earlier that when you added the |
| 11:46:37 | 13 | information for Mr. Hinojosa to the information from the CS and |
| 11:46:43 | 14 | "Pitufo," you came up with $80 million, correct? |
| 11:46:45 | 15 | A.   That's correct. |
| 11:46:45 | 16 | Q.   And just so I'm clear, when did "Pitufo" state the $50 |
| 11:46:50 | 17 | million was delivered to Colorado-Cessa? |
| 11:46:51 | 18 | A.   Between 2008, 2009. |
| 11:46:53 | 19 | Q.   During the timeframe of this conspiracy? |
| 11:46:54 | 20 | A.   Yes, sir. |
| 11:46:57 | 21 | Q.   Now, I want to refer your attention for the asset forfeiture |
| 11:47:00 | 22 | portion to page 45 and 46. |
| 11:47:02 | 23 |         THE COURT:  Let's go over that one more time. |
| 11:47:04 | 24 |         MR. GARDNER:  Yes, sir. |
| 11:47:07 | 25 |         THE COURT:  Read me back -- despite your hayfever, read |

11:47:11  1  me back the last question and answer, please.

11:47:42  2              (Last question and answer read back.)

11:47:43  3              THE COURT:  All right.  You may proceed.

11:47:44  4              MR. GARDNER:  Thank you, your Honor.

11:47:52  5  Q.   (BY MR. GARDNER) You have the superseding indictment in

11:47:54  6  front of you?

11:47:54  7  A.   I do.

11:47:55  8  Q.   With respect to the real property listed on pages 45 and 46,

11:48:01  9  did you become familiar with that property?

11:48:02  10 A.   Yes, sir, I did.

11:48:03  11 Q.   And how so?

11:48:05  12 A.   Well, we were originally provided intelligence that Jose

11:48:09  13 Trevino had bought this property, so we did a few surveillances,

11:48:11  14 overhead photos.  But the most familiar I became is the date of

11:48:15  15 arrest when we led this search and seizure and arrest at Jose

11:48:18  16 Trevino's property.

11:48:19  17 Q.   Okay.  Did you determine that these two properties through

11:48:22  18 your investigation were purchased by Jose Trevino?

11:48:25  19 A.   That's correct.

11:48:26  20 Q.   For what purpose?

11:48:27  21 A.   To further his horse-breeding, money-laundering operation.

11:48:32  22 Q.   All right.  Just because there's actually three addresses

11:48:39  23 associated with that property, correct?

11:48:40  24 A.   That's correct.

11:48:41  25 Q.   And one is just a small little shack or portion.  But just

11:48:45   1   for the record, the three properties are located 17840 84th

11:48:51   2   Street, Lexington, Cleveland County, Oklahoma is paragraph 1;

11:48:55   3   paragraph 2, 17850 84th Street, Lexington, Cleveland County,

11:49:02   4   Oklahoma; paragraph 3, 17860 84th Street, Lexington, Cleveland

11:49:06   5   County, Oklahoma.  And even though they're separate physical

11:49:09   6   addresses, did they encompass a single piece of property?

11:49:13   7   A.   That's correct.

11:49:16   8   Q.   And based on the course of your investigation, were these --

11:49:19   9        THE COURT:  Does that include the second ranch that --

11:49:25   10   he was buying at the time of all of this broke that the gentleman

11:49:31   11   never got back?

11:49:32   12        MR. GARDNER:  Yes, sir.  That includes two ranches, the

11:49:34   13   Bill Pilgrim parcel and the other previously purchased parcel

11:49:39   14   totalling about 168.

11:49:40   15   Q.   (BY MR. GARDNER) Would that be --

11:49:40   16   A.   Yes, sir.  The Pilgrim parcel, there was still some money to

11:49:43   17   be paid, but he had paid approximately $400,000.

11:49:49   18   Q.   (BY MR. GARDNER) And just for the record, your Honor, that's

11:49:51   19   Exhibit No. 32 for the Bill Pilgrim purchase contract.

11:49:56   20        THE COURT:  All right.

11:49:57   21   Q.   (BY MR. GARDNER) Based on the course of your investigation,

11:49:59   22   were these properties used to facilitate and further the

11:50:01   23   money-laundering conspiracy?

11:50:01   24   A.   That correct.

11:50:02   25   Q.   And could you just briefly give the Court examples of how

| | | |
|---|---|---|
| 11:50:05 | 1 | these properties were used in furtherance of that? |
| 11:50:08 | 2 | A.   Yes, sir.  They just had several barns for breeding stud |
| 11:50:13 | 3 | horses to recipient mares or to the quality mares, and then, |
| 11:50:18 | 4 | there was several boarding facilities for the recipient mares to |
| 11:50:22 | 5 | carry the foals to term.  There was all kinds of tractors and |
| 11:50:28 | 6 | things to maintain the property, to spread feed, and to do the |
| 11:50:33 | 7 | daily tours around the property. |
| 11:50:35 | 8 | Q.   And ultimately at the point where you received a search |
| 11:50:40 | 9 | warrant, how many horses, organizational horses did you seize |
| 11:50:43 | 10 | from those properties? |
| 11:50:48 | 11 | A.   It was over 400 just in Lexington. |
| 11:50:51 | 12 | Q.   Okay.  So the vast majority of the 484 have currently been |
| 11:50:56 | 13 | sold? |
| 11:50:56 | 14 | A.   That's correct. |
| 11:50:56 | 15 | Q.   Now, turning your attention to the farm and ranch equipment |
| 11:50:59 | 16 | located on pages 23 and 24, you briefly testified to it, but with |
| 11:51:06 | 17 | respect to how they're listed there, where did that information |
| 11:51:10 | 18 | come from? |
| 11:51:10 | 19 | A.   On the day of the arrest, we did an inventory of all |
| 11:51:14 | 20 | property located on the premises. |
| 11:51:17 | 21 | Q.   Okay.  So this list here on pages 23 and 24 is an inventory |
| 11:51:20 | 22 | of the property as you found it on June 12, 2012? |
| 11:51:24 | 23 | A.   That's correct. |
| 11:51:26 | 24 | Q.   And, again, although you mentioned it, just so I'm sure I'm |
| 11:51:29 | 25 | clear on the record for this particular portion of the |

11:51:32  1  proceeding, how were those vehicles and equipment used in the

11:51:35  2  facilitation and furtherance of the money-laundering conspiracy?

11:51:38  3  A.    They're used to further the care of the horses and, you

11:51:42  4  know, to further the conspiracy.

11:51:45  5  Q.    Turning your attention to the currency seized from Mr.

11:51:49  6  Eusevio Huitron's residence located on page 22, currency in the

11:51:54  7  amount of $12,758, was that seized from Eusevio Huitron's

11:52:00  8  residence?

11:52:01  9  A.    From the residence, yes, sir.

11:52:02  10  Q.    Can you describe the circumstances of that seizure?

11:52:04  11  A.    The consent search began after the arrest of Eusevio, and he

11:52:11  12  granted consent to the search of his residence.  Inside the room

11:52:15  13  of his son Adrian Huitron, in a dresser there was found various

11:52:20  14  bundles of cash, including approximately 1,500 in a wallet that

11:52:25  15  totalled approximately $12,000.

11:52:27  16  Q.    And why is it your belief that that money came from the

11:52:30  17  money-laundering conspiracy?

11:52:32  18  A.    When Adrian was asked where the money came from, he

11:52:36  19  explained that it was from the monthly fees of boarding horses.

11:52:41  20  Q.    And at that time, was Eusevio Huitron boarding and training

11:52:47  21  horses belonging to the organization?

11:52:48  22  A.    That's correct.

11:52:48  23  Q.    I'll pass the witness, your Honor.

11:52:56  24        MR. LECHTENBERGER:  May I have 45 seconds with my

11:52:58  25  client, Judge?

| | | |
|---|---|---|
| 11:52:59 | 1 | THE COURT:  Yes. |
| 11:53:11 | 2 | MR. LECHTENBERGER:  That was under 45 seconds.  No |
| 11:53:14 | 3 | questions, Agent. |
| 11:53:16 | 4 | THE COURT:  I anticipate more than 45 seconds of cross? |
| 11:53:21 | 5 | MR. SANCHEZ:  A little bit more, your Honor. |
| 11:53:22 | 6 | THE COURT:  All right.  Well, we can't -- |
| 11:53:27 | 7 | MR. SANCHEZ:  Did you say we -- |
| 11:53:29 | 8 | THE COURT:  We can't exhaust the court reporter.  It |
| 11:53:31 | 9 | looks like we're going to go on.  You may step down, sir.  So |
| 11:53:35 | 10 | we'll recess till 1:30.  Let me try to get a handle on some |
| 11:53:40 | 11 | things.  We've got one more witness. |
| 11:53:43 | 12 | MR. GARDNER:  He will only address -- |
| 11:53:45 | 13 | THE COURT:  Well, I don't -- he'll be what he is. |
| 11:53:49 | 14 | MR. GARDNER:  Yes. |
| 11:53:50 | 15 | THE COURT:  So I'm not concerned about that.  So we've |
| 11:53:54 | 16 | got one other.  We've got -- what I'm really trying to figure out |
| 11:54:03 | 17 | as to whether we're going to reach Mr. Ramirez or not, Mr. |
| 11:54:08 | 18 | Harris, I don't know. |
| 11:54:12 | 19 | MR. HARRIS:  I hope so. |
| 11:54:12 | 20 | THE COURT:  If you have a tent where you could sleep in |
| 11:54:14 | 21 | our beautiful outdoors, don't give it away.  All right.  Recess |
| 11:54:19 | 22 | till 1:30. |
| 13:27:03 | 23 | (Lunch recess.) |
| 13:27:11 | 24 | THE COURT:  You're still under oath. |
| 13:27:13 | 25 | THE WITNESS:  Yes, your Honor. |

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
| 13:27:15 | 1  | CROSS-EXAMINATION                                         |
| 13:27:15 | 2  | BY MR. SANCHEZ:                                           |
| 13:27:20 | 3  | Q.   Thank you, your Honor.                              |
| 13:27:21 | 4  | Mr. Lawson, I want to talk to you about a couple of |
| 13:27:34 | 5  | things.  I want to start by, first, were you referring to this |
| 13:27:43 | 6  | CI, CI-1?  I just want to get a -- something I can refer to.  The |
| 13:27:47 | 7  | one that gave information about the 12 million and broken up into |
| 13:27:52 | 8  | two, two million and 10 million, was that CI-1?        |
| 13:27:55 | 9  | A.   That's correct.                                     |
| 13:27:55 | 10 | Q.   Okay.  So I want to ask you about CI-1 first.  And I guess |
| 13:28:02 | 11 | what you were saying is CI-1 is the one that told you that the |
| 13:28:06 | 12 | roughly 10 million listed in the PSR that Francisco Colorado |
| 13:28:13 | 13 | paid, that's -- it's paid back and the information that you're |
| 13:28:17 | 14 | relying on is CI-1?                                      |
| 13:28:19 | 15 | A.   That's part of the information.  Yes, sir.         |
| 13:28:23 | 16 | Q.   So CI-1, I want to ask you, is he cooperating with the |
| 13:28:27 | 17 | government because he's, in fact, in custody?           |
| 13:28:33 | 18 | A.   He is in custody.                                   |
| 13:28:35 | 19 | Q.   Okay.  And so, is he in custody because he has a federal |
| 13:28:39 | 20 | case?                                                    |
| 13:28:40 | 21 | A.   Yes.                                                |
| 13:28:41 | 22 | Q.   More than one federal case?                         |
| 13:28:44 | 23 | MR. GARDNER:  Your Honor, at this point, I would object |
| 13:28:46 | 24 | to any further description that might serve to identify the |
| 13:28:52 | 25 | identity of this individual.  I think we're getting a little |

| 13:28:55 | 1 | close to that line. |

13:28:55  1  close to that line.

13:28:56  2           MR. SANCHEZ:  I'm --

13:28:58  3           THE COURT:  Does it make any difference if he's got 30

13:29:01  4  cases or one?

13:29:03  5           MR. SANCHEZ:  Well.

13:29:05  6           THE COURT:  Let's go.

13:29:06  7           MR. SANCHEZ:  I want to know how many -- I want to be

13:29:08  8  able to impeach him, and it does make a difference if he's trying

13:29:11  9  to give information in order to reduce his sentence.  I do think

13:29:16 10  that's relevant.

13:29:18 11           THE COURT:  Then ask him that.  It doesn't make any

13:29:20 12  difference if it's one or ten.  If it's --

13:29:23 13           MR. SANCHEZ:  I'd also like to ask what kind of

13:29:26 14  sentence he's facing, what his range is, in order to try to judge

13:29:28 15  his credibility as far as the information that he's giving,

13:29:32 16  whether -- what's he looking at.  If he's looking at --

13:29:34 17           THE COURT:  Do you have a crystal ball to look at

13:29:38 18  whatever the Judge is going to do one way or the other?

13:29:41 19           MR. SANCHEZ:  Your Honor, when it comes to the record,

13:29:42 20  I think it's important because a person that's facing a two-year

13:29:46 21  sentence versus a person that's facing a 50-year sentence has

13:29:50 22  more incentive to make things up and that's the --

13:29:54 23           THE COURT:  That's all right.  I never have met a CI

13:29:56 24  with a two-year sentence.  So let's go on.  Maybe we will learn

13:29:59 25  something.

| | | |
|---|---|---|
| 13:30:00 | 1 | Q.   (BY MR. SANCHEZ) Do you know whether the CI has been |
| 13:30:03 | 2 | sentenced? |
| 13:30:04 | 3 | A.   He has not. |
| 13:30:05 | 4 | Q.   Do you know what kind of range of punishment he's facing? |
| 13:30:10 | 5 | A.   I haven't seen the PSI, but I understand that it's |
| 13:30:14 | 6 | substantial. |
| 13:30:15 | 7 | Q.   What do you mean by substantial? |
| 13:30:19 | 8 | A.   I believe ten to life comes to mind. |
| 13:30:24 | 9 | Q.   Ten to life is what the statutory range is, or is that what |
| 13:30:29 | 10 | the guideline range is? |
| 13:30:32 | 11 | THE COURT:  If he hadn't seen the PSI, I don't know if |
| 13:30:35 | 12 | he can answer that question.  If he has seen the PSI, you'd |
| 13:30:38 | 13 | better have the judge's permission to have seen the PSI. |
| 13:30:43 | 14 | Q.   (BY MR. SANCHEZ) Do you know what the government is offering |
| 13:30:47 | 15 | him in exchange for the information that he's providing? |
| 13:30:54 | 16 | A.   I know they have made a statement that they will let the |
| 13:30:58 | 17 | judge know of his cooperation. |
| 13:31:00 | 18 | Q.   Have they recommended a certain reduction to his sentence? |
| 13:31:08 | 19 | A.   I don't think I've heard legal terms of, you know, what |
| 13:31:11 | 20 | rule, or anything, they're going to try to use toward the |
| 13:31:16 | 21 | defendant. |
| 13:31:16 | 22 | Q.   So you don't know whether the government's recommending some |
| 13:31:20 | 23 | sort of reduction to his sentence? |
| 13:31:22 | 24 | A.   I understand there's going to be some form of |
| 13:31:24 | 25 | recommendation. |

13:31:26  1   Q.   What's your understanding?  Is it a percentage of what is

13:31:29  2   calculated by the guidelines, or is it a certain number of years

13:31:33  3   off?

13:31:34  4   A.   I do not have an understanding because the best I

13:31:38  5   understand, we're still waiting on what information is going to

13:31:41  6   be used, if it's going to help any other cases, that type of

13:31:43  7   thing.

13:31:49  8   Q.   How many times have you sat down and met with this

13:31:53  9   particular individual?

13:31:56  10  A.   Probably eight.

13:31:59  11  Q.   And those eight times, were reports written about that

13:32:02  12  meeting?

13:32:04  13  A.   Yes.

13:32:10  14  Q.   When was the first time -- and I'm not talking about a date.

13:32:15  15  Just in relation to those eight meetings, when was the first time

13:32:18  16  he provided this information about this alleged $12 million

13:32:22  17  payment?

13:32:28  18  A.   I'd be guessing a little.  I'm going to say the third time.

13:32:31  19  Q.   So he did not provide it the first or the second time?

13:32:37  20  A.   No.  As I said in the trial, my general rule in debriefing

13:32:42  21  any defendant is to be very generic the first time or two and get

13:32:45  22  a broad picture, and then, you come back for specific details.

13:32:49  23  Q.   Other than those eight times that you sat in, how many other

13:32:52  24  times has he sat in either before or after your meetings?

13:32:57  25  A.   With other interviewers?

13:33:00  1    Q.    With other interviewers.

13:33:01  2    A.    I know of one.  At the most, two.  I think just one without

13:33:08  3    me.

13:33:10  4    Q.    Has he provided other information about Francisco Colorado

13:33:14  5    in those nine to ten interviews?

13:33:17  6    A.    Yes.

13:33:19  7              MR. SANCHEZ:  Your Honor, at this time, we'd ask to

13:33:20  8    have copies, whether they're redacted or not, of those interviews

13:33:24  9    to be able to further impeach this faceless person's credibility.

13:33:28  10   And also, to see if there's any favorable information that he's

13:33:31  11   giving about our client.  If this gentleman's going to be taking

13:33:37  12   the bad things that he said about our client and leaving out some

13:33:40  13   of the better things, then that's obviously a problem for us.  So

13:33:44  14   we'd ask for a redacted copy of these reports of his interviews.

13:33:51  15             MR. GARDNER:  Your Honor, I have the reports right

13:33:54  16   here.  I would offer them to the Court in camera to determine

13:33:56  17   whether Mr. Scott Lawson, who authored some of the reports, is

13:34:01  18   not testifying as truthfully to those reports.

13:34:03  19             THE COURT:  Let's mark that.

13:34:06  20             MR. SANCHEZ:  And, your Honor, if I can respond to

13:34:09  21   that.

13:34:09  22             THE COURT:  Well, let's -- you, of course, can respond.

13:34:14  23             MR. SANCHEZ:  What I'm afraid of is if the Court then

13:34:17  24   has information about our client that's in those reports and we

13:34:20  25   don't have access to it and we're never given an opportunity to

13:34:23   1   rebut them, then that's a problem for us, as well.  So I would

13:34:30   2   object to --

13:34:31   3              THE COURT:  Like the government does not have an

13:34:33   4   opportunity to rebut the records that were made all by your

13:34:38   5   client's company because it's in Mexico?

13:34:41   6              MR. SANCHEZ:  Your Honor, those records were provided

13:34:44   7   in April of this year.  They've had --

13:34:47   8              THE COURT:  I'm just illustrating exactly the problem

13:34:51   9   that's in this case, illustrated throughout this record.  I'll

13:34:56  10   take that now.  Counsel makes a good point with regard to the

13:35:23  11   fact that I've already disclosed on the record or will disclose

13:35:29  12   on the record exactly what I had reviewed in preparation for the

13:35:35  13   sentencings that hopefully will take place in this century, and

13:35:51  14   it will not be any of these.  It will take quite a bit of time

13:36:08  15   for you to review that, that material.

13:36:20  16              Put a rubber band on it and let's call it --

13:36:24  17              MR. GARDNER:  Your Honor, if that's going to be the

13:36:25  18   case, I would request the Court not to take into any

13:36:29  19   consideration the information provided by CS-1 in terms of

13:36:32  20   sentencing.  Rather than have this procedural aid or to disclose

13:36:37  21   either redacted portions of the reports that may identify the

13:36:42  22   confidential source, we'll withdraw any of that testimony and ask

13:36:45  23   the Court not to consider that information.

13:36:50  24              MR. SANCHEZ:  I'm okay with that, your Honor.

13:36:52  25              THE COURT:  Okay.  Well, I wasn't going to pay any

| | | |
|---|---|---|
| 13:36:55 | 1 | attention to it, anyway, so it was a draw. |
| 13:37:00 | 2 | All right.  But still -- well, if we're withdrawing it, |
| 13:37:05 | 3 | then I'll allow you to withdraw the unnumbered exhibit at this |
| 13:37:13 | 4 | time because this case has plenty of exhibits. |
| 13:37:15 | 5 | MR. SANCHEZ:  And, your Honor, I'm going to go into the |
| 13:37:18 | 6 | next source of information, but can we approach briefly instead |
| 13:37:23 | 7 | of putting -- I want to put something on the record, not in open |
| 13:37:26 | 8 | court. |
| 13:37:28 | 9 | (At the bench, on the record.) |
| 13:37:36 | 10 | MR. SANCHEZ:  The next source of information is |
| 13:37:41 | 11 | "Pitufo," and it was one of the possible witnesses at trial.  We |
| 13:37:49 | 12 | know his name but I want to -- and I cleared it with Doug that |
| 13:37:54 | 13 | we're talking about the same person.  So before I ask this -- |
| 13:37:59 | 14 | THE COURT:  I won't know. |
| 13:38:03 | 15 | MR. DEGEURIN:  That's right. |
| 13:38:03 | 16 | MR. SANCHEZ:  Right.  So I don't know how you want to |
| 13:38:05 | 17 | handle it.  Whether we'll just stipulate that "Pitufo" is, in |
| 13:38:08 | 18 | fact, a person named Salvador Puga-Quintanilla or if you wanted |
| 13:38:13 | 19 | me to ask the agent that. |
| 13:38:16 | 20 | MR. GARDNER:  I'll stipulate to that, your Honor. |
| 13:38:17 | 21 | THE COURT:  Okay.  Tell me, again, the name.  You |
| 13:38:20 | 22 | referred to him as "Pitufo" so the record is clear. |
| 13:38:23 | 23 | MR. SANCHEZ:  Okay. |
| 13:38:24 | 24 | THE COURT:  Salvador what? |
| 13:38:25 | 25 | MR. SANCHEZ:  Salvador Puga.  And Puga is P-U-G-A. |

| | | |
|---|---|---|
| 13:38:29 | 1 | Quintanilla, Q-U-I-N-T-A-N-I -- I'm going to give up at that -- |
| 13:38:37 | 2 | MR. GARDNER:  Your Honor, just as part of that, we |
| 13:38:38 | 3 | would ask the Court to seal that portion of the transcript. |
| 13:38:40 | 4 | THE COURT:  Yeah.  This part of the transcript will be |
| 13:38:43 | 5 | sealed and it's a closed conversation, and the court reporter's |
| 13:38:49 | 6 | listening to it right now so. |
| 13:38:51 | 7 | MR. GARDNER:  Your Honor, as part of Special Agent |
| 13:38:55 | 8 | Lawson's preparation for "Pitufo," I'll represent to the Court he |
| 13:38:59 | 9 | has reviewed no reports prepared by any other agents with respect |
| 13:39:03 | 10 | to Mr. "Pitufo."  He has prepared the reports with respect to his |
| 13:39:07 | 11 | interview by "Pitufo." |
| 13:39:09 | 12 | THE COURT:  At any time? |
| 13:39:10 | 13 | MR. GARDNER:  At any time.  The only information came |
| 13:39:12 | 14 | from when Mr. "Pitufo" was up in our offices, during the course |
| 13:39:15 | 15 | of the trial, when we talked to him in anticipation of using him |
| 13:39:18 | 16 | as a witness.  So we have no written reports or written notes by |
| 13:39:21 | 17 | that agent or any other agent with regards to those interviews on |
| 13:39:25 | 18 | the occasion during the course of the trial. |
| 13:39:28 | 19 | MR. SANCHEZ:  I assumed that, anyway, and so, I wasn't |
| 13:39:31 | 20 | going to ask those questions. |
| 13:39:35 | 21 | MR. ESPER:  Judge, what I want to ask is, is that CI-1 |
| 13:39:38 | 22 | the same -- is represented by the same lawyer that represented |
| 13:39:39 | 23 | the other? |
| 13:39:41 | 24 | MR. GARDNER:  Sure.  I'll make that representation that |
| 13:39:42 | 25 | he's not. |

| | | |
|---|---|---|
| 13:39:43 | 1 | MR. ESPER:  That he is? |
| 13:39:44 | 2 | MR. GARDNER:  He's not. |
| 13:39:45 | 3 | MR. ESPER:  Oh, okay. |
| 13:39:45 | 4 | THE COURT:  But you can ask. |
| 13:39:47 | 5 | MR. ESPER:  Thought I'd get it out.  Thought I'd flush |
| 13:39:49 | 6 | it out now. |
| 13:40:06 | 7 | THE COURT:  You may proceed. |
| 13:40:08 | 8 | Q.   (BY MR. SANCHEZ) I want to ask you some questions now about |
| 13:40:10 | 9 | the source of information that you labeled as "Pitufo." |
| 13:40:12 | 10 | A.   Sure. |
| 13:40:13 | 11 | Q.   And "Pitufo," he's a Mexican citizen? |
| 13:40:17 | 12 | A.   He is. |
| 13:40:18 | 13 | Q.   He was actually here in Austin getting ready to testify back |
| 13:40:23 | 14 | in April or May of this year in this case? |
| 13:40:25 | 15 | A.   That's correct. |
| 13:40:27 | 16 | Q.   That was a decision the government made not to put him on as |
| 13:40:30 | 17 | a witness during the trial? |
| 13:40:31 | 18 | A.   That's correct. |
| 13:40:32 | 19 | Q.   But "Pitufo" has actually been cooperating down in Mexico |
| 13:40:37 | 20 | for some length of time? |
| 13:40:38 | 21 | A.   That's correct. |
| 13:40:39 | 22 | Q.   And "Pitufo," you're aware of he was arrested first in 2007 |
| 13:40:46 | 23 | and then, again, in 2008 down in Mexico? |
| 13:40:49 | 24 | A.   I know he's been arrested in the past. |
| 13:40:51 | 25 | Q.   Were you aware that he's -- since 2008, he's been working |

13:40:55  1  with the Mexican Attorney General earning 5,000 a month?

13:40:59  2  A.    I don't know if he has a salary or anything of that nature.

13:41:02  3  Q.    Were you aware that in addition to the $5,000 a month, he

13:41:06  4  was receiving room and board under the care of the Mexican

13:41:10  5  Attorney General?

13:41:13  6  A.    I don't believe in my time with "Pitufo "that we discussed

13:41:17  7  his arrangements in Mexico.

13:41:18  8  Q.    Were you aware that "Pitufo" has testified in over 83 cases

13:41:25  9  and a lot of those cases have now been reversed, and the

13:41:29  10  reversals have hinged on the lack of credibility as to "Pitufo"?

13:41:35  11  A.    I'm not aware to the fact as you stated.

13:41:39  12  Q.    Were you aware that in Mexico, the procedure is the first

13:41:44  13  time you give a proffer in order to have and to maintain some

13:41:48  14  sort of immunity from what you're proffering, you need to discuss

13:41:53  15  everything that you have ever done illegal?

13:41:56  16  A.    I'm not aware of Mexico's proffer situation.

13:41:59  17  Q.    You know that "Pitufo" first proffered -- his first proffer

13:42:02  18  where he listed everything he did was back in 2008?

13:42:05  19  A.    Not aware of that.

13:42:06  20  Q.    Are you aware that "Pitufo" hasn't done or claims to not

13:42:09  21  have done anything illegal since 2008?

13:42:12  22  A.    I'm not aware of that.

13:42:14  23  Q.    Are you aware that "Pitufo" gave a sworn declaration in

13:42:18  24  Mexico against Francisco Colorado in 2012 for the first time?

13:42:25  25  A.    I'm not aware to any specific legal things he's done in

| | | |
|---|---|---|
| 13:42:28 | 1 | Mexico. |
| 13:42:29 | 2 | Q.   Were you aware that in this sworn declaration, he never made |
| 13:42:34 | 3 | mention of this $50 million? |
| 13:42:36 | 4 | A.   Not aware of a sworn declaration, so I would not be aware of |
| 13:42:40 | 5 | anything in a sworn declaration. |
| 13:42:44 | 6 | Q.   Were you aware that "Pitufo" has testified that he has |
| 13:42:57 | 7 | worked for numerous different cartels at the same time, even |
| 13:43:01 | 8 | though they are at war with each other? |
| 13:43:04 | 9 | A.   I'm not aware of that. |
| 13:43:09 | 10 | Q.   Are you aware that there's been a large scale investigation |
| 13:43:17 | 11 | into "Pitufo" and other similar cooperating witnesses down in |
| 13:43:23 | 12 | Mexico? |
| 13:43:23 | 13 | A.   No. |
| 13:43:32 | 14 | Q.   Are you aware where "Pitufo" claimed to have lived in? |
| 13:43:37 | 15 | A.   I'm sorry? |
| 13:43:37 | 16 | Q.   Are you -- do you know where he says he lived? |
| 13:43:41 | 17 | A.   Like any time in the past or? |
| 13:43:44 | 18 | Q.   During the year of 2008 when he -- or 2009, when he claims |
| 13:43:48 | 19 | to have been part of the $50 million payment? |
| 13:43:52 | 20 | A.   I do remember him discussing different areas of Mexico he |
| 13:43:56 | 21 | was responsible for at different times but not specifically, no. |
| 13:44:00 | 22 | Q.   Do you know what he was arrested for, what he was charged |
| 13:44:04 | 23 | and convicted of?  If I say possession of a gun and aggravated |
| 13:44:12 | 24 | kidnapping, would that ring a bell? |
| 13:44:14 | 25 | A.   I remember something about a gun, not the kidnapping. |

13:44:18  1   Q.   Do you know that he actually testified and admitted that he

13:44:21  2   was a gang -- in a gang, a leader of a gang that committed

13:44:26  3   aggravated kidnappings in Mexico City?

13:44:31  4   A.   From what I recall, "Pitufo" said that he was comfortable

13:44:34  5   doing what he did because he did not participate in kidnappings.

13:44:39  6   Q.   Are you aware that he testified to the opposite of that?

13:44:42  7   A.   No.  I'm not aware of any particular of "Pitufo's"

13:44:52  8   testimony.

13:45:16  9         MR. SANCHEZ:  Your Honor, at this point I would pass

13:45:18  10  the witness.  But one thing that I want to point out to the Court

13:45:20  11  is that we were not aware through the process of objections and

13:45:26  12  responses and replies to those objections to the PSR that any

13:45:30  13  information about "Pitufo" would come in at the sentencing.  And

13:45:34  14  the reason why I'm pointing that out is that had we known that,

13:45:37  15  we would have been prepared to introduce more evidence about

13:45:42  16  "Pitufo," as opposed to simply asking, "did you know" or "are you

13:45:45  17  aware" questions.

13:45:47  18         I'm not sure how the Court is going to handle any of

13:45:50  19  this information.

13:45:54  20         THE COURT:  Of course, the reason that you didn't get

13:46:00  21  that information is just the way things go, and that is probation

13:46:04  22  officer prepares the presentence investigation, the parties

13:46:10  23  object to it, the parties respond.  It's not unusual at all for

13:46:14  24  people to be called as a witness that aren't even mentioned in

13:46:18  25  the report.  But I have no idea -- you know, I don't have a

13:46:28  1   clever way to erase what I hear, but I don't even know how to

13:46:34  2   spell "Pitufo."  So I don't think it's going to be of great

13:46:37  3   influence.

13:46:38  4          I'm far more concerned with the evidence I heard in

13:46:42  5   this trial.  Sworn testimony by the witnesses in this trial.  So

13:46:47  6   that's the best I can do to help your concern.

13:46:50  7          MR. SANCHEZ:  Well, I'll pass witness, your Honor.

13:46:52  8          THE COURT:  All right.

13:46:56  9          MR. SANCHEZ:  Thank you, your Honor.

13:46:57  10                         CROSS-EXAMINATION

13:46:57  11  BY MR. WOMACK:

13:46:59  12  Q.   Special Agent Lawson?

13:46:59  13  A.   Good afternoon.

13:47:00  14  Q.   Going along with what his Honor just said, your sworn

13:47:03  15  testimony at the trial was that Fernando Garcia first comes into

13:47:07  16  this conspiracy in the fall of 2010, correct?

13:47:15  17  A.   I don't recall if I said the fall of 2010.

13:47:18  18  Q.   If we remember it that way, that is what you said, wasn't

13:47:20  19  it?

13:47:20  20  A.   I'm sorry?

13:47:22  21  Q.   If the Judge --

13:47:24  22          THE COURT:  That may be the greatest question I've ever

13:47:26  23  heard.

13:47:28  24          MR. WOMACK:  Thank you.  I appreciate it, your Honor.

13:47:30  25          THE COURT:  Why don't you try another one.

13:47:32  1   Q.   (BY MR. WOMACK) Do you recall that you said it was around

13:47:34  2   the fall or September of 2010 that you first have Fernando Garcia

13:47:39  3   actively involved with these alleged coconspirators?

13:47:42  4   A.   I can recall that was the first time I saw him on the

13:47:45  5   surveillance.  But I know that I was referred to him by Tyler

13:47:48  6   Graham before I saw him on surveillance.

13:47:50  7   Q.   And what you have Tyler Graham talking about is that there

13:47:56  8   were horses at Southwest Stallion Station, and that it

13:48:00  9   appeared -- it was pretty clear that Fernando Garcia was making

13:48:06  10  sure these horses were taken care of and they were paid for.

13:48:09  11  Bills were paid?

13:48:10  12  A.   Yes.

13:48:11  13  Q.   And you know from your investigation that there's no

13:48:13  14  evidence that Fernando Garcia was using his meager funds to pay

13:48:18  15  for the horses for Mr. Colorado-Cessa or Mr. Trevino.  You know

13:48:22  16  that?

13:48:22  17  A.   No.  He wasn't using his funds.

13:48:25  18  Q.   And from your investigation, you know that throughout this

13:48:30  19  two years or so, 2010 up to 2012 that Mr. Garcia appeared to be

13:48:35  20  actively involved with these other codefendants.  He never made

13:48:39  21  over $80,000 a year, did he?

13:48:42  22  A.   I'm not sure what he was being paid.

13:48:44  23  Q.   Okay.  From your investigation, though, it looked like he

13:48:46  24  was getting around $80,000 or less a year.

13:48:49  25  A.   I haven't seen any numbers to what Fernando made.

```
13:48:53   1   Q.   You've seen his tax returns.

13:48:55   2   A.   I have not seen his tax returns.

13:48:56   3   Q.   Okay.  So during the course of what you have seen, you're

13:49:01   4   not aware that Mr. Garcia was only making -- I'm not saying it

13:49:06   5   was bad money, but he was making $80,000 or less per year?

13:49:09   6   A.   I'm not aware of that.

13:49:10   7   Q.   Okay.  You have not seen where he's been given any

13:49:13   8   exorbitant fees by Mr. Colorado-Cessa?

13:49:17   9   A.   No.  I haven't seen.

13:49:19  10   Q.   Or where he was given any exorbitant amount of money from

13:49:22  11   any person, correct?

13:49:23  12   A.   I've seen him flying on Cessa's jets and on his boats in

13:49:27  13   Mexico.

13:49:27  14   Q.   You don't know anything about him being on a boat in Mexico,

13:49:30  15   do you?

13:49:30  16   A.   I do.

13:49:31  17   Q.   That's never come up at trial.

13:49:32  18   A.   I didn't say it came up at trial.  I said I knew that.

13:49:34  19   Q.   You didn't just forget to tell the jury that, did you?

13:49:39  20   A.   No.  There's a lot there --

13:49:44  21         THE COURT:  You let him ask the questions, but you can

13:49:47  22   answer them.

13:49:48  23         THE WITNESS:  Yes, sir.

13:49:49  24   Q.   (BY MR. WOMACK) And we did have pictures, I believe, of Mr.

13:49:52  25   Garcia once getting on this private plane, someone's private
```

13:49:56   1   plane flying around America.  Do you recall that?

13:49:58   2   A.   What's the question?

13:49:59   3   Q.   You did see at trial there was a photograph of Mr. Garcia --

13:50:02   4   A.   I did.

13:50:02   5   Q.   -- getting on a private plane that was flying within the

13:50:04   6   United States?

13:50:04   7   A.   Yes.

13:50:05   8   Q.   Okay.  And you testified with regards to Mr. Huitron, you

13:50:18   9   were asked about Fernando Garcia having a leadership role?

13:50:21   10   A.   Yes.

13:50:21   11   Q.   And you said that you thought it was a leadership role

13:50:24   12   because you said, in your words, he brought back Mr. Huitron to

13:50:28   13   work for some of these men, correct?

13:50:30   14   A.   That was a piece of why I said he had a leadership role.

13:50:33   15   Q.   And when you say brought back, you don't mean that he went

13:50:36   16   out and actively recruited Mr. Huitron or cajoled him to come

13:50:40   17   back and work for anyone, did you?  You don't mean that, do you?

13:50:43   18   A.   I believe he invited him and -- Carlos Nayen invited Huitron

13:50:47   19   to come into New Mexico.

13:50:48   20   Q.   But you have no evidence of Mr. -- of Fernando Garcia doing

13:50:52   21   that, do you?

13:50:55   22   A.   I believe there's a call where he tells Tyler that we have

13:50:59   23   Huitron in New Mexico.

13:51:02   24   Q.   So you have a call, you think, where Fernando Garcia tells

13:51:07   25   Tyler Graham at Southwest Station, we think Mr. Huitron is going

| | | |
|---|---|---|
| 13:51:10 | 1 | to be training a horse? |
| 13:51:11 | 2 | A.   Be training horses in New Mexico. |
| 13:51:14 | 3 | Q.   Okay.  And, of course, you know from your investigation as |
| 13:51:16 | 4 | it came out at trial, Mr. Huitron is a highly regarded trainer |
| 13:51:20 | 5 | that people would want to have training their horses. |
| 13:51:23 | 6 | A.   Before this case, I didn't see anybody outside of Texas use |
| 13:51:26 | 7 | Huitron. |
| 13:51:28 | 8 | Q.   But he was still highly regarded within Texas? |
| 13:51:30 | 9 | A.   He was pretty decently regarded in Texas. |
| 13:51:33 | 10 | Q.   Okay.  And so, what you have is Fernando Garcia talking to |
| 13:51:40 | 11 | Tyler Graham saying, hey, Mr. Huitron is going to be training |
| 13:51:43 | 12 | some horses, correct? |
| 13:51:44 | 13 | A.   Our horses. |
| 13:51:46 | 14 | Q.   You had no evidence of Fernando Garcia telling Mr. Huitron |
| 13:51:51 | 15 | how to train horses, do you? |
| 13:51:53 | 16 | A.   No. |
| 13:51:54 | 17 | Q.   You don't have any evidence of Fernando Garcia ordering |
| 13:51:59 | 18 | anyone to do anything, do you, as far as directing how they |
| 13:52:03 | 19 | operate? |
| 13:52:11 | 20 | A.   Not necessarily ordering. |
| 13:52:25 | 21 | Q.   Sir, no further questions.  Thank you. |
| 13:52:28 | 22 | THE COURT:  Mr. Esper. |
| 13:52:30 | 23 | CROSS-EXAMINATION |
| 13:52:30 | 24 | BY MR. ESPER: |
| 13:52:32 | 25 | Q.   Just a couple of questions, Agent. |

13:52:34   1          You said you suggested that when Mr. Huitron went to

13:52:38   2     New Mexico, he had been invited or drawn back into training

13:52:45   3     horses, correct?

13:52:46   4     A.   That's correct.

13:52:46   5     Q.   And your investigation revealed that he obviously had been

13:52:50   6     terminated by this group prior to that time?

13:52:53   7     A.   Yeah.  They would use a trainer, get tired of him, go

13:52:57   8     somewhere and then, come back.

13:52:58   9     Q.   Vacillate back and forth?

13:53:03   10    A.   Yes.

13:53:03   11    Q.   Okay.  That's all I have.

13:53:06   12             THE COURT:  Any redirect?

13:53:07   13             MR. GARDNER:  Redirect, your Honor, briefly.

13:53:09   14                     RE-DIRECT EXAMINATION

13:53:09   15    BY MR. GARDNER:

13:53:11   16    Q.   Special Agent Lawson, with respect to the information by

13:53:13   17    "Pitufo" and Hinojosa, that's $68 million absent the information

13:53:18   18    on the CS we're asking the Court not to consider, correct?

13:53:22   19    A.   That's correct.

13:53:22   20    Q.   All right.  That information is not being supplied to the

13:53:27   21    probation office for the $10 million loss calculation

13:53:30   22    attributable to Colorado-Cessa?

13:53:32   23    A.   That's correct.

13:53:33   24    Q.   That is based on the records introduced at trial?

13:53:35   25    A.   That's correct.

13:53:36  1   Q.   I guess the point is, is the information that "Pitufo"

13:53:40  2   supplied, does that corroborate all the information adduced at

13:53:43  3   trial from other witnesses?

13:53:43  4   A.   Yes.

13:53:44  5   Q.   Did it confirm your investigation?

13:53:45  6   A.   Yes.

13:53:47  7   Q.   I forgot a couple of things on the asset forfeiture portion.

13:53:53  8   So if I could ask you to look at your superseding indictment

13:53:55  9   again for me, please.

13:53:57  10  A.   Sure.

13:53:57  11  Q.   With respects to the pages 21 and 22, the business and bank

13:54:03  12  accounts, were those analyzed as part of the money-laundering

13:54:06  13  investigation?

13:54:06  14  A.   They were.

13:54:07  15  Q.   And could you just generally describe those accounts?  And I

13:54:13  16  apologize.  The financial accounts listed from paragraph eight,

13:54:17  17  nine, 10, 11 and 12.

13:54:21  18  A.   Paragraph eight through 12 are accounts owned by Jose

13:54:25  19  Trevino or in the name of one of his shell companies.

13:54:28  20  Q.   Okay.  And were those accounts used as part of this

13:54:33  21  money-laundering conspiracy to facilitate and further the actual

13:54:35  22  conspiracy itself?

13:54:36  23  A.   They were.

13:54:37  24  Q.   Just for the court record, those accounts were introduced at

13:54:41  25  trial, subpoenaed bank records 250A, B, C and D; correct?

13:54:46   1   A.   Correct.

13:54:46   2   Q.   Now, looking at page 21 of the superseding indictment, Count

13:54:51   3   No. 1, was that also analyzed as part of this investigation?

13:54:54   4   A.   It was.

13:54:55   5   Q.   And, again, it was pretty obvious it's a Francisco

13:55:00   6   Colorado-Cessa account, correct?

13:55:01   7   A.   Yes, sir.

13:55:01   8   Q.   In the amount of $648?

13:55:03   9   A.   Yes.

13:55:04  10   Q.   Was that account also analyzed and determined to be part of

13:55:08  11   the facilitation or furtherance of the money-laundering

13:55:10  12   conspiracy?

13:55:11  13   A.   Yes, sir.  The check for $2.2 million came out of that

13:55:14  14   account.

13:55:15  15   Q.   And finally, based on the investigation, what other agents

13:55:19  16   have relayed to you on the financial information, did you

13:55:23  17   determine or agents determine that the source of the funds used

13:55:26  18   to buy the two farms in Lexington, Oklahoma were the source of

13:55:31  19   either drug proceeds or extorted funds?

13:55:33  20   A.   Yes, sir.  We traced the money that Alfonso Del Rayo sent

13:55:39  21   through Tyler Graham to Jose Trevino was used to purchase the

13:55:41  22   first ranch.  And the November 11 sale at Heritage Place where

13:55:45  23   Jose watched four horses through the sale and was used to

13:55:49  24   purchase the second half of the ranch.

13:55:50  25   Q.   And so, the question with respect to the ranch, had Jose

| | | |
|---|---|---|
| 13:55:53 | 1 | Trevino not received the extorted funds from Alfonso Del Rayo, |
| 13:55:57 | 2 | would he have been able to purchase that ranch? |
| 13:55:59 | 3 | A.   No. |
| 13:55:59 | 4 | Q.   And had Jose Trevino not sold his own horses at auction for |
| 13:56:03 | 5 | inflated prices, would he have been able to purchase the second |
| 13:56:06 | 6 | portion of that ranch? |
| 13:56:07 | 7 | A.   No. |
| 13:56:07 | 8 | Q.   May I have one moment, your Honor? |
| 13:56:09 | 9 | THE COURT:  Yes, sir. |
| 13:56:30 | 10 | MR. GARDNER:  That's all I have, your Honor. |
| 13:56:33 | 11 | THE COURT:  Any further questions from defense counsel? |
| 13:56:37 | 12 | You may step down, sir. |
| 13:56:39 | 13 | THE WITNESS:  Thank you. |
| 13:56:42 | 14 | MR. GARDNER:  No further witnesses, your Honor. |
| 13:56:44 | 15 | THE COURT:  Any rebuttal witnesses? |
| 13:56:47 | 16 | MR. SANCHEZ:  No, your Honor. |
| 13:56:48 | 17 | MR. LECHTENBERGER:  None, your Honor. |
| 13:56:50 | 18 | MR. SANCHEZ:  Your Honor, I mentioned this when Mr. |
| 13:56:52 | 19 | Segura was going to -- or did testify and I don't think I |
| 13:56:55 | 20 | actually did it.  The updated Exhibit C, I gave a copy to the |
| 13:57:00 | 21 | government.  I just want to provide it for the Court. |
| 13:57:04 | 22 | THE COURT:  Now, he had two volumes.  You've got it |
| 13:57:08 | 23 | combined to one for me?  Thank you. |
| 13:57:11 | 24 | MR. SANCHEZ:  Yeah.  The second volume was never |
| 13:57:13 | 25 | addressed during direct and cross.  So it was actually not |

| | | |
|---|---|---|
| 13:57:16 | 1 | something that -- |
| 13:57:18 | 2 | THE COURT:  So let's do the Defendant Colorado-Cessa |
| 13:57:23 | 3 | Sentencing Exhibit 1. |
| 13:57:30 | 4 | MR. SANCHEZ:  So it's clear, this is -- I know it won't |
| 13:57:33 | 5 | replace it in the record, but, in other words, this is just |
| 13:57:35 | 6 | updates to Exhibit C that's already in the record, attached to |
| 13:57:38 | 7 | our original objection. |
| 13:57:40 | 8 | THE COURT:  Were your original objections filed?  My |
| 13:57:44 | 9 | copy is not.  You might want to check that. |
| 13:57:50 | 10 | MR. SANCHEZ:  I'll check it. |
| 13:57:52 | 11 | THE COURT:  The other stuff I got from y'all were -- |
| 13:57:55 | 12 | always was filed.  But I didn't see a file mark on the one.  It |
| 13:57:58 | 13 | may have come directly from you as a courtesy copy and, |
| 13:58:03 | 14 | therefore, did go past the clerk's office. |
| 13:58:05 | 15 | MR. SANCHEZ:  What happened was we e-mailed what we |
| 13:58:07 | 16 | could to the probation office, and then, we sent originals -- |
| 13:58:11 | 17 | they're much greater volume to the probation, government and the |
| 13:58:14 | 18 | Court to have original copies.  But we will file that after this |
| 13:58:18 | 19 | or make sure that it was filed. |
| 13:58:20 | 20 | MR. DEGEURIN:  That was my decision at the time, Judge, |
| 13:58:23 | 21 | and I may have -- I always give it to the probation officer, not |
| 13:58:26 | 22 | to the Court. |
| 13:58:27 | 23 | THE COURT:  Well, that's the way it's normally done. |
| 13:58:29 | 24 | But when he said it's on record, I wanted to make sure.  Just |
| 13:58:32 | 25 | check on it, if it is, file it.  And if you need to file it under |

| | | |
|---|---|---|
| 13:58:37 | 1 | seal, make appropriate application for it. |
| 13:58:39 | 2 | MR. SANCHEZ:  Yes, your Honor. |
| 13:58:42 | 3 | THE COURT:  All right.  Any further evidence by anybody |
| 13:58:45 | 4 | with regard to the objections to the presentence investigation |
| 13:58:50 | 5 | regarding the guideline calculation? |
| 13:58:53 | 6 | MR. GARDNER:  Nothing from the government, your Honor. |
| 13:58:54 | 7 | THE COURT:  All right. |
| 13:58:56 | 8 | MR. WOMACK:  No, your Honor. |
| 13:58:57 | 9 | MR. ESPER:  No, your Honor. |
| 13:58:58 | 10 | MR. LECHTENBERGER:  None, your Honor. |
| 13:59:02 | 11 | THE COURT:  All right.  Then the Court calls Jose |
| 13:59:05 | 12 | Trevino-Morales. |
| 13:59:05 | 13 | *        *        * |
| 14:49:08 | 14 | THE COURT:  Francisco Antonio Colorado-Cessa. |
| 14:50:37 | 15 | Mr. Colorado-Cessa, would you tell me your full name, |
| 14:50:39 | 16 | please, sir? |
| 14:50:39 | 17 | DEFENDANT COLORADO-CESSA:  Francisco Antonio |
| 14:50:48 | 18 | Colorado-Cessa. |
| 14:50:49 | 19 | THE COURT:  And have you had the opportunity to sit |
| 14:50:50 | 20 | down with your lawyers and review the presentence investigation |
| 14:50:52 | 21 | made in your case? |
| 14:50:53 | 22 | DEFENDANT COLORADO-CESSA:  Yes, your Honor. |
| 14:50:58 | 23 | THE COURT:  The probation department has determined in |
| 14:51:00 | 24 | your case a guideline range under the Sentencing Guidelines of |
| 14:51:06 | 25 | 235 to 293 months. |

14:51:10   1          I have no objections from the government.  I have two

14:51:14   2   objections from the defense.  First, that the base level is

14:51:19   3   incorrect and that the application of a role was inappropriate.

14:51:31   4   Apparently the -- no.  That it should be a minor role.  Excuse

14:51:37   5   me.  And no minor role was given.

14:51:41   6          MR. SANCHEZ:  Your Honor, there's a third objection

14:51:42   7   that's really very much tied to the first one, but the first

14:51:46   8   objection being that there's no illegal proceeds used by Mr.

14:51:52   9   Colorado; and therefore, the proceeds aren't drug proceeds.

14:51:57  10          THE COURT:  I understand that.  But that would be the

14:51:59  11   amount of laundered -- I understand that that's your argument,

14:52:05  12   but that's what makes the -- if you're correct, that's what makes

14:52:11  13   the probation officer's amount wrong.

14:52:15  14          MR. SANCHEZ:  And just to be clear, it's actually

14:52:18  15   listed out as three objections.  One's to the amount of money.

14:52:21  16   Two is to the fact of whether the proceeds are drugs or not.  And

14:52:25  17   three is to the minor role.  I just --

14:52:27  18          THE COURT:  All right.  We'll handle it that way.  And

14:52:31  19   I'll be glad to listen to you at this time.

14:52:34  20          MR. SANCHEZ:  Our objection -- and I'll focus on the

14:52:39  21   first objection almost entirely.  But our objection is pointing

14:52:44  22   out the fact that at trial, there was no evidence or barely any

14:52:50  23   evidence to suggest that Mr. Colorado ever funneled drug

14:52:58  24   proceeds.  He made payments, or he authorized payments, or there

14:53:01  25   are payments that are attributable to him through one of his

14:53:04    1    companies, and that is that $10 million figure or the 38

14:53:09    2    transactions.  We're not disputing that those payments came from

14:53:14    3    him or from his company, but under the guidelines and the case

14:53:19    4    law that digest those guidelines, that amount of money -- in

14:53:24    5    order to use that amount of money under the money-laundering

14:53:27    6    guideline, it has to be proceeds of some specified unlawful

14:53:33    7    activity.

14:53:34    8             Our position through trial and our position today at

14:53:38    9    sentencing has always been that Mr. Colorado was using his own

14:53:45   10    money, money that he earned through his company, and he was not

14:53:49   11    ever in possession of, or handled, or in charge of any specified

14:53:56   12    unlawful activities.  And very specifically, for those 38

14:53:59   13    transactions, we've gone through one-by-one and introduced the

14:54:04   14    source of those payments that come from the Pemex contracts.

14:54:08   15             So when we filed our objections, we didn't have a

14:54:11   16    response from the government.  When they started to put on

14:54:15   17    evidence today, it became clear that they're not really attacking

14:54:20   18    that particular point with the evidence that they put on today.

14:54:25   19    They're not saying or there was no new evidence in the fact on

14:54:29   20    whether Mr. Colorado was paid back for that $10 million.

14:54:34   21             So with that in mind, that $10 million shouldn't be

14:54:37   22    used to increase his base offense level.  And so, instead of 28,

14:54:42   23    it should start at eight.  And so, then you look at what money

14:54:47   24    was used and if the amount is zero, then obviously no drug

14:54:50   25    proceeds were laundered by Mr. Colorado.  So the six-level

14:54:55  1  increase that applies when drug proceeds are laundered should not

14:54:59  2  apply either.

14:55:02  3          And for the reasons stated in our objection, we also

14:55:04  4  believe those facts support a conclusion that Mr. Colorado taking

14:55:12  5  part in this conspiracy in some ways, in adding legitimate money

14:55:16  6  to the conspiracy, and being this face of wealth that supports

14:55:26  7  this group of people, that may be, but he never actually

14:55:31  8  laundered money.  And that goes back to the closing arguments of

14:55:36  9  Mr. DeGeurin was arguing that his checks and his transactions

14:55:41  10  weren't -- doesn't include any specified unlawful activities.  We

14:55:45  11  actually have an objection from the government where it says it's

14:55:47  12  not necessary.

14:55:50  13          And they haven't really backed down from that

14:55:52  14  particular point.  They're just --

14:55:56  15          THE COURT:  There's evidence, pretty undisputed

14:56:04  16  evidence in the record in the trial where people that he sought

14:56:08  17  out -- or at least one person that he sought out to assist him in

14:56:14  18  investments outside of Mexico said he had a bad habit of mixing

14:56:23  19  up ADT and his own funds.  That stands undenied.

14:56:32  20          MR. SANCHEZ:  That's true, your Honor.

14:56:34  21          THE COURT:  And then, we have -- so where did this

14:56:39  22  money come from?

14:56:40  23          MR. SANCHEZ:  The money?  Or is that a question or --

14:56:43  24          THE COURT:  No, no.  I'm just talking out loud so that

14:56:45  25  you know what the Court is -- feel free to ask me any questions

14:56:50  1    you want.  This is, of course, serious business.

14:56:55  2           So where does the money come from?  The government, I

14:57:01  3    suspect in a minute, is going to say it's anything comes from ADT

14:57:06  4    came from fraudulent money, just like the money that came from

14:57:18  5    Mr. Del Rayo, who had the courage to say no, finally.  But I

14:57:30  6    understand your objection.

14:57:34  7           I also understand that just like today's testimony with

14:57:38  8    Mr. Segura, the Court puts no credibility in that testimony

14:57:43  9    because it's all self-manufactured by the books of ADT, which

14:57:49  10   this man runs individually.  I kept waiting during the trial and

14:57:57  11   I kept waiting today for bank records, or something.  And

14:58:04  12   admittedly, most everything that comes out of Mexico has to be

14:58:07  13   questioned to some degree.  I've been used to that all my life.

14:58:13  14          MR. SANCHEZ:  And, your Honor, in regards to that, we

14:58:15  15   submitted 1,500 pages of bank records at trial.

14:58:18  16          THE COURT:  Oh, I understand that.  I understand.  I've

14:58:21  17   gone through that.  You know, you want to know what's troubling

14:58:30  18   the Court is, of course, there's no doubt in my mind that Mr.

14:58:38  19   Colorado-Cessa's guilty.  He's guilty of being a member of this

14:58:42  20   conspiracy.  He furthered the conspiracy.  Didn't take the jury

14:58:46  21   long to do that.

14:58:48  22          Now, how to calculate these guidelines is, of course,

14:58:52  23   what we're up against at this point.  So you take the position

14:58:57  24   that there is no evidence of it.

14:59:02  25          MR. SANCHEZ:  Your Honor, just can I ask -- take no

| | |
|---|---|
| 14:59:04 | 1 |
| 14:59:07 | 2 |
| 14:59:12 | 3 |
| 14:59:12 | 4 |
| 14:59:13 | 5 |
| 14:59:15 | 6 |
| 14:59:23 | 7 |
| 14:59:31 | 8 |
| 14:59:36 | 9 |
| 14:59:40 | 10 |
| 14:59:45 | 11 |
| 14:59:52 | 12 |
| 14:59:56 | 13 |
| 14:59:59 | 14 |
| 15:00:04 | 15 |
| 15:00:08 | 16 |
| 15:00:12 | 17 |
| 15:00:15 | 18 |
| 15:00:21 | 19 |
| 15:00:25 | 20 |
| 15:00:30 | 21 |
| 15:00:32 | 22 |
| 15:00:38 | 23 |
| 15:00:41 | 24 |
| 15:00:41 | 25 |

1   evidence of it being -- in our objections, we didn't --

2        THE COURT:  No evidence that drug money was used by Mr.

3   Colorado-Cessa.

4        MR. SANCHEZ:  That's correct.

5        THE COURT:  In purchase of these horses.  Well, we know

6   that it was commingled for certain with payment of expenses

7   because when it went through Nayen, or Mr. Garcia, or others, it

8   was disbursed to multiple other persons.  But I understand your

9   argument.  So I'll hear from the government.

10        MS. FERNALD:  Your Honor, the evidence that was

11   presented at trial is really quite simple and that was -- is that

12   there were two different theories on the level of moneys.  The

13   first theory or the evidence that was presented at trial was

14   based upon the financial statements in which ADT had presented to

15   UBS.  They were the only legitimate documents that we had in

16   order to assess what the financial status was.

17        And the undisputed testimony that was given by Agent

18   Fernald was that ADT would not have paid its expenses from the

19   income it received and been able to purchase horses.  So the

20   money must have come from another source, as the Court has said.

21   And from the circumstantial evidence that was presented in trial

22   and from the cooperators presented at trial that you heard, that

23   circumstantial evidence would lead to the conclusion of the Zeta

24   money.

25        We had three different cooperators that came into

15:00:44    1   trial.  We have "Mamito," we had Hinojosa, we had the evidence

15:00:51    2   that today was presented by the agents with "Pitufo" that his

15:00:57    3   knowledge and his intricate involvement with the Zetas from as

15:01:02    4   long as 2004 on.

15:01:04    5            The second part --

15:01:04    6            THE COURT:  There's no question that there was a close

15:01:07    7   association between Mr. Colorado-Cessa and the Zetas.  I kept

15:01:12    8   most of that evidence out of the record because of the prejudice

15:01:15    9   that it had.  The record will reflect that.  But I don't recall

15:01:21   10   anything other than a logical jump that it had to be drug money

15:01:31   11   because there wasn't enough money in ADT to do it.

15:01:35   12            MS. FERNALD:  And the second half of that is the

15:01:37   13   commingling part, and that is that what happened in this

15:01:43   14   particular case is the agents never found any cash transaction

15:01:46   15   from drugs to buy horses.  And I acknowledge that to the Court.

15:01:50   16   There was no evidence of that.  But as the Court has said, this

15:01:53   17   is a much more sophisticated scheme or plan in which there was

15:01:57   18   commingled money.

15:01:59   19            So the evidence that we attempted to present to the

15:02:02   20   Court was that, in fact, the money would come from the Zetas.

15:02:07   21   The money would be funneled through different politicians so that

15:02:12   22   Pemex contracts were then paid to, bid on, given to

15:02:20   23   Colorado-Cessa and kicked back to him so that there actually was

15:02:24   24   a money-laundering scheme.  And that's a logical conclusion about

15:02:27   25   how this was actually traced.

15:02:29   1          We do not have access to any of the Mexican documents
15:02:33   2   or, of course, we would have analyzed that and traced it.  The
15:02:37   3   records as the Court has already acknowledged that we had
15:02:40   4   received from the objections today, the bank records, they're
15:02:44   5   incomplete.  We can't tell.  But it was the government's intent
15:02:47   6   to present evidence not of cash transactions coming through
15:02:52   7   directly from the Zetas to purchase these horses, but that it
15:02:56   8   went through and it funneled through different sources in order
15:02:59   9   to get to Colorado-Cessa.  Without the Zetas, ADT would not have
15:03:05  10   been able to function.  Without Pemex, ADT would not have been
15:03:08  11   able to function.  And I'll submit to the Court without ADT,
15:03:12  12   Colorado-Cessa would have had no money either.
15:03:14  13          And so, that was the evidence that was attempted to be
15:03:17  14   presented.
15:03:19  15          MR. SANCHEZ:  There's a couple of points I want to
15:03:21  16   address that Ms. Fernald just testified to.  One, I think she
15:03:25  17   made a misstatement that Agent Fernald's testimony --
15:03:27  18          THE COURT:  What she just testified to?  Is that what
15:03:29  19   you --
15:03:30  20          MR. SANCHEZ:  Yeah.  That Agent Fernald's testimony was
15:03:33  21   undisputed and that's not true.  But the other thing is that the
15:03:37  22   source of those -- I mean, we've gotta keep in mind where those
15:03:41  23   financial statements -- or where did they come from.  They
15:03:43  24   originally came from ADT that were sent to UBS.  And UBS did a
15:03:48  25   very thorough investigation about the value and the worth of this

15:03:52  1   company.  The value and the worth of the company that UBS

15:03:56  2   determined was 70 to 90 million, and that's something that came

15:03:59  3   from the government's witness.

15:04:01  4           So to say that it's a company barely breaking even from

15:04:04  5   reading a few financial statements by a person that has no

15:04:08  6   information about how financial statements are put together in

15:04:11  7   Mexico, doesn't know about the financial laws of Mexico or what

15:04:16  8   needs to be reported as income, it's not an undisputed fact that

15:04:22  9   he was barely breaking even.  That doesn't -- that's not true.

15:04:25  10          The other thing that I want to talk about is this idea

15:04:29  11  that the witnesses clearly testified -- the three witnesses

15:04:36  12  clearly testified that Francisco received money back.  If you

15:04:41  13  look at that testimony, it's not even -- I mean, it's so far

15:04:45  14  removed from being direct testimony, they're saying, well, I

15:04:49  15  heard that from Miguel that he may have paid some money back.

15:04:52  16  When?  I don't know.  How much?  I don't know.  I mean, we don't

15:04:55  17  have any ideas from that.

15:04:57  18          Then the last point, your Honor, is --

15:05:01  19          THE COURT:  When did Torres die?

15:05:03  20          MR. SANCHEZ:  Pardon?

15:05:04  21          THE COURT:  When did Torres die?

15:05:05  22          MR. SANCHEZ:  2007.  And --

15:05:07  23          THE COURT:  And I heard evidence that Mr.

15:05:12  24  Colorado-Cessa was called upon to pay back the debts that he owed

15:05:16  25  Torres, and then, he was told just to wipe it off.  The witness

15:05:21  1    testified to that from the stand.

15:05:23  2              MR. SANCHEZ:  Right.  And we don't agree to that.  But

15:05:26  3    even if you accept that, that means that in 2007, there is no

15:05:31  4    more debt between Mr. Colorado and the Zetas.

15:05:34  5              THE COURT:  Or there was an agreement between them how

15:05:36  6    the debt would be paid.

15:05:37  7              MR. SANCHEZ:  But that's not -- I mean, that's not

15:05:39  8    supported by -- I mean, that's one of those leaps that I think

15:05:42  9    the Court shouldn't make from the record that we have.

15:05:45  10             The other point that I want to make about the documents

15:05:48  11   that Mr. Segura testified to, those documents are documents that

15:05:55  12   ADT had in its possession, but they're all bank-produced

15:05:59  13   documents or documents that come from Pemex.  We provided a bulk

15:06:03  14   of those documents -- so the mix of the documents in that Exhibit

15:06:07  15   C or in the Exhibit 1 that we've now supplemented are documents

15:06:11  16   that either come from the government that we provided to Mr.

15:06:14  17   Segura from the government, from their bank statements that they

15:06:17  18   collected, bank statements that we had, or Pemex documents that

15:06:23  19   they would be able to at least make some effort to go to Pemex.

15:06:26  20             I mean, if they can bring a Mexican-protected witness

15:06:29  21   under the custody of the Attorney General, you'd think they would

15:06:33  22   have had the access to get publicly available documents in

15:06:36  23   Mexico, and there was never any attempt to do so.

15:06:39  24             THE COURT:  They couldn't even get, at your request,

15:06:43  25   information whether or not felony charges were pending against

15:06:48   1   the witness in this case.  Wasn't your fault.  The State
15:06:53   2   Department couldn't get it.  So don't tell me what you can and
15:06:55   3   can't get out of Mexico.
15:06:57   4            MR. SANCHEZ:  Well, but I think we're being put in an
15:06:59   5   unfair position in saying, well, I don't know that those
15:07:02   6   documents are accurate when we're providing all the documents
15:07:06   7   that we received from the bank.  And I'm not sure how much
15:07:09   8   further we can go to give the Court the information that we have
15:07:14   9   access to to show that the payments that Mr. Colorado made that
15:07:17  10   make up that $10 million come from legitimately earned money from
15:07:22  11   Pemex.
15:07:23  12            And in regards to these bribes and these different
15:07:27  13   things, we've put on a witness that said that if there was a $6
15:07:33  14   million cash infusion, that would have been obvious to see.  And
15:07:35  15   if he was in charge of getting that -- those machines and that
15:07:40  16   didn't happen.  Other than asking him whether he's being
15:07:45  17   truthful, there wasn't really very much legitimate
15:07:48  18   cross-examination against that point.
15:07:50  19            They don't have any documents to support this idea that
15:07:53  20   machines were purchased with cash.  They didn't -- as far as I
15:07:56  21   know, didn't make any attempts to get any documents to verify
15:08:00  22   whether $6 million was used to make cash payments.  We have the
15:08:06  23   second notebook that I didn't introduce, that I didn't discuss.
15:08:11  24   It's actually a list of equipment that was purchased during that
15:08:16  25   year, and it shows how the money was purchased, what accounts the

15:08:19  1   money came from, and it goes through in detail.  It wasn't

15:08:23  2   something that was necessary because there wasn't a lot of

15:08:25  3   cross-examination into that point.

15:08:27  4            If the Court doubts the credibility of Mr. Segura, I

15:08:31  5   don't know if that would help in any way.  But we're prepared to

15:08:35  6   proffer that, as well, your Honor.

15:08:41  7            THE COURT:  Well, in this case you've had the really

15:08:49  8   virtually undeniable truth that the Zetas had drug money.  We

15:08:59  9   know the Zetas had drug money and that the Zeta money that came

15:09:04  10  across that went into these operations was certainly laundered.

15:09:25  11  And the problem exists is the inability of the government or the

15:09:32  12  credibility of the witness and/or records brought by the

15:09:37  13  defendant, because all we know is that money, big sums of it,

15:09:45  14  went from Mexico from Mr. Colorado-Cessa to purchase these

15:09:51  15  horses.

15:09:52  16           We also know, which is obviously what convicted him,

15:09:59  17  that he was a big part of the joint efforts of these people to

15:10:07  18  buy and sell horses and race horses and make money off of horses,

15:10:14  19  even to the point of taking bad horses and overpaying them just

15:10:21  20  to get the money in the system.  That seems where we are now.  So

15:10:29  21  get me your best shot from the government's standpoint as to how

15:10:34  22  I can take the hurdle that Mr. Colorado-Cessa, while clearly a

15:10:44  23  conspirator in this conspiracy, used illegal drugs -- or used

15:10:48  24  illegal money from drugs or --

15:10:51  25           MS. FERNALD:  If I could.

15:10:52  1            THE COURT:  -- whatnot.

15:10:53  2            MS. FERNALD:  -- do a little bit of a story line and go

15:10:55  3    back to 2004 when ADT, according to Charlie Hinojosa, was

15:11:00  4    struggling and he asked for a $6 million loan where a $6 million

15:11:06  5    loan was given from "Zeta 14," Efrain Torres, to Colorado-Cessa

15:11:11  6    in order to capitalize ADT Petro Servicios.  It was drug money

15:11:16  7    that started that business.  I say started it.  It had already

15:11:19  8    been in existence but really made that business grow, according

15:11:23  9    to the testimony that was -- that has been given to us.

15:11:26  10           And as the defendant got further and further behind

15:11:30  11   with his gambling debts, some of the evidence was proffered to

15:11:34  12   the Court.  Not heard by the jury but proffered to the Court.

15:11:38  13   Additional moneys were given by Efrain Torres up until his death

15:11:42  14   of 2007.  So ADT, in essence, is a Zeta organization.  And in

15:11:51  15   fact, you have other cooperators that talks about 80 percent, 20

15:11:56  16   percent, 80 percent being owned by the Zetas, 20 percent being

15:12:00  17   owned by this particular defendant of ADT.

15:12:03  18           Anything, according to the commingling theory, anything

15:12:07  19   that comes from ADT from Pemex, or anything, is now at this point

15:12:13  20   so commingled with Zeta money that it's unable to be

15:12:17  21   distinguished.  And if you look at the application note under

15:12:22  22   2S1.1(3)(B), it talks specifically about this commingling.  And

15:12:27  23   the commingling being that in a transaction where there are

15:12:35  24   derived funds, it is the amount of criminally derived funds, not

15:12:39  25   the amount of the commingled, if the defendant provides

15:12:42   1   sufficient information to determine the amount.  If the amount of

15:12:46   2   the criminally derived funds is difficult or impractical to

15:12:50   3   determine, the value of the laundered funds, for the purpose of

15:12:54   4   subsection (a)(2), is the total amount of the commingled funds.

15:12:59   5   And that's what the PSI has given you on this particular case,

15:13:03   6   and that is what the government is relying upon.

15:13:05   7           I want to address one issue that was brought up about

15:13:09   8   whether or not his debt was paid off when he met with "40" after

15:13:14   9   the death of Efrain Torres.

15:13:18   10          THE COURT:  You say his debt was paid off.  It was

15:13:20   11   taken off the list.

15:13:22   12          MS. FERNALD:  Correct.

15:13:22   13          THE COURT:  Owed debts.

15:13:24   14          MS. FERNALD:  It is not the government's position that

15:13:26   15   his debt was paid off.  The government's position is he now

15:13:30   16   worked for "40," and that could be evidence as this court can

15:13:34   17   tell by the records by that Jaff loan, which happened afterwards.

15:13:40   18   He was desperate to get the money together, Colorado-Cessa was,

15:13:43   19   to buy additional horses; and he was so desperate to do that for

15:13:46   20   "40" that he went out and got a ten percent month loan from Arian

15:13:51   21   Jaff that was a loan shark.  And I think there's sufficient

15:13:54   22   evidence to prove those.

15:13:56   23          THE COURT:  Loan shark is a -- that he got two loans

15:13:59   24   that were just no person in their right business mind would do

15:14:05   25   that.

15:14:06   1          MS. FERNALD:  And the jury verdict, Mr. Gardner's

15:14:10   2    reminding me, the jury verdict in this particular case, I think,

15:14:13   3    your Honor, is pretty telling about what the jury determined in

15:14:15   4    this particular case.  As the Court will recall, there were four

15:14:18   5    different possible theories on the guilty verdict.  And Mr.

15:14:24   6    Colorado-Cessa's case, this jury, as you read through it, took a

15:14:28   7    lot of time to determine the different theories, and they had

15:14:31   8    different yes-and-no answers on these.

15:14:35   9          There was no evidence on this particular case that was

15:14:37   10   presented against Colorado-Cessa of structuring, of avoiding the

15:14:43   11   currency requirements, the kidnapping, or the bribery.  The only

15:14:46   12   evidence that's been presented by the government in this

15:14:49   13   particular case was of the drug proceeds, and that is exactly

15:14:53   14   what this jury found on the verdict form on those four

15:14:57   15   questionnaires, and I think it's pretty telling of what was going

15:15:00   16   on in their minds.

15:15:01   17         THE COURT:  The question is not that drug money wasn't

15:15:05   18   used.  Even by Mr. Cessa.  The jury found it.  The question is

15:15:12   19   how much.  Okay.  Anything further?

15:15:19   20         MR. SANCHEZ:  Just briefly, your Honor, in regards to

15:15:21   21   the commingling.  That's the argument that we laid out in our

15:15:24   22   reply why it didn't make sense.  So I mean, it would -- so, in

15:15:28   23   other words, they're not saying that they could point to any

15:15:31   24   amount within those 38 transactions that they can say are

15:15:34   25   actually drug proceeds, but instead, they can point to some $6

15:15:39   1   million figure that was given back in 2004, 2005.

15:15:43   2        What that would do is alleviate them from any

15:15:45   3   responsibility if they can just go back to an earlier amount and

15:15:48   4   show half of the money that's put in as drug proceeds, and then,

15:15:51   5   all of a sudden, they don't have to show what happens down the

15:15:54   6   road.  I don't think that's what the note is asking.

15:15:58   7        THE COURT:  Well, I don't know that the note, just like

15:16:01   8   many cases that seem to fall in Austin when you try to put the

15:16:05   9   facts of a given case into the sentencing guideline structure,

15:16:12   10  you end up getting shredded wheat.  The difficulty here is it

15:16:19   11  works both ways, frankly.  It works hard on the defendant, but it

15:16:23   12  works harder on the government.  They can't get any information

15:16:26   13  on there, so they have to create that.

15:16:30   14       If you take your position literally, it would be almost

15:16:34   15  impossible for any Mexican citizen to be guilty of laundering in

15:16:40   16  the United States, which is not this case.

15:16:46   17       MR. SANCHEZ:  Well, the only other thing that I want to

15:16:50   18  point out is that --

15:16:53   19       THE COURT:  I'm going to let Mr. DeGeurin speak because

15:16:55   20  he's going to start hollering at me.

15:16:57   21       MR. DEGEURIN:  I don't want to repeat and I don't want

15:17:06   22  -- but I want to weigh in.  If we go back to how I met Mr.

15:17:16   23  Colorado.

15:17:17   24       THE COURT:  No.  You're not going to become a witness.

15:17:20   25       MR. DEGEURIN:  Okay.  But I just -- for one point.

15:17:22    1          THE COURT:  No.  This is an objection.  If you have

15:17:24    2   something to put on the objection.

15:17:26    3          MR. DEGEURIN:  Yes, I do.

15:17:27    4          THE COURT:  All right.

15:17:29    5          MR. DEGEURIN:  You have a person that took the stand

15:17:32    6   that said he knows that there was $6 million in 2003 or 4.

15:17:39    7   That's what the government is relying upon.  And he says, the way

15:17:44    8   I prove that is because I have it in my books and I gave it to

15:17:48    9   the government.  And for a half a day, I asked him, where is your

15:17:54   10   computer?  The government has it.  I gave him both a disc and a

15:18:00   11   so and so.  That's proof.  That's like saying, if you don't

15:18:04   12   believe this is snake oil that will cure a broken heart, just

15:18:08   13   read the bottle.  But they never came up with it.

15:18:12   14          So you compare that with what do you do if someone says

15:18:17   15   that it's not true?  You call the person that was around that

15:18:23   16   actually bought the equipment, that actually was involved in

15:18:27   17   buying equipment with the records and bank records and Pemex

15:18:32   18   records, and you show the Court it did not have it.

15:18:38   19          And so, here, the Court is left, of course, with here's

15:18:42   20   a guy that says he doesn't back it up, no proof of it except what

15:18:48   21   he said on the stand.  And we know all the situation he's in:

15:18:52   22   He's a person that was involved in the killings of people to get

15:18:56   23   their way.  Do you think he might -- should it be considered how

15:19:02   24   easy it would be to kind of testify about something that's not

15:19:07   25   true?  It's much easier to do that than it is to kill a child or

15:19:11   1  kill his wife, but they do that.  And you compare that, you know,

15:19:16   2  in the real picture, Judge, compare that with what we gave you.

15:19:22   3  Way in advance in trial, 1,500 pages before the sentencing, we

15:19:27   4  give it -- we got the records; and they're not only our records,

15:19:31   5  they're the bank records and they're Pemex records.

15:19:34   6          Remember, Judge, the testimony that the most -- the

15:19:40   7  largest environmental tragedy in the history of Mexico happened

15:19:44   8  in 2005.  In 2005, Mr. Colorado went in and saved a river, got

15:19:55   9  $30 million, paid from Pemex to him in an emergency situation,

15:19:59  10  and that's where we come from a small company and kept growing

15:20:04  11  from that in 2005, well before this conspiracy, all the way

15:20:08  12  through.  So you have that, too.  Don't -- I mean, I know it's

15:20:13  13  hard.

15:20:13  14          THE COURT:  So I said, I'm not going to let you give a

15:20:19  15  jury argument and that's all you're doing.

15:20:24  16          MR. DEGEURIN:  It's the way -- I just don't want it

15:20:28  17  forgotten that there is some burden on the government to show

15:20:32  18  that the funds were from the specified unlawful activity and not

15:20:37  19  legitimate funds.

15:20:39  20          MS. FERNALD:  Your Honor, may I add one more thing?

15:20:41  21          THE COURT:  Yes, ma'am.

15:20:42  22          MS. FERNALD:  The Court actually said this from the

15:20:46  23  onset and the PSI in this case was very -- in my opinion was very

15:20:51  24  conservative.  There's some testimony about how conservative the

15:20:54  25  figures were.  But even on the PSI itself, on the $10 million, a

15:20:59   1   little bit over $10 million that was assessed to Mr.

15:21:04   2   Colorado-Cessa, no relevant conduct was ever assessed in that

15:21:07   3   PSI.  No conduct for what was reasonably foreseeable.

15:21:11   4          So I think that this $10 million is accurate.  I think

15:21:15   5   it's a conservative figure.  But I think it also leaves out any

15:21:19   6   relevant conduct that could have been picked up in the PSI from

15:21:22   7   the other coconspirators that were reasonably foreseeable to Mr.

15:21:26   8   Colorado-Cessa.

15:21:49   9          THE COURT:  There's no sense to me from all of the

15:21:53  10   evidence that's conflicting or the omission of evidence that you

15:21:57  11   can't get totally illogical that Mr. Colorado-Cessa, without

15:22:13  12   being under force, would put up all of the money that was put up

15:22:23  13   with people who he knew were certainly not popular in the United

15:22:30  14   States.

15:22:37  15          Counsel makes a good argument.  The answer to his

15:22:41  16   argument is the government couldn't get that proof.  Everybody's

15:22:48  17   dead.  Mr. Torres is dead.  Conspirators in this case are dead.

15:22:58  18   Fellow conspirators with Mr. Colorado-Cessa, I might add.  The

15:23:05  19   government says they've made a case.  I've got no doubt that drug

15:23:15  20   money was involved in Mr. Colorado-Cessa's contribution to this

15:23:26  21   and his purchase of horses, which he let other people, for the

15:23:31  22   most part, have.  Although from a fellowship standpoint, he was

15:23:41  23   in on the races, and that type of thing, with his fellow

15:23:45  24   conspirators.

15:23:46  25          So I'll overrule the objection from the defense.  But I

15:23:50    1   put everybody on notice that my sentence today is not going to be

15:23:54    2   a guideline sentence.  It's going to be pursuant to 18 United

15:24:01    3   States Code 3553(a).  And I tell you that so that you could make

15:24:05    4   whatever appropriate arrangement -- statements you wish to make

15:24:10    5   at the time of sentencing.

15:24:19    6            So that will take care of the first two objections.

15:24:27    7   The second on role on not getting to be a minor player in the

15:24:34    8   conspiracy, counsel in his honesty has already answered that

15:24:39    9   himself.  This was the head of the conspiracy with regard to the,

15:24:50   10   quote, amount of money that was available to back up the bids and

15:24:53   11   whatever.

15:24:55   12            Mr. Colorado was not the leader in the conspiracy.

15:24:59   13   Obviously.

15:25:00   14            MR. SANCHEZ:  I think I used the word "face."  Just --

15:25:02   15            THE COURT:  Okay.  Face is the same thing to me, and I

15:25:06   16   don't mean to embarrass you.  It's just that that's -- certainly

15:25:12   17   when Colorado-Cessa said that the money would come in -- or

15:25:16   18   they'd say it's Colorado-Cessa, the money would come in and it

15:25:20   19   did come in, I don't believe he was a minor participant in any

15:25:25   20   way, shape or form, and I think he knew exactly what was going

15:25:28   21   on.

15:25:29   22            Do you know of any legal reason with those rulings that

15:25:34   23   we shouldn't proceed with sentencing?

15:25:37   24            MR. SANCHEZ:  No.  Other than what I've already stated

15:25:39   25   on the record and in writing.  And, your Honor, I'm going to sit

15:25:42   1   down, stay close so Mr. DeGeurin can finish the rest.

15:25:47   2         THE COURT:  Then I'll ask Mr. DeGeurin, do you know of

15:25:49   3   any legal reason we shouldn't proceed?

15:25:51   4         MR. DEGEURIN:  Well, we do have a second memorandum

15:25:53   5   where we're asking for departures and variance.

15:25:56   6         THE COURT:  Well, that's true.  But I'm not depriving

15:25:58   7   you of those --

15:26:00   8         MR. DEGEURIN:  Right.

15:26:01   9         THE COURT:  -- opportunities to state that.  This is

15:26:04  10   just whether or not we go into sentencing.

15:26:07  11         MR. DEGEURIN:  No.  We're certainly going to be able to

15:26:10  12   talk about those before you --

15:26:11  13         THE COURT:  Yeah.  That's what we do all the time.

15:26:13  14         MR. DEGEURIN:  Well, I mean, I have had the other --

15:26:16  15         THE COURT:  You know, I have reviewed -- I've reviewed

15:26:18  16   both of your things.  I have reviewed the CD.  I have got

15:26:28  17   everything that the probation department has given me.  I've got

15:26:32  18   your objections.  I feel like a bar going to a final examination

15:26:40  19   after a semester.

15:26:44  20         But the sentence that I'm going to impose will not be

15:26:47  21   made until you've had a full opportunity to tell me what and why

15:26:52  22   you're requesting.

15:26:53  23         MR. DEGEURIN:  All right.  Then there is no legal

15:26:55  24   reason not to proceed.

15:26:57  25         THE COURT:  Does the government have any reason not to

15:26:59   1   proceed?

15:27:00   2           MS. FERNALD:  No, your Honor.

15:27:01   3           THE COURT:  Well, Mr. Colorado-Cessa, we start off with

15:27:03   4   you, sir.  You have the right to say anything that you wish.

15:27:06   5   You're not required to say anything, but you have that right.

15:27:10   6   And then, so that you know what will happen, then your lawyers

15:27:12   7   would have the right to speak.  Then the government's lawyers has

15:27:16   8   the right to speak.  Then the probation department can comment if

15:27:19   9   they wish.  And then, in the federal courts here, anybody has the

15:27:23  10   right to speak.  And then, you and Mr. DeGeurin would have the

15:27:27  11   right to respond if you thought a response was necessary for what

15:27:31  12   was said.

15:27:33  13           So if you'd like to speak, now is the opportunity for

15:27:36  14   you to do so.

15:27:37  15           DEFENDANT COLORADO-CESSA:  Good afternoon.

15:27:55  16           Throughout all of this, a lot has been said about me

15:27:57  17   personally and about my company ADT Petro Servicios, but

15:28:07  18   unfortunately, we have still not gotten the whole truth.  And I'd

15:28:25  19   like to state the following, which is part of this whole truth,

15:28:29  20   and I want to say that so that you will begin to know who I am.

15:28:41  21           My full name is Francisco Antonio Colorado-Cessa.  I am

15:28:45  22   Francisco because my father was a Francisco and my -- Antonio is

15:28:48  23   from my grandfather.  I'm 52 years old and I am a Mexican

15:28:58  24   businessman.  I have worked for Petro Mexicanos for 32 years, and

15:29:10  25   in 2001, I established ADT Petro Servicios.  I want to tell you

15:29:27  1   I'm very proud of the life I've had because I have been very

15:29:30  2   fortunate, but nothing has been coming easily for me.

15:29:49  3          ADT Petro Servicios, throughout this period that it's

15:29:57  4   been accused of all this, won public contracts.  It wasn't given

15:30:05  5   things, it won publicly tendered contracts for amounts of over

15:30:10  6   $450 million for a period even before the Zetas came into

15:30:14  7   existence.  I am a person who because I followed my instincts and

15:30:33  8   my dreams has been bankrupt on three occasions.  Just like the

15:30:52  9   phoenix, through hard work and perseverance, I have been able to

15:30:56  10  take flight and have been able to create a very successful

15:30:59  11  company.

15:31:11  12         I want you to know, your Honor, I've survived two very

15:31:13  13  intense wars.  The first one, I underwent 17 years ago, and this

15:31:26  14  is the war I waged against my addiction to cocaine and other

15:31:30  15  character flaws I had.  And the second war is the one I'm

15:31:43  16  fighting now, trying to show that I am a good, decent man; and

15:32:09  17  for that reason, on July 14th, 2012, I personally turned myself

15:32:15  18  in, after having seen on -- in the newspapers and on the internet

15:32:21  19  my name linked to this shameful case.

15:32:26  20         And, your Honor, let's go straight to the most

15:32:40  21  important facts.  I am the father of three incredible children of

15:32:44  22  who I am extremely proud.  And I love my wife so much more than

15:32:56  23  most people could even imagine.  And I'd like to thank people in

15:33:20  24  the United States and the Constitution that they have for the

15:33:22  25  laws that arise out of that Constitution, for the justice that I

15:33:29   1   have seen since I have turned myself in.

15:33:42   2          And with all due respect, I'd like to thank the

15:33:49   3   prosecutor, Doug Gardner, for having treated me with all the

15:33:52   4   dignity I am due.  But I'd also like to say there are many

15:34:08   5   occasions, facts are not what they seem to be when you look at

15:34:11   6   them, but they are circumstantial.  And in this specific case, I

15:34:22   7   find myself involved in a very big dilemma.

15:34:51   8          I ask, what would you do if you find yourself at a sale

15:34:57   9   or purchasing something and you get a phone call saying, you do

15:35:03  10   me the favor of buying this and/or your family will die like this

15:35:10  11   and this and this.  It's difficult.

15:35:15  12          THE COURT:  Hold on.  We'll take a brief recess and

15:35:19  13   talk with your client.

15:35:20  14          MR. DEGEURIN:  Okay.

15:39:00  15          (Recess.)

15:39:07  16          THE COURT:  Ready to continue, Mr. DeGeurin?

15:39:09  17          MR. DEGEURIN:  Yes, we are.  Thank you, Judge.

15:39:12  18          THE COURT:  Mr. Colorado-Cessa.

15:39:32  19          DEFENDANT COLORADO-CESSA:  I would also like to say to

15:39:33  20   Michelle, I thank you for the kindness of asking how my sons have

15:39:39  21   done, and by doing so, you always showed clearly what a lady you

15:39:54  22   are and you have my full respect.  I would also like to say a

15:40:06  23   word to my family, Pancho, Michel, Antonio and Maria.  I truly

15:40:14  24   love you.  I love you.  And for you, your Honor, with all due

15:40:31  25   respect, I would like to quote a paragraph from Don Quijote de la

15:40:38  1   Mancha written by Saavedra.

15:40:38  2          THE COURT:  I've read the book.

15:40:45  3          THE INTERPRETER:  Sorry.  Interpreter, sorry.

15:40:51  4          DEFENDANT COLORADO-CESSA:  Sancho, he's talking to Don

15:40:55  5   Quijote, and fear not, my Lord, because in the face of your

15:41:05  6   judgment, they have placed a wise man whose hammer, according to

15:41:27  7   those people who know, works in favor of the Lord and not in

15:41:31  8   favor of mankind.  Thank you, your Honor.

15:41:35  9          THE COURT:  Thank you, sir.  Mr. DeGeurin.

15:41:38  10         MR. DEGEURIN:  Yes, your Honor.

15:41:42  11         You have the letters.  You've read the letters.  We

15:41:47  12   produced the video because I wanted you to actually see the

15:41:54  13   people that are talking about him and his company of which

15:41:58  14   they're all so proud, because I think these issues go to the 3553

15:42:05  15   considerations that you said you're going to think about.

15:42:13  16         The dilemma that Mr. Colorado was talking about, I

15:42:20  17   believe, is when he came to my office and said, what do I do?

15:42:26  18   And I said, you face the charges.  And it became clear that

15:42:32  19   through the law, as we know it, there's no clear defense of

15:42:42  20   coercion and duress, because no one held a gun to his head, but

15:42:49  21   there was a dilemma just the same.

15:42:52  22         And the dilemma was -- and also, Judge, I want you to

15:42:56  23   consider, you struggle with it because there's no evidence, no

15:43:00  24   proof from the government that drug money was given to Mr. Zeta

15:43:06  25   -- I mean, Mr. Colorado.  So he paid for those horses with his

15:43:16    1   funds and with ADT funds.  And when it was requested that he pay

15:43:22    2   a whole lot at a certain period of time, he went out and borrowed

15:43:27    3   money from a ten percent interest twice and then, as we put the

15:43:37    4   evidence on, paid that back with his own funds, not drug money,

15:43:44    5   not Zeta money, but ADT money.  And that's why I had to provide

15:43:54    6   for you the people that talk about ADT, let you know and see for

15:43:58    7   yourself is a real company that does wonderful things and is a

15:44:03    8   socially conscious company because of Mr. Colorado.

15:44:09    9          Everybody that was asked about Mr. Colorado loves him.

15:44:20   10   You see it of the 100-and-something letters, we gave you 13.  You

15:44:26   11   can see the rest if you want to, but these are the best samples.

15:44:29   12   Video you saw, the stories you hear, they're all about the person

15:44:37   13   who cares about others, regardless of their stature in life, a

15:44:43   14   generous person, a kind person, and a person who had given back

15:44:52   15   his fortunate situation.  That's totally inconsistent with a

15:44:58   16   group of people who take what they want and they learned to get

15:45:04   17   their will.  They use fear.  It is not empty threats.  People are

15:45:11   18   killed.  You have that -- you have the evidence.  The government

15:45:15   19   has the evidence.  It didn't go before the jury, but you have it,

15:45:21   20   you know it, and you've heard about it over and over again.

15:45:25   21          If a person who comes into the focus of that

15:45:34   22   organization, which actually started like in 2007 and 8, didn't

15:45:39   23   start before that, that organization, but that's when the brutal,

15:45:44   24   sadistic murders, decapitations, torture started.  So at that

15:45:51   25   period of time when someone who is big in his community, loved by

15:45:58   1   everybody, it's in the paper.  Remember he got a $30 million

15:46:03   2   contract in 2005.  He became known to everybody, "Pancho"

15:46:11   3   Colorado.  He started his environmental company because he

15:46:15   4   realized the consciousness of Mexico was going towards

15:46:19   5   environmental concerns, and he took advantage of it.

15:46:23   6          So once you get in the focus of Los Zeta, if they focus

15:46:32   7   on you and they want something you've got, in this case, as the

15:46:36   8   government said in some of the pleadings, they wanted legitimate

15:46:40   9   funds to be used by the horses to come to Mr. Colorado.  One

15:46:48   10   other thing, Judge, that's very important to this dilemma I'm

15:46:52   11   talking about is if -- and you heard testimony, your Honor, that

15:47:00   12   the law enforcement in Mexico has been infiltrated.  A whole

15:47:10   13   police force, according to one witness, was kidnapped and turned

15:47:16   14   into Zetas.

15:47:19   15          So you have a situation where if you come into their

15:47:22   16   focus in a town -- in the state of Tuxpan, which are the articles

15:47:30   17   that we attached said, the President of Mexico said the Zetas

15:47:34   18   have almost taken over Veracruz, the state of Veracruz.  If you

15:47:45   19   go to the authorities, terrible things happen.  Your family could

15:47:49   20   be kidnapped, your children could be murdered.  If you don't go

15:47:53   21   to the authorities and you do as they ask, then they leave you

15:47:58   22   alone for a while.  And that's what happened to Mr. Colorado.  He

15:48:03   23   left alone so long as he paid the money, his money when they

15:48:09   24   wanted it.  And when he didn't have the money because he had

15:48:14   25   obligations, he had to borrow it.  But the evidence shows all the

15:48:18    1    money that he borrowed, he paid back with good money, and all the

15:48:21    2    money he spent was good money.

15:48:22    3         Now, why would he part with money without getting

15:48:27    4    anything in return?  And, Judge, I think you can answer that

15:48:33    5    question yourself.  It's a difficult time when you have to fend

15:48:37    6    for yourself in Veracruz, Mexico the last decade.

15:48:45    7         THE COURT:  I saw the pictures of it, Del Rayo.

15:48:50    8         MR. DEGEURIN:  You know, that's a good point because

15:48:52    9    Del Rayo was a businessman, also, and a very successful --

15:48:59   10         THE COURT:  Was indicted in this case.

15:49:02   11         MR. DEGEURIN:  Was indicted.

15:49:04   12         THE COURT:  Came forward and told the truth.

15:49:06   13         MR. DEGEURIN:  Well, you know what happened.

15:49:07   14         THE COURT:  And had the guts to testify.

15:49:09   15         MR. DEGEURIN:  Yeah.  He actually spent his money and

15:49:13   16    made his good money, and they used it to further their

15:49:20   17    conspiracy.  They bought horses or paid for expenses with this

15:49:25   18    good money.  So because it was his good money, not -- take away

15:49:29   19    the coercion, it wouldn't have been counted.  It was laundered

15:49:33   20    money, but it was still used and he could have been part of the

15:49:36   21    conspiracy.

15:49:37   22         THE COURT:  Or could have been counted as laundered

15:49:40   23    money because it was by extortion, beating up and assault.

15:49:44   24         MR. DEGEURIN:  Yeah.  Which would be a different

15:49:48   25    indictment for -- but at any rate.  So if Mr. Colorado is not in

15:49:56    1    the same shoes, he's at least in -- faced the same dilemma as Del

15:50:05    2    Rayo.  And you can't go to the federal authorities then, maybe

15:50:13    3    even now, in Mexico and say, please don't tell anybody, you've

15:50:19    4    got to keep it secret, these people want me to do this.  Can you

15:50:22    5    help me?  But you can't tell anybody like we could do with the

15:50:26    6    FBI in the United States.  If they kidnapped your daughter, you

15:50:29    7    go to the FBI and you say, gosh, they say if I contact the

15:50:32    8    authorities, my daughter dies.  So be careful.

15:50:38    9         In Mexico at this time, as we've heard from the

15:50:40   10    testimony and newspapers, is if you went to authorities, the

15:50:45   11    Zetas would know and your daughter would die.  So you have to --

15:50:49   12    this is a long way of saying, your Honor, as Mr. Colorado

15:50:54   13    explained in the -- in Mexico at this time.  At the time this was

15:51:02   14    going on in Veracruz, you are alone.  A dilemma comes, you have

15:51:10   15    to settle it your own way.  You can't go to the authorities for

15:51:13   16    help.  I have the money, take the money.  I bought the horses,

15:51:20   17    they want the horse, take them.  It's all yours.  Still a crime,

15:51:26   18    Judge.  It's a crime in the United States.

15:51:28   19         So he's got a situation where it's between two evils.

15:51:33   20    He gets nothing in return other than the safety of himself, his

15:51:36   21    family, and his business.  He knows it's a crime in the United

15:51:43   22    States to help some people launder money and he chooses to do it.

15:51:52   23    So I tell him, turn yourself in, I'll go with you.  They will

15:52:01   24    hear you out.  They'll understand.  You will receive a just

15:52:09   25    sentence.

15:52:09  1       His family was with him.  My office together, we go, we
15:52:13  2  walked over.  He has told you today he appreciates -- well, of
15:52:20  3  course, he'd like to be out on bond during the trial, but he
15:52:22  4  appreciates the fairness of the proceedings.  Everything has been
15:52:25  5  provided for him.  And we're at that point where I told him we'd
15:52:32  6  be at.  You would hope that if you lived your life as well as he
15:52:41  7  has lived his life, you have all of these people that love you,
15:52:46  8  all of these people you helped, the 60-year-old people he
15:52:50  9  educates so they could read a book, the schools he started, the
15:52:55  10 children he's helped.
15:52:56  11      The people that he doesn't even know that have a heart
15:53:02  12 attack or have a heart problem, they can't do anything about it,
15:53:05  13 he provides without expectation of anything in return.  Going to
15:53:12  14 the scene of an employee's heart attack and holding the person
15:53:17  15 until the hospital comes.  Providing transportation for children
15:53:23  16 on his own.  He has money, but he goes out there himself, too.
15:53:29  17 Go to the hospitals and see people that are maids and young poor
15:53:35  18 people that work for him.  That's the type of person he is.
15:53:39  19      So I would hope that you recognize that.  And I would
15:53:43  20 hope that if you live yourself like that, when someone like
15:53:49  21 "Mamito" or Hinojosa comes and says something about you that is
15:53:59  22 harmful, can't be proved except by word, although Hinojosa said,
15:54:09  23 I've got it down in a book, you can read it, the government has
15:54:12  24 it, you would hope that your life in the past would have some
15:54:16  25 kind of presumption to it so that the judgment day comes, the

15:54:24  1   Court with balance those things out and somehow, your good life

15:54:31  2   will help.

15:54:33  3          So with that, Judge, I'm asking that you sentence him

15:54:38  4   to 60 months, five solid years.  I think that is an adequate

15:54:46  5   sentence.  I think under the guidelines, time served is what is

15:54:51  6   called for if we'd won the objection.  But 60 months for a man as

15:54:57  7   good as Mr. Colorado, who will -- he's 53 years old.  Not in the

15:55:09  8   best of health, but he's okay.  A life in front of him.  He won't

15:55:12  9   be in the United States.  When he serves that time, he'll be sent

15:55:16  10  back to Mexico.  And that's what I ask for.

15:55:22  11         THE COURT:  I'll hear from the government.

15:55:26  12         MS. FERNALD:  Your Honor, we are asking for 240 months

15:55:29  13  under the guidelines.  In the alternative under 3553(a),

15:55:36  14  longstanding relationships to the Los Zetas, even the formation

15:55:41  15  back in 2004 as it continued up until the date of his arrest.

15:55:46  16  Frankly, the argument that was posed by defense counsel comparing

15:55:50  17  Mr. Colorado-Cessa to Del Rayo Mora who testified in this case is

15:55:56  18  quite insulting.  There's no evidence that that was ever true.

15:55:59  19  There has been no attempt to approach the government that he was

15:56:04  20  under any type of situation similar to that.

15:56:07  21         We're asking for 240 months.

15:56:10  22         MR. DEGEURIN:  Your Honor, I will point out that there

15:56:13  23  was -- a government witness that testified that he was there when

15:56:18  24  his wife and children had fled Mexico and seeking asylum,

15:56:25  25  security guards had been hired by him and he was ruffled.  He was

15:56:30  1  unlike himself and that was when he went out and got that big

15:56:34  2  loan.  So, I mean, there is evidence of that coercion.

15:56:41  3          THE COURT:  You just provided it if you were a witness.

15:56:45  4          MR. DEGEURIN:  But I'm quoting what happened.

15:56:48  5          THE COURT:  Probation have anything?

15:56:49  6          PROBATION OFFICER:  Nothing, Judge.

15:56:52  7          THE COURT:  Does anybody wish to speak at this

15:56:54  8  sentencing?

15:57:02  9          Well, the elements of the statute, for the benefit of

15:57:04  10  those in the courtroom, when I'm to consider the nature and

15:57:08  11  circumstance of the offense.  The nature and circumstance of the

15:57:15  12  offense, those of you that have been here all day, you've already

15:57:19  13  seen the destruction of one family.  You've heard about the

15:57:25  14  deaths of two others that were involved in the conspiracy.  For

15:57:30  15  those of you who watched the trial, you saw what happens when you

15:57:34  16  say no or you follow through.  You make your arrangements, you

15:57:47  17  get your family out.  Then at some point in time, you have to

15:57:54  18  make a stand somewhere, somehow, and there's always a cost to it.

15:58:03  19          No telling how many people financially were hurt by

15:58:08  20  those races that were fixed.  But it was not just that you bought

15:58:14  21  the horses, sir.  It's that you participated in their activities.

15:58:21  22  Probably the smartest one there.  I'll say probably you're the

15:58:27  23  smartest one there.  You could anticipate the problems.  You

15:58:31  24  could anticipate the horror.  You could anticipate, you know,

15:58:39  25  when Mr. Villarreal died, Lopez died, too.  I can't remember the

15:58:44   1    other one.  Accidents.

15:58:50   2          Circumstance and nature of the offense is deplorable.

15:58:57   3    History and characteristics of the defendant.  Well, the

15:58:59   4    government says that you've been in debt with the Zetas for a

15:59:01   5    long period of time, and that's the theory of their case.  Your

15:59:07   6    lawyer and other people that I've read the letters and looked at

15:59:11   7    the video could go either way.  The punishment is to reflect the

15:59:21   8    seriousness of the offense.  And let's talk about seriousness of

15:59:30   9    the offense.

15:59:34   10         The laundered money from the drug cartels in the United

15:59:44   11   States is serious to both countries.  Promote respect for the

15:59:53   12   law.  You don't have any respect for the law of Mexico.  It may

15:59:58   13   be a valid proposition.  I do not know.  I do not wish to ever

16:00:02   14   know.  But I can tell you this:  You don't have any respect for

16:00:05   15   the laws in the United States either because you participated in

16:00:11   16   this, and you were smart enough to know, sir, that it was wrong.

16:00:19   17   You made the decision.

16:00:20   18         I find no fault with the defense from the standpoint of

16:00:24   19   I don't want my family hurt and I don't want to be hurt.

16:00:29   20   Unfortunately, it was an everyday occurrence.  I see people in

16:00:33   21   this courtroom every month that I've sentenced for being here

16:00:41   22   illegally, and they're back in two weeks, showing the signs of

16:00:45   23   what happens when they go back to Mexico.  And I see fear when

16:00:53   24   they go back.

16:00:54   25         And you're not responsible for that, not directly, but

16:01:00   1   the activities that you have done in this particular lawsuit and,

16:01:05   2   particularly, the activities of the conspiracy is an illustration

16:01:21   3   of what happens when people don't take a stand.  The sentence is

16:01:26   4   supposed to promote respect for the law, and it will, and provide

16:01:32   5   a just punishment for the offense.  That's always difficult

16:01:38   6   because you've expressed today, for the first time, as far as I

16:01:41   7   know, and your lawyer has for the first time that I know, what

16:01:50   8   does a parent who's been a parent from the beginning, who was a

16:01:55   9   parent from the time that you brought your wife and children to

16:02:00   10  the United States to make them safe.

16:02:09   11          To afford an adequate deterrence to criminal conduct,

16:02:15   12  it has to be substantial things.  And to protect the public from

16:02:18   13  the further crimes of the defendant.  That's also in your

16:02:23   14  benefit.  I don't think in the future you will be a danger to the

16:02:30   15  public.  But you were a danger to the public in this conspiracy.

16:02:37   16  Not just the public of the conspirators and their families or the

16:02:47   17  people affected by all of the aftereffects, but all of the people

16:02:55   18  that you grew up with that, apparently, according to your lawyer,

16:02:59   19  you served, intentions, providing transportation.  All of those

16:03:10   20  people who are subject to the same fears, threats, and risk of

16:03:20   21  life and injury that you and your family were.  So it's kind of a

16:03:27   22  split.

16:03:28   23          The Court does not find that you are not a just person.

16:03:33   24  The Court does not find that you are a bad person.  You have not

16:03:37   25  been charged by that.  You apparently have accomplished a life in

16:03:41   1   a successful way.  The Court has no knowledge sufficient to place

16:03:48   2   any credence on any of the stuff with Mr. Torres other than the

16:03:55   3   testimony I've heard in this trial.

16:04:01   4           But after I've considered -- and I've considered hard

16:04:04   5   on all of these elements, I believe the just punishment in this

16:04:09   6   case and I sentence you to a term in the penitentiary under 18

16:04:12   7   United States Code 3553(a), a variance to whatever the guidelines

16:04:18   8   are, ultimately turned out to be to 240 months, followed by a

16:04:26   9   three-year term of supervised release.  Simply because of the

16:04:33  10   background and your association and the allegations, you will on

16:04:39  11   your supervision have the 15-day test of drugs.  You will not

16:04:48  12   take any illegal drugs.  You will not take any alcohol if you

16:04:52  13   have any supervision in the United States.

16:04:57  14           If you're deported, as I anticipate that you will be, I

16:05:00  15   place the conditions of 18 United States Code 3583 on that

16:05:05  16   supervision, which means that if you attempt to come into this

16:05:10  17   country within three years of your deportation, or if you're

16:05:15  18   found here within three years of your deportation illegally, then

16:05:20  19   you can be sentenced again in this case, as well as a separate

16:05:25  20   case for being over here illegally.  And I'm sure that counsel

16:05:30  21   will refer to that.

16:05:34  22           One of the things that is remarkable in this case is

16:05:44  23   that no defendant had criminal histories.  They participated in

16:05:53  24   it for greed, or for fear, or for intimidation.  Nobody had any

16:06:04  25   criminal history.  All these lives lost because of this activity

| | | |
|---|---|---|
| 16:06:08 | 1 | or all of these lives damaged.  I can't say lost.  Somebody might |
| 16:06:14 | 2 | -- you never can tell what can happen with life.  I'm a big |
| 16:06:21 | 3 | believer the Lord works in a lot of different ways. |
| 16:06:34 | 4 | I declare -- if you are supervised in this country, you |
| 16:06:39 | 5 | will have the conditions that you will submit the information to |
| 16:06:47 | 6 | the United States probation officer at the request of any |
| 16:06:50 | 7 | financial information, and you will sign any releases at the |
| 16:06:58 | 8 | time, financial information requested by the probation officer. |
| 16:07:04 | 9 | And any other special conditions? |
| 16:07:38 | 10 | PROBATION OFFICER:  No. |
| 16:07:41 | 11 | THE COURT:  All other terms and conditions of |
| 16:07:44 | 12 | supervision as set out in the standing order of this district |
| 16:07:48 | 13 | should you be supervised in the United States will be in full |
| 16:07:51 | 14 | force and effect.  Because of forfeiture in the case, I will not |
| 16:07:56 | 15 | specifically give you a fine, but I will forfeit all of your |
| 16:08:09 | 16 | right, title and interest to all of the items that are in the |
| 16:08:14 | 17 | indictment and are summarized with the two exceptions stated in |
| 16:08:20 | 18 | the preceding case. |
| 16:08:29 | 19 | MR. SANCHEZ:  Your Honor, in regard to the forfeiture, |
| 16:08:32 | 20 | if we could -- we were always waiting for a preliminary order or |
| 16:08:38 | 21 | a motion for preliminary order from the government.  If we could |
| 16:08:42 | 22 | have that second option that you gave to Mr. Trevino.  In other |
| 16:08:46 | 23 | words, treat this as a preliminary order and set a hearing to |
| 16:08:50 | 24 | allow us to come back and file objections -- or file objections |
| 16:08:54 | 25 | before that hearing, once we have the transcript from this |

16:08:58   1   particular hearing, in order to contest any preliminary order or

16:09:05   2   final order from the Court.

16:09:13   3           MS. CRUZ-ZAPATA:  Your Honor, all the evidence that we

16:09:15   4   have with regards to the forfeitures has already been presented.

16:09:18   5   Defense counsel was given notice in the indictment of all the

16:09:21   6   forfeiture, and they were given notice in the PSR of all the

16:09:24   7   forfeiture, and they've waived a jury for the forfeiture to be

16:09:26   8   able to present evidence here.

16:09:28   9           THE COURT:  All that's true.  The only thing that

16:09:30   10   hadn't been specified is they didn't have any motion for $60

16:09:36   11   million judgment, and I will set a hearing, and if you have any

16:09:39   12   additional evidence, you can find it.

16:09:42   13           I have found from the evidence in this case that I will

16:09:45   14   forfeit all of Mr. Colorado-Cessa's interest in these properties

16:09:50   15   listed in the indictment, but counsel has the right to review

16:09:55   16   whatever they wish and not be surprised at sentencing.  And I

16:10:00   17   will set a hearing in the near future so that you can make a

16:10:03   18   presentation and take what objections that you wish.

16:10:06   19           It looks like there's other lawsuits that have been

16:10:09   20   filed already.  One on the airplane.

16:10:12   21           MR. SANCHEZ:  That was part of the confusion, your

16:10:15   22   Honor, when we saw that that was filed.

16:10:17   23           THE COURT:  It was part of my confusion, too.  You

16:10:19   24   weren't the only ones confused.  But we can take up that, if

16:10:23   25   necessary, although that's a separate lawsuit apparently, but

| | | |
|---|---|---|
| 16:10:27 | 1 | it's a duplication of the forfeiture in this particular case. |
| 16:10:32 | 2 | MR. DEGEURIN:  Your Honor, with regard to the |
| 16:10:34 | 3 | designation, I have -- |
| 16:10:36 | 4 | THE COURT:  Let's get to that.  I'm going to work with |
| 16:10:38 | 5 | you on a lot of things, but I want to get through. |
| 16:10:49 | 6 | Okay.  So all of the right, title and interest of Mr. |
| 16:10:54 | 7 | Francisco Antonio Colorado-Cessa and the interest of the property |
| 16:11:01 | 8 | in the indictment are forfeited to the United States.  But I will |
| 16:11:06 | 9 | set a hearing so that counsel can make whatever record they wish |
| 16:11:10 | 10 | to object to the motion for $60 million, joint and several |
| 16:11:17 | 11 | liability judgment. |
| 16:11:25 | 12 | Probation officers are always good to remind you, a |
| 16:11:29 | 13 | $100 mandatory assessment under the Victims of Crime Act. |
| 16:11:35 | 14 | MR. SANCHEZ:  Your Honor. |
| 16:11:35 | 15 | THE COURT:  Now, I'm sorry. |
| 16:11:36 | 16 | MR. SANCHEZ:  In regards to the two airplanes, I |
| 16:11:39 | 17 | believe there's some issues with ADT and ADT's right to contest |
| 16:11:43 | 18 | it.  So if we can include that in the future hearing. |
| 16:11:48 | 19 | THE COURT:  What I intend to do in that case unless the |
| 16:11:51 | 20 | government -- you can talk with the government.  But what I |
| 16:11:56 | 21 | intend to do is -- since it's a separate lawsuit is let that |
| 16:11:59 | 22 | lawsuit proceed. |
| 16:12:02 | 23 | MR. DEGEURIN:  That's kind of what we want. |
| 16:12:03 | 24 | THE COURT:  And extrapolate it from the judgment that |
| 16:12:05 | 25 | will ultimately be entered in this case because they filed a |

16:12:09   1   separate lawsuit.

16:12:11   2           MR. SANCHEZ:  Okay.  Yeah.  So -- right.  We agree with

16:12:13   3   that.

16:12:15   4           THE COURT:  Now, designation.

16:12:17   5           MR. DEGEURIN:  Your Honor, we would ask that you

16:12:22   6   designate Bastrop.  It has five levels there, four levels there.

16:12:31   7   More importantly, it has a secured, well-trained Bureau of

16:12:35   8   Prisons staff.

16:12:36   9           THE COURT:  I have no problem with that.

16:12:38  10           MR. DEGEURIN:  I have what is -- I've been talking

16:12:42  11   about with Bureau of Prisons specialists and they have given me a

16:12:48  12   -- what they say would be a well-worded request by the Court.

16:12:54  13   Could I hand it to the Court?  It's just something that's in the

16:12:58  14   language of the Bureau of Prisons.  They won't just -- the fact

16:13:01  15   that Zetas are involved might affect them, even though he's not

16:13:07  16   in charge of any kind of violent behavior, et cetera.

16:13:11  17           May I approach the bench?

16:13:13  18           THE COURT:  Certainly.  Just hand it to the clerk.

16:13:16  19   This is something that occurs frequently.

16:13:20  20           MR. DEGEURIN:  Yes.

16:13:21  21           THE COURT:  And I will assure you that my probation

16:13:24  22   officer will advise the BOP accordingly.  I don't know of any

16:13:30  23   reason Mr. Colorado-Cessa won't be ultimately placed in Bastrop.

16:13:34  24   However, we have a full population there.  It may be that he's

16:13:39  25   placed someplace else for a period of time.  But as soon as

16:13:43   1   there's an opening and as soon as there is an opinion from the

16:13:49   2   BOP that he's not a danger to himself or anybody else, my

16:13:53   3   experience is they will get you there.  But I will look at this

16:13:58   4   and contemplate placing that in the judgment.

16:14:03   5         I'm going to seal the presentence report, the addenda

16:14:13   6   to the report.  Nobody's business but Mr. Colorado-Cessa and the

16:14:17   7   government.  The government may use their copies for official

16:14:20   8   purposes, and in the event of any appeal, it becomes part of the

16:14:27   9   record.

16:14:32   10        Anything else that you could think of?  Lonnie,

16:14:38   11  anything else?

16:14:38   12        PROBATION OFFICER:  No, Judge.

16:14:40   13        THE COURT:  Okay.  Do you wish to object?

16:14:46   14        MR. SANCHEZ:  We object to the sentence under

16:14:50   15  substantive and procedural grounds for all the reasons previously

16:14:53   16  stated.  It's higher than necessary, your Honor.

16:14:55   17        THE COURT:  And the objection is overruled.

16:14:57   18        MR. DEGEURIN:  Not other than that.

16:15:00   19        THE COURT:  All right.  Then I remand Mr.

16:15:03   20  Colorado-Cessa to the custody.

16:15:25   21        I need to advise you, just in case your lawyers

16:15:29   22  wouldn't know, that you have 15 -- 14 days from today to tell

16:15:41   23  your lawyers if you wish to appeal.  You lose that right after 14

16:15:46   24  days, and I'm going to give you a letter that says that.  I'm

16:15:50   25  just required to tell you that.  You've got good lawyers and

```
16:15:54   1   they'll take care of you in that regard, but I'm required to tell
16:15:57   2   you that.  And with that.
16:16:00   3              DEFENDANT COLORADO-CESSA:  Thank you.
16:16:00   4              THE COURT:  Yes.  All right.  We're in recess for ten
16:16:03   5   minutes.
           6              (End of proceedings.)
           7
           8
           9
          10
          11
          12
          13
          14
          15
          16
          17
          18
          19
          20
          21
          22
          23
          24
          25
```

1                          * * * * * *

2

3

4  UNITED STATES DISTRICT COURT)

5  WESTERN DISTRICT OF TEXAS    )

6

7      I, LILY I. REZNIK, Official Court Reporter, United States

8  District Court, Western District of Texas, do certify that the

9  foregoing is a correct transcript from the record of proceedings

10  in the above-entitled matter.

11      I certify that the transcript fees and format comply with

12  those prescribed by the Court and Judicial Conference of the

13  United States.

14      WITNESS MY OFFICIAL HAND this the 18th day of October, 2013.

15

16

17                              /s/Lily I. Reznik
                                LILY I. REZNIK, CRR, RMR
18                              Official Court Reporter
                                United States District Court
19                              Austin Division
                                501 W. 5th Street, Suite 4153
20                              Austin, Texas 78701
                                (512)391-8792
21                              Certification No. 4481
                                Expires:  12-31-14
22

23

24

25